# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Valerie M. Verduce, Catherine Day, Anthony Pollock, and Michael McKinney, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*<br><br>vs.<br><br>Vanguard Chester Funds, Mortimer J. Buckley, Christine M. Buchanan, John E. Schadl, Emerson U. Fullwood, Amy Gutmann, F. Joseph Loughrey, Mark Loughridge, Scott C. Malpass, Deanna Mulligan, André F. Perold, Sarah Bloom Raskin, Peter F. Volanakis, and The Vanguard Group, Inc.,<br><br>*Defendants* | Case No. 2:22-cv-00955-ER<br><br>**FIRST AMENDED COMPLAINT — CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

i

## Table of Contents

I.     Introduction........................................................................................................ 1

II.    Parties.............................................................................................................. 2

       A.     Plaintiffs..................................................................................................... 2

       B.     The Trust and Trustee/Officer Defendants. ........................................... 3

       C.     Defendant Vanguard Group. ................................................................... 3

III.   Jurisdiction and Venue................................................................................... 4

IV.    Facts. ............................................................................................................... 5

       A.     Vanguard's target date funds. ................................................................ 5

       B.     Large sell-offs result in capital gains distributions that harm only taxable
              investors (and not tax-advantaged retirement plans). ........................... 6

       C.     To cater to retirement plans, Vanguard triggers an "elephant stampede"
              sell-off. ...................................................................................................... 8

              1.     Vanguard's decision......................................................................... 8

              2.     The sell-off. .................................................................................... 10

              3.     The harm to investors holding funds in taxable accounts.......... 12

       D.     In contrast to Vanguard, Fidelity lowers fees for retirement plans without
              harming taxable investors. .................................................................... 13

       E.     After the damage is already done, Vanguard merges the funds. ......... 14

       F.     Vanguard admits that it consciously disregarded its taxable investors............. 15

       G.     Defendants' culpability.......................................................................... 16

              1.     The Trust and Trustee Defendants.............................................. 17

              2.     Officer Defendants........................................................................ 17

              3.     Vanguard Group............................................................................ 18

              4.     Each Defendant's actions were grossly negligent, reckless, or in
                     bad faith. ...................................................................................... 18

       H.     Like other taxable investors, Plaintiffs were harmed by Defendants'
              actions. ...................................................................................................... 22

V.     Class Action Allegations............................................................................... 24

VI.    Claims. ............................................................................................................ 26

       Count 1: Breach of Fiduciary Duty................................................................ 26

       Count 2: Gross Negligence ............................................................................ 27

       Count 3: Breach of the Covenant of Good Faith and Fair Dealing .............. 28

       Count 4: Unjust Enrichment ......................................................................... 29

Count 5:  Violation of Massachusetts Consumer Protection Law (Ch. 93A) .................. 29

Count 6:  Violation of the Illinois Consumer Protection Law (815 ILCS 505/2) ............ 32

Count 7:  Violation of California Unfair Competition Law (UCL) ................................. 33

VII.     Jury Demand. ....................................................................................................... 34

VIII.    Relief. ................................................................................................................... 34

**I.     Introduction.**

1.     Many mutual funds are organized as trusts and managed by trustees. [1]  The

trustees (along with fund officers and advisors) must manage the fund for the benefit of all its

shareholders.  Trustees cannot favor larger investors, while disregarding and harming smaller

investors.

2.     Vanguard offers "set-it-and-forget-it" target date retirement funds.  These funds

are organized as a trust and managed by the same trustees.  The investment strategy is based on a

target retirement year, such as 2030 or 2050.  Vanguard offers two tiers of target date funds: (1)

funds for individuals and retirement plans with less than $100M (the "Retail Funds"); and (2)

funds for retirement plans with over $100M (the "Institutional Funds").  The strategy and

investments are the same, but the Institutional Funds charge lower fees and expenses.

3.     When target date funds sell assets, they are required by federal tax law to

distribute any capital gains to shareholders.  Investors who hold target date funds in tax

advantaged accounts can simply reinvest these distributions, without incurring any tax liability.

Vanguard's larger investors (like retirement plans) fall into this bucket.  But Vanguard also

markets and sells its target date funds directly to smaller, ordinary investors who hold these

funds in taxable accounts.  These investors have to pay taxes on these distributions, even when

they automatically reinvest them (which is what most do).  For these investors, if there is a

massive sell-off of assets in their target date fund, this results in massive tax bills.

4.     Normally, Vanguard's target date funds don't sell many assets, so capital gains

distributions are minimal.  But beginning in December of 2020, Vanguard itself caused an

"elephant stampede" sell-off from its Retail Funds.  Vanguard chose to open its Institutional

---

[1] A mutual fund buys assets, such as stocks and bonds, for the benefit of its shareholders.
Investors buy shares of the fund, which are valued based on the fund's assets.

Funds (which hold the same assets as the Retail Funds) to all retirement plans with at least $5M, so that retirement plans invested in the Retail Funds could sell their shares and move over to cheaper, but otherwise identical, Institutional Funds.  And this is what happened.

5.      To raise cash to redeem so many shares, the Retail Funds were forced to sell off as much as 15% of their assets (or even more).  When these assets were sold, the Retail Funds recognized capital gains on the assets.  The resulting capital gains distributions to investors were unprecedented (40 times previous levels).  While this didn't hurt retirement plans, it left taxable investors holding the tax bag.

6.      Vanguard had other, readily-available ways to lower costs for retirement plans without hurting its taxable investors.  But it either did not even consider these options, or did not care about hurting its smaller, taxable investors.  This was a gross violation of Vanguard's fiduciary duties (among other legal duties).

## II.      Parties.

### A.      Plaintiffs.

7.      Valerie M. Verduce is domiciled in Georgia.  She invested in Vanguard's 2020, 2030, and 2040 Retail Funds, in taxable accounts.

8.      Catherine Day is domiciled in Massachusetts.  She invested in Vanguard's 2025 and 2030 Retail Funds, in a taxable account.

9.      Anthony Pollock is domiciled in California.  He invested in Vanguard's 2025 and 2035 Retail Funds, in taxable accounts.

10.     Michael McKinney is domiciled in Illinois.  He invested in Vanguard's 2030 Retail Fund, in a taxable account.

11.     The proposed class includes taxable, Retail Fund investors nationwide.

**B.     The Trust and Trustee/Officer Defendants.**

12.     Vanguard's target date funds are organized as Vanguard Chester Funds, a Delaware statutory trust ("the Trust").  Its shareholders are domiciled nationwide.

13.     The Trust and each of its funds, including the Institutional and Retail Funds, were managed, at the relevant times, by the same group of trustees and officers (the "Trustee and Officer Defendants").  The Trustee and Officer Defendants and their domicile are identified below:

| Defendant | Role | Domicile |
|---|---|---|
| Mortimer J. Buckley | CEO, Chairman of the Board, and President of the Trust. Trustee | Pennsylvania |
| Christine M. Buchanan | CFO | Pennsylvania |
| John E. Schadl | Chief Compliance Officer (CCO) | Pennsylvania |
| Emerson U. Fullwood | Trustee | New York |
| Amy Gutmann | Trustee | Pennsylvania or New York |
| F. Joseph Loughrey | Trustee | Indiana |
| Mark Loughridge | Lead Independent Trustee | Connecticut |
| Scott C. Malpass | Trustee | Indiana or Florida. |
| Deanna Mulligan | Trustee | New York |
| André F. Perold | Trustee | Massachusetts |
| Sarah Bloom Raskin | Trustee | Washington, DC or Maryland |
| Peter F. Volanakis | Trustee | New Hampshire |

**C.     Defendant Vanguard Group.**

14.     The Vanguard Group, Inc. ("Vanguard Group") is a Pennsylvania Corporation with its headquarters at 100 Vanguard Boulevard, Malvern, Pennsylvania, 19355.  Vanguard

3

Group provides "virtually all" of the "corporate management, administrative, and distribution services" for the Trust.  It also provides investment advisory services to the target date funds. [2]

### III.     Jurisdiction and Venue.

15.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2).  The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class is a citizen of a State different from any Defendant.

16.      The Court has personal jurisdiction over the Trust, and each Trustee and Officer Defendant, because the claims arose from, or relate to, Trust management decisions that were made and/or carried out by the Trustee and Officer Defendants (or their agents) at Vanguard's headquarters in Pennsylvania.  For example, Trustee meetings occurred there, the Trustees and Officers worked with Vanguard Group to execute fund management decisions there, the Trustee and Officer Defendants entered into relevant contractual relationships centered there (including service contracts with Vanguard Group), and the mailing address of the Trustees, for Trust business, is P.O. Box 876, Valley Forge, Pennsylvania 19482.  By conducting fund business in Pennsylvania, each Defendant purposefully availed itself of the privilege of doing business in the state.  In addition, certain Trustee and Officer Defendants are domiciled in Pennsylvania.

17.      The Court has personal jurisdiction over Vanguard Group because its principal place of business is in Pennsylvania.

18.       For the Trust and Trustee/Officer Defendants, venue is proper under 28 U.S.C. § 1391 because a substantial part of Defendants' conduct giving rise to the claims occurred in this

---

[2] Vanguard Chester Funds, "Statement of Additional Information January 31, 2022" at B-35, https://advisors.vanguard.com/pub/Pdf/sai059.pdf

District, at Vanguard's headquarters. Also, certain Trustee and Officer Defendants reside in this District.

19. For Vanguard Group, venue is proper because it resides in this District.

IV. **Facts.**

A. **Vanguard's target date funds.**

20. Vanguard's target date funds invest money across asset classes based on a target retirement year, such as 2030, 2040, or 2050. These target date funds buy and hold other Vanguard funds, like Vanguard stock and bond index funds. As the target date approaches, the target date funds become more conservatively invested, with more bonds and fewer stocks. As a result, as investors get closer to retirement (and closer to potentially needing the money) their portfolio becomes more conservative and less volatile.

21. Target date funds are marketed to consumers who don't want to actively manage their portfolio. Vanguard founder John Bogle describes the core philosophy of Vanguard's mutual funds as "set it and forget it." [3] And financial advisors recommend target date funds as a "set-it-and-forget-it option" where investors can "literally invest their entire portfolio." [4] In Vanguard's words, the funds are "an all-in-one solution for those without the time, willingness, or ability to build and manage their own portfolio." [5]

---

[3] Chron.com, "Vanguard founder's advice: Set it and forget it,"
https://www.chron.com/business/article/Vanguard-founder-s-advice-Set-it-and-forget-it-1780677.php
[4] Morningstar.com, "A Set-It-and-Forget-It Target-Date Series from Vanguard,"
https://www.morningstar.com/articles/929967/a-set-it-and-for get-it-target-date-series-from-vanguard
[5] Vanguard, "Vanguard Broadens Access to Low-Cost Institutional Target-Date Funds,"
https://pressroom.vanguard.com/news/Press-Release-Vanguard-Broadens-%20Access%20 to-Low-Cost-Institutional-Target-Date-Funds-12-11-2.html

22.     Vanguard has two tiers of target date funds: (1) the Retail Funds for individuals and retirement plans with less than $100M; and (2) the Institutional Funds for retirement plans with over $100M.  These two tiers have the same strategy, managers, and investments (the same underlying Vanguard funds), but the Institutional Funds charge lower fees and expenses.  In other words, the Retail and Institutional Funds are identical, other than differing fees and expenses (and investment minimums).

**B.      Large sell-offs result in capital gains distributions that harm only taxable investors (and not tax-advantaged retirement plans).**

23.     When a target date fund sells assets and receives cash, it is required by federal tax law to distribute the capital gains it realizes to its shareholders.  *See* 26 U.S.C.S. § 852(a)(1).  Such distributions are pro rata.  If an investor holds the target date fund in a tax-advantaged account, such as a 401(k) plan, the investor can simply re-invest the cash without paying any taxes.  But if the funds are held in taxable accounts, any distributions will be subject to substantial federal and state taxes (over 20% for many investors).  This is true even if the investor receives no cash, and the distribution is instead immediately reinvested in the fund (which is typically what happens).  For taxable investors, large capital gains distributions mean large capital gains tax bills.

24.     Normally, Vanguard target date funds don't sell many assets, and capital gains distributions (and resultant taxes) are minimal.  The strategy of these funds is to passively invest in long-term assets like Vanguard index funds.  Mutual funds typically keep enough cash on hand to pay for normal redemptions, so normal redemptions don't require selling substantial assets.  Also, each year, there are typically small capital gains distributions from stock dividends and potentially from the slow re-balancing of the portfolio to include more bonds.  The capital gains distributions from rebalancing and stock dividends are usually only a fraction of a percent

6

of the overall value of the fund.  For this reason, investors reasonably expect capital gains distributions from their funds to be minimal.

25.    Most shares of Vanguard's target date funds are held in tax-advantaged accounts, such as retirement plans, that are exempt from relevant capital gains taxes.  According to Vanguard, "four out of five participants in 401(k) plans [kept] at Vanguard are now invested in a target-date fund." [6]  Plans with under $100M invest in the Retail Funds, and the largest plans (with over $100M) invest in the cheaper Institutional Funds.

26.    However, Vanguard also markets and sells its Retail Funds directly to consumers. As a result, there is a minority class of investors:  everyday consumers who hold shares of Vanguard's target date funds in their taxable accounts.  According to FINRA, about a third of U.S. households have investments in taxable accounts:



*FINRA, A Snapshot of Investor Households in America* [7]

---

[6] Vanguard, "Vanguard Broadens Access to Low-Cost Institutional Target-Date Funds," https://pressroom.vanguard.com/news/Press-Release-Vanguard-Broadens-%20Access%20to-Low-Cost-Institutional-Target-Date-Funds-12-11-2.html
[7] FINRA, "A Snapshot of Investor Households

27.     If an investor buys target date funds in a taxable account, and those funds go up substantially in value, the investors are stuck for the long term.  These investors cannot sell their shares of the funds and buy alternative investments without realizing substantial capital gains and incurring substantial capital gains taxes (which hurt their long-term investment returns). This means that, once taxable investors buy into the Retail Fund, they are effectively at the mercy of Vanguard's management decisions.

**C.      To cater to retirement plans, Vanguard triggers an "elephant stampede" sell-off.**

28.     In December of 2020, to cater to retirement plans, Vanguard intentionally caused an unprecedented sell-off from its Retail Funds.

**1.      Vanguard's decision.**

29.     Vanguard competes to get the most assets under management, while maintaining low fees.  It is one of the largest investment companies in the world, with over $8 trillion under management. [8]  It is "the largest mutual fund provider" and is engaged in an ongoing "price war" with its competitors. [9]  And "Vanguard is the largest target-date fund manager in the industry and the number one recipient of cash flowing into target-date funds." [10]

---

in America," https://www.sec.gov/spotlight/fixed-income-advisory-committee/finra-investor-education-foundation-investor-households-fimsa-040918.pdf

[8] Vanguard, "Facts and Figures,"
https://corporate.vanguard.com/content/corporatesite/us/en/corp/who-we-are/sets-us-apart/facts-and-figures.html

[9] AP News, "Fidelity slashes fees as funds battle for investors,"
https://apnews.com/article/1f2ed0e747f6495faa18db2d55a17ff2

[10] Vanguard, "Vanguard Broadens Access to Low-Cost Institutional Target-Date Funds,"
https://pressroom.vanguard.com/news/Press-Release-Vanguard-Broadens-%20Access%20to-Low-Cost-Institutional-Target-Date-Funds-12-11-2.html

30.     Most of the money in Vanguard's target date funds comes from company and institutional retirement plans.  Vanguard is therefore incentivized to keep the managers of its retirement plans happy.

31.     Before December 2020, only retirement plans with $100M or more could access the Institutional Funds.  Plans with under $100M were limited to the Retail Funds, with higher fees.  Naturally, plans with under $100M wanted the lower fees available to the Institutional Fund investors.

32.     In or around December 2020, to keep its competitive edge against other mutual fund providers, Vanguard chose to lower fees for retirement plans in its Retail Funds (those plans with $5M-$100M invested).  The problem was that, if Vanguard opened up the Institutional Funds to these plans, it would trigger a massive sell-off in the Retail Funds, as plans sold their assets to move them over.  To get cash to redeem shares, the Retail Funds would have to sell a substantial portion of their assets.  In doing so, the Retail Funds would realize capital gains on any assets they sold that had appreciated in value.  And, as required by law, the Retail Funds would be required to distribute those capital gains as cash to the remaining investors.  This would result in an unprecedented capital gains distribution that would hurt only smaller investors whose funds were held in taxable accounts (who are required to pay capital gains taxes) while sparing large, institutional investors whose funds were held in tax-advantaged accounts (who are able to re-invest the cash without tax liability).

33.     Vanguard had a number of readily-available options to avoid causing this problem, including to:

- Lower the Retail Fund fees for plans that had at least $5M invested.  This could be done by restructuring share classes, reclassifying shares, or other readily-available means.  Such fee-tiering is commonly done by mutual funds (including

Vanguard funds).  This would reward retirement plans, with no adverse tax consequences for smaller, taxable investors.

- Merge the Retail and Institutional Funds.  Such fund mergers are ordinary in the mutual fund industry.  And here, because the funds had the same strategy, asset mix (of other Vanguard funds), and management, merging the funds would be straightforward.  Importantly, this merger could be completed without tax consequences for any shareholders.  Vanguard could then adjust or tier the fees in the merged fund.

34.    Or, instead of these two options, Vanguard could choose to:

- Disregard taxable investors, immediately drop the Institutional Fund investment minimums, and trigger a massive sell-off.

35.    In December 2020, Vanguard chose the "massive sell-off" option.  It decided:

> Effective immediately, the plan-level minimum investment requirement [for the Institutional Funds] has been reduced to $5 million from $100 million, enabling more 401(k) and 403(b) plan sponsors to offer these low-cost, broadly diversified options to their retirement plan participants. [11]

36.    The decision announcement touted the benefit to retirement plans, with no mention of the impact on smaller, taxable investors.  The press release stated: "'Vanguard works tirelessly to improve outcomes for plans sponsors and their participants.'" *Id.*

### 2.    The sell-off.

37.    As The Wall Street Journal described, that "set off an elephant stampede, as multimillion-dollar corporate retirement plans got out of the standard target funds and into the

---

[11] Vanguard, "Vanguard Broadens Access to Low-Cost Institutional Target-Date Funds," https://pressroom.vanguard.com/news/Press-Release-Vanguard-Broadens-%20Access%20-to-Low-Cost-Institutional-Target-Date-Funds-12-11-2.html.  Notably, the press release states that this crucial decision came from "Valley Forge, PA" (Vanguard's headquarters).

Institutional equivalents." [12]

38.     Specifically, in the months that followed the December 2020 decision, plans with $5M-$100M sold their Retail Fund shares and moved to the Institutional Funds.  The Retail Funds were forced to sell assets to raise cash to redeem the shares. For example, The Wall Street Journal reported that "assets at Vanguard's 2035 target fund shrank to $38 billion from $46 billion" and the "2040 fund shriveled to $29 billion from $36 billion." [13] This was an unprecedented sell-off of 15% (or more) of the assets of the entire fund.

39.     As the Retail Funds sold assets, they inevitably realized capital gains.  And as required, Vanguard distributed those capital gains to investors, pro rata.  At the end of 2021, Retail Fund investors were hit with capital gains distributions at least 40 times larger than ever before.  The following Morningstar chart illustrates the scale of these distributions:



---

[12] The Wall Street Journal, "The Huge Tax Bills That Came Out of Nowhere at Vanguard," https://www.wsj.com/articles/vanguard-target-retirement-tax-bill-surprise-11642781228
[13] The Wall Street Journal, "The Huge Tax Bills That Came Out of Nowhere at Vanguard," https://www.wsj.com/articles/vanguard-target-retirement-tax-bill-surprise-11642781228

40.     These distributions did not result from Vanguard's strategic sale of assets, i.e., a sale designed to increase long-term investment returns. Instead, the distributions resulted from Vanguard's decision to cater to retirement plans (at the expense of taxable investors) by shuffling these plans between funds that had identical underlying investments and investment strategies. Vanguard caused a massive sale of apples to buy apples, and heaped capital gains taxes on ordinary investors in the process.

### 3.     The harm to investors holding funds in taxable accounts.

41.     An important benefit of "set-it-and-forget-it" target date funds is the ability of investments to grow in value and compound over many years (until retirement and beyond), without being liquidated, distributed and taxed.  As Vanguard states, target date funds are "designed for an investor who plans to withdraw the value of an account in the Fund over a period of many years after the target year."[14]

42.     For tax-advantaged retirement plans, the large distributions were harmless.  These plans simply reinvested the cash, without taking any tax hit.  But for smaller, taxable investors, these distributions meant enormous tax bills (tens of thousands or even hundreds of thousands of dollars).  To be sure, if these investors started withdrawing money after the target retirement year (e.g., 2040), they would potentially have to pay capital gains taxes then.  But by being forced to pay taxes on the capital gains distributions now, these investors lost the ability to earn compounding returns on that money for many years.

43.      This loss of compounding returns is no trivial thing. The 100-year average return for the S&P 500 is about 10%. [15] At a conservative, 8% rate of return, money doubles in under

---

[14] Vanguard Target Retirement 2040 Summary Prospectus.
[15] Investopedia, "What Is the Average Annual Return for the S&P 500?"
https://www.investopedia.com/ask/answers/042415/what-average-annual-return-sp-500.asp

10 years, which is far shorter than, say, the 2040 target date.  By being forced to pay taxes now, taxable investors lost the ability to double that money (or more).  And for most investors, who set their distributions to immediately and automatically reinvest in the fund, the tax bill comes without any cash to pay it, forcing them to sell assets and potentially incur even more capital gains tax liability.  On top of this, taxable investors paid Vanguard fees and expenses in exchange for making decisions that only hurt them.

44.     The claims asserted in this case are direct claims (and not derivative claims).  Here, the injury to taxable investors was independent of any injury to the Trust (i.e., to the funds themselves).  The Trust was not injured.  And most shareholders were not harmed, because most shareholders were tax-advantaged.  In fact, the largest non-taxable investors benefitted, since they received access to the Institutional Funds.  As the Wall Street Journal summarized, Vanguard's actions "benefited big clients" but "left little ones holding the bag." [16]  It would be unjust for the Trust itself to receive the benefit of any recovery; instead, the recovery should go directly to taxable investors that were harmed.

**D.      In contrast to Vanguard, Fidelity lowers fees for retirement plans without harming taxable investors.**

45.     Fidelity is Vanguard's main competitor for target date funds.

46.     Fidelity's Index Target Date Funds are comparable to Vanguard's target date funds.

47.     In January of 2021 (the month after Vanguard triggered the sell-off), Fidelity announced that it too was lowering the investment minimum for its "Institutional" target date shares, from $100 million to $5 million.  Like Vanguard, Fidelity did this to cater to "retirement

---

[16] The Wall Street Journal, "The Huge Tax Bills That Came Out of Nowhere at Vanguard," https://www.wsj.com/articles/vanguard-target-retirement-tax-bill-surprise-11642781228

plan sponsors."  With this action, "all Fidelity Freedom Index Funds" had "net expenses equal to or lower than comparable Vanguard index target date funds." [17]  But unlike Vanguard, Fidelity did this by restructuring its share classes, which avoided a massive sell-off and avoided capital gains tax liability for taxable investors.

48.     Vanguard too could have restructured or reclassified its share classes, to reduce fees for retirement plans without harming its taxable investors.  But Vanguard instead chose to cause the sell-off and harm its taxable investors.

**E.     After the damage is already done, Vanguard merges the funds.**

49.     In September 2021, less than a year after it triggered the massive sell-off, Vanguard decided that it was, after all, going to merge the Retail and Institutional Funds.

50.     This was straightforward, as the "merged funds will retain the same investment strategy, asset allocations, and glide path [change in asset allocation as the target date approaches]." [18]  Critically, the merger had no tax consequences for any investors.  Vanguard got a tax opinion saying so. [19]

51.     The merger eliminated duplicative costs for all investors and lowered expense ratios. The problem was, at this point, the harm was done.  Taxable investors had already incurred unnecessary capital gains distributions—and corresponding taxes—that could not be erased.

---

[17]  Fidelity Investments Expands Access to Low-Cost Share Class of Index Target Dates Funds, https://s2.q4cdn.com/997146844/files/doc_news/2021/Fidelity-Freedom-Index-Fund-Lower-Investment-Minimum-NR-1-19-21-F-(1).pdf

[18] Vanguard, "Vanguard to Lower Investor Costs by an Estimated $190 Million through Enhancements to its Target Retirement Series," https://pressroom.vanguard.com/news/Press-Release-Vanguard-to-Lower-Investor-Costs-by-an-Estimated-190M-Through-Enhancements-to-TRFs-092821.html

[19] Dechert Tax Opinion, https://www.sec.gov/Archives/edgar/data/0000752177/000113743922000131/taxopinion.htm

52.     Defendants could have made the decision to merge the Retail and Institutional Funds in December 2020.  Had Defendants chosen to do so at that time, none of smaller, taxable investors would have incurred the large capital gains tax liabilities arising from the massive sell-off in the Retail Funds.

**F.     Vanguard admits that it consciously disregarded its taxable investors.**

53.     In response to inquiries by investors, Vanguard's Relationship Management department explained what happened: "In response to stiff competition from our competitor's target date funds (i.e., the Fidelity Freedom Funds, etc.), Vanguard made a decision to increase the attractiveness of our Institutional target date funds" to "employer or plan sponsors."  And when "plan sponsors began to switch from the investor [Retail] shares to the institutional shares," it "caused very significant outflow from the investor shares, which led to large capital gains."  The "capital gains were then passed along to shareholders."

54.     One Relationship Manager frankly admitted to an investor that Vanguard disregarded its taxable investors because the "vast majority of target retirement funds are held in retirement accounts":

> I asked my team why we decided to lower the minimum investment threshold for these Target Retirement funds if the funds were to be merged next year anyway, and I asked if the tax consequences were considered. Here is the answer I received:
>
> -We lowered the minimum investment of the fund to remain competitive in the marketplace for these investments …
> - While the impact of capital gains resulting from redemptions in the fund were considered, the vast majority of target retirement funds are held in retirement accounts, thus avoiding the adverse taxation

55.     This was not the unrepresentative opinion of one Vanguard employee—it was a considered answer delivered after consulting with the Relationship Management "team," who no doubt consulted with others at Vanguard.  According to this admission, Vanguard recognized that its sell-off decision would cause "capital gains resulting from redemptions in the fund," with

15

"tax consequences" for ordinary investors.  But Vanguard focused solely on remaining

"competitive in the marketplace," i.e., winning retirement plans from competitors like Fidelity.

And since "the vast majority of target retirement funds are held in retirement accounts,"

Vanguard concluded: taxable investors did not matter.  To maintain its retirement plan market

share, Vanguard consciously disregarded its taxable retail investors and triggered a massive sell-

off just a year before the funds would "be merged … anyway."

**G.**     **Defendants' culpability.**

56.     Vanguard recognizes its "core" legal duties to shareholders:

> Core to our mission to give investors the best chance for investment success is our
> fiduciary duty to maximize long-term investment returns for our funds'
> shareholders. [20]

57.     Each Defendant had this duty (among other legal duties).  The decision to drop

the Institutional Fund investment minimums—as opposed to taking other actions that lowered

fees for retirement plans without triggering a massive sell-off in Retail Funds—violated this

duty.  It intentionally triggered asset sell-offs, resulting in capital gains distributions.  It caused

taxable shareholders to sustain unnecessary tax liabilities that could have been deferred for many

years, or even eliminated altogether.  This did not maximize long-term investment returns—it

did the opposite.

58.     Each Defendant was responsible for this decision.  That is, each Defendant is

jointly responsible, or in the alternative, each Defendant is individually responsible.

---

[20] Vanguard, "Our approach to ESG investing: Engage, allocate, and avoid,"
https://corporate.vanguard.com/content/corporatesite/us/en/corp/articles/our-approach-to-esg-investing.html

### 1.    The Trust and Trustee Defendants.

59.    The Trustee Defendants are responsible for the governance of the Trust, including the target date funds.  The Trustees must coordinate the funds, and manage each fund, in the interest of all shareholders.  According to Vanguard, the "trustees believe that their primary responsibility is oversight of the management of each fund for the benefit of its shareholders." [21] The Trustees must manage the funds for the benefit of all "its shareholders" (taxable and non-taxable), and not just for retirement plans.

60.    The Trustees "set broad policies for the funds," "monitor fund operations," and monitor "regulatory compliance." [22]  The same Trustees are responsible for all funds in the Chester Trust (Retail and Institutional) and coordinate their management.  So the Trustees were ultimately responsible for the sell-off decision that hurt taxable investors.

### 2.    Officer Defendants.

61.    The Officer Defendants are also responsible for the harm done here.  The sell-off decision would require the involvement, advice, and approval of the Officer Defendants:  The Trust's CEO, CFO and Chief Compliance Officer (CCO).  The CEO would, for example, evaluate the overall strategy; the CFO would evaluate the financial and tax consequences; and the CCO would evaluate the legality.  As with the Trustees, these Officers have legal duties to manage the funds for the benefit of all shareholders.

62.    When Vanguard decided to merge the funds, the announcement included a quote from CEO Buckley:

> Vanguard will continue to innovate for clients, and our unique client-owned
> structure allows us to share our success with clients through lower fees," said Tim

---

[21] Vanguard Chester Funds, "Statement of Additional Information January 31, 2022," https://advisors.vanguard.com/pub/Pdf/sai059.pdf
[22] Id.

Buckley, Vanguard Chairman and CEO. [23]

63.     But Buckley, and Vanguard, were really only sharing their success with larger

retirement plans.  And to do this, they injured ordinary, taxable investors.

### 3.     Vanguard Group.

64.     Vanguard Group "manages the day-to-day operations of the funds under the

direction of the board of trustees." [24]  Vanguard Group also serves as the investment advisor to

the target date funds.  In its role, it too has a legal duty to manage the funds for the benefit of all

shareholders.

65.     Given its role, Vanguard Group would have been involved in the sell-off decision,

would have advised on it, and consented to it.  So Vanguard Group, too, is culpable here.

### 4.     Each Defendant's actions were grossly negligent, reckless, or in bad faith.

66.     Defendants had complete control over when, and how, Vanguard chose to lower

fees for its retirement plans.  The same Trustee and Officer Defendants controlled the structure

of both the Retail and Institutional Funds, and Vanguard even controlled the underlying

investments (themselves Vanguard funds).  There was no pressing deadline for this voluntary

change—Defendants had all the time they needed to be diligent and prudent.  Finally, the change

was made expressly to favor one class of investors: the retirement funds that drive Vanguard's

bottom line.  This was a red flag that demanded careful attention to conflicts between investors.

---

[23] Vanguard, "Vanguard to Lower Investor Costs by an Estimated $190 Million through Enhancements to its Target Retirement Series," https://pressroom.vanguard.com/news/Press-Release-Vanguard-to-Lower-Investor-Costs-by-an-Estimated-190M-Through-Enhancements-to-TRFs-092821.html
[24] Vanguard Chester Funds, "Statement of Additional Information January 31, 2022," https://advisors.vanguard.com/pub/Pdf/sai059.pdf

67.    There are only two plausible explanations for what happened.  They each entail a fundamentally broken decision-making process and a grossly negligent, reckless, or bad faith breach of fiduciary duty by each Defendant.

68.    The first possibility is that Defendants disregarded their legal duties to taxable investors and failed to even consider the harm that would result.  This would mean that Defendants made the sell-off decision without:

(a)    informing themselves of, and considering, the capital gains distributions;

(b)    informing themselves of, and considering, the tax consequences for taxable investors; and

(c)    identifying, exploring, and duly weighing alternative paths that would avoid this harm.

69.    Under this possibility, each Defendant grossly and recklessly breached their fiduciary duties by failing to inform themselves of this information and taking necessary steps to protect all investors, including smaller, taxable investors in the Retail Funds.

70.    The second possibility is that Defendants did appreciate that their decision would harm taxable investors, but disregarded this harm because Vanguard cares more about retirement plans than retail investors.  This was, at a minimum, a reckless breach of Defendants' duties to ordinary investors.  In fact, the harm that would result to taxable investors was not just a high risk; it was a certainty.  Any disregard of that harm was bad faith.  Each Defendant consciously put the financial interests of large retirement plans above those of smaller, taxable investors.

71.    As detailed above, the Vanguard Relationship Management team admitted to one investor that this second possibility (i.e., that Vanguard consciously disregarded the harm to its taxable investors) is what occurred.

19

72.     In any scenario, all the information that Defendants needed was available with even the scantest care.  In fact, it was known to Defendants (and consciously disregarded).

73.     When Defendants decided to open up the Institutional Funds to plans with over $5M, the mass sell-off was not just foreseeable—it was intended.  Defendants wanted larger retirement plans to sell their Retail Fund shares and use the proceeds to buy Institutional Fund shares.  This was the entire point of dropping the Institutional Fund minimums.  In other words, this was not an unforeseen sell-off caused by some external event like a market shock; it was a sell-off intentionally caused by Defendants, to cater to retirement plans and maintain Vanguard's market share for these plans.

74.     Each Defendant knows that many retail investors hold target date funds in taxable accounts.  Under the direction of Defendants, Vanguard:

- Markets and sells its Retail Funds directly to consumers, including consumers that use taxable accounts;

-  Tracks what Vanguard accounts (taxable or non-taxable) are used to buy target date funds; and

- Specifically recognizes, in fund prospectuses, that investors will use taxable accounts to hold target date funds. [25]

75.     Furthermore, each Defendant knows that tax laws require target date funds to distribute any capital gains it realizes to its investors as cash.  And Defendants know that those distributions will result in capital gains taxes for investors who hold the funds in their taxable accounts.  Vanguard's prospectuses recognize that, unlike its tax-advantaged investors, its taxable investors are vulnerable to capital gains distributions:

---

[25] Vanguard, "Vanguard Target Retirement 2035 Fund Summary Prospectus" at 9, https://personal.vanguard.com/pub/Pdf/sp305.pdf?2210177789 (discussing taxable investors).

The Fund's distributions may be taxable as ordinary income or capital gain.  If you are investing through a tax-advantaged account, such as an IRA or an employer-sponsored retirement or savings plan, special tax rules apply. [26]

76.     Defendants were thus aware that, unlike Vanguard's tax-advantaged investors, its taxable investors are vulnerable to capital gains distributions. [27]

77.     Thus, the harm to taxable investors from the sell-off was not some hidden risk that would require care to discover; the harm was foreseeable, obvious, and known to Defendants.  It was simply a matter of looking at how many plans had more than $5M invested, calculating the likely outflow, remembering that taxable investors exist, and considering the tax consequences for them.

78.     Furthermore, Defendants had alternative, readily-available paths to accomplish their desired result without harming taxable investors.  For one, Defendants could have lowered fees in the Retail Funds, for plans with over $5M.  Alternatively, they could have chosen to merge the Retail and Institutional Funds (as they belatedly did).

79.     Worse, after the sell-off decision was made, Defendants sat by for nine months and watched the sell-off occur, without taking any remedial action.  In the months following December 2020, retirement plans in the Retail Funds redeemed their shares, requiring the funds to sell assets and realize capital gains.  Defendants did nothing to pause or reverse the process; they just watched it unfold.  It took Defendants until nine months later (after the harm was already done), to decide to merge the Retail and Institutional Funds.

*     *     *

_____

[26] Vanguard, "Vanguard Target Retirement 2035 Fund Summary Prospectus" at 9, https://personal.vanguard.com/pub/Pdf/sp305.pdf?2210177789

[27] As illustrated, Vanguard's prospectuses disclose that fund distributions may be taxable.  But Plaintiffs' claims here are based on Vanguard's violation of legal duties independent of disclosure, like its core fiduciary duty to use good faith and care in making fund management decisions for the benefit of all investors (and not just retirement plans).

80.     Vanguard was founded, by John Bogle, to offer low-cost mutual fund investments directly to everyday investors.  Vanguard's "core purpose" is:

**Core purpose:**

——

To take a stand for all investors, to treat them fairly, and to give them the best chance for investment success.

Vanguard "Facts and Figures." [28]

81.     Over its history, Vanguard has often lived up to that purpose.  It has become one of the most respected and successful investment companies in the world.  But in this case, it has fallen far short.  It harmed its smaller, taxable investors (the very people it was founded to serve) to cater to the retirement plans that drive its bottom line.

**H.     Like other taxable investors, Plaintiffs were harmed by Defendants' actions.**

82.     Plaintiffs each held Retail Fund shares in one or more taxable accounts during the relevant timeframe.  Each Plaintiff suffered the tax fall-out from Vanguard's actions and paid Vanguard unjust fees and expenses.  Plaintiffs suffered the same type of harm as all class members, caused by the same misconduct.  For each target year of the Retail Funds, the same

---

[28] Vanguard, "Facts and Figures," https://corporate.vanguard.com/content/corporatesite/us/en/corp/who-we-are/sets-us-apart/facts-and-figures.html.

Vanguard decisions (made by the same Defendants) incentivized retirement plans to sell their shares and switch to the corresponding Institutional target date year.  This impacted each Retail target date year in the same way: it caused large and abnormal outflows, resulting in large and abnormal capital gains distributions.  As a result, taxable investors in each Retail target year suffered the same type of harm: substantial capital gains tax liability.

83.    Valerie M. Verduce invested in Vanguard's 2020, 2030, and 2040 Retail Funds. She held these investments in taxable accounts.  In 2021, her funds distributed over $60,000 in capital gains.  She estimates that her resulting tax liability will be over $9,000.  Ms. Verduce also paid Vanguard fees and expenses each year.

84.    Catherine Day invested in Vanguard's 2025 and 2030 Retail Funds, in a taxable account.  In 2021, her funds distributed over $80,000 in capital gains.  She estimates that her resulting tax liability will be over $12,000.  Ms. Day also paid Vanguard fees and expenses each year.

85.    Anthony Pollock invested in Vanguard's 2025 and 2035 Retail Funds, in taxable accounts.  In 2021, his funds distributed over $105,000 in capital gains.  He estimates that his resulting tax liability will be over $36,000.  Mr. Pollock also paid Vanguard fees and expenses each year.

86.    Michael McKinney invested in Vanguard's 2030 Retail Fund, in a taxable account.  In 2021, his fund distributed over $65,000 in capital gains. He estimates that his resulting tax liability will be over $12,000.  Mr. McKinney also paid Vanguard fees and expenses each year.  Mr. McKinney's capital gains distribution also caused him to lose a large portion of his Affordable Care Act health insurance subsidy.

23

87.     Plaintiffs seek fair compensation for the harm done to them and other taxable Retail Fund investors.  Across all taxable investors, that harm is hundreds of millions of dollars or more.

88.     Plaintiffs also seek an injunction forbidding Vanguard from taking actions that trigger additional sell-offs or that further harm taxable investors in its target date funds.  Despite being harmed by Vanguard, Plaintiffs (and class members) whose shares have appreciated in value are trapped in their Retail Funds.  They cannot sell the funds without incurring additional capital gains tax liability.  These Plaintiffs and class members are thus vulnerable to future Vanguard decisions that trigger more sell-offs, or that otherwise injure taxable investors in the Retail Funds.  This risk is concrete and imminent, because Vanguard has shown a disregard for its taxable investors.  As one Vanguard Relationship Manager admitted to an investor, "it wouldn't be surprising if" large fund outflows and capital gains distributions "were to repeat itself."

**V.     Class Action Allegations.**

89.     Plaintiffs bring claims on behalf of the class of: all U.S. investors in Vanguard's Retail Funds who held these funds in taxable accounts (i.e., accounts subject to applicable state or federal taxes on distributions) and who received 2021 capital gains distributions from the Retail Funds (the "**Nationwide Class**").

90.     Plaintiff Anthony Pollock brings certain claims on behalf of a subclass of investors who reside in California (the "**California Subclass**").

91.     Plaintiff Catherine Day brings certain claims on behalf of a subclass of investors who reside in Massachusetts (the "**Massachusetts Subclass**").

92.     Plaintiff Michael McKinney brings certain claims on behalf of a subclass of investors who reside in Illinois (the "**Illinois Subclass**").

24

93.     The following people are excluded from the class and the subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parent entities have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and their experts and consultants; and (6)  the legal representatives, successors, and assignees of any such excluded persons.

*Numerosity*

94.     The proposed class is so numerous that joinder is impractical.  Plaintiffs believe that there are tens of thousands (or more) class members.

*Commonality*

95.     There are questions of law and fact common to the proposed class.  Common questions of law and fact include, without limitation:

- Whether Defendants violated their fiduciary duties;

- Whether Defendants' violations harmed class members;

- Whether Defendants violated applicable consumer protection statutes; and

- What damages are needed to reasonably compensate class members.

*Typicality*

96.     Plaintiffs' claims are typical.  Like the class, Plaintiffs are taxable investors in Vanguard's Retail Funds that were hit with substantial 2021 capital gains distributions and accompanying tax liability.

*Predominance and Superiority*

25

97.     Prosecuting separate actions would risk inconsistent outcomes and inconsistent standards for Defendants.  For example, this would risk inconsistent findings on whether Defendants breached their fiduciary duties to similarly-situated taxable investors.

98.     Common questions of law and fact predominate over any individual questions. For example, core liability questions are common: whether Defendants breached their fiduciary duties (among other legal duties) and whether this harmed class members.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical.  It would be unduly burdensome to litigate tens of thousands (or more) individual claims in separate lawsuits, every one of which presents the issues present here.

*Ascertainability*

100.    The identity of class members can be obtained from Vanguard's investment records.

**VI.    Claims.**

<u>**Count 1:  Breach of Fiduciary Duty**</u>
(Nationwide Class)
(Against all Defendants)

101.    Plaintiffs incorporate the facts alleged above.

102.    Plaintiffs bring this claim individually and for the Nationwide Class.

103.    As Trustees and Officers of the Chester Funds, the Trustee and Officer Defendants owed fiduciary duties to Plaintiffs and class members, including the duties of care, loyalty, and good faith.

104.    As the investment advisor and manager of the Chester Funds, Vanguard Group owed similar fiduciary duties to Plaintiffs and class members.

105.    As explained in detail above, each Defendant breached their fiduciary duties in connection with the December 2020 sell-off decision.  This breach was grossly negligent, reckless, or made in bad faith.  As alleged more fully above and summarized here, Defendants:

- Grossly and recklessly breached their duty of care by disregarding their duty to taxable investors, failing to consider how the decision would harm these investors, and failing to consider other options that would achieve the same goals without this harm; or

- Acted recklessly, and in bad faith, by recognizing, and consciously disregarding, the harm to taxable investors, because Defendants placed the interests of larger, institutional investors (which drive Vanguard's bottom line) over the interests of smaller, ordinary investors.

106.    In addition, or in the alternative, Vanguard Group aided and abetted the Trustee and Officer Defendants in breaching their fiduciary duties.  As the manager and investment advisor to the Trust, Vanguard Group knew that the Trustee and Officer Defendants were breaching their fiduciary duties, in the way alleged in detail above, and provided substantial assistance in carrying out this breach.

107.    These breaches were a direct and proximate cause of harm and damage to Plaintiffs and class members.

108.    As described in detail above, Defendants acted with conscious disregard and reckless indifference to the rights of Plaintiffs and class members.

**Count 2:  Gross Negligence**
(Nationwide Class)
(Against all Defendants)

109.    Plaintiffs incorporate the facts alleged above.

110.    Plaintiffs bring this claim individually and for the Nationwide Class.

111.    As Trustees and Officers of the Chester Funds, the Trustee and Officer
Defendants owed a duty of care to Plaintiffs and class members.

112.    As the investment advisor and manager of the Chester Funds, Vanguard Group
also owed a duty of care to Plaintiffs and class members.

113.    As explained in detail above, in connection with the 2020 sell-off decision, each
Defendant grossly deviated from the standard of care.  Each Defendant was indifferent to their
duty to taxable shareholders and intentionally failed to perform this duty, with awareness and
reckless disregard of an extreme risk of harm to Plaintiffs and class members.

114.    Defendants' gross negligence was a direct and proximate cause of harm and
damage to Plaintiffs and class members.

### Count 3:  Breach of the Covenant of Good Faith and Fair Dealing
(Nationwide Class)
(Against the Trust and Trustee Defendants)

115.    Plaintiffs incorporate the facts alleged above.

116.    Plaintiffs bring this claim individually and for the Nationwide Class.

117.    A contract was formed between (a) Plaintiffs' and class members, and (b) the
Trust and Trustee Defendants, that included the Chester Funds Declaration of Trust. [29] That
agreement states that it was "entered into … by the Trustees" and that "[e]very Shareholder by
virtue of having become a Shareholder shall be held to have expressly assented and agreed to the
terms."

118.    The contract provided the Trust and Trustee Defendants with discretion to make
fund management decisions, including merging funds, altering investment minimums, and

---

[29] Chester Funds Declaration of Trust,
https://www.sec.gov/Archives/edgar/data/752177/000093247112001166/declarationoftrust_chest
erfu.htm

adjusting fees.  This discretion included an implied duty of good faith and fair dealing.

119.    As alleged in detail above, these Defendants failed to exercise their discretion in good faith, in connection with the December 2020 sell-off decision.  Each Defendant acted unreasonably and frustrated the benefits of the bargain that Plaintiffs and class members reasonably expected.

120.    Defendants' breach was a direct and proximate cause of harm and damage to Plaintiffs and class members.

**Count 4:  Unjust Enrichment**
(Nationwide Class)
(Against all Defendants)

121.    Plaintiffs incorporate the facts alleged above.

122.    Plaintiffs bring this claim individually and for the Nationwide Class.

123.    This equitable claim is asserted in the alternative, if Plaintiffs and class members lack an adequate contractual remedy.

124.    Plaintiffs and class members paid fees and expenses that were used to pay Defendants, for managing the Retail Funds with due care and in good faith.  This includes both direct fees and expenses, paid to the Trust and the Vanguard Group, and the compensation of the Trustee and Officer Defendants.

125.    As alleged in detail above, Defendants grossly violated these duties.

126.    In this way, Defendants received a direct and unjust benefit, at the expense of Plaintiffs and class members.

**Count 5:  Violation of Massachusetts Consumer Protection Law (Ch. 93A)**
(Massachusetts Subclass)
(Against all Defendants)

127.    Plaintiff Catherine Day brings this claim individually and for the Massachusetts Subclass.

29

128.     Plaintiff incorporates the facts alleged above.

129.     Massachusetts consumer protection law (Chapter 93A) prohibits "unfair" conduct. *See* Mass. Gen. Laws ch. 93A, § 2.

130.     As alleged in detail above, Defendants' mismanagement caused substantial injury to Plaintiff and class members.  The harm was not outweighed by any countervailing benefits to consumers or to competition.  Indeed, Defendants could have provided the same benefits to Vanguard's retirement plans, without doing any harm to Plaintiff or class members.  In contrast, Plaintiff and class members could not have reasonably avoided this injury, as they had no control over Defendants' decision.

131.     Defendants' conduct, as alleged above, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

132.     Defendants' unfair practices are within the penumbra of common-law and statutory concepts of unfairness.  By common law and statute, mutual fund managers must exercise due care, and good faith, in managing the fund for the benefit of all shareholders.  Each Defendant's conduct grossly violated these duties.

133.     Each Defendant's unfair acts occurred in a course of conduct involving trade or commerce.  The Trust and the Vanguard Group offer Retail Fund shares, and associated management services, to the public.  The Vanguard Group is identified in Retail Fund Prospectuses and the Statement of Additional Information as the investment advisor and fund manager.

134.     The Trustee and Officer Defendants also expressly offer their services to the public.  Retail Fund documents, distributed to the public, identify the Trustee and Officer Defendants and tout their qualifications.  For example:

All of the trustees bring to each fund's board a wealth of executive leadership experience derived from their service as executives (in many cases chief executive officers), board members, and leaders of diverse public operating companies, academic institutions, and other organizations. … . Each trustee is determined to have the experience, skills, and attributes necessary to serve the funds and their shareholders because each trustee demonstrates an exceptional ability to consider complex business and financial matters, evaluate the relative importance and priority of issues, make decisions, and contribute effectively to the deliberations of the board. … The business acumen, experience, and objective thinking of the trustees are considered invaluable assets for Vanguard management and, ultimately, the Vanguard funds' shareholders. [30]

[This document goes on to name the Trustees and Officers and summarize their qualifications]

135.    Also, as alleged above (Count 3), the Declaration of Trust states that it was "entered into … by the Trustees" and that "[e]very Shareholder by virtue of having become a Shareholder shall be held to have expressly assented and agreed to the terms."  In other words, when consumers (members of the public) purchase Retail Fund shares, the Declaration purports to bind them into a contractual relationship with the Trustees.  So consumers are expressly purchasing the services of the Trustee Defendants.  And the fees and expenses that consumers pay to Vanguard, in connection with Retail Shares, goes to pay the Trustees and Officers substantial compensation for their advertised services.

136.    Defendants' unfair conduct was a direct and proximate cause of harm and damage to Plaintiffs and Subclass members.

137.    On March 14, 2022, Ms. Day provided a written demand for relief to each Defendant, on behalf of herself and the Massachusetts Subclass.  It is undisputed that the statutory notice period, to bring this claim, has now been satisfied.  ECF No. 11 ¶5 (stipulation that the notice period has been satisfied).

---

[30] Vanguard Chester Funds Statement of Additional Information (January 31, 2022), https://advisors.vanguard.com/pub/Pdf/sai059.pdf

**Count 6:  Violation of the Illinois Consumer Protection Law (815 ILCS 505/2)**
(Illinois Subclass)
(Against all Defendants)

138.    Plaintiff Michael McKinney brings this claim individually and for the Illinois Subclass.

139.    Plaintiff incorporates the facts alleged above.

140.    The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair" conduct.  *See* 815 Ill. Comp. Stat. Ann. 505/2.  Each Defendant's conduct was unfair.

141.    As alleged in detail above, Defendants' mismanagement caused substantial injury to Plaintiff and class members.  The harm was not outweighed by any countervailing benefits to consumers or to competition.  Indeed, Defendants could have provided the same benefits to Vanguard's retirement plans, without doing any harm to Plaintiff or class members.  In contrast, Plaintiff and class members could not have reasonably avoided this injury, as they had no control over Defendants' decision.

142.    Defendants' conduct, as alleged above, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

143.    One public policy predicate to this claim is that mutual fund managers must exercise due care, and good faith, in managing the fund for the benefit of all shareholders.  This public policy is tethered to the extensive statutory and regulatory scheme that governs the conduct of mutual fund managers and trustees.  Defendants' conduct violated this public policy.

144.    As alleged in more detail above (Count 5) and incorporated here, each Defendant's unfair acts occurred in the conduct of trade or commerce.

145.    Defendants' unfair conduct was a direct and proximate cause of harm and damage to Plaintiffs and Subclass members.

32

**Count 7:  Violation of California Unfair Competition Law (UCL)**
(California Subclass)
(Against all Defendants)

146.    Plaintiff Anthony Pollock brings this claim individually and for the California Subclass.

147.    Plaintiff and Subclass members assert this claim in the alternative, if they lack an adequate remedy at law.

148.    Plaintiff incorporates the facts alleged above.

149.    California's Unfair Competition Law (UCL) prohibits "unfair" business practices. *See* Bus. & Prof. Code §17200 and the following.  Each Defendant's conduct was unfair.

150.    As alleged in more detail above (Count 5) and incorporated here, each Defendant's unfair acts were business practices.

151.    As alleged in detail above, Defendants' mismanagement caused substantial injury to Plaintiff and class members.  The harm was not outweighed by any countervailing benefits to consumers or to competition.  Indeed, Defendants could have provided the same benefits to Vanguard's retirement plans, without doing any harm to Plaintiff or class members.  In contrast, Plaintiff and class members could not have reasonably avoided this injury, as they had no control over Defendants' decision (nor warning of it).

152.    Defendants' conduct, as alleged above, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

153.    One public policy predicate to this claim is that mutual fund managers must exercise due care, and good faith, in managing the fund for the benefit of all shareholders.  This public policy is tethered to the extensive statutory and regulatory scheme that governs the conduct of mutual fund managers and trustees.  Defendants' conduct violated this public policy.

154.    Defendants' unfair conduct was a direct and proximate cause of harm and damage to Plaintiffs and Subclass members.

**VII.    Jury Demand.**

155.    Plaintiffs demand a jury trial on all issues so triable.

**VIII.    Relief.**

156.    Plaintiffs seek the following relief for themselves and for the class:

- An order certifying the asserted claims, or issues raised, as a class action;

- A judgment in favor of Plaintiffs and the proposed class;

- Damages, including statutory, enhanced, or punitive damages where applicable;

- An injunction prohibiting Defendants from further harming class members;

- Restitution;

- Disgorgement, and other just equitable relief;

- Pre- and post-judgment interest;

- Reasonable attorneys' fees and costs, as allowed by law; and

- Any additional relief that the Court deems reasonable and just.

Dated: May 3, 2022

**DOVEL & LUNER, LLP**
By:  */s/ Jonas Jacobson*

Jonas B. Jacobson (Cal. Bar No. 269912)*
jonas@dovel.com
Simon Franzini (Cal. Bar No. 287631)*
simon@dovel.com
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: (310) 656-7066

* Admitted Pro Hac Vice

**LeVAN STAPLETON SEGAL COCHRAN LLC**

Peter H. LeVan, Jr.
plevan@levanstapleton.com
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 561-1500

*Counsel for Plaintiffs*

## <ins>CERTIFICATE OF SERVICE</ins>

I certify that on this day I caused a true and correct copy of the foregoing Amended

Complaint to be filed using the Court's Electronic Filing System ("ECF System"). The

documents are available for viewing and downloading via the ECF System and will be served by

operation of the ECF System upon all counsel of record.

Dated: May 3, 2022                    **DOVEL & LUNER, LLP**
                                      */s/ Jonas Jacobson*
                                      Jonas B. Jacobson