**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE VANGUARD CHESTER FUNDS LITIGATION | Lead Case No. 2:22-cv-955-ER<br><br>**CLASS ACTION** |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO**
**DISMISS THE CONSOLIDATED COMPLAINT**

# **TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ................................................................ 1

II.  STATEMENT OF FACTS ..................................................................... 3

    A.   Vanguard Offered Target Date Retirement Funds to Taxable Investors ............. 3

    B.   Defendants Spark a Massive Sell-Off, Triggering Unprecedented Capital
        Gains Distributions and Major Tax Liabilities for Taxable Investors ................. 5

    C.   Defendants Disregarded Viable Alternative Means to the Same Ends that
        Would Not Have Damaged Taxable Investors .................................... 7

III. ARGUMENT ................................................................................. 8

    A.   Plaintiffs Have Standing Because Their Injuries are Not Speculative ............... 8

        1.   Plaintiffs Have Standing to Seek Monetary Damages ........................ 9

            a.   Plaintiffs Allege Concrete Out-of-Pocket Damages....................... 10

            b.   Defendants' Arguments Concern Only the Amount of Damages.... 13

            c.   Ample Case Law Supports Plaintiffs' Damages Theory................. 15

        2.   Plaintiffs Have Standing to Seek Injunctive and Other Relief .............. 19

    B.   The Complaint Adequately Alleges Claims for Breach of Fiduciary Duty........ 22

        1.   Defendants Each Owed Fiduciary Duties to Plaintiffs ......................... 22

        2.   Defendants Breached Their Fiduciary Duties to Plaintiffs .................... 24

    C.   The Complaint Adequately Alleges Claims for Aiding and Abetting a
        Breach of Fiduciary Duty................................................ 28

    D.   The Complaint Adequately Alleges Claims for Gross Negligence .................. 30

        1.   Plaintiffs' Gross Negligence Claims Can Proceed Side-by-Side
            With Their Fiduciary Duty Claims ........................................ 30

        2.   The Complaint Alleges an Extreme Departure From the Ordinary
            Standard of Care ............................................................ 31

    E.   The Complaint Adequately Alleges Claims for Breach of the Covenant
        of Good Faith and Fair Dealing ......................................... 32

    F.   The Complaint Adequately Alleges Claims for Unjust Enrichment ................. 34

G.     The Complaint Adequately Alleges Claims for Violations of State
       Consumer Protection Statutes ............................................................... 36

       1.     The Complaint Adequately Alleges Claims Under the California
              Unfair Competition Law .......................................................... 36

       2.     The Complaint Adequately Alleges Claims Under the Colorado
              Consumer Protection Act ......................................................... 38

       3.     The Complaint Adequately Alleges Claims Under the Massachusetts
              Consumer Protection Law ........................................................ 41

       4.     The Complaint Adequately Alleges Claims Under the Illinois
              Consumer Fraud Act ............................................................... 44

IV.    CONCLUSION ...................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Airborne Health, Inc. v. Squid Soap, LP*,
  984 A.2d 126 (Del. Ch. 2009) ................................................. 33

*Airgas, Inc. v. Cravath, Swaine & Moore LLP*,
  No. CIV.A. 10-612, 2010 WL 3046586 (E.D. Pa. Aug. 3, 2010) ........................... 22

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
  No. CIV.A. 762-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ..................... 30, 31

*Allied Cap. Corp. v. GC-Sun Holdings, L.P.*,
  910 A.2d 1020 (Del. Ch. 2006) ............................................... 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................ 8

*Avery v. State Farm Mut. Auto. Ins. Co.*,
  216 Ill. 2d 100 (2005) ..................................................... 45

*Bailets v. Pennsylvania Tpk. Comm'n*,
  645 Pa. 520 (2018) ........................................................ 14

*Baker v. Fam. Credit Counseling Corp.*,
  440 F. Supp. 2d 392 (E.D. Pa. 2006) ......................................... 28

*Baldwin v. New Wood Res. LLC*,
  283 A.3d 1099 (Del. 2022) ............................................... 32, 33

*Bamford v. Penfold, L.P.*,
  No. 2019-0005-JTL, 2020 WL 967942 (Del. Ch. Feb. 28, 2020) ...................... 35

*Bardin v. DaimlerChrysler Corp.*,
  136 Cal. App. 4th 1255 (2006) .............................................. 36

*BCBSM, Inc. v. Walgreen Co.*,
  512 F. Supp. 3d 837 (N.D. Ill. 2021) ..................................... 44, 45

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013) ................................................ 23

*Bigelow v. RKO Radio Pictures*,
  327 U.S. 251 (1946) ........................................................ 14

*Bowman v. Wilson*,
  672 F.2d 1145 (3d Cir. 1982) ................................................ 9

*Brooks v. Thomson Reuters Corp.*,
  No. 21-cv-01418-EMC, 2021 WL 3621837 (N.D. Cal. Aug. 16, 2021) ................................. 36

*Cagwin v. Centralized Showing Serv. Inc.*,
  No. 20-CV-03033-KLM, 2022 WL 952875 (D. Colo. Mar. 30, 2022) ................................... 39

*Capano v. Capano*,
  No. CIV.A. 8721-VCN, 2014 WL 2964071 (Del. Ch. June 30, 2014) ................................... 29

*Carroll v. Myriad Genetics, Inc.*,
  No. 4:22-CV-00739-YGR, 2022 WL 16860013 (N.D. Cal. Nov. 9, 2022) ........................... 37

*Chaleplis v. Karloutsos*,
  579 F. Supp. 3d 685 (E.D. Pa. 2022) ................................................................. 23

*Charest v. President & Fellows of Harvard Coll.*,
  No. CV 13-11556-DPW, 2016 WL 614368 (D. Mass. Feb. 16, 2016) .................................. 43

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................................... 9, 17

*Clearing Corp. v. Fin. & Energy Exch., Ltd.*,
  No. 09 CV 5383, 2010 WL 2836717 (N.D. Ill. July 16, 2010) ......................................... 44

*Clinton Hosp. Ass'n v. Corson Grp., Inc.*,
  907 F.2d 1260 (1st Cir. 1990) .......................................................................... 42

*Coleman v. Mondelez Int'l Inc.*,
  554 F. Supp. 3d 1055 (C.D. Cal. 2021) ............................................................... 37

*Commonwealth v. Fremont Inv. & Loan*,
  452 Mass. 733 (2008) ..................................................................................... 41

*Conquest v. WMC Mortg. Corp.*,
  247 F. Supp. 3d 618 (E.D. Pa. 2017) ................................................................. 23

*Cottrell v. Alcon Labs.*,
  874 F.3d 154 (3d Cir. 2017) ............................................................................ 9

*Covalesky v. Covalesky*,
  No. 340 MDA 2014, 2015 WL 7012540 (Pa. Super. Ct. June 10, 2015) ............................. 15

*Crowe v. Tull*,
  126 P.3d 196 (Colo. 2006) .............................................................................. 39

*Cruz v. Progressive Cas. Ins. Co.*,
  No. CV 20-10966 DSF (SK), 2021 WL 1557750 (C.D. Cal. Feb. 5, 2021) ........................... 37

*DeBenedictis v. Merrill Lynch & Co.*,
    492 F.3d 209 (3d Cir. 2007) ................................................................................ 8

*Diaz v. FCA US LLC*,
    No. 21-CV-00906-EJW, 2022 WL 4016744 (D. Del. Sept. 2, 2022) ................................ 20, 21

*Dukich v. IKEA US Retail LLC*, No.,
    CV 20-2182, 2021 WL 1534520 (E.D. Pa. Apr. 19, 2021) ...................................... 12

*Enigma Info. Retrieval Sys., Inc. v. Radian, Inc.*,
    No. CIV.A.04C06069FSS, 2005 WL 445568 (Del. Super. Ct. Feb. 23, 2005) ................ 14, 15

*Eshelman v. Agere Sys., Inc.*,
    554 F.3d 426 (3d Cir. 2009) ................................................................................ 15

*Finkelman v. Nat'l Football League*,
    810 F.3d 187 (3d Cir. 2016) ................................................................................ 17

*Frank v. Elgamal*,
    No. 6120-VCN, 2014 WL 957550 (Del. Ch. Mar. 10, 2014) .................................... 35

*Freedom Med. Inc. v. Gillespie*,
    634 F. Supp. 2d 490 (E.D. Pa. 2007) .................................................................... 26

*Gardner v. Safeco Ins. Co. of Am.*,
    No. 14-CV-02024-JCS, 2014 WL 2568895 (N.D. Cal. June 6, 2014) ...................... 37

*Gelman v. State Farm Mut. Auto. Ins. Co.*,
    583 F.3d 187 (3d Cir. 2009) ................................................................................ 8

*Glenn K. Jackson Inc. v. Roe*,
    273 F.3d 1192 (9th Cir. 2001) .............................................................................. 36

*Goldstein v. S.E.C.*,
    451 F.3d 873 (D.C. Cir. 2006) ............................................................................ 23

*Gould v. Am.-Hawaiian S. S. Co.*,
    535 F.2d 761 (3d Cir. 1976) ................................................................................ 14

*Gridley v. State Farm Mut. Auto. Ins. Co.*,
    217 Ill. 2d 158 (2005) ...................................................................................... 45

*Guanci v. Kessler*,
    No. 2:14-CV-01299-APG, 2015 WL 4423587 (D. Nev. July 17, 2015) .................... 15

*Guzman v. Bridgepoint Educ., Inc.*,
    305 F.R.D. 594 (S.D. Cal. 2015) .......................................................................... 39

*Guzman v. Polaris Indus. Inc.*,
    49 F.4th 1308 (9th Cir. 2022) ................................................................. 38

*Hall v. Hall*,
    753 F. App'x 96 (3d Cir. 2018) .............................................................. 15

*Hall v. Walter*,
    969 P.2d 224 (Colo. 1998) ..................................................................... 39

*Harry & Jeanette Weinberg Found. Inc. v. ANB Inv. Mgmt. & Tr. Co.*,
    No. 97 C 4362, 1997 WL 652342 (N.D. Ill. Oct. 10, 1997) ............................................. 16, 17

*Hazdovac v. Mercedes-Benz USA, LLC*,
    No. 20-cv-00377-RS, 2022 WL 2161506 (N.D. Cal. June 15, 2022) ...................................... 37

*In re Alloy, Inc.*,
    No. CIV.A. 5626-VCP, 2011 WL 4863716 (Del. Ch. Oct. 13, 2011) .................................... 26

*In re Citigroup Inc. S'holder Derivative Litig.*,
    964 A.2d 106 (Del. Ch. 2009) ................................................................. 30

*In re Covenant Partners, L.P.*,
    No. 17-cv-0052, 2018 WL 4377000 (E.D. Pa. Sept. 13, 2018) ............................................ 24

*In re Fruehauf Trailer Corp.*,
    250 B.R. 168 (D. Del. 2000) ................................................................... 30

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*,
    903 F.3d 278 (3d Cir. 2018) .......................................................... 9, 17, 19, 21

*In re Morrow Park Holding LLC*,
    C.A. No. 2017-0036-PAF, 2022 WL 3025780 (Del. Ch. Aug. 1, 2022) .................................. 33

*In re Opus East, LLC*,
    528 B.R. 30 (Bankr. D. Del. 2015) ............................................................ 24

*In re PMTS Liquidating Corp.*,
    526 B.R. 536 (D. Del. 2014) ................................................................... 26

*In re Szostek*,
    886 F.2d 1405 (3d Cir. 1989) .................................................................. 12

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ....................................................................... 25

*In re: Old Bpsush, Inc.*,
    No. 16-12373 (BLS), 2021 WL 4453595 (D. Del. Sept. 29, 2021) ........................................ 24

*Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*,
  44 F.3d 40 (1st Cir. 1995) ................................................................................. 41

*Institut Pasteur v. Simon*,
  383 F. Supp. 2d 809 (E.D. Pa. 2005) ................................................................. 18

*Kedra v. Schroeter*,
  876 F.3d 424 (3d Cir. 2017) ................................................................................. 9

*Kemmerer v. ICI Americas Inc.*,
  70 F.3d 281 (3d Cir. 1995) ........................................................................... 17, 18

*LaSala v. Bordier et Cie*,
  519 F.3d 121 (3d Cir. 2008) ............................................................................... 28

*Luxul Tech. Inc. v. Nectarlux, LLC*,
  78 F. Supp. 3d 1156 (N.D. Cal. 2015) ............................................................... 38

*McNair v. Synapse Grp. Inc.*,
  672 F.3d 213 (3d Cir. 2012) ......................................................................... 19, 21

*McPadden v. Sidhu*,
  964 A.2d 1262 (Del. Ch. 2008) .......................................................................... 25

*Mionix, LLC v. ACS Tech.*,
  No. 16-CV-02154-RBJ, 2018 WL 2196065 (D. Colo. May 14, 2018) ................... 40

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................................................. 9

*Moran v. Davita, Inc.*,
  No. CIV.A. 06-5620 JAP, 2013 WL 3810703 (D.N.J. July 22, 2013) ................... 18

*Muschlitz Excavating, Inc. v. Gary J. Strausser Homebuilders, Inc.*,
  No. C–48–CV–2012–4247, 2014 WL 8854202 (Pa. Ct. Com. Pl. Feb. 14, 2014) ............... 35

*NAMA Holdings, LLC v. Related WMC LLC*,
  No. CV 7934-VCL, 2014 WL 6436647 (Del. Ch. Nov. 17, 2014) .......................... 33

*Nemec v. Shrader*,
  991 A.2d 1120 (Del. 2010) .................................................................................. 34

*NGV Gaming, Ltd. v. Upstream Point Molate, LLC*,
  355 F. Supp. 2d 1061 (N.D. Cal. 2005) ............................................................. 14

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
  135 F. Supp. 3d 1059 (N.D. Cal. 2015) ............................................................. 29

*NRT New England, Inc. v. Moncure*,
  No. 20053861, 2008 WL 4739794 (Mass. Super. Oct. 23, 2008) ........................................... 41

*Oddi v. Ayco Corp.*,
  947 F.2d 257 (7th Cir. 1991) ....................................................................................... 13, 19

*OTK Assocs., LLC v. Friedman*,
  85 A.3d 696 (Del. Ch. 2014) ............................................................................................. 29

*Pa. Fed'n, Bhd. of Maint. of Way Emps. v. Norfolk S. Corp.*, No. Civ.A.,
  02–9049, 2004 WL 2315795 (E.D. Pa. Oct. 12, 2004) ...................................................... 24

*Pan Am. World Airways, Inc. v. Cont'l Bank*,
  435 F. Supp. 642 (E.D. Pa. 1977) ..................................................................................... 28

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  716 F. Supp. 2d 236 (S.D.N.Y. 2010) ............................................................................... 22

*People v. Rader*,
  822 P.2d 950 (Colo. 1992) ................................................................................................ 40

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ............................................................................................... 9

*PMP Assocs., Inc. v. Globe Newspaper Co.*,
  366 Mass. 593 (1975) ....................................................................................................... 41

*Pruett v. Erickson Air-Crane Co.*,
  183 F.R.D. 248 (D. Or. 1998) ........................................................................................... 15

*Quinton v. Gavin*,
  No. 98860B, 2001 WL 1194151 (Mass. Super. Feb. 15, 2001) ........................................... 43

*R. Rudnick & Co. v. G.F. Prot., Inc.*,
  No. 08 C 1856, 2009 WL 112380 (N.D. Ill. Jan. 15, 2009) ................................................ 45

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
  62 P.3d 142 (Colo. 2003) .................................................................................................. 40

*Rizzo v. Haines*,
  520 Pa. 484 (1989) ........................................................................................................... 14

*Robinson v. Toyota Motor Credit Corp.*,
  201 Ill. 2d 403 (2002) ....................................................................................................... 44

*S.E.C. v. Ambassador Advisors, LLC*,
  576 F. Supp. 3d 286 (E.D. Pa. 2021) ................................................................................ 23

*Sanders v. Wang*,
 No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) .......................................... 30

*Saunwin Int'l Equities Fund LLC v. Donville Kent Asset Mgmt. Inc.*,
 No. CV 17-11585-FDS, 2018 WL 3543533 (D. Mass. July 20, 2018) .................... 23

*Showpiece Homes Corp. v. Assurance Co. of Am.*,
 38 P.3d 47 (Colo. 2001) ........................................................................................ 39

*Solin v. Domino*,
 No. 08 Civ. 2837(SCR), 2009 WL 536052 (S.D.N.Y. Feb. 25, 2009) .................... 19

*Sonner v. Premier Nutrition Corp.*,
 971 F.3d 834 (9th Cir. 2020) ............................................................................ 37, 38

*Starceski v. Westinghouse Elec. Corp.*,
 54 F.3d 1089 (3d Cir. 1995) .................................................................................. 12

*Steele v. Kelley*,
 46 Mass. App. Ct. 712 (1999) ............................................................................... 43

*Stone v. Ritter*,
 911 A.2d 362 (Del. 2006) ....................................................................................... 25

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) ............................................................................................... 19

*Diamond Real Estate v. Am. Brokers Conduit*,
 No. 16-cv-03937-HSG, 2017 WL 412527 (N.D. Cal. Jan. 31, 2017) ..................... 37

*Swartz v. Schaub*,
 818 F. Supp. 1214 (N.D. Ill. 1993) ........................................................................ 44

*Thorne v. Pep Boys Manny Moe & Jack Inc.*,
 980 F.3d 879 (3d Cir. 2020) .................................................................................. 17

*Tomczak v. Morton Thiokol, Inc.*,
 No. CIV. A., 7861, 1990 WL 42607 (Del. Ch. Apr. 5, 1990) ................................. 26

*UBS Fin. Servs., Inc. v. Aliberti*,
 483 Mass. 396 (2019) ............................................................................................ 41

*United States v. Martin*,
 454 F. Supp. 2d 278 (E.D. Pa. 2006) .................................................................... 28

*Value Partners S.A. v. Bain & Co.*,
 245 F. Supp. 269 (D. Mass. 2003) ......................................................................... 42

*Yenchi v. Ameriprise Fin., Inc.*,
   639 Pa. 618 (2017) ................................................................................................ 23

*ZRii, LLC v. Wellness Acquisition Grp., Inc.*,
   No. CIV. A. 4374-VCP, 2009 WL 2998169 (Del. Ch. Sept. 21, 2009) .................................. 22

**Statutes**

815 Ill. Comp. Stat. Ann. 501(f) ................................................................................. 44

815 Ill. Comp. Stat. Ann. 505/2 ................................................................................. 44

Cal. Civ. Code § 1770 ................................................................................................ 38

Colo. Rev. Stat. Ann. § 6-1-105 ................................................................................. 38

Mass. Gen. Laws ch. 93A, § 11 ................................................................................. 42

**Rules**

Fed. R. Civ. P. 8(d)(2) ............................................................................................... 29

Fed. R. Civ. P. 9(b) ................................................................................................... 26

Plaintiffs Haifan Liang, Julia Lucas, Mary R. Richardson, Donald R. Lichtenstein, Catherine Day, Ardes Poisson, Valerie M. Verduce, John Harvey, Caitlin Brigham, Jeffrey Chaussee, Zeb Bradford, Benjamin Deming, and James Daily (collectively, "Plaintiffs") submit this memorandum in opposition to the motions by (1) Defendants The Vanguard Group, Inc. ("Vanguard"), Vanguard Chester Funds (the "Trust"), Mortimer J. Buckley, John Bendl, Christine M. Buchanan, and John E. Schadl (the "Officer Defendants") (Dkt. No. 85, "Vanguard Motion"), and (2) Defendants Emerson U. Fullwood, Amy Gutmann, F. Joseph Loughrey, Mark Loughridge, Scott C. Malpass, Deanna Mulligan, André F. Perold, Sarah Bloom Raskin, and Peter F. Volanakis (the "Trustee Defendants") (Dkt. No. 84, "Trustee Motion"), to dismiss Plaintiffs' Consolidated Complaint (Dkt. No. 65, "Complaint").[1]

## I.  PRELIMINARY STATEMENT

Plaintiffs and the putative Class are investors in Vanguard's Target Retirement Funds ("Target Date Funds") who held the funds in taxable accounts. The Target Date Funds are "set-it-and-forget-it" mutual funds designed for long-term investors who aim to hold the funds until at least their target retirement date. In most years, these funds have minimal levels of capital gains distributions and taxable investors incur minimal tax liabilities on those distributions. In 2021, however, Defendants needlessly caused the Target Date Funds to make unprecedented levels of capital gains distributions, resulting in massive, surprise tax bills for Plaintiffs.

In December 2020, Vanguard had a separate Retail Fund and Institutional Fund for each target retirement date (*i.e.*, a 2040 Retail Fund and a 2040 Institutional Fund). The funds were

---

[1] References to "Vanguard Br." are to the memorandum of law in support of the motion to dismiss filed by Vanguard, the Trust, and the Officer Defendants (Dkt. No. 85-2). References to "Trustee Br." are to the memorandum of law in support of the motion to dismiss filed by the Trustee Defendants (Dkt. No. 84). References to "¶__" are to paragraphs of the Complaint.

identical except that the Institutional Funds had lower fees and a $100 million investment minimum. In an effort to compete for investments from institutional retirement plans, who account for the bulk of Vanguard's Target Date Fund revenues, Defendants decided to lower the minimum investment threshold for the Institutional Funds from $100 million to $5 million. This caused an "elephant stampede" of newly-eligible retirement plans redeeming their Retail Fund shares and buying into the Institutional Funds. In order to satisfy this extraordinary wave of redemptions the Retail Funds had to sell off assets, realizing capital gains that had to be distributed to the smaller shareholders left behind. Those distributions, made at the end of 2021, soared as high as 4,000% of previous levels.  For context, the following chart illustrates the unprecedented increase in capital gains distributions for the 2040 Retail Fund that Defendants caused:



Plaintiffs were blindsided by the exorbitant tax bills from these distributions. Some faced IRS penalties or had to liquidate other assets just to cover the tax payments. Plaintiffs bring claims against Defendants for breach of fiduciary duty, gross negligence, and other causes of action because Defendants needlessly caused this foreseeable harm to Plaintiffs. Defendants knew that

2

lowering the investment minimum for the Institutional Funds would spark a massive sell-off in the Retail Funds and cause Plaintiffs to incur unprecedented tax liabilities. Defendants recklessly or consciously disregarded the harmful impact their actions would have on Plaintiffs by eschewing readily available alternatives—fee tiering or merging the funds—that would have accomplished the same goal of lowering fees for institutional clients *without* damaging Plaintiffs.

Defendants' motions to dismiss the Complaint fail because, *inter alia*, Plaintiffs allege concrete, out-of-pocket damages sufficient to support standing, and Defendants' actions constituted at least reckless, if not knowing, dereliction of their duties to act in the best interests of *all* of their investors, including Plaintiffs. There is no minimum investment threshold for Defendants' fiduciary duties to act in their investors' best interest. Defendants once again errantly focus their attention on the benefit to their institutional clients from lower fees, but as Plaintiffs allege, the readily available alternatives would have achieved this same benefit while avoiding the foreseeable harm to Plaintiffs. Needlessly selling out Plaintiffs and other individual investors to woo institutional investors who generate more revenue for Vanguard is wrongful. There is no real dispute that Defendants' actions had a material, negative financial impact on Plaintiffs. The Court should deny Defendants' motions to dismiss in their entirety.

## II.      STATEMENT OF FACTS

### A.      Vanguard Offered Target Date Retirement Funds to Taxable Investors

Vanguard was founded in 1975 to offer low-cost mutual fund investments directly to everyday investors. ¶49. Vanguard is now the largest provider of mutual funds in the world, and one of the largest investment companies overall, managing assets of over $8 trillion. ¶50.

Mutual funds consist of a portfolio of stocks, bonds, or other securities. ¶52. They are managed by financial professionals to serve the investment purposes of the funds' shareholders.

*Id.* Vanguard's mutual funds are organized as trusts. A fund's board of trustees, along with its officers and advisors, are required to manage the fund for the benefit of *all* its shareholders. *Id.*

Vanguard offered a series of Target Date Funds, organized as the Trust. ¶53. These funds invest money across asset classes based on a target retirement year. *Id.* The Target Date Funds buy and hold other Vanguard index funds – typically a mix of stock and bond funds. ¶54. As a fund's target date (*i.e.*, 2030 or 2040) approaches, its investment managers gradually adjust the fund's portfolio to reduce risk exposure, with more bonds and fewer stocks. This is called the "glide path" of the fund. *Id.* The appeal of the Target Date Funds is that they are low-cost, efficient investment products for investors who want their portfolio to grow more conservative and less volatile over many years as they approach their target retirement date, without having to actively manage their portfolio. ¶¶55-56. These type of funds have become extremely popular retirement investments, with Vanguard being the largest target-date fund manager in the industry. ¶55.

At the end of 2020, Vanguard offered two tiers of Target Date Funds: (1) Institutional Funds for retirement plans with over $100 million in assets invested; and (2) Retail Funds for individuals and smaller retirement plans with less than $100 million invested. ¶57. For each target date, the Institutional and Retail Funds shared the same investment strategy, the same trustees and officers, the same underlying investments, and the same glide path. ¶58. The only difference was that the Institutional Funds offered lower management fees and expenses. *Id.*

When the Target Date Funds sell assets, they must distribute to their shareholders any capital gains they realize on the sale on a *pro rata* basis. ¶59. Most investors hold their shares in tax-advantaged accounts, such as a 401(k), and they can reinvest the distributions without incurring any tax liability. ¶60. However, many investors hold shares of Vanguard's Target Date Funds in

4

taxable accounts. ¶61.[2] For these investors, any capital gains distributions are subject to substantial federal and state taxes, even if they reinvest the distributions into the same fund. ¶62.

Target date funds, including Vanguard's, typically do not sell many assets, so capital gains and taxes for investors in those funds are typically minimal. ¶66. The general investment strategy for these funds is to buy and hold long-term, tax-efficient assets like index funds. *Id.* This is an attractive feature for taxable investors, as it means less taxes to pay at the end of the year. *Id.* Normal levels of redemptions typically do not require the funds to sell substantial assets. ¶67. Funds typically make small capital gains distributions from events like stock dividends or the gradual re-balancing of the portfolio, but these distributions typically amount to a mere fraction of a percent of the value of the fund. *Id.* Accordingly, Target Date Fund investors expect capital gains distributions and tax liabilities to be insignificant. *Id.*

### B.   Defendants Spark a Massive Sell-Off, Triggering Unprecedented Capital Gains Distributions and Major Tax Liabilities for Taxable Investors

Vanguard aims to maximize its assets under management and is engaged in an ongoing "price war" with its competitors to attract and keep clients. ¶68. Vanguard and its competitors typically charge flat fees based on the assets managed within the client's account, including for the Target Date Funds. ¶69. Most of the management fees generated by Vanguard's Target Date Funds come from institutional retirement plans. ¶¶70, 74.

Before December 2020, only large retirement plans with at least $100 million in assets invested could access the Institutional Funds. ¶71. Investors falling below this threshold were limited to the Retail Funds. *Id.* In December 2020, the expense ratio for the Institutional Funds

---

[2] Investors who held Target Date Funds in taxable accounts and investors who held the funds in tax-advantaged accounts but opted not to reinvest capital gains within those accounts are referred to collectively as "taxable investors." ¶8.

was over 30% lower than the Retail Funds. *Id.* As the Institutional and Retail Funds were otherwise identical, there was no reason that a retirement plan that qualified for the Institutional Funds would remain invested in the Retail Funds if given the opportunity to switch. ¶¶72-74.

In December 2020, to keep pace with competitors, Defendants decided to lower its fees for mid-size retirement plan clients. ¶75. The way they chose to do that was by lowering the minimum investment threshold for the Institutional Funds from $100 million to $5 million (the "December 2020 decision"). ¶¶75-76. This decision set off "an elephant stampede" in the following months as mid-size retirement plans with between $5-100 million invested ditched the Retail Funds in favor of the Institutional Funds for which they now qualified. ¶¶78-79. Lowering the threshold opened the Institutional Funds to an additional 8,500 retirement plans with approximately 3.2 million participants, for whom the switch was "a no-brainer." ¶79. However, the Institutional and Retail Funds were separate funds, not share classes within the same fund. ¶80. This meant that retirement plans making the switch had to redeem their Retail Fund shares and buy new Institutional Fund shares. The Retail Funds had to sell assets to satisfy the massive wave of redemptions from the fleeing retirement plans. ¶82.

The Target Date Funds see a modest level of redemptions in any given year, which are typically offset by share issuances to incoming investors. ¶82. The Retail Funds' sell-off in 2021 far exceeded the asset sales seen in prior years. ¶81. Assets held in Vanguard's Retail Funds shrank by billions of dollars due to the unprecedented sell-off of over 15% of the funds' assets. *Id.* Unsurprisingly, the Retail Funds realized significant capital gains as they sold off assets, which they distributed to investors at the end of 2021. ¶84. As a result, Retail Fund investors received unprecedented capital gains distributions in 2021, which for some funds exceeded 4,000% of

previous levels. ¶¶84-87. These outsized distributions were the direct and foreseeable result of Defendants' decision to lower the threshold for Institutional Funds. ¶88.

### C.   Defendants Disregarded Viable Alternative Means to the Same Ends that Would Not Have Damaged Taxable Investors

Lowering the minimum investment threshold for the Institutional Funds was not the only way Defendants could have reduced fees for their institutional clients. In fact, Defendants disregarded multiple viable alternatives that would have accomplished this same goal *without* causing foreseeable harm to taxable investors.

First, Defendants could have lowered the fees within the Retail Fund (*i.e.* fee tiering) for plans that had at least $5 million invested, either by restructuring share classes or reclassifying shares within the Retail Funds. ¶89. Fee tiering is routinely done by mutual funds, including other Vanguard funds. *Id.* Second, Defendants could have merged the Retail and Institutional Funds. Merging similar funds is common in the mutual fund industry and there were no significant barriers or complications to doing so here. *Id.* After merging the funds, Defendants could then tier the fees within the merged fund *without* sparking a massive sell-off and harming taxable investors. *Id.*

The availability of these alternative means to reduce fees for mid-size retirement plans was demonstrated by one of Vanguard's direct competitors. Fidelity offers Freedom Index Funds which are comparable to Vanguard's Target Date Funds. ¶99. In January 2021, the month immediately following Defendants' December 2020 decision, Fidelity also lowered the investment minimum for its "Institutional" target date shares from $100 million to $5 million. ¶100. The difference was that Fidelity's institutional shares were a separate share class within the same fund, not a separate fund. *Id.* Accordingly, Fidelity's actions did not spark a massive sell-off and unprecedented capital gains tax liabilities for Fidelity's taxable investors. *Id.*

In September 2021, just nine months after the December 2020 decision, Vanguard announced it would merge the Retail and Institutional Funds after all. ¶102. The merger was straightforward and was completed in February 2022. ¶103. Unfortunately, it came too late for taxable investors who had already incurred significant tax liabilities.

In January 2022, Massachusetts securities regulators launched an investigation into these same set of events. ¶18. On July 6, 2022, a subsidiary of Vanguard reached a $6.25 million settlement with Massachusetts, through which eligible Massachusetts investors can seek a partial recovery of up to 65% of the tax liability they incurred as a result of Defendants' actions. ¶19.

## III.   ARGUMENT

When considering Defendants' motions to dismiss under Rule 12(b)(6), the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 215 (3d Cir. 2007).[3] The pleadings must contain sufficient factual allegations so as to state a facially plausible claim for relief. *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### A.     Plaintiffs Have Standing Because Their Injuries are Not Speculative

Plaintiffs have standing under Article III of the Constitution because they allege Defendants caused them to suffer concrete, non-speculative, redressable injuries. For a plaintiff to establish Article III standing, they must allege an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."

---

[3] Internal citations and quotations are omitted and emphasis is added unless otherwise noted.

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). At the pleading stage, the Court applies the same standard when evaluating a challenge to standing as it does when considering a motion to dismiss for failure to state a claim under Rule 12(b)(6). That is, the Court "must 'accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [Plaintiffs].'" *Kedra v. Schroeter*, 876 F.3d 424, 434 (3d Cir. 2017) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008)).

To establish standing at the pleading stage, a plaintiff need only set forth "sufficient factual allegations that, if proven true, would permit a factfinder to determine that she suffered at least *some* economic injury." *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 287 (3d Cir. 2018) (emphasis in original). "The injury-in-fact requirement is 'very generous' to claimants, demanding only that the claimant 'allege[] some specific, "identifiable trifle" of injury.'" *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) (quoting *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982)).

### 1.    Plaintiffs Have Standing to Seek Monetary Damages

Plaintiffs seek recovery of out-of-pocket monetary damages caused by Defendants' misconduct, as alleged in the Complaint. Plaintiffs suffered damages in the form of, among other things, the 2021 tax liabilities they incurred and paid as a direct result of Defendants' December 2020 decision. ¶¶91, 145-159. Those tax liabilities and payments are not speculative, the damage is done. Defendants' argument that Plaintiffs' injuries are too speculative ignores this reality. Defendants argue that because the *amount* of damages they caused may be offset in part, if at all, some years or decades into the future, that means Plaintiffs cannot recover a single dollar. That is not the law, nor should it be. The Court can evaluate this premature offset defense and arguments concerning the amount of damages at summary judgment, after the submission of expert reports.

It need not resolve those issues at the pleading stage, because Plaintiffs have alleged facts showing they have suffered concrete damages. No more is required to establish standing.

### a.   Plaintiffs Allege Concrete Out-of-Pocket Damages

As an initial matter, Defendants fundamentally misrepresent how mutual fund capital gains distributions work. Defendants incorrectly portray capital gain distributions as positive value "received" by investors (net of taxes). *See* Vanguard Br. at 9. This more aptly describes a *dividend* distribution. In a capital gains distribution, the total value of investors' holdings is unchanged. The only effect is that some unrealized gains are converted to realized gains, incurring tax liability.

Defendants' crucial omission is that when mutual funds, such as the Target Date Funds, sell assets, realize capital gains, and distribute those gains to shareholders, the funds' net asset value ("NAV") is reduced by an amount equal to the distribution.[4] For example, if an investor holds 10 shares of a fund worth $10 per share, their holdings are worth $100. If the fund makes a capital gains distribution of $1 per share, the investor receives $10, pays taxes on that $10 distribution, ***and*** the fund's NAV (upon which its share price is based) is reduced by $1 per share, or $10. The investor's total holdings are still worth $100, not $110. The investor does not "receive" the $10 capital gains distribution except insofar as they also "receive" a $10 loss from the concomitant NAV reduction. Thus, the only out-of-pocket impact is the tax the investor must pay on the $10 distribution. The only thing the investor "receives" in return for paying the tax liability is a $10 increase in cost basis for their unchanged holdings.[5]

---

[4] *See* Wallace, Karen, "What You Need to Know About Capital Gains Distributions," Morningstar.com, *available at* https://www.morningstar.com/articles/720873/what-you-need-to-know-about-capital-gains-distributions

[5] Mutual fund investors typically elect to automatically reinvest distributions back into the fund. For investors such as Plaintiff Richardson who did not reinvest distributions, the net result is essentially the same. In the example above, instead of retaining $100 in shares post-distribution with $10 of increased cost basis, these investors would have $10 in cash and $90 in shares.

The most reasonable inference (and certainly a plausible one) to draw from the facts of the Complaint is that Plaintiffs' actual out-of-pocket losses from paying taxes on the 2021 capital gains distributions exceed any countervailing unrealized benefits from the adjusted cost basis. Thus, there is no speculation or uncertainty as to whether Plaintiffs suffered damages.

Plaintiffs invested in "set-it-and-forget-it" retirement date funds. ¶56. As Vanguard itself acknowledges, the Target Date Funds are "designed for an investor who plans to withdraw the value of an account in the Fund over a period of many years after the target year." ¶90. Upon retirement, when investors would finally be drawing from their investments instead of their wages, Plaintiffs would most likely have lower taxable incomes, subjecting them to lower capital gains and income tax rates. ¶93. This is a common, reasonable, and advisable investing strategy.

In fact, Plaintiffs may not end up paying *any* capital gains taxes at all. For example, in 2023 individuals with incomes up to $89,250 (for married couples filing jointly) pay 0% capital gains taxes.[6] Alternatively, Plaintiffs might not sell their holdings at all and instead pass on their shares through their estate. In that case the cost basis of those shares is "stepped up" to its value at the date of the inheritance, such that the recipients could then sell the shares without incurring *any* capital gains taxes, and without Plaintiffs or their estate realizing any benefit from the adjusted cost basis that resulted from the Target Date Funds' 2021 capital gains distributions.[7]

At minimum, Plaintiffs are financially worse off paying taxes now even if they ultimately pay the same tax rate at whatever point—years or decades into the future—they sell their holdings,

---

[6] *See* Dore, Kate, "Here's how much you can earn and still pay 0% capital gains taxes in 2023," CNBC.com, *available at* https://www.cnbc.com/2022/10/20/irs-how-much-income-you-can-have-for-0percent-capital-gains-taxes-in-2023.html

[7] *See* "What is the difference between carryover basis and a step-up in basis?", Tax Policy Center - Urban Institute & Brookings Institution, *available at* https://www.taxpolicycenter.org/briefing-book/what-difference-between-carryover-basis-and-step-basis

due to the time value of money. *E.g.*, ¶92. The time value of money is neither speculative nor insignificant, especially with current record-high interest rates and Plaintiffs' long-term investment horizons, and represents recoverable damages. In *Dukich v. IKEA US Retail LLC*, No. CV 20-2182, 2021 WL 1534520, at *4 (E.D. Pa. Apr. 19, 2021), the plaintiffs had purchased defective dressers and alleged they had not been informed of a recall/refund opportunity from several years earlier. The Court found that damages were not too speculative, rejecting the defendants' argument that the plaintiffs could still return their dressers for a refund now because "any refund they obtained at that time [years before] would have been worth more than a refund issued today due to the 'time value of money.'" *Id.* (quoting *In re Szostek*, 886 F.2d 1405, 1406 n.1 (3d Cir. 1989)).[8]

The Court should reject Defendants' argument, Vanguard Br. at 9, that damages are speculative because it is theoretically possible that Plaintiffs could end up better off having paid taxes on the 2021 capital gains distributions. First, Defendants' argument turns the pleading standard on its head. It requires drawing inferences in Defendant's favor, rather than viewing the facts in the light most favorable to Plaintiffs. Second, Defendants' hypothetical scenarios are highly implausible and misleadingly incomplete. They should not bear any weight at the pleading stage. The first hypothetical, that the fund's value might decrease, misleadingly omits the impact of the reduction in the fund's NAV at the time of the distribution and directly contradicts what Vanguard tells investors on its own website about the risks of investing for long-term investors like Plaintiffs: that "your chance of losing money… if you invested for 10 years…would drop to about 1 in 25—and after 20 years, to zero."[9] Defendants' second hypothetical, that Plaintiffs could

---

[8] *See also Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1102 (3d Cir. 1995) ("the purpose of a pre-judgment interest is to … compensate for loss of the time value of money.").

[9] "How risk, reward & time are related," *available at* https://investor.vanguard.com/investor-resources-education/how-to-invest/risk-reward-compounding

pay a *higher* tax rate on further gains, assumes: (1) that Congress raises the capital gains tax rate—a prediction which neither evidence nor any allegation in the Complaint supports[10]; and (2) that the future increase in tax rates is large enough, and the additional gains small enough, such that the "net return" (which, again, Defendants misleadingly portray by omitting the effect of the NAV reduction) is lower.[11] Both hypotheticals also completely ignore the time value of money.

Finally, Plaintiffs also allege other forms of monetary damages, which Defendants do not contend are speculative. First, Plaintiffs incurred prepayment penalties imposed by the IRS. ¶¶150, 156, 160. Plaintiffs did not know they would incur unprecedented tax liabilities in 2021, as the capital gains were not distributed until the end of the year. ¶84. Accordingly, they did not reasonably expect to have to prepay estimated taxes and could not have avoided these penalties, which they incurred due to Defendants' actions. These penalties are in no way speculative. Second, Plaintiffs suffered consequential damages when they had to sell assets to pay the unexpected taxes they incurred from Defendants' actions, causing them to incur even more capital gains tax liability. ¶¶95, 150, 155. Third, Plaintiffs paid Vanguard unjust management fees. ¶¶96, 145-159.

> **b.    Defendants' Arguments Concern Only the Amount of Damages**

To the extent the potential future benefits from an increased cost basis might ultimately offset some of the out-of-pocket damages Plaintiffs incurred, if they do so at all, that would speak only to the amount of damages, not the existence of actionable harm. Damages are improperly

---

[10] In *Oddi v. Ayco Corp.*, 947 F.2d 257, 268 (7th Cir. 1991), the Seventh Circuit held that the plaintiff met his burden of proving damages "by showing that he will be damaged if tax rates remain the same. In other words, we give plaintiffs in cases like this the benefit of a presumption that the status quo will continue." The court reasoned that "on occasions when predictions of the future rate are truly speculative, to deny plaintiffs the benefit of a presumption would absolve financial advisors of any liability for their erroneous advise."

[11] For example, Defendants' hypothetical falls apart on its own inherently flawed terms if the $100 in gains appreciates to $115 (or more) instead of $110 before being taxed at 30%, as the investor would then still be better off than they would if they had paid 20% of their $100 "gain."

speculative "only if the uncertainty concerns the *fact* of damages, rather than the *amount*." *Rizzo v. Haines*, 520 Pa. 484, 505 (1989) ("The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages").

Under Pennsylvania law, "damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences.… Where the amount of damages can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with entire accuracy." *Bailets v. Pennsylvania Tpk. Comm'n*, 645 Pa. 520, 540 (2018) (collecting cases). *See also Gould v. Am.-Hawaiian S. S. Co.*, 535 F.2d 761, 782 (3d Cir. 1976). *Gould* found that in the investment context, the *existence* of lost opportunity damages was not wholly speculative, and even though the court highlighted the difficulty of determining the *amount* of damages, it nonetheless held that where the fact of the loss is almost certain, "the risk of uncertainty as to amount of damages is cast on the wrongdoer and it is the duty of the fact finder to determine the amount of the damages as best he can from all the evidence in the case." *Id.* (citing *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–265 (1946)). Here, the fact of Plaintiffs' loss is certain. Defendants should bear the risk of uncertainty as to their potential partial offset defense regarding the amount of damages.

At the appropriate stage of this case, an expert will be able to craft a reliable model to help the factfinder assess the amount of damages based on Plaintiffs' theory of damages. As courts routinely recognize, "however difficult it might be to prove damages at trial, ultimately this is a question of fact subject to proof, and is inappropriate to support [a] motion to dismiss." *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005), *rev'd on other grounds sub nom. Enigma Info. Retrieval Sys., Inc. v. Radian, Inc.*, No.

CIV.A.04C06069FSS, 2005 WL 445568, at *3 (Del. Super. Ct. Feb. 23, 2005). *See also Enigma Info. Retrieval Sys., Inc. v. Radian, Inc.*, No. CIV.A.04C06069FSS, 2005 WL 445568, at *3 (Del. Super. Feb. 23, 2005) (rejecting argument that damages were too speculative at the pleading stage, noting that the court "must assume that [the plaintiff] will present experts to testify" about damages, and that the defendant could "raise its claims again through a summary judgment motion); *Guanci v. Kessler*, No. 2:14-CV-01299-APG, 2015 WL 4423587, at *3 (D. Nev. July 17, 2015) (finding "[t]he current and future value of these shares [underpinning the alleged damages] are subjects for summary judgment or trial. [The plaintiff] is not required to prove the precise value of his shares in his complaint.").

Plaintiffs have adequately alleged that they suffered concrete out-of-pocket damages, which is sufficient to establish their Article III standing. The Court should deny Defendants' motions and allow Plaintiffs to prove the amount of damages at the proper stage of this litigation.

### c.  Ample Case Law Supports Plaintiffs' Damages Theory

This Court would hardly be the first to permit plaintiffs to proceed on a damages theory based on tax liabilities. Several courts, including within this Commonwealth and Circuit, have recognized that plaintiffs may recover tax liabilities caused by defendants' misconduct. *See, e.g., Covalesky v. Covalesky*, No. 340 MDA 2014, 2015 WL 7012540, at *5 (Pa. Super. Ct. June 10, 2015) ("we find no error with the trial court's decision to order Appellants to pay the damages Sylvester incurred from the conversion, *i.e.*, the $89,691 tax liability"); *Hall v. Hall*, 753 F. App'x 96, 101 (3d Cir. 2018) (finding it is "appropriate for a plaintiff to receive … compensation for the tax consequences of [the defendant's] alleged breach of fiduciary duty. Accordingly, we will vacate the District Court's dismissal of the tax liability claims.") (citing *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 442 (3d Cir. 2009)); *Pruett v. Erickson Air-Crane Co.*, 183 F.R.D. 248, 253 (D. Or. 1998)

("Plaintiffs may recover damages arising from tax liabilities if they are … substantially caused by defendants' negligence"); *The Harry & Jeanette Weinberg Found. Inc. v. ANB Inv. Mgmt. & Tr. Co.*, No. 97 C 4362, 1997 WL 652342, at *7 (N.D. Ill. Oct. 10, 1997) (finding the plaintiff had adequately alleged "that it has suffered damage in this case, and the estimate it pleads is plausibly based on the tax liability it incurred as a result of the alleged unauthorized transaction.").

*ANB* closely aligns with the facts alleged here. In *ANB*, a charitable foundation sued the corporate trustee that managed mutual fund investments held in a trust on the foundation's behalf. *Id.* at *1. When the trustee moved the fund holdings into a new fund (without the foundation's authorization), the move required the trust to sell the existing funds and purchase shares of the new fund. *Id.* at *2. This caused the trust to incur capital gains of over $38 million and a tax liability of 1% of that amount (the applicable capital gains tax rate for tax-exempt organizations). *Id.*

ANB made the exact same argument that Defendant make here, "that the damages alleged by the Foundation—its tax liability of $387,812—are speculative and cannot provide the basis for recovery." *Id.* at *7. ANB argued that "the Foundation would have had to pay tax on these capital gains anyway at some point uncertain in the future, and that it is impossible to currently calculate the ultimate effect that ANB's actions had in triggering this tax liability []. Since the precise damage to the Foundation cannot be determined until [] all of its capital gains are realized, ANB asserts that the instant suit for damages arising from this transaction must be dismissed." *Id.* The court rejected this argument as "wholly without merit." *Id.* As the *ANB* court explained:

> If the Foundation prevails with respect to liability in this case, the Court is convinced that the Foundation will be entitled to some monetary relief. The fact that the exact amount of damages is debatable does not render this element of the Foundation's claim wanting at this juncture. The Court is unprepared to require the Foundation to wait until the extent of its damage has become crystal clear before it will be allowed to file suit on this matter. Thus, ANB's motion to dismiss on this basis is denied.

16

*Id.* The same reasoning the court applied in *ANB* applies with equal force here.

None of the cases Defendants cite involve facts or out-of-pocket damages akin to those alleged here. In *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), the plaintiffs alleged a "likelihood that their communications with their foreign contacts will be intercepted under [a challenged statute] at some point in the future." In *Finkelman v. Nat'l Football League*, 810 F.3d 187 (3d Cir. 2016), the plaintiffs alleged that the NFL's ticketing policy resulted in higher-priced Super Bowl tickets. One plaintiff had not even attempted to purchase Super Bowl tickets, "meaning that he suffered no out-of-pocket loss." *Id.* at 195. The second plaintiff purchased tickets that were resold on the secondary market, but the Third Circuit found that "we have no way of knowing whether the NFL's withholding of tickets would have had the effect of increasing or decreasing prices on the secondary market." *Id.* at 200. In *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 886 (3d Cir. 2020), the plaintiff asserted a different damages theory, alleging that "she did not receive the benefit of her bargain when she bought tires from Pep Boys that then went unregistered" and were therefore "defective." The Third Circuit found that "[w]e simply have no way of knowing" how complying with registration obligations would have changed Pep Boys's prices. *Id.* at 887. In *Johnson & Johnson*, the plaintiff purchased "unsafe" baby powder but "her own allegations require us to conclude that the powder she received was, in fact, *safe as to her*," and while she alleged general economic injury from her purchase under a benefit of the bargain theory, she "fail[ed] to allege that the purchase provided her with an economic benefit worth less than the economic benefit for which she bargained." 903 F.3d at 289-90.

*Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 290 (3d Cir. 1995) involved a post-trial appeal, assessing expert submissions at a much later stage in the case than a motion to dismiss. In *Kemmerer*, the Third Circuit actually recognized that "there would be force to [the plaintiffs']

argument" that they "suffered tax-related losses because they were forced immediately to pay taxes on the accelerated payments to them and thereby forgo the benefits of tax deferral," reasoning that "ordinarily from a taxpayer's viewpoint it is advantageous to defer the payment of taxes." *Id.* at 290. This accords with Plaintiffs' allegation here of the damages due to the time value of money from paying taxes now instead of many years later. Unlike here, however, the court was able to affirmatively conclude that the *Kemmerer* plaintiffs "were taxed at a much lower rate than would have been the case had payments been made several years later." *Id.* at 291.

In *Moran v. Davita, Inc.*, No. CIV.A. 06-5620 JAP, 2013 WL 3810703, at *1 (D.N.J. July 22, 2013), the plaintiff sought an additional award of $3,344 in "lost profits" due to the increased federal tax liability she might face as a result of a settlement payment being made in the current year, rather than the year prior. That is the exact opposite of what Plaintiffs allege here, where they have already incurred out-of-pocket tax liabilities and only the precise amount, not the existence, of damages is uncertain. Moreover, *Moran* concerned a motion to enforce a settlement agreement where the plaintiff had to prove—not merely plead—damages. Here, Plaintiffs also allege damages from the lost time value of money, which exist without assuming any future change in tax rates. In *Institut Pasteur v. Simon*, 383 F. Supp. 2d 809, 811–12 (E.D. Pa. 2005), a ruling at the summary judgment stage, the defendant counterclaimed that "the parties' protracted dispute over his inventorship and ownership status has diminished the value of the molecular combing technology [which had utterly failed to become commercialized] and, as a result, caused him damage." The court found that his theory of damages "assumes that, in the absence of the dispute, the commercialization of molecular combing would have been both successful and highly lucrative." *Id.* None of these cases even vaguely resemble the facts alleged here.

*Solin v. Domino*, No. 08 Civ. 2837(SCR), 2009 WL 536052 (S.D.N.Y. Feb. 25, 2009), *aff'd*, 501 F. App'x 19 (2d Cir. 2012) (applying New York law) is also distinguishable. Solin sought tax liability damages based on gains he realized from his own surrender of an annuity following erroneous tax advice. *Id.* at *1. Here, in contrast, it was Defendants' actions alone that caused the capital gains to be realized, not Plaintiffs'. Moreover, unlike here, Solin actually received the proceeds from the surrender, *id.*, whereas the only thing Plaintiffs received was an adjusted cost basis. Thus, the argument that recovering the tax liability would give Solin a "windfall" of "a tax-free annuity gain," *id.* at *3, does not apply here. The court also reasoned that Solin's gains fell squarely within New York's rule against the recovery of taxes owed. *Id.* at *3. New York law does not apply here. Whereas Solin relied on speculation that "he might have fared better under future tax laws," *id.*, here, Plaintiffs do not presume or rely on any changes to future tax laws. *See Oddi*, 947 F.2d at 268.

### 2.    Plaintiffs Have Standing to Seek Injunctive and Other Relief

To have standing to seek injunctive relief, a plaintiff must show that (1) they are "under threat of suffering 'injury in fact' that is concrete and particularized"; (2) the threat is "actual and imminent, not conjectural or hypothetical"; (3) the threat is "fairly traceable to the challenged action of the defendant"; and (4) it is "likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). A plaintiff seeking prospective relief must demonstrate that they are "'likely to suffer future injury' from the defendant's conduct." *Johnson & Johnson*, 903 F.3d at 292 (quoting *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012)). "In the class action context, that requirement must be satisfied by at least one named plaintiff." *McNair*, 672 F.3d at 223. Here, Plaintiffs have alleged facts showing that not only did they suffer concrete monetary damages, but that they are also likely to suffer future similar injury from Defendants' conduct absent injunctive relief.

The Complaint alleges that taxable investors holding Target Date Funds, including Plaintiffs, are effectively stuck with those funds for the long term. ¶97. Plaintiffs and other Target Date Fund investors intend to hold their shares until at least the target retirement date, which is often decades away. *Id.*; *see also* ¶90 (Vanguard: the funds are "designed for an investor who plans to withdraw the value of an account in the Fund over a period of many years after the target year."). As the value of these funds increases over time, investors cannot sell their shares without realizing substantial capital gains on the appreciated assets and incurring substantial taxes, which would depress the investors' returns and require significant out-of-pocket payments. ¶¶97, 162. This means that Plaintiffs are at the mercy of Defendants' management of the funds.

Defendants are correct that they cannot harm Plaintiffs again in *precisely* the same way because they belatedly realized their error and merged the Retail and Institutional Funds, Vanguard Br. at 13, but that does not foreclose them from taking other actions that disregard and harm the interests of taxable investors. For instance, Defendants might create new funds with lower fees that they make available to certain institutional Target Date Fund investors, sparking another mass exodus, sell-off, and capital gains distributions that harm taxable investors. Indeed, Plaintiffs allege that this risk is concrete and imminent due to Vanguard's "ongoing price war" with its competitors, ¶68, Defendants' strong incentives to appeal to institutional retirement plans, ¶70, and Defendants' apparent disregard for their taxable investors. ¶¶109-11, 163 (Vanguard Relationship Managers admitted that Defendants "considered" and disregarded the impact of their actions on taxable investors, and that "it wouldn't be surprising if" similar outsized fund outflows causing massive capital gains distributions "were to repeat itself").

*Diaz v. FCA US LLC*, No. 21-CV-00906-EJW, 2022 WL 4016744, at *14 (D. Del. Sept. 2, 2022) is instructive as to why Plaintiffs are likely to future injury absent injunctive relief. In *Diaz*,

the plaintiffs maintained ownership of the defective vehicles at issue, which the defendants had not adequately repaired, and the court found that "the likelihood of future injury from the allegedly unlawful conduct…is apparent, since Plaintiffs did not buy products for one-time use, but rather, for ongoing use." *Id.* at *14. Thus the court reasoned that "[u]nlike the plaintiffs in *Johnson & Johnson* and *McNair*, who 'were already aware of the allegedly deceptive business practices from which they sought future protection,' and were thus unlikely to contract with or purchase from the defendants again, Plaintiffs here are not insulated against future harms flowing from FCA's conduct, which has allegedly damaged them already." *Id.* (citing *Johnson & Johnson*, 903 F.3d at 293 (discussing *McNair*, 672 F.3d at 225)).

Here, Plaintiffs invested in the Target Date Funds with the intent and financial incentive to hold the funds long-term. They are not insulated from future harms flowing from Defendants' conduct due to Plaintiffs' continued ownership of the funds. Defendants have demonstrated their disregard for the impact of their decisions on taxable investors, including those that cause massive capital gains distributions, which Vanguard's representatives admit is likely "to repeat itself." ¶163. Unlike *Johnson & Johnson*, this is not a "'stop me before I buy again' claim." 903 F.3d at 292-93. Plaintiffs have adequately alleged they are likely to suffer future injury from Defendants' actions.

Finally, the Complaint alleges facts sufficient to support Plaintiffs' standing to seek restitution and disgorgement. Plaintiffs allege that they each paid Vanguard "unjust management fees" of a percentage of their investment ¶¶96, 145-59, which are concrete payments, not merely "conclusory assertions." *Johnson & Johnson*, 903 F.3d at 291. Vanguard unjustly received these fees despite Defendants' callous disregard for Plaintiffs' interests in needlessly causing Plaintiffs to incur unprecedented tax liabilities. No reasonable investor would have agreed to pay these fees

to Vanguard (instead of one of Vanguard's competitors offering nearly identical products, *see* ¶74) if they had known how Defendants would treat them.

### B.   The Complaint Adequately Alleges Claims for Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty under Pennsylvania law, a plaintiff must allege that a fiduciary relationship existed between the parties, as well as "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring[ing] about plaintiff's injuries." *Airgas, Inc. v. Cravath, Swaine & Moore LLP*, No. CIV.A. 10-612, 2010 WL 3046586, at *4 (E.D. Pa. Aug. 3, 2010) (Robreno, J.). This Court has previously noted that "the basic elements required under Pennsylvania… and Delaware [law] are identical." *Id.* at *3. To state a claim for breach of fiduciary duty under Delaware law, "a plaintiff must allege: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Id.* at *3 n.4 (citing *ZRii, LLC v. Wellness Acquisition Grp., Inc.*, No. CIV. A. 4374-VCP, 2009 WL 2998169 (Del. Ch. Sept. 21, 2009)). The Court should deny Defendants' motions to dismiss because the Complaint adequately alleges that Defendants breached fiduciary duties they owed to Plaintiffs.

### 1.   Defendants Each Owed Fiduciary Duties to Plaintiffs

Defendants do not dispute that the Officer Defendants and Trustee Defendants each owed fiduciary duties to Plaintiffs. Vanguard asserts that it owed Plaintiffs no fiduciary duty, but it has publicly admitted that it owes fiduciary duties to its investors, including Plaintiffs. Where a fund administrator "describe[s] itself as a 'fiduciary' consistently and repeatedly in publicly distributed materials," that fact "is relevant to the question of whether [it] owed a fiduciary duty to plaintiffs." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 236, 245 (S.D.N.Y. 2010). Here, as the Complaint alleges, Vanguard describes itself as "a fiduciary

for more than 30 million investors," ¶113, and publicly acknowledges on its corporate website its "fiduciary duty to manage investments in the best interest of clients." ¶114. Vanguard should not be permitted to deny its status as a fiduciary for investors when it publicly holds itself out as such.

The Complaint alleges facts demonstrating the existence of a fiduciary relationship between Vanguard and its Target Date Fund investors, including Plaintiffs. Under Pennsylvania law, a fiduciary relationship arises "whenever one occupies toward another such position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's [best] interest." *Conquest v. WMC Mortg. Corp.*, 247 F. Supp. 3d 618, 634 (E.D. Pa. 2017). The question of whether such a relationship exists is "fact specific and cannot be reduced to a particular set of facts or circumstances." *Chalepis v. Karloutsos*, 579 F. Supp. 3d 685, 704–05 (E.D. Pa. 2022) (Robreno, J.) (quoting *Yenchi v. Ameriprise Fin., Inc.*, 639 Pa. 618, 633 (2017)).

Contrary to Defendants' assertion, Vanguard Br. at 15, Vanguard's role with respect to Target Date Fund investors is not limited to serving merely as an "investment advisor" to the Trust.[12] Accordingly, Vanguard owes fiduciary duties not only to the Trust, but also to Target Date Fund investors, including Plaintiffs. In addition to serving as the investment advisor to the Target Date Funds, Vanguard also "manages the day-to-day operations of the funds." ¶127 (quoting Vanguard). More specifically, Vanguard has authority to control investment minimums in its funds,

---

[12] None of the cases Defendants cite, Vanguard Br. at 15, involved allegations that the investment advisor expressly held itself out as a fiduciary. *Goldstein v. S.E.C.*, 451 F.3d 873 (D.C. Cir. 2006) involved a petition for review of the SEC's regulation of hedge funds under the Investment Advisers Act of 1940. In *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 505 (3d Cir. 2013), the court found that to the extent the defendant served in a more direct and expansive role with respect to one plaintiff (Belmont), as Plaintiffs allege here, that was at least arguably sufficient to establish a fiduciary relationship. In *S.E.C. v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 286, 293 (E.D. Pa. 2021), there was no dispute as to the existence of a fiduciary relationship. In *Saunwin Int'l Equities Fund LLC v. Donville Kent Asset Mgmt. Inc.*, No. CV 17-11585-FDS, 2018 WL 3543533, at *11–12 (D. Mass. July 20, 2018), the plaintiffs did not allege that the defendants made express representations of being a fiduciary or that they were directly involved with the conduct at issue.

¶129 (quoting Vanguard), precisely the action at issue here. Accordingly, by its own admissions, Vanguard was not acting merely as an investment advisor to the Trust, but expressly held itself out, and acted, as a fiduciary to Target Date Fund investors, including Plaintiffs.

Viewing these allegations in the light most favorable to Plaintiffs, Plaintiffs have plausibly alleged a fiduciary relationship between Vanguard and Plaintiffs such that, at minimum, "further factual development is needed regarding Vanguard's role…and Plaintiffs have alleged enough to survive a motion dismiss." *Pa. Fed'n, Bhd. of Maint. of Way Emps. v. Norfolk S. Corp.*, No. Civ.A. 02–9049, 2004 WL 2315795, at *3 (E.D. Pa. Oct. 12, 2004).[13]

### 2.    Defendants Breached Their Fiduciary Duties to Plaintiffs

The Complaint alleges that Defendants breached their fiduciary duties of care, loyalty, and good faith. ¶¶180-81. The fiduciary duty of care requires that defendants: (1) "use that amount of care which ordinarily careful and prudent men would use in similar circumstances;" and (2) make decisions by "considering all material information reasonably available." *In re: Old Bpsush, Inc.*, No. 16-12373 (BLS), 2021 WL 4453595, at *8 (D. Del. Sept. 29, 2021). "A claim for breach of the duty of care requires a showing of gross negligence which generally requires directors and officers to fail to inform themselves fully and in a deliberate manner." *In re Opus East, LLC*, 528 B.R. 30, 66 (Bankr. D. Del. 2015). To meet this standard at the pleading stage, plaintiffs are required to allege facts that plausibly show Defendants were "'recklessly uninformed' or acted 'outside of the bounds of reason.'" *Old BPSUSH*, 2021 WL 4453595 at *8; *see also In re Covenant Partners, L.P.*, No. 17-cv-0052, 2018 WL 4377000, at *30 (E.D. Pa. Sept. 13, 2018) (same).

---

[13] Plaintiffs do not allege that the Trust owed fiduciary duties to Plaintiffs, or that it aided and abetted the other Defendants' breaches of their fiduciary duties. *See* ¶¶180-81, 187-89.

Contrary to Defendants' arguments (Vanguard Br. at 20; Trustee Br. at 10), the duty of loyalty is "not limited to cases involving a financial or other cognizable fiduciary conflict of interest." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). "It also encompasses cases where the fiduciary fails to act in good faith." *Id.* A lack of good faith may be shown by alleging "the conscious disregard for one's responsibilities." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) (citing *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66–68 (Del. 2006)).

The Complaint adequately alleges that Defendants breached their fiduciary duties to Plaintiffs by being recklessly uninformed or consciously disregarding their responsibilities to act in Plaintiffs' best interests. Defendants wanted to compete for investments from mid-size retirement plans by offering lower fees, but the way they chose to do that needlessly harmed Plaintiffs because there were readily available alternatives to achieve the same goal *without* harming Plaintiffs. Defendants could have lowered the fees for mid-size retirement plans without harming Plaintiffs by restructuring share classes or reclassifying shares within the Retail Funds. ¶89. Fidelity demonstrated that option just one month later. ¶100. Defendants could also have merged the Retail and Institutional Funds and *then* tiered the fees within the merged fund, which likewise would have avoided the harm to Plaintiffs. ¶89. Indeed, that is precisely what Vanguard itself did just nine months after Defendants' December 2020 decision. ¶102. Defendants could easily have chosen either of these alternatives in December 2020. ¶¶101, 106, 131. Instead, they chose a course of action that they knew would harm Plaintiffs.

Plaintiffs allege that Defendants breached their fiduciary duties by either (A) recklessly failed to inform themselves of the impact that their decision would have on Plaintiffs and the alternatives that would have accomplished the same goal without harming Plaintiffs (¶¶134-35);

or (B) actually considered the impact on Plaintiffs and the available alternatives and consciously disregarded the consequences of their actions (¶¶109-11, 136). *See also* ¶182.

Defendants' argument that their actions did not violate their fiduciary duties because they "had no adverse impact on the vast majority of shareholders" (Vanguard Br. at 20; Trustee Br. at 10-11) misses the point entirely. As Defendants concede, they owed fiduciary duties to "the *whole* body of stockholders," not just the "majority" of them. Vanguard Br at 20 (quoting *Tomczak v. Morton Thiokol, Inc.*, No. CIV. A. 7861, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990). Investors who held the Target Date Funds in tax-advantaged accounts would have been in the same position *either way*, as would the mid-size retirement plans Defendants were courting, had Defendants adopted one of the alternative plans. Defendants do not assert, and the Complaint certainly does not allege, that there was any countervailing benefit accruing to any investors from Defendants' actions that would not have been realized through an alternative plan. The impact of Defendants' actions on tax-advantaged investors or mid-size retirement plans is not at issue here and does not constitute a "plausible, and legitimate, explanation" for defendants' conduct. *In re Alloy, Inc.*, No. CIV.A. 5626-VCP, 2011 WL 4863716, at *12 (Del. Ch. Oct. 13, 2011).

Contrary to Defendants' argument, Vanguard Br. at 21, Plaintiffs adequately allege the role that the Officer Defendants and Trustee Defendants played in the December 2020 decision. As an initial matter, Plaintiffs do not allege fraud and need not satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *In re PMTS Liquidating Corp.*, 526 B.R. 536, 545 (D. Del. 2014) (where a "breach of fiduciary duty claim [] is not based in fraud … the heightened pleading standard of Rule 9(b) does not apply, and [the claim] need not be pled with particularity"); *Freedom Med. Inc. v. Gillespie*, 634 F. Supp. 2d 490, 517 (E.D. Pa. 2007) (under Pennsylvania law, "[n]either misappropriation of trade secrets or breach of fiduciary duties require

a showing of fraud and so neither must be pled with particularity"). Defendants cite no authority for dismissing the Complaint on these grounds. Vanguard Br. at 21. In any event, the Complaint alleges each of the Officer and Trustee Defendants' respective roles with respect to Vanguard and the Trust. ¶¶36-40. The Trustee Defendants also serve on Vanguard's board of directors, and the Officer Defendants were each officers and/or principals of Vanguard, and thus they were responsible for Vanguard's actions as alleged in the Complaint as well. ¶¶36-40, 122. Plaintiffs also allege the roles and responsibilities of the Trustee Defendants, the Officer Defendants, and Vanguard, with respect to the Target Date Funds and the December 2020 decision. ¶¶120-130.

The Trustee Defendants mischaracterize their role as simply relying on the Target Date Funds' senior management (the Officer Defendants) and investment advisor (Vanguard, whose board of directors the Trustees also sit on) to provide all relevant information for their decision-making process. Trustee Br. at 8-9. The Trustee Defendants are responsible for the governance and management of the Target Date Funds, and their "primary responsibility is oversight of the management of each fund for the benefit of its shareholders." ¶¶120-22 (quoting the Trust's Statement of Additional Information). The Trustee Defendants reviewed recommendations, data, and analysis from the funds' management, but they were ultimately responsible for signing off on the December 2020 decision. ¶¶123-24. The Trustee Defendants knew that capital gains distributed to Target Date Fund investors would result in tax liabilities for the funds' taxable investors. ¶¶139-40. The Trustee Defendants even knew (or could easily have estimated) the likely outflow from mid-size retirement plans who were newly eligible for the Institutional Funds, and thus how severe the impact of their decision would be on taxable investors. ¶142. Given their own direct involvement and awareness of the relevant facts, the Trustee Defendants cannot simply pass the

buck to the other Defendants. Defendants' cases concerning directors' reliance on the reports of qualified experts, Trustee Br. at 9, have no bearing on the facts alleged here.

### C.     The Complaint Adequately Alleges Claims for Aiding and Abetting a Breach of Fiduciary Duty

Plaintiffs allege, in the alternative, that to the extent Vanguard, the Officer Defendants, or the Trustee Defendants did not themselves breach their fiduciary duties to Plaintiffs, they aided and abetted the other Defendants in breaching their fiduciary duties. ¶¶187-89. "Under Delaware law, aiding and abetting a breach of fiduciary duty has three elements: (1) a breach of fiduciary duty, (2) knowing participation in that breach by the defendant, and (3) damages." *LaSala v. Bordier et Cie*, 519 F.3d 121, 130 (3d Cir. 2008). Similarly, a claim of aiding and abetting breach of fiduciary duty under Pennsylvania law requires: "(1) a breach of fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and, (3) substantial assistance or encouragement by the aider and abettor in effecting that breach." *Baker v. Fam. Credit Counseling Corp.*, 440 F. Supp. 2d 392, 417–18 (E.D. Pa. 2006)). As demonstrated above, Plaintiffs have adequately alleged a breach of fiduciary duty by at least some of the Defendants. Plaintiffs have also adequately alleged Defendants' knowing participation or substantial assistance.

The Officer Defendants do not challenge that the Complaint adequately alleges claims against them for aiding and abetting a breach of fiduciary duty, except to the extent that Defendants argue there is no underlying breach. Vanguard Br. at 16.[14] Contrary to Vanguard's argument, Vanguard Br. at 16, the Complaint alleges facts indicating Vanguard's knowledge and substantial assistance of the underlying breach. Specifically, Vanguard's corporate knowledge is derived from

---

[14] The Officer Defendants may not argue on reply that this claim fails as to them based on any other element. *United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006) (Robreno, J.) ("The Court declines to address any issue raised for the first time in a reply brief.").

the knowledge of its officers and directors, meaning the Officer Defendants and Trustee Defendants. *See Pan Am. World Airways, Inc. v. Cont'l Bank*, 435 F. Supp. 642, 649 (E.D. Pa. 1977) ("a corporation can acquire knowledge only through its officers and agents, and … the knowledge of high-ranking corporate officials must be imputed to the corporation itself."); *see also Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) ("it is uncontroversial for parent corporations to be subjected to claims for aiding and abetting breaches of fiduciary duty committed by directors of their subsidiaries"); *Capano v. Capano*, No. CIV.A. 8721-VCN, 2014 WL 2964071, at *16 (Del. Ch. June 30, 2014) (same, quoting *Allied Capital*, and rejecting defendants' argument that "corporation generally cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents").

Contrary to the Trustee Defendants' argument, the aiding and abetting claim against the Trustees need not be dismissed simply "because the Trustees are themselves fiduciaries." Trustee Br. at 11. Rule 8 expressly permits Plaintiffs to allege claims in the alternative, as they have in the Complaint (¶¶187-89). Fed. R. Civ. P. 8(d)(2); *see also OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 715 n.1 (Del. Ch. 2014) (rejecting the defendants' argument "on the theory that they cannot simultaneously be fiduciaries and aiders and abetters of a fiduciary breach. On the merits, they are correct, but this is a motion to dismiss, and [] OTK can plead legal theories in the alternative.").

In *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 135 F. Supp. 3d 1059, 1079-80 (N.D. Cal. 2015), *rev'd on other grounds*, 904 F.3d 821 (9th Cir. 2018), the court denied dismissal of the plaintiffs' claims against the trustees and investment advisor of an investment trust for aiding and abetting each other's breach of fiduciary duty. The *Northstar* court found that the plaintiffs alleged "that the Trustees and the Advisor are to have a close working relationship," including "overlapping responsibilities of the Trustees and the Advisor," and that those allegations "strongly

suggest that, if a breach did in fact occur, one Defendant knew what the other Defendant was doing, and may have helped facilitate the breach at issue." *Id.* That is exactly what the Complaint alleges, where the Officer Defendants and Trustee Defendants served as officers and/or directors of Vanguard and the Target Date Funds, with significant overlap in responsibilities of managing the funds. *See* ¶¶36-40, 120-130. This leads to the reasonable inference that the Defendants each knew what the others were doing and knowingly participated in, or substantially assisted, the other Defendants' breach of fiduciary duty arising from the December 2020 decision.

**D.    The Complaint Adequately Alleges Claims for Gross Negligence**

**1.    Plaintiffs' Gross Negligence Claims Can Proceed Side-by-Side With Their Fiduciary Duty Claims**

Defendants are wrong that "there is no standalone cause of action for gross negligence," and "such claims [against corporate officers and directors] are treated as claims for breach of fiduciary duty." Trustee Br. at 12; Vanguard Br. at 21. Courts routinely allow plaintiffs to bring gross negligence and breach of fiduciary duty claims against a company's officers and directors based on the same misconduct. *See, e.g., In re Fruehauf Trailer Corp.*, 250 B.R. 168, 176, 186, 198 (D. Del. 2000); *Sanders v. Wang*, No. 16640, 1999 WL 1044880, at \*10 (Del. Ch. Nov. 8, 1999); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. CIV.A. 762-N, 2005 WL 2130607, at \*8 (Del. Ch. Aug. 26, 2005).

Defendants' sole support for their argument is a footnote from *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 114 n.6 (Del. Ch. 2009), which does not support Defendants' position. Vanguard Br. at 21; Trustee Br. at 12. *Citigroup* does not state that claims for breach of fiduciary duty and gross negligence cannot proceed side-by-side under Delaware law. In fact, the court recognized that very possibility. 964 A.2d at 114 n.6 ("common law standards [for fiduciary

duties] thus govern … claims such as those for 'reckless and gross mismanagement,' *even if those claims are asserted separate and apart from claims of breach of fiduciary duty*.").

Defendants also argue that Plaintiffs' gross negligence claim "should be dismissed for the same reasons the breach of fiduciary duty claim should be dismissed" because the "same alleged misconduct" underlies Plaintiffs' fiduciary duty and negligence claims. Trustee Br. at 12. As demonstrated above, Plaintiffs' fiduciary duty claim should not be dismissed, and thus neither should its gross negligence claim. *See Alex. Brown*, 2005 WL 2130607, at \*8 ("The court has already found that the plaintiffs' claim for breach of the duty of care survive[s] the motion to dismiss. Therefore, this [gross negligence] claim survives as well.").

### 2. The Complaint Alleges an Extreme Departure From the Ordinary Standard of Care

Defendants are wrong that Plaintiffs "allege no facts showing an extreme departure from the ordinary standard of care." Vanguard Br. at 16.[15] The Complaint contains detailed factual allegations describing the ordinary standard of care that Defendants owe Plaintiffs and the irresponsible decision-making process that foreseeably resulted in substantial harm to Plaintiffs, representing an extreme departure from the standard of care.

The Complaint first details the ordinary standard of care that Defendants owe Plaintiffs: "to manage investments in the best interest of clients." ¶114. Vanguard itself repeatedly confirmed this duty, stating publicly that "[w]e believe responsible investment is consistent with our fiduciary duty to manage investments in the best interest of clients." *Id*. Vanguard admitted that its "core purpose" is to "take a stand for *all* investors, to treat them fairly, and to give them the best chance

---

[15] Defendants' argument that "Plaintiff's gross negligence claim consists of six paragraphs" clearly ignores the 177 preceding paragraphs, which Plaintiffs expressly "incorporate and reallege" in their gross negligence claim. ¶191.

for investment success." ¶115. Meeting this standard would require Defendants to fully explore, and not disregard, the implications of their actions for *all* shareholders and viable non-damaging alternatives to accomplishing the same goal, before making their decision. ¶132.

The Complaint also alleges that Defendants' December 2020 decision was an extreme departure from the standard of care. Defendants ignored viable alternatives that would have achieved the same result of lowering fees for mid-size retirement plans while avoiding foreseeable harm to Plaintiffs (¶¶89, 100-06), despite knowing that their decision would harm Plaintiffs (¶¶108-12, 133-43). Defendants failed to take even minimal effort to avoid harm to Plaintiffs, grossly deviating from the ordinary standard of care to act in the best interest of all shareholders.

### E. The Complaint Adequately Alleges Claims for Breach of the Covenant of Good Faith and Fair Dealing

Defendants argue that Plaintiffs fail to state a claim for breach of the covenant of good faith and fair dealing because Defendants' actions did not "frustrate the overarching purpose" of the Declaration of Trust, and Plaintiffs' claim is therefore being "used to circumvent the parties' bargain." Vanguard Br. at 21. Both arguments are wrong.

The Complaint alleges facts demonstrating that Defendants' decision frustrated the overarching purpose of the Declaration. The Declaration "provide[s] the Trustee and Officer Defendants with discretion to make fund management decisions" for the benefit of the shareholders. ¶199. Vanguard has admitted that its "core purpose" is "[t]o take a stand for all investors, to treat them fairly, and to give them the best chance for investment success." ¶¶114-15. Thus, Defendants' failure to take a stand for Plaintiffs, treat them fairly, and give them the best chance for investment success frustrated the overarching purpose of the Declaration. Plaintiffs' claim seeks to enforce the parties' bargain, not circumvent it.

When forming a contract, "some terms are 'so obvious' that the participants never think, or see no need, to address them." *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022). When this occurs, "courts will invoke the implied covenant to imply terms when necessary to protect the reasonable expectations of the parties." *Id*. The Declaration of Trust does not expressly state that "the Trustees will not make fund management decisions that needlessly harm shareholders," as such a term is so obvious that the parties would see no need to address it. Invoking the implied covenant is necessary here to protect the parties' reasonable expectations.

The facts here stand in contrast to the cases Defendants cite where a party seeks to "circumvent the parties' bargain" by rewriting the express contract terms. For example, in *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 (Del. Ch. 2009), the parties' contract included a representation that "[t]here are no Legal Proceedings … reasonably likely to prohibit or restrain the ability of Purchaser to enter into this Agreement." With its implied covenant claim, Squid Soap sought to broaden the representation to cover "Legal Proceedings of any kind," which the court found was an attempt to "re-write" a requirement that the parties expressly addressed in the contract. *Id*. at 139. Here, the Declaration did not expressly allow Defendants to needlessly harm investors, which is obviously contrary to the purpose of the agreement.

Defendants misstate the applicable law in arguing that this claim fails because the Complaint does not allege that Defendants acted in bad faith. Trustee Br. at 12; Vanguard Br. at 21. "A breach of the implied covenant … does not … require that a party have acted in bad faith." *NAMA Holdings, LLC v. Related WMC LLC*, No. CV 7934-VCL, 2014 WL 6436647, at *17 (Del. Ch. Nov. 17, 2014). Instead, "[w]hen used with the implied covenant, the term 'good faith' contemplates faithfulness to the scope, purpose, and terms of the parties' contract." *Id*.; *see also In re Morrow Park Holding LLC*, C.A. No. 2017-0036-PAF, 2022 WL 3025780, at *20 (Del. Ch.

Aug. 1, 2022). Here, the Complaint alleges facts demonstrating that Defendants were not faithful to the purpose of the contract, and thus failed to act in good faith. The Complaint also alleges facts showing bad faith, in that Defendants consciously disregarded the harm that their December 2020 decision would cause for taxable investors. *See* ¶¶100-12.[16]

### F. The Complaint Adequately Alleges Claims for Unjust Enrichment

Defendants incorrectly assert that the Complaint lacks allegations that Vanguard or the Trust received any "enrichment" or that the enrichment was "unjust." Vanguard Br. at 17. In this context an "enrichment" is a "retention of a benefit to the loss of another, or the retention of money or property of another." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). The Complaint alleges that Plaintiffs paid management fees and expenses to Vanguard and the Trust for the Target Date Funds. ¶¶145-159, 209. Payment from one party to another is a loss to the payer and a benefit to the receiver, and thus the management fees and expenses Plaintiffs paid to Vanguard and the Trust were an enrichment. The Trustee Defendants are likewise incorrect that "the only enrichment alleged is ordinary Trustee compensation," Trustee Br. at 14, as they ignore Plaintiffs' allegations.

An enrichment is "unjust" when it violates "the fundamental principles of justice or equity and good conscience." *Nemec*, 991 A.2d at 1130. The Complaint is replete with allegations demonstrating how Plaintiffs' payment of the management fees was "unjust." Among other things, Plaintiffs paid fees and expenses "in exchange for managing the relevant funds with due care and in good faith." ¶209. Instead, when managing the Target Date Funds, Defendants were "grossly negligent and/or acted with bad faith, willful malfeasance, and/or reckless disregard of their duties." ¶211. *See supra,* §§ III(B)-(D).

---

[16] Plaintiffs concede that the three Officer Defendants—Bendl, Buchanan, and Schadl—who are not alleged to be parties to the Declaration of Trust are excluded from this claim.

Defendants are also wrong that "any benefit from the decision to lower the minimum investment accrued not to Vanguard or the Trust but to investors in the Retail Funds." Vanguard Br. at 17. The Complaint alleges that Defendants made the December 2020 decision to attract investments from institutional retirement plans which generate most of the management fees from the Target Date Funds, ¶70, "to keep pace with mutual fund providers like Fidelity who were offering competing low-fee target date funds." ¶75. Defendants were pursuing a benefit to Vanguard and the Trust in increased management fees. Plaintiffs were harmed by Defendants' December 2020 decision, and there was no countervailing benefit to any other investors from Defendants' decision to ignore alternatives that would have achieved the same goal.

Defendants also argue that Plaintiffs' unjust enrichment claim is "duplicative of the fiduciary duty claim in Count I and should be dismissed along with it." Trustee Br. at 14; Vanguard Br. at 17 (similar). As demonstrated above, however, the Court should not dismiss Plaintiffs' breach of fiduciary duty claim, and "where the Court does not dismiss a breach of fiduciary duty claim, it likely does not dismiss a duplicative unjust enrichment claim." *Frank v. Elgamal*, No. 6120-VCN, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014). When, like here, "there is a reasonably conceivable basis for both claims, the plaintiff is entitled to discovery on them." *Id*. at *32. Moreover, "[a]t the pleading stage, when there is uncertainty about how the case will play out, it makes sense to preserve the claim for unjust enrichment and permit the plaintiff to plead in the alternative." *Bamford v. Penfold, L.P*., No. 2019-0005-JTL, 2020 WL 967942, at *33 (Del. Ch. Feb. 28, 2020); *Muschlitz Excavating, Inc. v. Gary J. Strausser Homebuilders, Inc*., No. C–48–CV–2012–4247, 2014 WL 8854202, *5 (Pa. Ct. Com. Pl. Feb. 14, 2014) ("Pennsylvania case law supports the notion that unjust enrichment … can be pled in the alternative.").

G.   **The Complaint Adequately Alleges Claims for Violations of State Consumer Protection Statutes**

1.   **The Complaint Adequately Alleges Claims Under the California Unfair Competition Law**

Defendants' arguments for dismissing Plaintiffs' claims for violations of California's Unfair Competition Law ("UCL") each fail. First, Defendants' assertion that "allowing *more* investors to take advantage of the Institutional Funds' lower costs is" not unfair, Vanguard Br. at 18, grossly misconstrues the Complaint. The "unfair" conduct that Plaintiffs allege is that Defendants reduced fees for some institutional investors in a way that unnecessarily caused significant, foreseeable harm to taxable investors while ignoring readily available alternatives that would accomplish the same goal *without* harming taxable investors. *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1268 (2006) holds that "the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." Here, the conduct at issue had zero utility because Defendants could have easily achieved the same benefit for institutional investors without harming Plaintiffs. ¶¶89, 102-106.

Second, Plaintiffs adequately allege the lack of an adequate remedy at law. Plaintiffs seek both injunctive relief and restitution/disgorgement. Plaintiffs still hold their Target Date Fund investments, and without injunctive relief to prevent Defendants from taking similar actions in the future, they may be unfairly harmed again. *Supra*, § III(A)(2). Courts have permitted plaintiffs to bring claims for injunctive relief in similar circumstances. *Brooks v. Thomson Reuters Corp.*, No. 21-cv-01418-EMC, 2021 WL 3621837, at *11 (N.D. Cal. Aug. 16, 2021) (collecting cases and noting that damages for past conduct does not necessarily dissuade future behavior).[17]

---

[17] Defendants' argument that the UCL claim should be dismissed because it "cannot be used to end-run the requirements of other available causes of action," Trustee Br. at 18, likewise fails. *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1203 (9th Cir. 2001) says only that that UCL claims cannot stand in for other claims that the plaintiff has not plead adequately *if the conduct at issue*

Moreover, courts have denied dismissal of UCL equitable restitution claims at the pleading stage because a plaintiff may not ultimately succeed in proving an element of their claims at law, but they could still prevail on a UCL claim. *See Hazdovac v. Mercedes-Benz USA, LLC*, No. 20-cv-00377-RS, 2022 WL 2161506, at *4 (N.D. Cal. June 15, 2022) (denying dismissal of UCL claim where plaintiff might not be able to prove fraud element of Consumer Legal Remedies Act ("CLRA") claim and thus equitable restitution might be their only remedy).[18]

Defendants rely on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), Vanguard Br. at 18, but *Sonner* was decided "[o]n the brink of trial," *id.* at 837, and thus it "does not address what a plaintiff must allege at the pleading stage in order to proceed on her equitable claims." *Carroll v. Myriad Genetics, Inc.*, No. 4:22-CV-00739-YGR, 2022 WL 16860013, at *6 (N.D. Cal. Nov. 9, 2022) (collecting cases and declining to apply *Sonner* on a motion to dismiss). *See also Coleman v. Mondelez Int'l Inc.*, 554 F. Supp. 3d 1055, 1065 (C.D. Cal. 2021) (*Sonner* does not bar equitable claims when legal claims "may impose more stringent elements that plaintiff may ultimately not be able to prove."). Here, Plaintiffs may ultimately be unable to prove elements of their other claims, leaving equitable relief as their only remedy. The UCL is a broad, flexible

---

*does not, in fact, meet the standard for a UCL claim*, *i.e.*, "does not rise to the level of immoral, unethical, oppressive, unscrupulous or substantially injurious conduct." Here, Plaintiffs have adequately pleaded their other claims and the conduct at issue does meet the standard for a UCL claim. *See supra*. *Diamond Real Estate v. Am. Brokers Conduit*, No. 16-cv-03937-HSG, 2017 WL 412527, at *9 (N.D. Cal. Jan. 31, 2017), does not appear to reference "identical language in other claims," *cf.* Trustee Br. at 18, but instead, "identical language" in a UCL claim in a different case.

[18] *Cruz v. Progressive Cas. Ins. Co.*, No. CV 20-10966 DSF (SK), 2021 WL 1557750, at *2 (C.D. Cal. Feb. 5, 2021) is inapposite because unlike here, the *Cruz* plaintiff did not seek an injunction and the court did not directly address an argument that the plaintiff's other claims might fail, leaving restitution as the only available relief. *Gardner v. Safeco Ins. Co. of Am.*, No. 14-CV-02024-JCS, 2014 WL 2568895, at *8 (N.D. Cal. June 6, 2014) is similarly inapposite. There, the court prohibited the plaintiff from seeking injunctive relief in a representative capacity because he had not brought a class action, and he had not shown why his claims for an insurer's failure to pay could not be addressed at law, granting leave to replead.

statute, and claims under the UCL do not require the same elements as Plaintiffs' legal claims. ¶¶215-18; *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1174 (N.D. Cal. 2015) ("Under the 'sweeping' coverage of the UCL, a practice does not need to be unlawful to be unfair."). Plaintiffs could prevail on their UCL claims without prevailing on their legal claims, and thus *Sonner* does not bar the UCL claims at this stage.[19]

### 2.   The Complaint Adequately Alleges Claims Under the Colorado Consumer Protection Act

Plaintiffs' claims under the Colorado Consumer Protection Act ("CCPA") adequately allege that Defendants "[e]ither knowingly or recklessly engage[d] in an[] unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice." Colo. Rev. Stat. Ann. § 6-1-105(rrr) (West). Defendants assert that Plaintiffs have failed to allege facts showing that Defendants "knowingly or recklessly" engaged in conduct that violates the CCPA. Trustee Br. at 17; Vanguard Br. at 19. Additionally, Defendants argue that Vanguard's decision to lower the minimum investment for the Institutional Funds was not "unfair" under the CCPA. Vanguard Br. at 18. Both of these arguments fail because the Complaint alleges facts showing the required scienter, and Defendants' acts had an unfair impact on Plaintiffs.

To state a claim for violation of the CCPA, a plaintiff must allege: (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public

---

[19] Notably, Plaintiffs do not have an available CLRA claim for legal damages that mirrors their UCL claims. *C.f. Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1312 (9th Cir. 2022) (Robreno, J. sitting by designation) (on summary judgment, *Sonner* bars UCL claims when an equivalent CLRA could have been timely asserted). The CLRA prohibits certain categories of deceptive conduct. Cal. Civ. Code § 1770. Plaintiffs do not allege any misrepresentation or similar conduct. Plaintiffs allege that Defendants' misconduct is actionable under the broad, flexible "unfair" prong of the UCL, but not under the CLRA. ¶215.

as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury. *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998). Defendants' arguments implicate only the first element.

The Colorado Supreme Court "has taken [a]n expansive approach … in interpreting the CCPA by reading and considering the CCPA in its entirety and interpreting the meaning of any one section by considering the overall legislative purpose." *Crowe v. Tull*, 126 P.3d 196, 202 (Colo. 2006). *Crowe* further held that "in determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct. That assumption is appropriate because of the strong and sweeping remedial purposes of the CCPA." *Id.* (citing *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 53 (Colo. 2001).

The Complaint alleges that Defendants knowingly or recklessly engaged in the conduct underlying CCPA claim. *See, e.g.,* ¶¶12, 117, 135, 136, 144, 182, 184, and 227. The Complaint alleges that Defendants were aware that taxable investors held shares of the Retail Funds (¶¶118, 139) and aware of the "foreseeable certainty" of the harm to taxable investors when they altered the investment minimums (¶¶137, 140, 142, 195), but still recklessly disregarded the outcome (¶136). The Complaint also alleges that Defendants in fact recognized, considered, and utterly disregarded the impact that their decision would have on taxable investors (¶¶109-12). These allegations support a knowing or reckless violation of the CCPA for the type of conduct alleged here – an unfair act taken for corporate gain at the expense of the investing public.[20]

---

[20] The cases Defendants cite involve fundamentally different conduct—false and misleading representations—than the conduct alleged in the Complaint. *Cagwin v. Centralized Showing Serv. Inc.*, No. 20-CV-03033-KLM, 2022 WL 952875 (D. Colo. Mar. 30, 2022) (CCPA claim based on a false representation); *Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594 (S.D. Cal. 2015) (claim

Defendants also ignore the alternative "reckless" level of scienter, which the Colorado Legislature added by amendment in 2019 at the same time they added the sub-section on which Plaintiffs' CCPA claim is based. 2019 Colo. Legis. Serv. Ch. 268 (H.B. 19-1289). Acting recklessly does not require knowledge. Moreover, even if Defendants did not *know* the outcome of their decision, the Complaint sufficiently alleges that Defendants' conduct was so reckless it should be deemed to be knowing. *See People v. Rader*, 822 P.2d 950, 953 (Colo. 1992) ("conduct can be so careless or reckless that it must be deemed to be knowing and will constitute a violation of a specific disciplinary rule" requiring knowledge).

Contrary to Defendants' assertion, Plaintiffs have alleged an unfair act that, by its nature, "may prove injurious, offensive, or dangerous to the public." Vanguard Br. at 18 (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003). The *Rhino Linings* decision is inapplicable here because it interpreted a prior version of the CCPA that is fundamentally different from the current iteration of the law. First, *Rhino Linings* involved an allegation of a deceptive (not "unfair") trade practice, requiring a materially false statement. 62 P.3d at 144. Second, *Rhino Linings* was decided before the 2019 amendment to the CCPA, which not only added the "reckless" standard for scienter, but also added the term "Unfair" to the title and added the particular section underpinning Plaintiffs' CCPA claim. 2019 Colo. Legis. Serv. Ch. 268 (H.B. 19-1289). When *Rhino Linings* was decided the CCPA only proscribed deceptive conduct, whereas now it proscribes unfair *or* deceptive conduct. Finally, the Complaint clearly alleges that Defendants' conduct was injurious to the investing public (¶¶51, 101, 106, 107) including a concrete injury suffered by the Colorado Subclass. *See supra*, § III(A)(1).

---

based on misleading marketing statements); *Mionix, LLC v. ACS Tech.*, No. 16-CV-02154-RBJ, 2018 WL 2196065 (D. Colo. May 14, 2018) (claim based on false representation).

### 3.     The Complaint Adequately Alleges Claims Under the Massachusetts Consumer Protection Law

Massachusetts General Chapter 93A ("Chapter 93A") adopts a broad view of what can be considered unfair. The statute "does not define unfairness, recognizing that [t]here is no limit to human inventiveness in this field." *Commonwealth v. Fremont Inv. & Loan*, 452 Mass. 733, 742 (2008). "It is well established that a practice may be deemed unfair if it is 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness.'" *Id.* (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)). A "breach of fiduciary duty falls within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *NRT New England, Inc. v. Moncure*, No. 20053861, 2008 WL 4739794, at *7 (Mass. Super. Oct. 23, 2008); *Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995) ("if a fiduciary relationship existed, its breach would have constituted a chapter 93A violation"). Defendants breached their fiduciary duties to Plaintiffs, *supra* § III(B), and have therefore acted unfairly under Chapter 93A.

In determining whether a practice is unfair under Chapter 93A, a factfinder may also "look to … whether it causes substantial injury to consumers" and "whether it is immoral, unethical, oppressive, or unscrupulous." *UBS Fin. Servs., Inc. v. Aliberti*, 483 Mass. 396, 412 (2019). The Complaint alleges facts that could lead a factfinder to conclude that Plaintiffs were substantially harmed, *supra* § III(A)(1), and that Defendants' actions were unscrupulous. *See supra* § III(B).

Moreover, "what the parties respectively knew or should have known may be relevant in determining unfairness." *UBS Financial Services, Inc.*, 483 Mass. at 413.  Plaintiffs invested in the Target Date Funds in large part because typically, "capital gains distributions … and tax liabilities incurred from these distributions are minimal." ¶9.  Accordingly, Plaintiffs were "blindsided by large tax liabilities" caused by Defendants. ¶16.  "Some investors had to face

penalties for failure to make estimated tax payments for liabilities of up to tens or hundreds of thousands of dollars that they had no idea were coming." *Id*. In contrast, Defendants were well aware of the harm to Plaintiffs that their decision would cause, and they knowingly disregarded that harm. ¶¶108-112, 137-42.

Defendants argue that Plaintiffs fail to plead an unfair business act because "allowing more investors to take advantage of the Institutional Funds' lower costs" cannot be deemed unfair. Vanguard Br. at 18. Once again, the real issue is the *way* that Defendants accomplished this goal, needlessly harming Plaintiffs while disregarding readily available alternatives that would have reduced fees for mid-size retirement plans while avoiding this harm. This is the unfair conduct that Plaintiffs allege, and it falls within what Massachusetts law considers unfair.

Defendants also argue that Plaintiffs' Chapter 93A claim fails because Defendants' decisions were made at "Vanguard's Pennsylvania headquarters," but "the statute[] is limited to conduct that occurred primarily in… Massachusetts." Vanguard Br. at 18; Trustee Br. at 17. This argument fails because, for "chapter 93A claims," the "place of [defendant's] conduct" is not the determining factor. *Value Partners S.A. v. Bain & Co.*, 245 F. Supp. 2d 269, 279 (D. Mass. 2003). Instead, the inquiry looks at "the location of the plaintiff rather than the defendant." *Id*. ("for the purpose of consumer protection law…. the critical factor is the locus of the recipient of the deception at the time of the reliance," not the "location of the [defendant]") (quoting *Clinton Hosp. Ass'n v. Corson Grp., Inc.*, 907 F.2d 1260, 1265 (1st Cir. 1990)). Plaintiff Day and the Massachusetts Subclass reside in Massachusetts. ¶¶25, 167. Accordingly, the Complaint easily satisfies the location requirement.[21]

---

[21] Moreover, "the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth" bears "the burden of proof." Mass. Gen. Laws ch. 93A,

Finally, the Trustee Defendants argue that the Chapter 93A claim fails against them because they did not take "any action" or engage in any "transaction" with Plaintiffs "that was commercial" or "in a business context." Trustee Br. at 15. This argument also fails. A trustee "perpetrate[s] [acts] within a business context" and "a commercial relationship exist[s] between the parties" when (a) the trustee "act[s] as the seller of professional services and [b] the plaintiffs act[s] as the buyers of these service." *Quinton v. Gavin*, No. 98860B, 2001 WL 1194151, at *32 (Mass. Super. Feb. 15, 2001). The Complaint alleges both elements.

The Trustee Defendants "expressly offer [their] services to the public." ¶242. Vanguard's marketing materials tout how the Trustee Defendants "have the experience, skills, and attributes necessary to serve the funds and their shareholders," and are "considered invaluable assets for Vanguard management and, ultimately, the Vanguard funds' shareholders." ¶242. The marketing materials name each Trustee Defendant and summarize their qualifications, demonstrating how they can serve shareholders. *Id*. The Complaint also alleges how "consumers expressly purchas[e] the[se] services of the Trustee Defendants." ¶243. "[W]hen consumers (members of the public) purchase Retail Fund shares," the Declaration of Trust "purports to bind [the shareholders] into a contractual relationship with the Trustees." ¶243.[22]

---

§ 11. Defendants cannot carry this burden at the motion to dismiss stage, nor have they done so here.

[22] The two cases Defendants cite are inapposite here. *Steele v. Kelley*, 46 Mass. App. Ct. 712 (1999) concerned "disputes … over the administration of a trust," and unlike here, "no commercial relationship—*i.e.*, that of buyer and seller of goods or services—ever existed between the parties." *Id*. at 726. Here, the Trustee Defendants marketed themselves to Plaintiffs and directly contracted with Plaintiffs. *Charest v. President & Fellows of Harvard Coll.*, No. CV 13-11556-DPW, 2016 WL 614368, at *65 (D. Mass. Feb. 16, 2016) concerned a dispute brought by a Harvard researcher against Harvard over royalty provisions in his employment agreement. Unlike here, *Charest* did not involve the marketing of services to the public, followed by a contract for those services.

### 4. The Complaint Adequately Alleges Claims Under the Illinois Consumer Fraud Act

Defendants' arguments to dismiss Plaintiffs' Illinois Consumer Fraud Act ("ICFA") claims each fail for the same reasons as they failed as to Plaintiffs' other consumer protection law claims.

Defendants repeat their argument that their actions were not "unfair" because they benefitted some institutional investors. As discussed above, *supra* § III(G)(1)-(3), this assertion mischaracterizes Defendants' alleged misconduct. It also fails under Illinois law, which largely tracks the law of Massachusetts. "In determining whether a given course of conduct or act is unfair," the factfinder should consider "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). Breaching fiduciary duties offends public policy. The Complaint details Defendants' unscrupulous acts and substantial injury to Plaintiffs. *See supra* §§ III(A)(1) and III(B). Accordingly, the Complaint alleges facts demonstrating unfairness for purposes of Plaintiffs' ICFA claims.

Defendants also argue that the ICFA claims fail because the conduct alleged did not "occur[] primarily in… Illinois." Vanguard Br. At 18 (relying on *BCBSM, Inc. v. Walgreen Co.*, 512 F. Supp. 3d 837, 856 (N.D. Ill. 2021)). This requirement applies only to nonresident plaintiffs. The ICFA defines "trade or commerce to "include any trade or commerce directly or indirectly affecting the people of this state." 815 Ill. Comp. Stat. Ann. 505/2; 815 ILCS 501(f); *Swartz v. Schaub*, 818 F. Supp. 1214, 1214 (N.D. Ill. 1993) (explaining that the ICFA deals with "the impact of the statutorily prohibited practices on <u>Illinois</u> consumers") (emphasis in original); *Clearing Corp. v. Fin. & Energy Exch., Ltd.*, No. 09 CV 5383, 2010 WL 2836717, at *5 (N.D. Ill. July 16, 2010) (same). If alleged conduct harms Illinois residents, it directly impacts Illinois consumers. Accordingly, where the alleged conduct occurred is relevant only for nonresident plaintiffs. *See*

*Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 185 (2005) (holding that, for a *nonresident's* claim, a "disputed transaction [must] occur primarily and substantially in Illinois").[23] Here, Plaintiff Poisson and the Illinois Subclass all "reside in Illinois." ¶¶26, 168. They are entitled to bring claims under the ICFA.

Defendants also argue that Plaintiffs' ICFA claims fail against the Trustees because "the Trustees were not involved in 'trade or commerce' with Plaintiffs." Trustee Br. at 15-16. This argument fails for the same reasons it fails as to the Chapter 93A claims. *Supra* § III(G)(3).

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny both motions to dismiss the Complaint in their entirety.

Dated: March 13, 2023

**THE ROSEN LAW FIRM, P.A.**

*/s/Jacob A. Goldberg*
Jacob A. Goldberg (PA ID: 66399)
Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
          jbaker@rosenlegal.com

Phillip Kim (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016

---

[23] Courts have repeatedly confirmed that the rule in *Avery* applies only to a nonresident's claim. *See, e.g., R. Rudnick & Co. v. G.F. Prot., Inc*., No. 08 C 1856, 2009 WL 112380, at *2 (N.D. Ill. Jan. 15, 2009) ("*Avery* does not support the argument [Defendant] is attempting to make" because "the focus is on the harm to (and location of) the consumer"); *id*. ("the faxes were received by consumers in Illinois, and thus to the extent that there was an unfair practice, it was felt within this state," even though "the faxes may have originated in another forum"); *Gridley v. State Farm Mut. Auto. Ins. Co.*, 217 Ill. 2d 158, 165 (2005) (noting that *Avery* concerned a nonresident's standing under the ICFA); *BCBSM, Inc.*, 512 F. Supp. 3d at 846 (cited by Defendants, Trustee Br. at 17) (applying *Avery* to a national class of Plaintiffs from Arizona, North Dakota, Florida, etc.).

Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
       jstern@rosenlegal.com

*Interim Lead Counsel for Plaintiffs and the Class*

**DOVEL & LUNER, LLP**
Jonas B. Jacobson
Simon Franzini
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: (310) 656-7066

*Additional Counsel for Plaintiffs*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Mark C. Rifkin
Matthew M. Guiney
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/545-4653

*Additional Counsel for Plaintiffs*

**GOLOMB, SPIRT, GRUNFELD, P.C.**
Richard M. Golomb
Kenneth J. Grunfeld
Kevin W. Fay
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Tel: (215) 985-9177
Fax: (215) 985-4169

**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
W. Daniel "Dee" Miles, III
James B. Eubank
218 Commerce Street
Montgomery, Alabama 36104
Tel: (334) 269-2343
Fax: (334) 954-7555

*Additional Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204

*Additional Counsel for Plaintiffs*

47

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

Dated: March 13, 2023

*/s/Jacob A. Goldberg*