**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE VANGUARD CHESTER FUNDS LITIGATION | : | CIVIL ACTION |
| | : | |
| | : | |
| | : | NO.  22-955 |
| | : | |
| | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                **November 20, 2023**

If a fiduciary considers two options to accomplish the same objective, and option A carries certain drawbacks that option B does not, could choosing option A breach a fiduciary duty?  Maybe.  It could depend on the process followed by those who evaluated the options and made the choice.

In December 2020, Vanguard changed a key aspect of its popular retirement-oriented mutual funds to make them more attractive to potential investors, and decided to do so using option A.  The change benefited most of the current investors.  But not everyone.  Some investors suffered surprise capital gains taxes because of the change.  Those investors sued Vanguard, its corporate officers, its statutory trust, and independent trustees to the trust.  They think Vanguard could have (and should have) done things differently (i.e., option B) when deciding to reconfigure its retirement funds, which in turn would have avoided unexpected tax consequences.

We must decide whether the complaint plausibly alleges a breach of fiduciary duty in the process of choosing option A.  And before we do, we must confirm that the investors have standing to pursue their claims.  Vanguard creatively posits that it might have done the aggrieved investors a favor by accelerating their tax liabilities, and since there's no way to really know for

sure, the investors' alleged harms are speculative.

We hold that the investors have standing and state a plausible claim for breach of the fiduciary duty of care. Some of their other claims move to discovery too.

## I. Factual Allegations

Vanguard helps people invest money using mutual funds. *See* DI 65 ¶¶ 2, 49-50, 52-53. Investors become shareholders in Vanguard's mutual funds in exchange for their money. *See id.* ¶ 52. Vanguard's financial professionals manage the money. *See id.* They use the money to buy stocks, bonds, or other securities on behalf of the investors. *See id.*

Twenty years ago, Vanguard created mutual funds "based on a target retirement year" ("Target Date Funds"). *Id.* ¶ 53. Each Target Date Fund is a series of a trust under Delaware law. *Id.* ¶ 44 (quoting Vanguard Chester Funds, *Statement of Additional Information January 31, 2022*, at B-35).[1] The Target Date Funds are managed by a group of independent trustees and Vanguard officers. *See id.* ¶¶ 34, 36.[2] And Vanguard itself "provides 'virtually all' of the 'corporate management, administrative, and distribution services' for the trust." *Id.* ¶ 44 (quoting Vanguard Chester Funds, *Statement of Additional Information January 31, 2022*, at B-35); *see id.* ¶¶ 46, 127, 129.

---

[1] "[A] 'document . . . *explicitly relied* upon in the complaint' may be considered" at the motion to dismiss stage "without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (second alteration in original) (internal quotation marks omitted) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

[2] Investors interested in the Target Date Funds contract with the trust's independent trustees and Vanguard's officers. *See id.* ¶¶ 199-200. The contract gives the independent trustees and Vanguard's officers "discretion to make fund management decisions, including merging funds, altering investment minimums, and adjusting fees." *Id.* ¶ 200.

"As the . . . name implies," most investors leave their money in the Target Date Funds "until the target retirement date." *Id.* ¶ 97.  Vanguard manages the Target Date Funds' investment portfolios to become less risky as a selected retirement date approaches by opting for safer investments. *Id.* ¶¶ 54, 55.  That is by design. *Id.* ¶ 90.  The target-date structure is popular among investors saving for retirement. *See id.* ¶¶ 54, 55.

When retirement approaches, the Target Date Funds' portfolios "glide" toward safer investments. *Id.* ¶ 54.  Because retirees are usually in a lower marginal tax bracket upon retirement, they pay less tax on the money liquidated from the Target Date Fund investments. *See id.* ¶¶ 92, 93, 94.  Vanguard's founder described the Target Date Funds as "set-it-and-forget-it" investments for those "who do not want to actively manage their portfolio." *Id.* ¶ 56; *see id.* ¶ 90.

For each target retirement date, Vanguard offered two "tiers" of its Target Date Funds. *Id.* ¶ 5.  One tier accepted investments from investors (e.g., retirement plans) with at least $100 million in assets ("Institutional Funds"). *Id.* ¶ 71.  The other tier accepted investments from investors that could not reach the $100 million threshold ("Retail Funds"). *See id.* ¶ 57.  Each tier had the same trustees, officers, target retirement date, investment strategy, and proportion of shares in the same underlying index funds. *Id.* ¶ 58.  But Vanguard structured the tiers as separate funds within its trust. *See id.* ¶¶ 34, 80.[3]

Vanguard's Institutional and Retail Funds had another key difference outside of

---

[3] As an example, Vanguard had a 2030 Institutional Fund and a 2030 Retail Fund; each tier had the same investment strategy and management, but their minimum investment thresholds and expense ratios differed.  *See id.* ¶ 58.

minimum investment amount: expense ratios.  *See id.* ¶ 71.  Expense ratios are an alternative to charging investors for individual transactions.  *See id.* ¶ 69.  The Institutional Fund had a lesser expense ratio than the Retail Fund.  *Id.* ¶ 71.

In December 2020, Vanguard[4] altered the specs of its Target Date Funds.  *See id* ¶¶ 75-76.  Vanguard lowered the minimum investment amount to access its Institutional Funds from $100 million to only $5 million.  *Id.* ¶ 76.  Lowering the amount meant investors previously unable to reach the $100 million threshold — for example, "mid-size retirement plans" — could now take advantage of a smaller expense ratio.  *Id.* ¶ 75.

Investors seized the "no-brainer opportunity" to move their money and benefit from the reduced expense ratio.  *Id.* ¶ 10; *see id.* ¶¶ 78-79.  For retirement plan managers previously unable to meet the $100 million threshold, Vanguard's decision offered "significantly reduced fees, with no material downside."  *Id.* ¶ 73.  As many as "8,500 401(k) plans with approximately 3.2 million participants" left Vanguard's Retail Funds and opted for its Institutional Funds. *Id.* ¶ 79.

To leave the Retail Funds, investors needed their shares of the mutual funds redeemed. *See id.* ¶ 11.  Redeeming shares pays investors "for the value of their shares."  *Id.* ¶ 82.  Mutual funds typically "keep sufficient cash on hand" for redemptions.  *Id.* ¶ 67.  In most years, Target

---

[4] To streamline the allegations, we refer to Vanguard as the defendant that lowered the minimum investment amount.  But we appreciate that labeling Vanguard — *the company* — as the one having decision-making authority is an oversimplification, evidenced by the two sets of defendants in this case, and the debate over who allegedly breached fiduciary duties owed to investors.  *See, e.g.*, *id.* ¶¶ 124-26, 128 (discussing parties involved with decision to lower investment threshold).  *But see id.* ¶ 123 (alleging, based on interview with Vanguard employee, that "the board of trustees 'would review the recommendations, all the data, all the analysis then would give the thumbs up or thumbs down,' making the final call on the decision").

Date Funds safely satisfy redemptions without selling assets.  *See id.* ¶¶ 82-83.

Not in December 2020.  Faced with an "elephant stampede" of redemption requests, *id.* ¶ 78, the Retail Funds had no choice but to sell off "an unprecedented amount of assets to satisfy all the share redemptions," *id.* ¶ 11; *see id.* ¶ 81 (Vanguard's 2035 Retail Fund sold off "over 15% of [its] assets").  The redemption of about 490 million shares outpaced the number of shares issued, resulting in an incurred "deficit of over $11 billion."  *Id.* ¶ 83.

The unprecedented sale of assets generated capital gains.  *Id.* ¶ 84.  And Congress requires funds (like the Retail Funds) to distribute capital gains to shareholders.  *See id.* ¶ 59.  Because assets are sold so infrequently to redeem shares, shareholders usually do not incur substantial capital gains.  *Id.* ¶ 66.  Not after the December 2020 decision.  The mass share redemption caused a sharp spike in capital gains distributions.  *See id.* ¶¶ 83-86.  The Retail Fund distributed capital gains to the shareholders that did not leave the fund.  *Id.* ¶ 84.

For most shareholders that remained in the Retail Fund, receiving capital gains distributions came without consequence.  *See id.* ¶ 7.  This is because investors in the Target Date Funds can opt to hold their fund shares in tax-advantaged accounts.  *See id.* ¶ 60.  The tax-advantaged accounts — for example, a 401(k) — automatically reinvest capital gains distributions without having to pay taxes on them.  *Id.*  Many shareholders had the capital gains distributions reinvested without second thought.

But not all shareholders in the Retail Fund used a tax-advantaged account.  *See id.* ¶ 6.  The Retail Fund shareholders that did not elect for a tax-advantaged account faced unexpected, sizable capital gains tax liabilities.  *See id.* ¶¶ 62, 91, 146-59.  Some Retail Fund shareholders had to sell off other assets to cover the surprise tax bills.  *Id.* ¶¶ 16, 95.  Other shareholders faced

IRS and state law penalties for failing to pay the amount owed in 2021 capital gains taxes.  *See id.* ¶¶ 16, 150, 156.  And at least some Vanguard employees knew that these types of tax liabilities would spawn from their decision to lower the minimum investment amount.  *See id.* ¶¶ 108-09, 111.

Just nine months after changing the Institutional Funds' investment minimum, Vanguard scrapped the change by merging Retail and Institutional Funds.  *Id.* ¶¶ 102-05.  The merger would be accomplished through a "'tax-free exchange' of Retail Fund shares for Institutional Fund shares."  *Id.* ¶ 104.  And the merger gave shareholders a uniform expense ratio.  *Id.* ¶ 102.

Vanguard's reversal followed the actions of Fidelity — one of its biggest competitors.  *See id.* ¶¶ 99-100.  In January 2021 — just one month after the "elephant stampede" — Fidelity lowered its own institutional fund minimum investment amount by "lowering the . . . threshold for its institutional share class within the same fund," as opposed to moving money from one fund into another.  *Id.* ¶ 100.  Unlike Vanguard, the structuring of Fidelity's decision avoided imposing tax liabilities on some of its investors.  *See id.*

Though Vanguard merged its Retail and Institutional Funds, some investors felt like the damage had already been done.  The group of Retail Fund investors blindsided with taxes now sue Vanguard, its officers, the company's trust, and its trustees for the harm they suffered.

## II.    <u>Motions to Dismiss</u>

The proposed class of plaintiffs in this case ("Investors") meet two criteria:

- they invested their money in the Retail Funds using taxable accounts (or elected not to reinvest capital gains distributions in a tax-advantaged account), and

- they received a 2021 capital gains distribution from the Retail Funds.

*Id.* ¶ 164.  Their main claim is that Vanguard, its corporate officers, the trust comprising the

Target Date Funds ("Delaware Trust"), and the Delaware Trust's trustees ("Independent

Trustees") breached their fiduciary duties of care and loyalty by failing to consider the tax

consequences of their decision to lower the Institutional Funds' minimum investment amount.

*See id.* ¶¶ 178-184.  Investors allege that, in the time leading up to the December 2020 change,

defendants ignored the ramifications for those who did not use tax-advantaged accounts, *see id.*

¶¶ 4, 10, failed to consider suitable alternatives for changing its Target Date Funds, *see id.* ¶¶ 89,

134-36,  knew of and considered the consequences for Investors, *see id.* ¶¶ 142-43, but

"disregarded this impact . . . to remain 'competitive in the marketplace,'" *id.* ¶ 111.[5]

Investors' complaint faces two motions to dismiss.  The first comes from Independent

Trustees.  *See generally* DI 84.[6]  The second comes from Vanguard, its Delaware Trust, and

individual officers of Vanguard (together, "Vanguard Defendants").  *See generally* DI 85-2.[7]

The motions share the same fundamental arguments.

---

[5] Investors bring other claims outside of breach of fiduciary duty, including aiding and abetting a breach of fiduciary duty brought in the alternative (Count II, *see id.* ¶¶ 185-90), gross negligence (Count III, *see id.* ¶¶191-96), breach of an implied covenant of good faith and fair dealing (Count IV, *see id.* ¶¶ 197-205), unjust enrichment brought in the alternative (Count V, *see id.* ¶¶ 206-11), and various states' consumer protection statute violations (Counts VI-IX, *see id.* ¶¶ 210-53).

[6] Independent Trustees refers to the following individuals: Emerson U. Fullwood, Amy Gutmann, F. Joseph Loughrey, Mark Loughridge, Scott C. Malpass, Deanna Mulligan, André F. Perold, Sarah Bloom Raskin, and Peter F. Volanakis.  *See* DI 65 ¶ 36.  During the alleged events, the Delaware Trust had one more trustee — Mortimer J. Buckley — who also served as a Vanguard corporate officer.  *See id.*

[7] Vanguard Defendants refers to the following parties: Vanguard, Inc., the Delaware Trust, Mortimer J. Buckley, John Bendl, Christine M. Buchanan, and John E. Schadl.  Where necessary, we will refer to the company, Delaware Trust, and Vanguard's individual officers separately.

First, Independent Trustees and Vanguard Defendants argue that Investors lack standing to pursue their claims.  *See* DI 84 at 2; DI 85-2 at 8-14.  They argue that the harm purportedly suffered "depends on a number of inherently unknowable future events and circumstances."  DI 85-2 at 10.  They believe that Investors' claimed injuries are contingent, in large part, upon the unpredictability of the stock market — which would affect any future returns on investments made by Investors with the money they received as a capital gains distribution — and the uncertainty of Investors' future tax brackets — which would affect any future capital gains taxes paid on distributions.  *See id.* at 10.  In Independent Trustees' and Vanguard Defendants' view, standing is not conferred on parties with such conjectural injuries.[8]

Second, Independent Trustees and Vanguard Defendants argue that Investors fail to plausibly allege any breach of fiduciary duty.  *See* DI 84 at 7-11; DI 85-2 at 14-15, 19-21.  They argue that the allegations do not show "an 'extreme' departure from the ordinary standard of care" during the process of changing the Institutional Funds' investment threshold.  DI 84 at 8.  They submit that Investors' own complaint contains allegations showing they properly considered information at their disposal to make a decision benefiting the large majority of investors.  *See* DI 84 at 8; DI 85-2 at 20.  And they insist that Investors fail to allege any self-interested transaction or actions in bad faith — one of which is required for a breach of the duty of loyalty claim.  *See* DI 84 at 9-11.

Investors disagree.  *See generally* DI 86.  First, standing.  They argue that the "damage is done"; they received unexpected capital gains distributions and had to pay taxes on them.  *Id.* at

---

[8] Independent Trustees and Vanguard Defendants also argue that Investors do not have standing to pursue injunctive relief, restitution, or disgorgement.  *See, e.g.*, DI 85-2 at 12-14.

9.  Investors argue we can infer several plausible outcomes showing they suffered concrete, out-of-pocket damages. *See id.* at 10-13.  They characterize any argument against standing as one incorrectly focusing on the amount of damages, rather than the existence of an injury. *See id.* at 13-15.

Second, fiduciary duties.[9]  Investors cite to the "readily available alternatives" that could have been utilized to change to the Institutional Funds' minimum investment amount, remain competitive in the investment marketplace, and avoid the adverse effects of unanticipated capital gains distributions. *See id.* at 25.  And, specifically for the Independent Trustees, Investors argue they cannot simply point the finger and blame the information and data they relied upon to change the Institutional Funds' structure. *See id.* at 27.  The finger-pointing, according to Investors, is a distraction from their failure to critically consider the effects of the December 2020 decision on Investors. *See id.* at 25-26.

We have subject-matter jurisdiction over the action. *See* 28 U.S.C. § 1332(d)(2).  We also heard oral argument on the pending motions. *See* DI 97.  They are ripe for adjudication.

For the reasons set forth below, we grant in part and deny in part the motions.

**III.    <u>Standard of Review</u>**

The motions challenge Investors' standing and the sufficiency of their complaint.  "[T]o survive a motion to dismiss for lack of standing, a plaintiff 'must allege facts that affirmatively and plausibly suggest that it has standing to sue.'" *Finkelman v. NFL (Finkelman I)*, 810 F.3d 187, 194 (3d Cir. 2016) (second alteration in original) (quoting *Amidax Trading Grp. v.*

---

[9] Investors concede that the Delaware Trust did not owe them a fiduciary duty. *See* DI 86 at 24 n.13.

*S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).  And "[w]hen assessing standing on the basis of the facts alleged in a complaint, . . . we apply the same standard of review we use when assessing a motion to dismiss for failure to state a claim." *Id.* (citing *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)).  So, the same standard of review applies for the challenges to standing and the plausibility of Investors' claims.

Our review of motions to dismiss proceeds in three steps.  Step one: "tak[e] note of the elements a plaintiff must plead to state a claim." *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).  Step two: "review[] the complaint and disregard[] any 'formulaic recitation of the elements of the claim' . . . or other legal conclusion.'" *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022) (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016)).  Step three: assume the veracity "of the remaining allegations . . . constru[e] them in the light most favorable to the plaintiff, and draw[] all reasonable inferences in the plaintiff's favor." *Id.* at 328.

While "we must accept [the non-movant's] allegations as true," we do so "with the important caveat that the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (second alteration in original) (quoting *Iqbal*, 556 U.S. at 679).  And we apply Delaware law to most of Investors' claims,[10] but will not

---

[10] There is somewhat of a consensus regarding which states' laws apply to Investors' claims.  In Independent Trustees' motion, they argue Delaware law applies.  *See* DI 84 at 7.  In Vanguard Defendants' motion, they state that Delaware law applies to claims against the Delaware Trust and individual defendants, but not to Vanguard.  *See* DI 85-2 at 14 n.8 (citing the

"impute[]" the pleading standards under Delaware law, which require more specificity than federal courts.  *See In re Tower Air, Inc.*, 416 F.3d 229, 236 (3d Cir. 2005).

## IV.    <u>Analysis</u>

### A.    **Investors plausibly alleged a non-speculative injury in fact.**

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The doctrine "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood."  *Id.*

To have standing, a plaintiff must show "three 'irreducible' elements":

> First, the plaintiff must have suffered an "injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."

> Second, the plaintiff's injury must be "fairly traceable to the challenged action of the defendant," meaning that "there must be a causal connection between the injury and the conduct complaint of."

> Third, it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision.

*Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (cleaned up) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "The plaintiff bears the burden of proving standing."

*Finkelman v. Nat'l Football League* (*Finkelman II*), 877 F.3d 504, 511 (3d Cir. 2017).

---

internal affairs doctrine).  They "assume[]" that Pennsylvania law applies to the claims against Vanguard, "as that is the law of the forum and Vanguard is incorporated and headquartered in" Pennsylvania.  *Id.*

In response, Investors start by citing the elements for a breach of fiduciary duty claim under Pennsylvania law, but pivot and assert that Delaware law and Pennsylvania law have identical standards.  *See* DI 86 at 22.  Throughout their opposition brief, Investors cite both Delaware and Pennsylvania case law.

We apply Delaware law except for Investors' claims against Vanguard.  Without much substantive choice-of-law analyses from either party, we express no further opinion as to which should apply.

Here, Vanguard Defendants and Independent Trustees question Investors' ability to satisfy element one: injury in fact.  We focus our analysis there.

 "The purpose of the injury-in-fact requirement, the Supreme Court has explained, is 'to distinguish a person with a direct stake in the outcome of a litigation — even though small — from a person with a mere interest in the problem.'"  *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 162 (3d Cir. 2017) (quoting *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 660, 689 n.14 (1973)).  "In the context of a motion to dismiss, . . . 'the [i]njury-in-fact element is not Mount Everest'"; showing an injury in fact "require[s] only that [a] claimant allege[] some specific, identifiable trifle of injury."  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (second and fifth alterations in original) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005)).

An injury in fact has three essential elements: it is concrete, it is particularized, and it is actual or imminent.  *See Cottrell*, 874 F.3d at 167 ("An injury must be *both* concrete and particularized; these are distinct components of injury in fact."); *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022) (quoting *Lujan*, 504 U.S. at 560) ("[T]he injury must be 'actual or imminent, not "conjectural" or "hypothetical."'").

Vanguard Defendants and Independent Trustees argue that the alleged injuries are conjectural.  *See* DI 84 at 2 (injury "depends on conjecture as to" multiple factors); DI 85-2 at 10 ("rest[] entirely on speculation" and are "based on nothing more than conjecture as to when [Investors] would have sold their investments"), 12 ("injury rests entirely on speculation regarding the future value of a hypothetical investment"); DI 87-2 at 8.  Therefore, we focus only on whether Investors allege a conjectural injury.

12

A "financial harm is a 'classic' and 'paradigmatic form[]' of injury in fact." *Cottrell*, 874 F.3d at 163 (alteration in original) (quoting *Danvers*, 432 F.3d at 291); *see also Harry & Jeanette Weinberg Found. Inc. v. ANB Inv. Mgmt.*, 1997 WL 652342, at *7 (N.D. Ill. Oct. 10, 1997) (holding charitable foundation alleged a non-speculative injury in fact where money manager generated an unexpected capital gains tax through portfolio restructuring).  Similarly, "the deprivation of a monetary benefit is precisely the sort of economic injury that normally satisfies the injury in fact requirement." *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1025 (C.D. Cal. 2020) (holding injury in fact was not conjectural where IRS had already decided to deny stimulus payments to group of incarcerated individuals before they filed tax returns); *Bodor v. Maximus Fed. Servs., Inc.*, 2021 WL 4941503, at *2 (E.D. Pa. Oct. 22, 2021) (holding plaintiff suffered an actual injury where she could not make "use of" or "earn interest" on improperly withheld tax refund); *cf. Coon v. Wood*, 160 F. Supp. 246, 251 (D.D.C. 2016) (holding, at summary judgment, that "the mere possibility of future tax liability" from property sale did not confer standing where there was "no evidence" that IRS would audit plaintiff or impose future "additional taxes").

The Third Circuit has "provide[d] a clear lesson" for a plaintiff seeking to establish an economic injury: "do more than offer conclusory assertions."  *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 285 (3d Cir. 2018). Allegations of "some economic injury" are vital, even if that calls for sketching out some of the underlying economic theory.  *Id.* at 287-88.  But courts should avoid requiring a "detail[ed] economic model[]" at the pleading[s] stage" to show economic injury.  *Id.*  Requiring such detailed pleadings improperly lumps together Article III's injury-in-fact requirement with

proving damages. *Finkelman I*, 810 F.3d at 202 n.92 ("In the mine run of cases, where a complaint alleges that a defendant committed an unlawful acted that caused a traditional injury, the most plausible inference will be that the plaintiff sustained an Article III injury. The *amount* of damages is then a question of proof.").

The Third Circuit's pair of decisions in *Finkelman* illustrate these principles. *See Finkelman I*, 810 F.3d 187; *Finkelman II*, 877 F.3d 504. In *Finkelman*, two football fans wanted tickets to the Super Bowl. *See Finkelman I*, 810 F.3d at 190. One of the fans purchased tickets well above face value. *See id.* at 190. He alleged the NFL's practice of withholding tickets from fans caused him economic harm in the form of higher prices on the ticket resale market. *See id.* at 190-91.

The fan raised two standing arguments — both rejected. Relevant here, the Third Circuit rejected the argument that the NFL's withholding strategy (and reduction of ticket supply) raised resale market prices and caused his injury. *See id.* at 199. The Third Circuit distinguished from a "simple price inflation theory [of standing] based on the relationship between supply and demand in the ticket resale market," explaining "[i]t is pure conjecture about what the ticket resale market might have look like if the NFL had sold its tickets differently." *Id.* at 201. The "bald assertion" of economic harm was "unsupported by well-pleaded facts" about how the NFL's strategy affected the market. *Id.* at 202-03. Thus, the Third Circuit dismissed the appeal for lack of jurisdiction. *Id.* at 203.

The standing issue reappeared before the Third Circuit after the fan amended his complaint. *See Finkelman II*, 877 F.3d at 507. This time, the fan supported his theory, i.e., the economic effect of the withholding strategy on the resale market, with more allegations from "an

economist who specializes in sports and ticketing." *See id.* at 509-12.  The Third Circuit held

that he sufficiently alleged that withholding tickets prevents more "direct fan-to-fan sales,"

which in turn prevents lower resale prices. *Id.* at 512.  The Third Circuit said the second attempt

at demonstrating a non-speculative injury "offered economic facts that are specific, plausible,

and susceptible to proof at trial." *Id.* at 513.

So, a plaintiff claiming an economic injury must provide allegations beyond "strong

suspicion[s]" that a defendant's conduct caused financial harm. *Finkelman I*, 810 F.3d at 201.

At the pleadings stage, we should not have to guess about the effects of a defendant's action on

the market to conclude that an injury occurred.  *See also Thorne v. Pep Boys Manny Moe & Jack

Inc.*, 980 F.3d 879, 887 (3d Cir. 2020) (holding plaintiff "propound[ed] an economic injury that

requires speculation about market or firm-level effects" from selling tires differently).

Here, Investors have adequately alleged that the unexpected capital gains taxes resulted

in a plausible injury-in-fact.  Ample allegations outline the structure, investment strategy, and

logic behind investing in Vanguard's Target Date Funds.  *See, e.g.*, DI 65 ¶¶ 54-56, 90-94.  The

allegations make it plausible that Investors — most of which "do not plan to sell any share in the

fund until the target retirement date" — would have paid less in capital gains taxes when

liquidating their shares of the Target Date Funds upon retirement. *Id.* ¶ 97; *see id.* ¶ 93.  The

December 2020 decision plausibly deprived them of the exact benefit that the funds present to

prospective investors: invest with us, save for retirement, make money, and pay less in taxes on

the money you saved (and earned) upon retiring. *See id.* ¶ 93.  That is enough to demonstrate

standing.

*Finkelman*'s reasoning supports our conclusion.  Investors were not required at the

pleadings stage to explain their entire economic theory of damages with precision.  Investors do,
however, give us what the Third Circuit demands: allegations making their theory of damages
"susceptible to proof at trial."  *Finkelman II*, 877 F.3d at 513.  The allegations of an injury are
more than a "suspicion" that the December 2020 change is correlated to actual financial harm.

Vanguard Defendants and Independent Trustees' counterarguments speak more to
estimating the amount of damages — or perhaps the potential challenges of doing so — rather
than whether an Article III injury in fact exists.  Their own authorities suggest as much.  *See
Kemmerer v. ICI Ams. Inc.*, 70 F.3d 281, 290 (3d Cir. 1995) (assessing plaintiffs' "projection of
damages" in a post-trial appeal); *Solin v. Domino*, 2009 WL 536052, at *2 (S.D.N.Y. Feb. 25,
2009) (assessing, at the pleadings stage, the plausibility of "proximate and actual damages"
element of a negligent misrepresentation claim under New York law).  But the inquiries are
crucially different.  And they may rightly point out that tax rates, tax laws, and tax consequences
are subject to change in the future.  DI 85-2 at 10, 12.  But again, arguing about the effects of
future changes to tax laws goes more towards guessing the amount of damages Investors could
be owed — not whether the complaint demonstrates the *existence* of a non-speculative injury.
Here, Investors allege enough facts to show they suffered an economic injury the decision to
lower the Institutional Funds' investment threshold.  They met their burden of establishing
standing at the pleadings stage.[11]

---

[11] For Investors' claim for injunctive relief, we agree with Vanguard Defendants that the
well-pleaded facts do not demonstrate a "certainly impending" or concrete injury sufficient to
confer standing.  *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 402 (2013); *see Const. Party of
Pa. v. Aichele*, 757 F.3d 347, 361 (3d Cir. 2014) (alteration in original) (quoting *City of LA v.
Lyons*, 461 U.S. 102, 103 (1983)) ("However, '[p]ast exposure to illegal conduct does not in
itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any

**B.      Investors plausibly alleged that Independent Trustees and Vanguard's officers breached their duty of care.  But Investors' claim fails against Vanguard because there are no plausible allegations of a fiduciary or confidential relationship.[12]**

Our analysis of Investors' claims will proceed separately between Vanguard (the company) and all other individual defendants.[13]  The parties generally agree that Pennsylvania law should apply with respect to Vanguard, and for everyone else, Delaware law.  *See* DI 84 at 7;

---

continuing, present adverse effects.'").

    And for Investors' claim for restitution or disgorgement, we disagree with Vanguard Defendants' argument that Investors make only "conclusory assertion[s]."  DI 85-2 at 14. Investors plausibly allege that they paid a "set percentage of their investment" in management fees.  These are, as Investors argue, "concrete payments" sufficient for this stage of the case.  DI 86 at 16.

    [12] Because Investors plead their aiding and abetting claim in the alternative, we express no opinion as to whether they state a plausible cause of action against Independent Trustees or the members of Vanguard's C-suite.  *See* DI 65 ¶¶ 185-90.  The claim can only be asserted as to Vanguard, but "[a] corporation cannot aid and abet violations by the fiduciaries who serve it."  *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 54 (Del. Ch. 2014); *see also In re Cornerstone Therapeutics Inc. Stockholder Litig.*, 2014 WL 4418169, at *12 (Del. Ch. Sept. 10, 2014) (similar), *rev'd on other grounds*, 115 A.3d 1173 (Del. 2015); *Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co.*, 2014 WL 3954987, at *5 (Del. Ch. Aug. 7, 2014).

    Further, Investors' unjust enrichment claim is pled in the alternative.  *See* DI 65 ¶ 208. Because we hold that Investors have a plausible, "adequate remedy at law," we dismiss Count V of their complaint.

    [13] As noted, Investors dropped their fiduciary duty claim against the Delaware Trust.  *See supra* n.10.

    And, to be clear, we are *not* deciding whether the business judgment rule protects the conduct at issue because the Third Circuit treats the rule as an affirmative defense, and "the unanswered affirmative defense [does not] appear[] on the face of [Investors'] complaint." *Schmidt v. Sholas*, 2015 WL 6955440, at *5 (E.D. Pa. Nov. 10, 2015); *see In re Tower Air, Inc.*, 416 F.3d 229, 283 (3d Cir. 2005) ("Generally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6).  *A complaint may be dismissed under Rule 12(b)(6) where an unanswered affirmative defense appears on its face, however* . . . ." (emphasis added)).

    The parties submitted supplemental briefing on this issue and seem to agree with us.  *See* DI 98 at 2; DI 99 at 2 (stating that defendants challenge the "first hurdle" to pleading a breach of fiduciary claim — gross negligence — and not the "second step"— the business judgment rule).

DI 85-2 at 14 n.8; DI 86 at 23 (citing fiduciary relationship standard under Pennsylvania law when discussing claim with respect to Vanguard).

       1.  <u>Investors plausibly allege that Independent Trustees and Vanguard's officers acted with gross negligence in enacting the changes to the Target Date Funds.</u>

Investors allege that Independent Trustees and Vanguard's officers breached both the duty of care and duty of loyalty owed under Delaware law.  *See* DI 65 ¶ 180.  A plausible claim for a breach of duty of care exists, but not duty of loyalty.

       a.  *Duty of Care*

Under Delaware law, "[t]he fiduciary duty of due care requires that directors . . . 'use that amount of care which ordinarily careful and prudent men would use in similar circumstances,' and 'consider all material information reasonably available' in making business decisions, and that deficiencies in the directors' process are actional only if the directors' actions are *grossly negligent*."  *In re Walt Disney Co. Derivative Litig.* (*Disney II*), 907 A.2d 693, 750 (Del. Ch. 2005) (emphasis added) (footnote omitted) (first quoting *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963); then quoting *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000)).

"In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was 'recklessly uninformed' or acted 'outside the bounds of reason.'"  *Albert v. Alex. Brown Mgmt. Servs., Inc.* (*Albert II*), 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) (quoting *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906, at *42 (Del. Ch. Sept. 3, 1996)).  A demonstration of gross negligence "requires the articulation of facts that suggest a *wide* disparity between the process the directors used . . . and that which would have been rational."  *Guttman v. Huang*, 823 A.2d 492, 507 n.39 (Del. Ch. 2003).  Said differently, gross negligence may be supported by allegations that

"suggest that the defendant directors . . . adopt[ed] a 'we don't care about the risks' attitude concerning a material corporate decision." *In re Walt Disney Co. Derivative Litig.* (*Disney I*), 825 A.2d 275, 289 (Del. Ch. 2003).  Delaware law's "definition of gross negligence . . . is extremely stringent." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008); *see also In re: Old Bpsush, Inc.*, 2021 WL 4453595, at *8 (D. Del. Sept. 29, 2021) (cleaned up) ("In contrast to ordinary negligence, gross negligence is an extreme departure from the ordinary standard of care.").

When analyzing the plausibility of a duty of care claim, the Third Circuit has said "an unsuccessful attack on an allegedly egregious [business] decision does not preclude an attack on the process used to reach that decision." *Tower Air*, 416 F.3d at 240.  In *Tower Air*, the Third Circuit held that allegations of "rubber-stamping . . . major capital expenditures" displayed a failure "to be informed and exercise judgment" — the "core duty of care inquiry." *Id.* at 240. The duty of care claim survived a motion to dismiss despite the dismissal of a fiduciary duty claim based on the actual "merits of [the] business decision." *Id.*  Applying Delaware law, the Third Circuit said that the "[s]ubstantive review of business decisions . . . is effected when decisions are tested for bad faith or waste." *Id.*

Further, "criticism . . . for not evaluating fully alternative transactions does not implicate director self-interest or lack of independence," but it may "state at best a claim for breach of the duty of care." *In re Alloy, Inc.*, 2011 WL 4863716, at *8 (Del. Ch. Oct. 13, 2011); *see Paramount Commc'ns Inc. v. QVC Network Inc.*, 1993 WL 544314, at *3 (Del. Dec. 9, 1993) (stating directors had duty "to summon, and act with due care on, all material information reasonably available, including information necessary to compare the two [transactions] to

determine which of these transactions, or an alternative course of action, would provide the best value available to the stockholders"). In this situation, we "should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives." *Albert II*, 2005 WL 2130607, at *4.

Here, Investors plausibly allege that Independent Trustees and Vanguard's officers[14] adopted a "we don't care about the risks" attitude when lowering the Institutional Funds' minimum investment amount, and failed to meaningfully consider alternative ways to enact the change. The well-pleaded facts show some awareness of — and a somewhat careless attitude towards — the repercussions of the change for Investors. *See, e.g.*, DI 65 ¶¶ 108-11, 136. We can reasonably infer that Independent Trustees' and Vanguard's officers' interest in competitive advantage caused them to overlook the effects of their decision. *See id.* ¶¶ 111, 134-36. 142. And this inference is bolstered by allegations of alternative transactions that Independent Trustees and Vanguard's officers could have chosen to implement without forcing Investors to suffer tax consequences. *See, e.g.*, *id.* ¶¶ 89, 99-100, 103-05. Instead, and with knowledge of the tax consequences for Investors, they neglected the risks. *See id.* ¶ 136. At the pleadings stage, allegations of alternative ways to change the Institutional Funds' investment threshold is not simple "second-guessing" — it is suggestive of a process-oriented failure.[15]

---

[14] Unlike Vanguard *the company*, its officers do not argue that they do not owe a fiduciary duty to Investors. *Cf.* DI 85-2 at 19-21.

[15] On this point, Vanguard's officers cite to *In re Affiliated Computer Services*, stating that "[a] complaint which alleges merely that some course of action other than that pursued by the Board of Directors would have been more advantageous gives rise to no cognizable cause of action." DI 85-2 at 19 (quoting 2009 WL 296078, at *10 n.46 (Del. Ch. Feb. 6, 2009)). Vanguard's officers extract this language from a footnote quoting a New York state court case regarding application of the business judgment rule. *See In re Affiliated Comp. Servs.*, 2009 WL

We do not agree with Independent Trustees' argument that Investors' only "quarrel" is with the overall decision to lower the minimum investment amount.  *See* DI 84 at 9; *cf.* DI 65 ¶¶ 135-36.  *Tower Air* tells us that a plausible duty of care claim can exist even if, as the Vanguard officers argue, "the decision had no adverse tax impact on the vast majority of shareholders."  DI 85-2 at 20.  The argument does not rule out — at the pleadings stage — the possibility that Independent Trustees and Vanguard officers acted "outside the bounds of reason" by disregarding alternatives.  *Albert II*, 2005 WL 2130607, at *4.  For these reasons, Investors' duty of care claims against Independent Trustees and Vanguard officers move to discovery.

        b.   *Duty of Loyalty*

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."  *DelphX Corp. v. Fondren*, 600 F. Supp. 3d 540, 549 (E.D. Pa. 2022) (alteration in original) (internal quotation marks omitted) (quoting *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d at 33).  "Under Delaware law, to state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs."  *In re Solns. Liquidation LLC*, 608 B.R. 384, 401 (Bankr. D. Del. 2019) (cleaned up) (quoting *In re Fedders N. Am. Inc.*, 405 B.R. 527, 540 (Bankr. D. Del. 2009)).  "[T]he absence of an illicit directorial motive and the presence of a strong rationale for a decision taken . . . makes it difficult for a plaintiff to state a loyalty claim."  *In re Lear Corp. S'holder Litig.*, 967 A.2d at

---

296078, at *10 n.46.  Because we are not deciding whether the business judgment rule applies to the decision to lower the Institutional Funds' investment threshold, we presently do not find the language persuasive.

654 n.62.

A "subsidiary element" of the duty of loyalty is the "duty to act in good faith."  *In re Fedders N. Am., Inc.*, 405 B.R. at 540.  "Loyalty claims predicated on bad faith must be supported by allegations amounting to 'more than gross negligence,'" and are demonstrated in only "[a] very extreme set of facts."  *In re: Old Bpsush, Inc.*, 2021 WL 4453595, at *12 (quoting *In re Lear Corp. S'holder Litig.*, 967 A.2d at 654-55); *see also Lipman v. GPB Cap. Holdings LLC*, 2020 WL 6778781, at *11 (Del. Ch. Nov. 18, 2020) ("It is well-settled under Delaware law that gross negligence is not bad faith.").  "The Delaware Supreme Court has identified three examples of conduct that may establish a failure to act in good faith":

> (1) where a director intentionally acts with a purpose other than that of advancing the best interests of the corporation;
>
> (2) where a director acts with the intent to violate applicable positive law; [or]
>
> (3) where [a] director intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.

*In re Fedders N. Am., Inc.*, 405 B.R. at 540 (cleaned up).

Here, Investors argue that Independent Trustees and the Vanguard officers breached their duty of loyalty by acting in bad faith.  *See* DI 86 at 25.  The allegations do not show an intentional failure to act by Independent Trustees or the Vanguard officers in the best interests of Investors.  The facts plausibly demonstrate gross negligence in the failure to consider different ways of enacting the changes to the Target Date Funds, but absent are any allegations of intentional acts, intentional failures, or an intent to violate the law on the part of those with decision-making authority.  Rather, the allegations explicitly admit a "strong rationale" for the decision to enact the change to the Target Date Funds.  *In re Lear Corp. S'holder Litig.*, 967

A.2d at 654 n.62; *see* DI 65 ¶¶ 7, 10 (calling the change for "[m]ost investors" a "no-brainer opportunity").

Therefore, Investors do not allege a plausible duty of loyalty claim.

> 2. Investors' fiduciary duty claim against Vanguard fails because the facts do not plausibly allege a fiduciary or confidential relationship.

"The Pennsylvania Supreme Court has said that a plaintiff alleging a fiduciary breach must first demonstrate that a fiduciary or confidential relationship existed, which requires that 'one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms.'" *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 500 (3d Cir. 2013) (citation omitted) (quoting *In re Est. of Clark*, 359 A.2d 777, 781 (Pa. 1976)). "[N]o precise formula exists" to decide whether someone is owed a fiduciary duty, but it "exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Silver v. Silver*, 219 A.2d 659, 662 (Pa. 1966); *see Conquest v. WMC Mortg. Corp.*, 247 F. Supp. 3d 618, 634 (E.D. Pa. 2017) ("The fundamental element to establish a breach of a fiduciary duty is the existence of fiduciary relationship between both parties."); *see also Brandow Chrysler Jeep Co. v. DataScan Techs.*, 511 F. Supp. 2d 529, 539 (E.D. Pa. 2007) (complaint alleged fiduciary relationship where plaintiff had "complete trust in" and relied on "defendant's 'pretense of expertise'").

The Third Circuit has articulated three elements a plaintiff must prove for a breach of fiduciary duty under Pennsylvania law:

> (1) the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed;
>
> (2) the plaintiff suffered an injury; and

  (3) the agent's failure to act solely for the plaintiff's benefit . . . was a real
    factor in bring[ing] about plaintiff's injuries,

*Dinger v. Allfirst Fin., Inc.*, 82 F. App'x 261, 265 (3d Cir. 2003) (alteration in original) (quoting

*McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998)).  "The party

arguing for the fiduciary [or confidential] relationship bears the burden of proving it exists."

*Reginella Const. Co., Ltd. v. Travelers Cas. & Sur. Co. of Am.*, 949 F. Supp. 2d 599, 611 (W.D.

Pa. 2013).

   The Pennsylvania Supreme Court examined the nature of and differences between

fiduciary and confidential relationships in *Yenchi v. Ameriprise Financial. See* 161 A.3d 811

(Pa. 2017).  The court recognized that some fiduciary relationships "exist[] as a matter of

law" — like "[p]rincipal and agent, trustee and cestui que trust, attorney and client, guardian and

war, and partners." *Id.* at 820.  Where the fiduciary relationship does not exist as a matter of law,

"equity compels" the recognition of "confidential relationships" in certain circumstances. *Id.*

The circumstances, though fact-specific, can include "[f]amily relationships or close personal

friendships," parties with "special vulnerabilit[ies]," or "[w]here one party lacks the ability to

understand the nature and terms of the transaction and simultaneously reposes their complete

trust in the other party based on well-established relationships." *Id.* at 821.

   Further, the Third Circuit has said Pennsylvania fiduciary duty claims against investment

advisers must show a relationship that can be "characterized by justifiable reliance or

'overmastering influence.'" *See Belmont*, 708 F.3d at 506 n.44.[16]  In *Belmont*, four investors fell

---

   [16] *Belmont* discussed — but did not conclusively decide — whether the fiduciary duty
claims "can properly be brought as a matter of [Pennsylvania] law" as opposed to federal law.

victim to a Ponzi scheme orchestrated in part by an officer to an advisory firm.  *Id.* at 477-79.

Two of the investors "entered into advisory agreements with" the firm; the other two did not.  *Id.*

at 479.  The Third Circuit said the two investors that did not enter advisory agreements "could

not justifiably rely on any [of the firm's] advice," therefore, they could not establish a fiduciary

relationship.  *Id.* at 506 n.44.  The other two investors had "better grounds on which to claim a

fiduciary relationship" because of the advisory agreements they signed with the firm.  *Id.*; *see id.*

at 506 (noting the advisory firm "d[id] not contest that [it] owed a fiduciary duty . . . based on

their investment advisory agreements").  Nevertheless, the investors failed to proffer facts

showing that they "d[id] not deal with [the advisory firm] on equal terms," that is, failed to show

a breach of fiduciary duty.  *Id.* (quoting *In re Est. of Clark*, 359 A.2d at 781).

 Here, Vanguard argues that it advises the Delaware Trust, thus, the duties it owes are to

only the Delaware Trust — not Investors.  *See* DI 85-2 at 15.  In response, Investors argue that

Vanguard's role is "not limited to serving merely as an 'investment advisor,'" and the company's

own representations to shareholders exhibit its fiduciary relationship.  DI 86 at 23-24.[17]

 The facts do not show a plausible fiduciary or confidential relationship between

Vanguard and Investors under Pennsylvania law.  For example, Investors do not allege that they

---

*Id.* at 503.  The Third Circuit noted the "paucity of Pennsylvania law on the fiduciary duties
owed by investment advisors" when comparing the elements of the Pennsylvania Securities Act
to the Advisers Act, which prohibits investors from engaging in certain trading activities  *Id.* at
503 n.39.

[17] We tried clearing up the nature of the relationship at oral argument.  Vanguard echoed
that it advises the Delaware Trust on a contractual basis and does not owe a duty to the Delaware
Trust's shareholders.  *See* DI 65 ¶ 46.  Vanguard also said at oral argument that Independent
Trustees are the ones who vote on decisions like the December 2020 change, "informed by the
advisor and input from the advisor" — Vanguard.

had a fiduciary relationship as a matter of law with Vanguard.  *Cf.* DI 87-2 at 9 n.6.  They do not

claim that Vanguard acted as an agent or trustee for Investors.  Investors' allegations are

dissimilar to any of the "relationships" discussed in *Yenchi* that the Pennsylvania Supreme Court

said may constitute a fiduciary or confidential relationship.

Even outside of the relationships in *Yenchi*, a fact-specific inquiry does not reveal a

fiduciary or confidential relationship with Vanguard.  The allegations reflect that Vanguard

advises the Delaware Trust and Independent Trustees in its day-to-day operations and fund

management decisions.  This "advising" is fundamentally different than, for example, the actions

of the investors and advisory firm in *Belmont*.  Perhaps most importantly, there are no allegations

that Vanguard *directly* advised Investors' individual decisions to invest money in the Target Date

Funds.  *Cf. Belmont*, 708 F.3d at 479-80.  Without facts showing an overmastering influence

over decisions, Investors fail to allege a plausible fiduciary or confidential relationship.

Therefore, they fail to state a breach of fiduciary duty claim under Pennsylvania law.

### C.  Investors' gross negligence cause of action is dismissed because it is duplicative of their fiduciary duty claim.

Both Independent Trustees and Vanguard Defendants seek dismissal of the gross

negligence cause of action because "Delaware law does not recognize an independent cause of

action against corporate directors and officers for reckless or gross mismanagement; such claims

are treated as claims for breach of fiduciary duty."  *In re Citigroup Inc. S'holder Derivative

Litig.*, 964 A.2d 106, 114 n.6 (Del. Ch. 2009).  Investors read this language from *Citigroup*

differently, arguing that it leaves open the possibility of asserting a separate claim for gross

negligence.  *See* DI 86 at 31 (citing *Citigroup*, 964 A.2d at 114 n.6) ("These common law

standards thus govern the duties that directors and officers owe the corporation as well as claims

such as those for 'reckless and gross mismanagement,' *even if those claims are asserted separate and apart from claims of breach of fiduciary duty*." (emphasis added)).

We agree with Independent Trustees and Vanguard Defendants — not just because of the plain language of *Citigroup* but also because of the authority upon which it relies. *Citigroup* first references *Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies Inc.*, which reviewed a "common law fraud by nondisclosure" claim against a company where the plaintiff did *not* assert an additional breach of fiduciary duty claim. 854 A.2d 121, 152 & n.71 (Del. Ch. 2004) ("In a rare instance of selective targeting, the complaint explicitly limits its fiduciary duty claims . . . and *does not* purport to state such a claim against [the company] . . . ." (emphasis added)). *Citigroup* then cited to *Albert v. Alex. Brown Management Services, Inc.* (*Albert I*), which explained how "[p]laintiffs . . . scrupulously avoided using the words 'breach of fiduciary duty' to describe [d]efendants' conduct" in a negligence cause of action. 2004 WL 2050527, at *3 (Del. Super. Ct. Sept. 15, 2004). In other words, disguising fiduciary duty claims as other torts to avoid actually bringing a fiduciary duty cause of action under Delaware law.

*Citigroup* plainly states that we should not allow Investors' independent causes of action to proceed. It explains that courts should be wary of attempts to circumvent a normal fiduciary duty analysis under Delaware law by pleading fraud or negligence causes of action. Therefore, we dismiss Investors' cause of action.[18]

---

[18] Worth noting, the Third Circuit faced a similar question of whether a gross negligence action may proceed alongside duty of care claims in *Tower Air*. 416 F.3d at 241-42. The Third Circuit described the claims as having an "identical theory" and "apparent redundancy." *Id.* at 242. But the Third Circuit let the gross negligence claim through to discovery, stating that "[i]t may be that the adversarial process in its later stages elicits refinements in the concepts of gross negligence in Delaware that the parties have not yet uncovered." *Id.* The Delaware Chancery

### D. Investors' breach of covenant of good faith and fair dealing claim will pass into discovery.[19]

Under Delaware law, the implied covenant of good faith in a contract "is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (footnotes omitted) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)). "[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *All. Data Sys. Corp. v. Blackstone Cap. Partners V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009). "To prevail on an implied covenant claim, a plaintiff must prove 'a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Am. Healthcare Admin. Servs., Inc v. Aizen*, 285 A.3d 461, 478 (Del. Ch. 2022) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

But the "implied covenant of good faith and fair dealing [also] requires that the *discretion*" conferred on a party in a contract "be used reasonably and in good faith." *Winshall v. Viacom Intern., Inc.*, 55 A.3d 629, 638 (Del. Ch. 2011) (emphasis added); *see also Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 459 (Del. Ch. 2023) ("When

---

Court decided *Citigroup* four years after *Tower Air*, and we see enough of the "refinements" the Third Circuit predicted to dispose of the issue.

[19] Investors do not assert their breach of covenant claim against Vanguard or the Delaware Trust. *See* DI 65 at 49. And in their opposition brief, Investors exclude Vanguard officers from their implied covenant claim. *See* DI 86 at 34 n.16. The only set of defendants left are Independent Trustees.

applied to an exercise of discretion, this means that the exercise of discretionary authority must

fall within the range of what the parties would have agreed upon during their original

negotiations, if they had thought to address the issue.").  "At a minimum, the implied covenant

requires that the party empowered with the discretion to make a determination 'use good faith in

making that determination.'"  *Aizen*, 285 A.3d at 479 (quoting *Gilbert v. El Paso Co.*, 490 A.2d

1050, 1055 (Del. Ch. 1984)); *see In re P3 Health Grp. Holdings, LLC*, 2022 WL 16548567, at

*26 (quoting Restatement (Second) of Contract § 205 cmt. a (Am. Law. Inst. 1981)) ("To

exercise a discretionary right in good faith for purposes of the implied covenant means to do so

with 'faithfulness to an agreed common purpose and consistency with the justified expectations

of the other party.'").

Here, the parties do not dispute that their contract gives Independent Trustees "discretion

to make fund management decisions, including . . . altering investment minimums."  DI 65

¶ 200; *see* DI 84 at 13.  Independent Trustees argue that the facts do not show they "acted in bad

faith" in exercising their discretion to alter the Institutional Funds' investment minimum.  DI 84

at 13.  And without allegations of bad faith, according to Independent Trustees, the claim fails.

We disagree.  Independent Trustees have not cited convincing authority that a showing of

bad faith is a prerequisite for a breach of implied covenant claim.  *See* DI 86 at 33; *see also*

*Dieckman v. Regency GP LP*¸155 A.3d 358, 368 (Del. 2017) ("Our use of the implied covenant

is based on the *words of the contract* and not the disclaimed fiduciary duties." (emphasis

added)); *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *17 (Del. Ch. Nov.

17, 2014) ("A breach of the implied covenant also does not necessarily require that a party have

acted in bad faith."); *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member,*

*LLC*, 50 A.3d 434, 442 (Del. Ch. 2012) ("There are references in Delaware case law to the implied covenant turning on the breaching party having a culpable mental state . . . , [but] [p]roving a breach of contract claim does not depend on the breaching party's mental state." (citation omitted)).

While the briefing did not make the issue perfectly clear, it is fair to say that Investors did carry their burden as movant.  Investors' breach of implied covenant claim survives the motions to dismiss.

> **E.  Most of Investors' state consumer protection law causes of action will proceed to discovery.**

For the reasons explained below, Investors consumer protection law causes of action may proceed against defendants under Colorado, Massachusetts, and Illinois law.

> 1.  <u>California</u>

The subclass of Investors from California allege that Independent Trustees and Vanguard defendants engaged in unfair conduct under the California Unfair Competition Law (UCL).  DI 65 ¶ 215 (citing Cal. Bus. & Prof. Code § 17200).  They assert their UCL claim "***in the alternative***, if they lack an adequate remedy at law." *Id.*  ¶ 213 (emphasis added).  Independent Trustees and Vanguard Defendants both argue that Investors' "adequate remedy at law" precludes the California claim.  DI 84 at 17; *see* DI 85-2 at 18.

We agree with Independent Trustees and Vanguard Defendants that Investors have failed to plead they do not have an adequate legal remedy.  *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 845 (9th Cir. 2020) (holding plaintiffs claiming a UCL violation "must establish that [they] lack[] an adequate remedy at law before securing equitable restitution for past harm"); *see also Marshall v. Prestamos CDFI, LLC*, 2023 WL 2727541, at *14 (E.D. Pa. Mar. 30, 2023)

(acknowledging that courts have followed *Sonner* at the motion to dismiss stage, and dismissing plaintiffs' UCL claims that were pled in the alternative to a breach-of-contract claim); *see Hickman v. Subaru of Am., Inc.*, 2022 WL 11021043, at *11 n.13 (D.N.J. Oct. 19, 2022) (dismissing, post-*Sonner*, a UCL claim pled in the alternative failed because "[p]laintiffs do not plead anywhere in the [a]mended [c]omplaint that they do not have an adequate remedy at law").

Therefore, we dismiss the California Investors' UCL claims.

2.  Colorado

The subclass of investors from Colorado allege that Independent Trustees and Vanguard Defendants violated Colorado's Consumer Protection Act (CCPA).  *See* DI 65 ¶¶ 220-34; *see also* Colo. Rev. Stat. Ann. § 6-1-105(rrr) (West) ("A person engages in a deceptive trade practice when . . . the person [e]ither knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice.").  Both Independent Trustees and Vanguard Defendants dispute whether Investors alleged that they "knowingly or recklessly ratified unlawful acts."  DI 84 at 17; *see* DI 85-2 at 19.  Here, as discussed, Investors have proffered some allegations that Independent Trustees and Vanguard Defendants knew their December 2020 decision would potentially subject Investors to unexpected tax consequences. *See, e.g.*, DI 65 ¶¶ 108-11, 136.  Therefore, the subclass's CCPA claim moves to discovery.

3.  Massachusetts

The subclass of Investors from Massachusetts claim Independent Trustees and Vanguard Defendants violated Massachusetts's consumer protection laws.  *See id.* ¶¶ 237-45; *see also* Mass. Gen. Laws ch. 93A, § 2(a) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.").  Vanguard

Defendants and Independent Trustees take two separate paths in their motions to foreclose this cause of action.  First, Vanguard Defendants argue that the conduct at issue did not "occur[] primarily in . . . Massachusetts."  DI 85-2 at 18-19; *see* Mass. Gen. Laws ch. 93A, § 11. Vanguard Defendants also argue that Investors fail to show the change to the investment threshold was "unfair."  DI 85-2 at 18.  Second, Independent Trustees argue they did not engage in a "trade or commerce."  *See* DI 84 at 15 (citing Mass. Gen. Laws ch. 93A, § 2(a)).

To start, we disagree with Vanguard Defendants' argument regarding the location of the conduct at issue.  Under Massachusetts law, it is Vanguard Defendants' burden to prove that transactions and actions did not occur "primarily and substantially within" Massachusetts.  Mass. Gen. Laws ch. 93A, § 11; *see* DI 86 at 42 n.21.  The question of where the conduct at issue occurred "is a fact-intensive inquiry, and one that is not appropriate at this stage of the proceedings, when the factual record has not yet been developed."  *TriState HVAC Equip., LLP v. Big Belly Solar, Inc.*, 2011 WL 3047784, at *4 (E.D. Pa. July 22, 2011) (analyzing Massachusetts consumer protection law).

Next, we are reluctant at the pleadings stage — and without the benefit of discovery — to adopt Vanguard Defendants' unfairness argument.  Unfairness is a circumstantial inquiry under Massachusetts law.  *See UBS Fin. Servs., Inc. v. Aliberti*, 133 N.E.3d 277, 293 (Mass. 2019). "Conduct is 'unfair' under Chapter 93A if it (1) falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; (2) is 'immoral, unethical, oppressive, or unscrupulous'; and (3) causes 'substantial injury to consumers.'"  *Louis v. Saferent Solns., LLC*, 2023 WL 4766192, at *14 (D. Mass. July 26, 2023) (quoting *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016)).  Unfair conduct "must generally be of an

egregious, non-negligent nature." *Walsh*, 821 F.3d at 160. As discussed in our fiduciary duty analysis, Investors allege conduct that at least crosses the line of ordinary negligence and closer to reckless disregard or gross negligence under Delaware law. Therefore, we reject Vanguard Defendants' unfairness argument.

Lastly, whether Independent Trustees engaged in "trade or commerce." "Under c. 93A, the 'trade or commerce' requirement is met when the defendant was operating in a 'business context' at the time of its allegedly unfair or deceptive activity," and "is a fact-specific, multifactor inquiry." *Aliberti*, 133 N.E.3d at 292. The motion to dismiss stage is not the place for the fact-specific inquiry that Massachusetts' "trade or commerce" requirement calls for.

Therefore, the subclass of Massachusetts Investors' claim moves forward.

4. <u>Illinois</u>

Finally, the subclass of Investors from Illinois allege that Independent Trustees and Vanguard Defendants the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA). *See* DI 65 ¶¶ 248-53. Independent Trustees and Vanguard Defendants raise largely overlapping arguments as the Massachusetts claim. *See* DI 84 at 16-17 (the conduct at issue did not "primarily and substantially" occur "in Illinois" (quoting *BCBSM, Inc. v. Walgreen Co.*, 512 F. Supp. 3d 837, 856 (N.D. Ill. 2021))); DI 85-2 at 18 (Vanguard Defendants' unfairness argument); DI 84 at 16 (Independent Trustees' "trade or commerce" argument). And both Investors and defendants admit that Investors' ICFA claim is largely the same as Massachusetts. *See* DI 84 at 16; DI 85-2 at 18-19; DI 86 at 44 (arguing "Illinois law . . . largely tracks the law of Massachusetts").

Because the subclass of Investors are residents of Illinois, and questions of unfairness and

whether defendants engaged in "trade or commerce" are fact-specific inquiries better left for

summary judgment, we deny the motions to dismiss with respect to the Illinois cause of action.

## V.  <u>Conclusion</u>

We conclude the following:

- Independent Trustees' and Vanguard Defendants' motions for leave to file reply briefs are granted.  *See* DI 87, 88.

- Defendants' motion to dismiss is granted in part and denied in part with respect to Count I (breach of fiduciary duty).  Only Investors' breach of fiduciary duty claims against Independent Trustees and Vanguard's officers based on the duty of care move to discovery.

- Defendants' motion to dismiss is granted without prejudice with respect to Investors' aiding and abetting cause of action (Count II) against Vanguard.

- Defendants' motion to dismiss is granted without prejudice with respect to Investors' gross negligence cause of action (Count III).

- Defendants' motion to dismiss is denied with respect to Investors' breach of the covenant of good faith and fair dealing claim against Independent Trustees (Count IV).

- Investors' unjust enrichment claim (Count V) is dismissed without prejudice because it is pled in the alternative, and Investors have a plausible remedy at law.

- Investors' causes of action under Colorado (Count VII), Massachusetts (Count VII), and Illinois (Count IX) state consumer protection laws proceed to discovery.  But we grant defendants' motion to dismiss their California cause of action (Count VI) without prejudice.