| | |
|---|---|
| **From:** | John Hughes |
| **To:** | Murphy_Chambers |
| **Cc:** | jstern@rosenlegal.com; pkim@rosenlegal.com; estone@rosenlegal.com; jbaker@rosenlegal.com; jgoldberg@rosenlegal.com; jday@paulweiss.com; amctootle@paulweiss.com; aehrlich@paulweiss.com; dkramer@paulweiss.com; azimmerman@debevoise.com; bfetzer@debevoise.com; mloconnor@debevoise.com |
| **Subject:** | In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM |
| **Date:** | Monday, February 17, 2025 6:29:47 PM |
| **Attachments:** | 2025-02-17 Objection to Motion for Final Approval.pdf |

==CAUTION - EXTERNAL:==

To the Chambers of Judge Murphy:

Please find attached my objection to Plaintiffs' Motion for Final Approval of the Proposed Class Action Settlement. I have copied counsel of record for all parties on this email. Please note that this has *not* been filed on ECF as it is a nonparty/absent class member objection and I understand that the parties or the Court will handle filing of nonparty submissions. Please let me know if chambers would like delivery of a hard copy.

Thank you for your assistance.

Respectfully submitted,
John Hughes

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

```
-------------------------------------------------------X
                                                    :
                                                    :
IN RE: VANGUARD CHESTER                             :
FUNDS LITIGATION                                    :    No. 2:22-cv-955-JFM
                                                    :
                                                    :
                                                    :
                                                    :
                                                    :
-------------------------------------------------------X
```

**OBJECTION TO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE**
**PROPOSED CLASS ACTION SETTLEMENT**

# CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ............................................................................................................3

I.    The Settlement Is Inadequate Because Class Members Receive No Benefit,
      While the Parties Capture Significant Value at the Class's Expense. ...........3

II.   The Notice Sent to the Class Was Incomplete, False, and Misleading.........6

      A.    The Notice Failed to Disclose the Related Regulatory Settlement...................6

      B.    The Notice Misrepresented the "Maximum" Recoverable Damages. ..............6

III.  The Settlement Does Not Treat Class Members Equitably, and
      Class Counsel's Distribution Methodology Creates Significant
      Conflicts of Interest Between Class Members. ..............................................9

IV.   The Settlement Suffers from Several Additional Procedural Flaws. ...........11

      A.    The Notice Program Was Inadequate. ............................................11

      B.    The Parties Imposed Draconian Opt-Out Requirements. ...............................11

      C.    The Parties Denied Objectors any Opportunity to Obtain
            the Discovery Record or Other Relevant Documents.....................................13

      CONCLUSION ............................................................................................14

## PRELIMINARY STATEMENT

Plaintiffs' Motion for Final Approval of the Proposed Class Action Settlement ("Mot.") pitches this settlement as a garden-variety compromise, where the risks of litigation are traded for certainty: "[T]he settlement eliminates the risk of continued litigation and locks in a substantial recovery for the class, recovering roughly 15.4% of the estimated 'losses.'" (Mot. 2.) But that framing masks a crucial fact: the only money going to class members is what Vanguard *already* must pay them under regulatory settlements.

On January 17, 2025, the U.S. Securities and Exchange Commission ("SEC") found that Vanguard Group, Inc. ("Vanguard") caused Vanguard Chester Funds (the "Trust") to commit securities fraud and willful violations of the Investment Advisers Act through the 2021 capital gains distributions. In addition to fines, Vanguard was ordered to pay at least $135 million to the victims of its fraud. As is customary, private settlements pending approval when the SEC order was entered can partially offset Vanguard's $135 million obligation—but the SEC emphasized that, if this deal falls through, Vanguard must pay the $40 million to the SEC within 10 days, for distribution to injured investors through the SEC's Fair Fund process. The SEC took no position on whether this settlement passes muster under Rule 23.

It plainly does not. While defendants can settle regulatory and class claims simultaneously by making the regulatory settlement contingent on class settlement approval, Vanguard did not take that path here. Instead, it committed to pay $135 million in remediation no matter what happens here. That means the payments Vanguard is legally bound to make to the SEC Fair Fund are not new consideration being exchanged through this settlement. They're a pre-existing obligation. The Court's "fiduciary" duty to "serve as a guardian of the rights of absent class members" precludes approving a deal where hundreds of thousands of unsophisticated, mom-and-pop retail investors release enormously valuable claims in exchange

for nothing beyond what they can receive from the SEC anyway. *Drazen v. Pinto*, 106 F.4th 1302, 1328 (11th Cir. 2024) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)).

Worse, these facts were not clearly disclosed to the class or the Court. While class counsel says it only learned of Vanguard's regulatory settlement last month, plaintiffs concededly knew of it when submitting their motion for settlement approval and counsel fees— yet never mentioned that the SEC order means the class gains nothing from approval of this deal.

The parties also misled the class about the settlement's value, claiming in the official notice it represents 15.4% of the "maximum" damages calculated by an expert. Plaintiffs refused to provide the expert report, but appear to be touting one particular scenario (seemingly run *after* the parties' mediation, not as part of the adversarial process) stacked with assumptions unfavorable to the class. This raises concerns that plaintiffs may have lowballed the estimate to inflate the claimed recovery percentage, which they cite repeatedly to justify higher fees.

Other red flags abound. The notice plan was inadequate (just one email, sent in the middle of Christmas holidays with no follow up, for most class members); the allocation plan treats class members inequitably (with some class members receiving more than 170 times as much per dollar of capital gains as others); the parties imposed opt-out procedures courts have criticized as onerous and coercive; and the parties withheld basic information needed to raise coherent objections. (Vanguard ignored repeated requests for its state settlements, which are public records but cannot be obtained through records requests before the objection deadline.)

In short, this settlement epitomizes class action abuse. Both its substance, and how it was presented, are unfair, unreasonable, and inadequate. The Motion should be denied.

**ARGUMENT**

I.    **THE SETTLEMENT IS INADEQUATE BECAUSE CLASS MEMBERS RECEIVE NO BENEFIT, WHILE THE PARTIES CAPTURE SIGNIFICANT VALUE AT THE CLASS'S EXPENSE.**

"Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995); *see also* Fed. R. Civ. P. 23(e)(2)(C). Here, the proposed settlement fails this basic test: Vanguard is already legally obligated to pay the entire $135 million settlement regardless of whether this deal is approved. There is no consideration given in exchange for the release.

The practical effect of the deal is to divert money from mom-and-pop investors and fraud victims (who could otherwise claim these funds through the SEC's Fair Fund) to class counsel, class representatives, and Vanguard (who receive fees, incentive awards, and a valuable release, respectively). "No class action settlement that yields zero benefits for the class should be approved, and a class action that seeks only worthless benefits for the class should be dismissed out of hand." *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) (internal quotation marks omitted).

The SEC order released last month, which shows that Vanguard must pay $135 million in remediation to fraud victims under settlements with the SEC, the Office of the New York State Attorney General ("NYAG"), and members of the North American Securities Administrators Association ("NASAA"), makes Vanguard's obligation to pay, regardless of this settlement, crystal clear:

> [I]n the event Vanguard does not pay the $40 million under the Class Action Settlement, as a result of the termination or withdrawal of the Stipulation of Settlement or the Court's rejection of the Class Action Settlement, Vanguard will

-3-

be obligated to pay the $40 million into the Commission's Fair Fund pursuant to Section 308(b) within 10 days of such termination or rejection.

(SEC Order ¶ 45, Baker Decl. Ex. 26, ECF No. 156-26.) Under 15 U.S.C. § 7246 and 17 C.F.R. §§ 201.1100-1106, through its Fair Fund, the SEC would run a robust process to identify victims, propose a distribution plan open to public comment, and distribute recoveries.

There is nothing inherently wrong with simultaneously settling regulatory and civil cases. Defendants often want "global peace" when settling. But traditionally, they achieve this by making the regulatory settlement conditional on a court's approval of the civil class action settlement, which the SEC allows in appropriate cases. *See, e.g.*, Judgment, *Securities & Exch. Comm'n v. Infinity Q Capital Mgmt.*, No. 23-cv-5081 (S.D.N.Y. June 30, 2023), ECF No. 9 (remediation obligation imposed by the SEC deemed satisfied through a class action settlement, but if the settlement is not approved, the SEC settlement will be "vacated" and the parties restored to a litigation posture in both cases). When structured that way, there is a genuine exchange: rejecting the settlement means the class gets nothing because neither settlement becomes final. Approval lets the class receive compensation for releasing their claims while the defendant resolves both matters.

This case is fundamentally different. Vanguard committed to pay the full $135 million regardless of what happens here. This means that, not only is there no new consideration, the class actually is better off rejecting the deal since the SEC Fair Fund will not deduct the $14,450,790.80 in fees and incentives plaintiffs seek here (meaning more funds are available to retail investors injured by this fraud). (ECF No. 155-1, at 1.) Additionally, rejection keeps this case alive, potentially yielding additional, incremental recoveries later. Now armed with the SEC's findings, class counsel might even negotiate a larger settlement. But even if the class gets nothing here, it's still better off rejecting this deal.

"The primary touchstone of [the adequacy] inquiry is the economic valuation of the proposed settlement." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995). Here, class members "will be unable to benefit," *id.* at 808, because the settlement does not require Vanguard "to do anything it was not already doing." *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017).

Class counsel argues they were unaware of the regulatory settlement and negotiated their deal independently. (Baker Decl. ¶¶ 55-57, ECF No. 156.) Even assuming that's true, it does not make the settlement adequate or allow the court to abandon its "fiduciary"duty to "absent class members." *Drazen*, 106 F.4th at 1328 (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 785).

Notably, class counsel does not contend that this settlement yields any incremental consideration for the class. Nor can it. That settlements with the SEC and multiple states became public less than four months after the mediation here (Baker Decl. ¶¶ 42-43, 55, ECF No. 156; Baker Decl., Ex. 26, ¶ 43, ECF No. 156-26) suggests that Vanguard knew (or at least had good reason to know) when mediating that it faced a regulatory remediation obligation well north of $40 million. Getting formal approval from multiple regulators can take months. While there's no way to know what Vanguard was thinking, the factual record here makes it quite possible that Vanguard simply calculated it had nothing to lose by trying to use regulatory payments to wipe out its civil exposure.

Ultimately, the negotiation history or what the parties intended is irrelevant. As of now, Vanguard is legally obligated to pay the $40 million no matter what. As a fiduciary and guardian of the absent class members, the court cannot give Vanguard a release for free.

## II.     THE NOTICE SENT TO THE CLASS WAS INCOMPLETE, FALSE, AND MISLEADING.

### A.     The Notice Failed to Disclose the Related Regulatory Settlement.

The notice did not inform class members that Vanguard must pay the settlement amount even if the deal is rejected, nor that individuals might recover more through the SEC Fair Fund (which does not deduct private counsel fees). That omission alone requires rejection. While plaintiffs' counsel was reportedly unaware of the regulatory settlement when notice was sent, counsel's good faith isn't the issue. The court must ensure class members are adequately informed, even of facts arising after notice is sent. *See, e.g.*, *Drazen*, 106 F.4th at 1337 ("The District Court neglected its duty in failing to inform the absent Class Members about" the Supreme Court's decision to grant certiorari in a related case *after* the class notice had been sent to absent class members).

### B.     The Notice Misrepresented the "Maximum" Recoverable Damages.

The notice also contains misleading statements about class members' potential recovery. The first page states: "The Settlement represents a recovery of approximately 15.4% of the maximum damages estimated by Plaintiffs' expert." No citation or support is provided, but court filings reveal this figure is not actually an analysis of maximum recoverable damages. It's just one scenario considered by plaintiffs' expert David Tabak, limited to a damages theory based on future tax liability and built on several questionable assumptions:

> The key assumptions used in arriving at this damages estimate include: (i) investors would sell all of their TRF shares 10 years after the target date(s); (ii) the Court would apply an interest rate equal to the federal prime rate (8.0% at the time of calculation); (iii) investors would fall one income tax bracket lower in retirement when they sold their TRFs; and (iv) only distributions tied to investors who redeemed Investor TRFs and bought the equivalent Institutional TRFs on the same day were attributed to Defendants' conduct.

(See Mot. for Preliminary Approval, ECF No. 149-1, at 10; Baker Decl., ECF No. 156, ¶ 44.) Plaintiffs refused my request to see Dr. Tabak's report (the ones filed on the docket do not address this scenario), and the bare-bones description given raises numerous questions. What does "one income tax bracket lower" mean given that the differences between brackets are not uniform? Does that include an adjustment for the 3.8% net investment income surtax?

In any event, this scenario plainly understates the "maximum" recoverable damages. The calculation seems to ignore the "claim for restitution or disgorgement" of management fees, which survived dismissal. *In re Vanguard Chester Funds Litig.*, No. CV 22-955, 2023 WL 8091999, at *8 n.11 (E.D. Pa. Nov. 20, 2023). One objector (ECF No. 153) notes he was a fee-based advisory services client, a service that is supposed to include advanced tax planning strategies and which can cost thousands, tens of thousands, or more per year. Those potential damages seem to have been ignored.

Even on tax implications, this scenario plainly is *not* the maximum recovery. Many class members forced to pay capital gains tax in 2021 otherwise could have avoided those taxes completely (rather than just deferring payment of them):

- As Dr. Tabak acknowledged, "investors who never sell their shares but pass them on through their estate" never owe capital gains tax due to basis step-up rules. (Tabak Report ¶ 26, ECF No. 125-3.)

- Retirees can often utilize the 0% capital gains bracket (up to $96,700 for a married couple this year) to realize capital gains over time in retirement at a 0% rate.

The scenario also seems to ignore state and local income taxes. Many professionals retire from high-tax states like New York to tax-free states like Florida, meaning that a premature forced realization event can trigger state and local taxes they otherwise could have avoided. There's no indication that Dr. Tabak looked at data showing what percentage of individual investor capital gains actually end up triggering tax liability.

The fundamental problem is that plaintiffs erroneously took on the burden of trying to disprove what is really Vanguard's burden of suggesting that victims of the fraud could benefit from some tax savings in the future that partially mitigate their losses. I have held shares in the 2050 fund continuously since December 17, 2008, and have no plans to sell unless I can do so at a 0% rate. My damages are simply the federal, state, and local taxes I paid plus prejudgment interest. Any suggestion that I might benefit from potential future tax savings is pure speculation. At most, Vanguard might be able to justify some small discount, reflecting perhaps a 5% chance that many decades from now I might receive some tax benefit of uncertain value. But simply looking to victims' 2021 out-of-pocket loss, which is clear-cut, is plainly a reasonable estimate of damages, which is all that the law requires. Class counsel erred in assuming the burden of speculating about potential tax savings that *might* hypothetically be received decades from now, depending on a series of unknowable contingencies. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

Plaintiffs thus misled the class by touting a scenario that makes a series of unfavorable assumptions as if it represented the "maximum." I was unable to find any evidence this scenario was ever presented as plaintiffs' "maximum" estimate *before* the parties settled— raising concerns that this estimate was not the product of a genuine adversarial process but rather a lowball estimate designed to buttress plaintiffs' fee application by creating the false impression they had achieved a large percentage recovery.

III.    **THE SETTLEMENT DOES NOT TREAT CLASS MEMBERS EQUITABLY, AND CLASS COUNSEL'S DISTRIBUTION METHODOLOGY CREATES SIGNIFICANT CONFLICTS OF INTEREST BETWEEN CLASS MEMBERS.**

Despite plaintiffs' claim that "The Settlement does not offer preferential treatment to any Settlement Class Member" (Mot. 20, ECF No. 154-1), the allocation plan creates stark inequities through differential "weights" based on fund maturity date. As a practical matter, younger class members can receive over 170 times more consideration per dollar of capital gains than older class members, creating significant age-based disparities and conflicts of interest between class members, without structural protections, like separately represented subclasses. *See, e.g.*, *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189 (3d Cir. 2012) (vacating certification order because of the potential for conflicts between class members).

These problems stem from plaintiffs' flawed assumption that virtually all class members eventually realize capital gains and thus receive offsetting tax savings. By focusing on the "time value of money" theory (rather than the simpler argument that future tax savings are too speculative and are not needed for a reasonable estimate of damages), class counsel created avoidable conflicts. Naturally, class members who have actually sold their shares must offset any actual tax savings they realized against their losses, but the vast majority of class members here are long-term holders of "through retirement" target date funds (these funds are specifically designed to be held throughout retirement) for whom the timing and value of any tax savings are speculative.

The distribution scheme chosen thus disadvantages elderly class members. Under plaintiffs' myopic and inaccurate assumption that everything must trigger tax liability eventually, elderly class members have little time to benefit from compounding. But elderly class members who still hold the funds today are *more* likely to pass away without selling during their lifetimes, meaning they could have avoided capital gains entirely through the estate tax basis step-up

-9-

(allowing them to leave larger gifts for their children and grandkids). An elderly taxpayer who

lost the benefit of a basis step-up is *more* damaged than a young taxpayer who eventually incurs

some capital gains tax liability. Given the large size of the class, the passage of more than three

years since the underlying events, and U.S. mortality, there could easily be 10,000 estates or

more in the class, many of which can prove conclusively that the 2021 capital gains they paid

were entirely unnecessary because nothing else was redeemed before the estate had a basis step-

up. The plan of allocation makes no adjustment for this reality, giving such claimants a tiny

fraction of what is paid to a young claimant who ended up liquidating their account three months

later and thus may have had only small damages by comparison.

       Plaintiffs argue they wanted to avoid requiring class members to submit tax

returns (Mot. 22, ECF No. 154-1), but this overlooks an obvious, time-tested solution: a two-

track claims process. As a baseline, class members could be given an allowed claim using

something like Dr. Tabak's method, assuming, say, a 15% federal tax rate on long-term gains

(and 0% state/local) and an adjustment that assumes, with 90% probability that class member

would eventually realize future tax savings that partially offset the losses. On the other hand,

class members could receive larger allowed claims by submitting documentation with the actual

federal, state, and local rates they paid in 2021, and/or an affidavit explaining whether they have

concrete plans to move to a no-tax state before selling, or if they intend to hold their shares for

life and pass them down to the heirs; depending on the circumstances, the probability of future

tax savings could be sharply reduced for appropriate class members (or at least with respect to

their state/local taxes), thus reducing any potential tax savings offset and increasing their allowed

damages. This approach accommodates privacy concerns, while allowing those with larger,

documented losses to receive benefits proportionate to their loss. *See, e.g.*, *McCoy v. Health Net,*

*Inc.*, 569 F. Supp. 2d 448, 470 (D.N.J. 2008) (approving a settlement with three groups, and noting that "[t]he priority given to those who can demonstrate out of pocket losses is fair and reasonable").

## IV.    THE SETTLEMENT SUFFERS FROM SEVERAL ADDITIONAL PROCEDURAL FLAWS.

### A.    The Notice Program Was Inadequate.

The notice program was remarkably thin for a case of this magnitude. Only a single email was sent, at 3:05 p.m. on December 23, 2024, the afternoon before Christmas Eve, when class members were likely distracted by holiday travel and family commitments. Most class members never received a postcard notice at all. (Evans Decl. ¶¶ 6-9, ECF No. 156-1.) The email's subject line, "Vanguard Chester Funds," likely misled recipients. Chester Funds isn't a brand name Vanguard uses with retail customers and sounds like a separate institution. While class counsel hasn't disclosed the participation rate, the administrator's website reportedly saw at most 17,996 visitors, less than 6% of the class. (Evans Decl. ¶ 14.) I personally overlooked the lone email and learned of the case only through news coverage. This anemic notice effort, with no follow-up communications, appears to have resulted in extraordinarily low participation rates.

### B.    The Parties Imposed Draconian Opt-Out Requirements.

The Eleventh Circuit recently warned district courts to scrutinize settlements with complex opt-out procedures—observing that requiring opt-out letters to be sent under penalty of perjury suggested "that the Settlement Agreement was deliberately structured by the parties' lawyers in a way that would ensure that no class members would opt out." *Drazen*, 106 F.4th at 1333.

The requirements here exceed even those criticized in *Drazen*. Not only must class members submit a letter signed under penalty of perjury, but they must also provide

"documentary proof" of their relevant holdings. These hurdles proved so onerous that nearly half the attempted opt-outs in this case were deemed "invalid" for failing to meet the parties' demands. The parties seem to be asking the Court to bind those class members to the settlement, despite their clear intent to opt out. (Evans Decl. ¶ 15, ECF No. 156-1.) The requirements are particularly coercive given that opting in requires merely entering an ID number and PIN online and clicking to sign, no account information or proof needed. By imposing such lopsided burdens on opt-outs, the parties effectively strong-armed class members to stay in.

The parties also publicly filed opt-outs' account statements, apparently without warning, exposing opt-outs' full names and service level with Vanguard. (ECF No. 156-1.) These service levels are irrelevant to the exclusion requests and reveal the approximate total amount of assets these investors held at Vanguard (not just those that are at issue in this case). The public can see the identity of <u>one</u> named opt-out who was a Voyager client of Vanguard (meaning that individual has assets at Vanguard between $50,000 and $500,000); <u>two</u> were Voyager Select clients (meaning total assets between $500,000 and $1 million); and <u>one</u> was a Flagship client (meaning total assets between $1 and $5 million). Exclusion requests typically only reveal specific trades made within a defined class period, not the total amount held (let alone the total approximate amount in the class member's brokerage account). *See, e.g.*, Murray Declaration, Ex. D, *McDermid v. Inovio Pharms., Inc.*, No. 2:20-cv-01402-GJP, ECF No. 156-11 (E.D. Pa. filed Nov. 10, 2022).[1]

---

[1]    For the same reason, I respectfully object on privacy grounds to other requirements imposed in the class notice for objectors to participate, like demands that objectors identify any "former . . . counsel." The names of lawyers who may have given advice on matters that have no bearing on this case are irrelevant. My ID number is JQH9-D8Q1-96E2, and I have never previously objected to a class action settlement. I respectfully reserve the right to attend hearing in the event that my schedule permits me to do so.

**C.    The Parties Denied Objectors any Opportunity to Obtain the Discovery Record or Other Relevant Documents.**

Shortly after Vanguard's regulatory settlement became public, I requested some basic documents from the parties, including (a) Vanguard's state regulatory settlements (referenced in the SEC order but not readily available online, to the best of my knowledge), and (b) Dr. Tabak's expert report supporting the claim that recovery is 15.4% of maximum damages. I offered to meet-and-confer to discuss my requests if needed. Vanguard and the Trust simply ignored multiple inquiries. Plaintiffs' counsel referred me to their public filings, which I had already reviewed and which lack the requested information. (*See* Exhibit A.)

The Third Circuit has established that objectors should typically be given access to party discovery materials and permitted to serve additional discovery requests if needed. *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 316 (3d Cir. 2005) (vacating settlement and directing the district court to reconsider allowing objectors to seek discovery, noting that "discovery may be appropriate if lead counsel has not conducted adequate discovery or if the discovery conducted by lead counsel is not made available to objectors"); *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (reversing settlement approval and ordering "a more complete development of the record" where the "objector Frackman was not afforded an adequate opportunity to test by discovery the strengths and weaknesses of the proposed settlement"). The parties' refusal to answer basic questions or provide even public documents is troubling.

As a practical matter, the settlement cannot be certified on this record, given the lack of consideration, the misleading notice, and other issues raised above. The Court has multiple, independent grounds on which to deny the Motion and should do so. In the event that the Court is not yet persuaded that this settlement must be rejected, I respectfully request that the

Court allow discovery and direct the parties to provide the information and documents I have requested.

## CONCLUSION

For the foregoing reasons, the Court's fiduciary duty to protect the interests of absent class members compels rejection of this settlement. The Motion should be denied.

Dated: February 17, 2025

Sincerely,

*/s/ John Hughes*

John Hughes

# EXHIBIT A



John Hughes <john.j.hughes@gmail.com>

---

## In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

**Joshua Baker** <jbaker@rosenlegal.com>         Wed, Feb 12, 2025 at 5:15 PM
To: John Hughes <john.j.hughes@gmail.com>, Jonathan Stern <jstern@rosenlegal.com>, Phillip Kim <pkim@rosenlegal.com>, Erica Stone <estone@rosenlegal.com>, Jacob Goldberg <jgoldberg@rosenlegal.com>, "jday@paulweiss.com" <jday@paulweiss.com>, "amctootle@paulweiss.com" <amctootle@paulweiss.com>, "aehrlich@paulweiss.com" <aehrlich@paulweiss.com>, "dkramer@paulweiss.com" <dkramer@paulweiss.com>, "azimmerman@debevoise.com" <azimmerman@debevoise.com>, "bfetzer@debevoise.com" <bfetzer@debevoise.com>, "mloconnor@debevoise.com" <mloconnor@debevoise.com>

Dear Mr. Hughes:

Thank you for reaching out. As you may have seen, Plaintiffs filed their motions for final approval of the settlement and for awards of attorneys' fees and expenses shortly after your February 3 email. ECF Nos. 154-56. I believe these documents, and other publicly available documents on the docket and in the Vanguard Chester Funds' SEC filings, will help answer some of your questions concerning the SEC Settlement, Dr. Tabak's proposed damages methodologies (which are further explained in Dr. Tabak's publicly filed expert reports, which you reference), and the basis for the proposed plan of allocation. If you still wish to object, the deadline to file objections is February 18, 2025.

Regards,

Josh Baker

THE ROSEN LAW FIRM, P.A.

101 Greenwood Avenue, Suite 440

Jenkintown, PA 19046

Tel: 215.600.2817

Fax: 212.202.3827

jbaker@rosenlegal.com

www.rosenlegal.com

---

**From:** John Hughes <john.j.hughes@gmail.com>
**Sent:** Tuesday, February 11, 2025 2:18 AM
**To:** Jonathan Stern <jstern@rosenlegal.com>; Phillip Kim <pkim@rosenlegal.com>; Erica Stone <estone@rosenlegal.com>; Joshua Baker <jbaker@rosenlegal.com>; Jacob Goldberg <jgoldberg@rosenlegal.com>; jday@paulweiss.com; amctootle@paulweiss.com; aehrlich@paulweiss.com; dkramer@paulweiss.com; azimmerman@debevoise.com; bfetzer@debevoise.com;

2/16/25, 11:38 PM                    Gmail - In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

mloconnor@debevoise.com
**Subject:** Re: In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

**[EXTERNAL EMAIL]**

Counsel,

I write to follow up on my February 3 email regarding the proposed settlement in *In re Vanguard Chester Funds Litigation*. I did not receive any response from either putative Class Counsel or counsel for Vanguard or the Trust.

As noted in my earlier email, I seek answers to basic questions that are not addressed in the Class Notice, such as: (i) whether the $40 million settlement provides any incremental benefit to the class beyond sums Vanguard is already obligated to pay under its regulatory settlements; (ii) the factual basis for the parties' representations about "maximum damages"; (iii) the source and derivation of the weighting factors the Court is being asked to approve in the Plan of Allocation; and (iv) how the settlement accounts for class members who would never otherwise owe capital gains.

My objective is to determine whether I need to object (and if so, to prepare a streamlined objection). Given the upcoming deadline of February 18, please let me know by close of business on February 12 whether any party intends to provide substantive responses or documents in response to my questions. If not, I will request that the Court order targeted discovery on these issues and consider the parties' failure to respond in its procedural fairness assessment under Rule 23(e)(2). I am available to meet and confer telephonically if that would be helpful.

Best,

John Hughes

On Mon, Feb 3, 2025 at 1:56 AM John Hughes <john.j.hughes@gmail.com> wrote:

Counsel,

I hold shares in the Vanguard Target Retirement 2050 Fund (acquired December 17, 2008) and received your Summary Notice of Pendency and Proposed Class Action Settlement on December 23, 2024 (ID No. JQH9-D8Q1-96E2). After reviewing the notice, class administrator's website, and case docket, I have several questions that remain unanswered.

I am unrepresented and have never objected to a class settlement. However, given the unusual nature of this settlement, I may need to retain counsel to file an objection. I would appreciate your response by Friday, February 7, 2025, or prompt notice if you cannot meet this timeline.

## Vanguard's Settlement with Governmental Authorities

The SEC's recent order imposing penalties on Vanguard for securities fraud and Advisers Act violations describes certain state regulatory settlements. *In re Vanguard Group, Inc.*, Securities Act Release No. 11359, Investment Advisers Act Release No. 6830, Investment Company Act Release No. 35453, Admin. Proc. File No. 3-22435 (Jan. 17, 2025).

- Please provide copies of the settlements referenced in paragraphs 44-45.
- Paragraph 45 states that while regulators agreed to credit the $40 million settlement in this case toward Vanguard's regulatory obligations, Vanguard must pay this amount regardless of whether this settlement is approved. Do the parties agree the SEC accurately described Vanguard's obligations?
- Given this, wouldn't the class benefit more if this settlement were rejected? My understanding is the regulatory settlements will create a larger SEC fair fund for class members regardless of this settlement's approval. Rejection would simply increase that fund by $40 million, directing more money to fraud victims (since class counsel fees are not deducted from settlements arranged by governmental agencies).
- If the parties disagree, please identify what additional consideration the class receives through this settlement that is not received if the settlement is rejected.

2/16/25, 11:38 PM

Gmail - In the interests of funds I hold (all 4/25/26, 2:22 series of Van...

Case 2:22-cv-00955-JFM Document 161 Filed 02/17/25 Page 21 of 21

- Was class counsel aware, during settlement negotiations, that Vanguard would be obligated to pay the $40 million settlement under its regulatory agreements?
- Can the parties cite any precedent allowing approval of a class settlement where the defendant was already required to pay the entire settlement amount to government authorities (for distribution via fair fund) even if the settlement was rejected? I'm unaware of supporting case law but would like to review any authority the parties are relying on that this structure satisfies Rule 23.

# Representations Made to Class Members About "Maximum" Recoveries

The notice's first page states: "The Settlement represents a recovery of approximately 15.4% of the maximum damages estimated by Plaintiffs' expert." However, a footnote in the preliminary approval motion (ECF No. 149-1, at 10 n.4) suggests this percentage actually refers to Dr. David Tabak's "Alternative Methodology," not his maximum damages estimate. Moreover, the footnote implies Dr. Tabak's report calculated damages of $259.5 million using the Alternative Methodology with four specific assumptions, but the cited reports neither explicitly adopt these assumptions nor calculate this figure.

I have several questions:

- Dr. Tabak's reports don't appear to conclude that the Alternative Methodology represents either the maximum recoverable amount or that it necessarily exceeds his Primary Methodology. What's the basis for telling the class that $40 million represents 15.4% of "**maximum** damages"?
- Please provide the expert report(s) where Dr. Tabak adopts and explains the reasoning for the four assumptions listed in the preliminary approval motion footnote.
- Please provide the total 2021 capital gains allocated to Vanguard target retirement funds held in taxable accounts, broken down by state. If exact figures aren't available, whatever relevant documents you have on this issue would suffice.
- Even setting aside the Alternative vs. Primary Methodology comparison, how can these represent maximum recoverable damages? In my case, I've held the fund since 2008 with no plans to sell. In 2021, I paid federal taxes at the highest bracket plus New York State and City taxes. I expect to hold this position until death for the basis step-up (it's my most appreciated position percentage-wise). If I ever sold, I'd do so only in a year when my federal capital gains would be 0% after moving to a no-income-tax state. For me and similar class members, wouldn't maximum recovery simply be taxes paid plus prejudgment interest? (*See* Tabak Report ¶ 26, ECF No. 125-3 ("[T]here is a certain percentage of investors who never sell their shares but pass them on through their estate, and thus receive no Future Tax Savings.").)
- How does the allocation plan account for class members who would never realize capital gains during their lifetime and thus would have had no capital gains tax liability if not for the forced distribution?
- Has Vanguard produced in discovery data showing the number of account holders who received taxable capital gains distributions in 2021 but who have subsequently reported a death to Vanguard of the account holder (or a death of the account holder's spouse in a community property state) prior to a realization event of the full target date fund? Please provide the number of class members in this situation, if known.

# Distribution Methodology

The notice includes a table showing weights to multiply class members' 2021 capital gains distributions, purportedly "to account for varying levels of allegedly excess distributions and time value of money." These weights range dramatically —from 0.144 for the 2015 and Income funds to 24.627 for the 2060 fund, over a 170x difference.

- I can't locate these weights' source in any expert reports. Please provide the relevant expert report or its docket number.
- Do the parties agree these weights assume class members would eventually pay capital gains taxes? In other words, are the weights utilized because plaintiffs limited their damages theory to the time value of money?
- The time-value focus appears to create serious class conflicts. Rather than basing payouts solely on objective facts (like actual 2021 capital gains received), the methodology relies on undisclosed and contestable assumptions. It favors 2065 fund holders (including at least one named plaintiff) over 2050 and earlier fund holders like myself. While I'd expect defense counsel to challenge class certification on these grounds, Vanguard didn't raise these conflicts in its opposition to class certification. I'd like to understand the parties' position on why such dramatically varying distributions are appropriate—or whether these conflicts preclude certification of even a settlement class.

I'm available to discuss any of these questions if helpful.

Best,

John Hughes

https://mail.google.com/mail/u/0/?ik=5df0c61d53&view=pt&search=all&permmsgid=msg-f:1823891530248158424&dsqt=1&simpl=msg-f:1823891530248158424    3/3