**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN VANGUARD CHESTER FUNDS LITIGATION | Case No. 2:22-cv-955-JFM <br><br> <u>CLASS ACTION</u> |

<u>**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'
MOTIONS FOR: (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT; AND (2)
AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION
EXPENSES, AND AWARDS TO PLAINTIFFS**</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF FACTS ......................................................................................... 2

III.    ARGUMENT ............................................................................................................... 3

        A.      The Reaction of the Settlement Class Supports Final Approval ............................ 3

        B.      The Reaction of the Settlement Class Also Supports Approval of the
                Requests for Attorneys' Fees and Expenses and Awards to Plaintiffs .................. 5

        C.      The Mitchell, May, Chernoff, Kiribamune, Duram, Warner, and
                Wiedwald Objections are Each Without Merit ...................................................... 7

                1.      The Court Should Overrule the Mitchell Objection ................................. 7

                2.      The Court Should Overrule the May Objection ........................................ 8

                3.      The Court Should Overrule the Chernoff Objection ................................. 9

                4.      The Court Should Overrule the Kiribamune Objection ........................... 10

                5.      The Court Should Overrule the Duram "Objection" ................................ 10

                6.      The Court Should Overrule the Wiedwald Objection .............................. 11

                7.      The Court Should Overrule the Warner Objection ................................... 13

                8.      The Court Should Disregard the Agnich Email ....................................... 14

        D.      The Brewer Objection is Without Merit ............................................................... 15

        E.      The Hughes Objection is Without Merit................................................................ 17

                1.      The Hughes Objection Falsely Portrays the SEC Settlement
                        as a "Pre-Existing Obligation" ................................................................ 17

                2.      Hughes' Criticisms of the Notice Are Misplaced and Lack Merit .......... 20

                3.      Hughes' Objections to the Plan of Allocation Lack Merit ...................... 23

                4.      Hughes' Additional Claims of Procedural Deficiencies Lack Merit ....... 25

                5.      The Court Should Deny Hughes' Vague Requests for Discovery............ 26

IV.     CONCLUSION........................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Bell Atl. Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir. 1993)...................................................................... 4

*Boone v. City of Philadelphia*,
  668 F. Supp. 2d 693 (E.D. Pa. 2009) ...................................................... 6

*Dewey v. Volkswagen Aktiengesellschaft*,
  681 F.3d 170 (3d Cir. 2012)................................................................... 23

*Drazen v. Pinto*,
  106 F.4th 1302 (11th Cir. 2024) ...................................................... 19, 20

*Dwyer v. Unum Life Ins. Co. of Am.*,
  548 F. Supp. 3d 468 (E.D. Pa. 2021) .................................................... 16

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975)................................................................ 3, 27

*Glaberson v. Comcast Corp.*,
  2015 WL 5582251 (E.D. Pa. Sept. 22, 2015) ......................................... 5

*Gleason v. Norwest Mortg., Inc.*,
  2008 WL 2945989 (D.N.J. July 30, 2008)............................................. 16

*Gunter v. Ridgewood Energy Corp.*,
  223 F.3d 190 (3d Cir. 2000).................................................................... 5

*In re AT & T Corp.*,
  455 F.3d 160 (3d Cir. 2006).................................................................... 5

*In re Cell Pathways, Inc., Sec. Litig. II*,
  2002 WL 31528573 (E.D. Pa. Sept. 23, 2002) ....................................... 6

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001).............................................................. 3, 4, 5

*In re Cmty. Bank of N. Virginia*,
  418 F.3d 277 (3d Cir. 2005).................................................................. 27

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995)..................................................................... 18

*In re Genta Sec. Litig.*,
  2008 WL 2229843 (D.N.J. May 28, 2008) .......................................... 4, 6

*In re Hemispherx Biopharma, Inc., Sec. Litig.*,
  2011 WL 13380384 (E.D. Pa. Feb. 14, 2011) ................................................... 6, 16

*In re Ikon Off. Sols., Inc., Sec. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000) ........................................................................ 16

*In re Ins. Brokerage Antitrust Litig.*,
  579 F.3d 241 (3d Cir. 2009) .............................................................................. 23

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
  176 F.R.D. 158 (E.D. Pa. 1997) ......................................................................... 4

*In re Par Pharm. Sec. Litig.*,
  2013 WL 3930091 (D.N.J. July 29, 2013) ........................................................ 6

*In re Reliance Sec. Litig.*,
  2002 WL 35645209 (D. Del. Feb. 8, 2002) ....................................................... 5

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005) .............................................................................. 5

*In re Schering-Plough Corp. Sec. Litig.*,
  2009 WL 5218066 (D.N.J. Dec. 31, 2009) ........................................................ 16

*In re Sterling Fin. Corp. Sec. Class Action*,
  2009 WL 2914363 (E.D. Pa. Sept. 10, 2009) ................................................... 6

*In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*,
  869 F.3d 551 (7th Cir. 2017) ............................................................................ 18

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................... 6

*In re Wawa, Inc. Data Sec. Litig.*,
  2023 WL 6690705 (E.D. Pa. Oct. 12, 2023) ..................................................... 3

*Koby v. ARS Nat'l Servs., Inc.*,
  846 F.3d 1071 (9th Cir. 2017) .......................................................................... 19

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ............................................................................ 4

*McDonough v. Horizon Blue Cross Blue Shield of New Jersey*,
  641 F. App'x 146 (3d Cir. 2015) ....................................................................... 28

*Nichols v. SmithKline Beecham Corp.*,
  2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ..................................................... 4, 5

*Serio v. Wachovia Sec., LLC*,
   2009 WL 900167 (D.N.J. Mar. 31, 2009) ........................................................ 4

*Serrano v. Sterling Testing Sys., Inc.*,
   711 F. Supp. 2d 402 (E.D. Pa. 2010) ............................................................. 5

*Stoetzner v. U.S. Steel Corp.*,
   897 F.2d 115 (3d Cir. 1990) ......................................................................... 4

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011) .................................................................. 16, 17

*Varacallo v. Massachusetts Mut. Life Ins. Co.*,
   226 F.R.D. 207 (D.N.J. 2005) .................................................................... 11

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) .......................................................................... 4

*Whiteley v. Zynerba Pharms., Inc.*,
   2021 WL 4206696 (E.D. Pa. Sept. 16, 2021) ................................................. 4

*Yedlowski v. Roka Bioscience, Inc.*,
   2016 WL 6661336 (D.N.J. Nov. 10, 2016) .................................................... 6

**Rules**

Fed. R. Civ. P. 23 ................................................................................. 12, 22, 23

## I.     INTRODUCTION

Plaintiffs Haifan Liang, Julia Lucas, Donald R. Lichtenstein, Samuel B. Skraly, Ardes Poisson, Valerie M. Verduce, John Harvey, Caitlin Brigham, Jeffrey Chaussee, Zeb Bradford, Benjamin Deming, and James Daily ("Plaintiffs") submit this memorandum in further support of their motions for: (1) final approval of the proposed class action Settlement and Plan of Allocation (Dkt. No. 154); and (2) an award of attorneys' fees, reimbursement of litigation expenses, and awards to Plaintiffs (Dkt. No. 155) (together, the "Motions").[1] This memorandum updates the Court on the status of the notice program, the status of the claims process, and the Settlement Class's reaction to the Motions, as well as explains why each of the objections filed by Settlement Class Members are without merit and provide no grounds upon which to deny the Motions.

After two and a half years of hard-fought litigation and a successful mediation facilitated by an experienced and widely renowned mediator, Plaintiffs achieved a $40,000,000 all-cash, non-reversionary settlement, which they submitted to the Court for final approval. In their opening memoranda in support of the Motions, Plaintiffs set forth ample grounds supporting final approval of the proposed Settlement and Plan of Allocation (Dkt. No. 154-1, "Final Approval Brief"), and an award of attorneys' fees and expenses and awards to Plaintiffs (Dkt. No. 155-1, "Fee Brief"). Now that the deadlines for filing claims and submitting exclusion requests or objections have passed, the reaction of the Settlement Class provides further support for the Court to find that the Settlement and Plan of Allocation are fair, reasonable, and adequate, and the requested awards to Class Counsel and Plaintiffs are merited. For this additional reason, the Court should grant the Motions. As explained herein, none of the objections warrant a different result.

---

[1] All capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Stipulation of Settlement dated November 6, 2024 ("Stipulation") (Dkt. No. 148). Citations and quotations are omitted and emphasis is added, unless otherwise noted.

II.    STATEMENT OF FACTS

The Court-appointed Claims Administrator, Strategic Claims Services ("SCS"), under the guidance of Class Counsel, timely and effectively disseminated notice to Settlement Class Members in accordance with the Court's instructions in the Preliminary Approval Order (Dkt. No. 152). SCS sent over 312,000 copies of the Summary Notice via email with direct links to the Long Notice and Claim Form, or the Postcard Notice via mail, to potential Settlement Class Members. Supplemental Declaration of Sarah Evans ("Evans Suppl. Decl.") ¶5.[2] SCS also published the Summary Notice electronically over *GlobeNewswire* and in *PR Newswire*. (Dkt. No. 156-1, "Evans Decl.") ¶12. On December 13, 2024, SCS established a website dedicated to the Settlement which included the online claim filing link and important documents including the Long Notice, Claim Form, Preliminary Approval Order, and Stipulation. Evans Suppl. Decl. ¶10. SCS has also maintained a toll-free telephone number for potential Settlement Class Members. *Id.* ¶9.

On February 4, 2025, two weeks prior to the objection deadline, Plaintiffs filed their opening papers in support of the Motions. (Dkt. Nos. 154-55). The Motions were supported by the declarations of Plaintiffs, Class Counsel, Additional Plaintiffs' Counsel, the Claims Administrator, and the mediator Judge Layn R. Phillips, a former U.S. District Judge. (Dkt. No. 156).

The Long Notice, Summary Notice, and settlement website informed Settlement Class Members of the February 11, 2025 claims filing deadline and the February 18, 2025 deadline to submit any objection to the Settlement, Plan of Allocation or fee and expense application, or to request exclusion from the Settlement Class. *See* Evans Suppl. Decl., ¶11. Those deadlines have now passed. To date, potential Settlement Class Members have submitted 187,602 claims. *Id.* ¶13.

---

[2] The Supplemental Declaration of Sarah Evans is attached as Exhibit 1 to the Supplemental Declaration of Joshua Baker ("Baker Suppl. Decl."), filed concurrently herewith.

Nine objections have been filed, each of which are addressed below. *Id.* ¶12. SCS received a total of seven valid requests for exclusion from the Settlement. *Id.* ¶11.[3]

An updated version of the Proposed Order and Final Judgment (Dkt. No. 148-6), conformed to the Preliminary Approval Order and reflecting the valid exclusion requests, is submitted herewith. Baker Suppl. Decl., Ex. 2.

## III.    ARGUMENT

### A.    The Reaction of the Settlement Class Supports Final Approval

One of the factors that courts in the Third Circuit consider when evaluating a proposed class action settlement is "the reaction of the class to the settlement." *In re Wawa, Inc. Data Sec. Litig.*, 2023 WL 6690705, at *3 (E.D. Pa. Oct. 12, 2023) (citing *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)). Here, the reaction of the Settlement Class was overwhelmingly positive. At Class Counsel's direction, SCS carried out a thorough notice program in accordance with the Court's Preliminary Approval Order, directly notifying over 312,000 potential Settlement Class Members of the pending Settlement. Over 181,000 claims were submitted, compared to only nine objectors and seven valid opt-outs. This "*Girsh*" factor weighs heavily in favor of approving the Settlement.

The low number of objectors compared to the number of notices sent and claims submitted demonstrates strong support for the fairness, reasonableness, and adequacy of the Settlement. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) ("The vast disparity between the number of potential class members who received notice of the Settlement [roughly 478,000, with

---

[3] In total, SCS received 12 exclusion requests. *Id*. This includes three invalid requests for exclusion that did not conform to the Court's directions. Evans Decl. ¶15; Preliminary Approval Order ¶¶25-26. SCS promptly notified these individuals of the deficiencies in their requests but received no response or attempt to cure the deficient requests. Evans Decl. ¶15. These three exclusion requests remain invalid. Evans Suppl. Decl. ¶11. One exclusion request was submitted by a person who is not a Settlement Class Member. *Id*. One exclusion request was revoked by the requestor. *Id*.

nearly 120,000 claims filed] and the number of objectors [six] creates a strong presumption that this factor weighs in favor of the Settlement"); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir. 1990) (when "only" 29 members of a class of 281 objected, the response of the class as a whole "strongly favors settlement"); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313–14 (3d Cir. 1993) (noting that "[l]ess than 30 of approximately 1.1 million class members objected," representing an "infinitesimal" fraction of the class); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 185 (E.D. Pa. 1997) ("the relatively low objection rate militates strongly in favor of approval of the settlement."); *Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616, at *21 (E.D. Pa. Apr. 22, 2005) (six objections to the settlement out of over 37,000 individual notices sent is "extremely small" and supports approval of the settlement); *In re Genta Sec. Litig.*, 2008 WL 2229843, at *2 (D.N.J. May 28, 2008) ("it is beyond dispute that the Settlement Class' reaction is favorable" when only eight objections were received); *Serio v. Wachovia Sec., LLC*, 2009 WL 900167, at *7 (D.N.J. Mar. 31, 2009) (finding that a "low percentage of objections is evidence, in and of itself, that the Settlement should be approved because the class believes the settlement is fair.").[4]

Likewise, a low number of requests for exclusion from the Settlement further demonstrates the Settlement Class's positive reaction to the Settlement and supports final approval. *See Cendant*, 264 F.3d at 234-35 (234 requests for exclusion out of 478,000 notices sent to class members "cuts strongly in favor of the Settlement."); *Whiteley v. Zynerba Pharms., Inc.*, 2021 WL 4206696, at *3 (E.D. Pa. Sept. 16, 2021) (two exclusion requests out of 24,000 potential class members was

---

[4] *See also Maher v. Zapata Corp.*, 714 F.2d 436, 456 (5th Cir. 1983) (holding that the "minimal nature of shareholder objection" favors approval of settlement); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

"persuasive evidence of the fairness and adequacy of the proposed settlement, and weighs in favor of a final approval"); *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 415 (E.D. Pa. 2010) (lack of exclusion requests was "persuasive evidence of the proposed settlement's fairness and adequacy," citing *Cendant*, 264 F.3d at 234-35); *Glaberson v. Comcast Corp.*, 2015 WL 5582251, at *9 (E.D. Pa. Sept. 22, 2015) (three exclusion requests and three objections out of class of 800,000 class members "weighs in favor of approval of the settlement").

Similarly, that only four objections to the Plan of Allocation were filed (as discussed below), compared to the hundreds of thousands of notices sent and claims submitted, supports final approval of the Plan of Allocation. *See In re Reliance Sec. Litig.*, 2002 WL 35645209, at *11 (D. Del. Feb. 8, 2002) ("the fact that ... only two Class Members have objected to the Allocation Agreement and Plan of Allocation weighs in favor of the approval of these settlements and the Plan of Allocation.").

**B.    The Reaction of the Settlement Class Also Supports Approval of the Requests for Attorneys' Fees and Expenses and Awards to Plaintiffs**

One of the factors that courts in the Third Circuit consider when evaluating requests for attorneys' fees and expenses is "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *In re AT & T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006) (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 (3d Cir. 2000)). Here, the low number of objections to the fee and expense requests, especially in light of the hundreds of thousands of notices sent and claims submitted, supports approval of the requested awards. *See, e.g., In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (finding the class's reaction supported fee request where "[n]otice of the fee request and the terms of the settlement were mailed to 300,000 class members, and only two objected. We agree with the District Court such a low level of objection is a 'rare phenomenon.'"); *Nichols*, 2005 WL 950616,

at *21 (finding three objections to fee request out of over 37,000 individual notices sent was "extremely small" and "weigh[s] in favor of approval of the requested fee"); *In re Sterling Fin. Corp. Sec. Class Action*, 2009 WL 2914363, at *2 (E.D. Pa. Sept. 10, 2009) (where there were only two objections to the fee request, "this factor weigh[ed] strongly in favor of approving the requested fee award."); *Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 713 (E.D. Pa. 2009) (single objection to the proposed attorneys' fees "weighs in class counsels' favor."); *In re Hemispherx Biopharma, Inc., Sec. Litig.*, 2011 WL 13380384, at *8 (E.D. Pa. Feb. 14, 2011) ("The miniscule number of objections here—only two—supports the reasonableness of the proposed award."); *In re Cell Pathways, Inc., Sec. Litig. II*, 2002 WL 31528573, at *9 (E.D. Pa. Sept. 23, 2002) (noting one objection to fee request demonstrates "that the class views the settlement as a success."); *Genta*, 2008 WL 2229843, at *9 ("the lack of meritorious objections … favors awarding the requested attorneys' fee."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 594 (S.D.N.Y. 2008) ("That only one objection to the fee request was received is powerful evidence that the requested fee is fair and reasonable.").

There were no objections at all to Plaintiffs' Counsel's request for reimbursement of $877,457.47 in litigation expenses or the requested awards to Plaintiffs of $20,000 each, which are less than or equal to the maximum figures (expenses of up to $985,000, and awards to Plaintiffs of up to $20,000 each) presented to potential Settlement Class Members in the Notice. *See* Evans Decl., Ex. A at 1. The lack of any objections weighs in favor of granting those requests. *Yedlowski v. Roka Bioscience, Inc.*, 2016 WL 6661336, at *23 (D.N.J. Nov. 10, 2016) (lack of objections to requests for expense reimbursement or award to lead plaintiff supported approval of those requests); *In re Par Pharm. Sec. Litig.*, 2013 WL 3930091, at *11 (D.N.J. July 29, 2013) (same).

### C.    The Mitchell, May, Chernoff, Kiribamune, Duram, Warner, and Wiedwald Objections are Each Without Merit

Objections to the Settlement and/or requests for attorneys' fees were filed by Peter S. Mitchell (Dkt. No. 153, "Mitchell Objection"), Eric May and Kelly Welchans (Dkt. No. 157, "May Objection"), Michael Chernoff (Dkt. No. 158, "Chernoff Objection"), Navin Kiribamune (Dkt. No. 159, "Kiribamune Objection"), George Thomas Duram (Dkt. No. 160, "Duram Objection"), David Wiedwald (Dkt. No. 162, "Wiedwald Objection"), and David H. Warner and Laura Breyfogle (Dkt. No. 163, "Warner Objection"). The Court should overrule each of these objections. Not one of these objections contains any citation to legal precedent, nor do they present any factual basis or persuasive argument for denying approval of the Settlement or the requested attorneys' fees.

To the extent some of these objections are procedurally deficient, as described below, they should be overruled on those grounds. The Court's Preliminary Approval Order sets forth the requirements for anyone wishing to object to the Settlement and states that "[a]ny Settlement Class Member who does not object in the manner prescribed above shall be deemed to have waived all such objections." Preliminary Approval Order ¶32.

#### 1.    The Court Should Overrule the Mitchell Objection

The Mitchell Objection comprises conclusory allegations about Vanguard's conduct and asks that the Court "revoke the settlement," which Mitchell opines "should impose severe reputational cost and financial consequences to the Vanguard Group." However, this is not a sentencing hearing based on a conviction, this is an arms'-length settlement of certain legal claims based on allegations that Plaintiffs had not yet proven (and Defendants have not conceded).

Mitchell's assertion regarding investor losses from "lost opportunity to invest funds otherwise paid in taxes" does not hold water, which is why Plaintiffs did not pursue that theory of

damages. That class members *could have* made money by investing the funds that they instead had to use to pay the excess taxes (*i.e.*, their out-of-pocket loss) is true in every case. The money used to pay the excess taxes could have come from anywhere, it was not tied directly to the Target Retirement Fund ("TRF") investment. If D steals $100 from P's wallet, P cannot recover additional damages beyond the $100 for hypothetical returns P might have realized if P had invested that $100 (aside from ordinary prejudgment interest). This makes sense as there is no way to prove what amount P might have made (or lost) on the hypothetical investment. Putting aside the funds used to pay the excess taxes, the capital gains distributions themselves could have been reinvested in the TRFs (as many investors do, automatically), offering the same compound growth opportunity Mitchell claims to have lost. In any event, Plaintiffs' damages theory and methodologies incorporated prejudgment interest rates to appropriately account for losses incurred due to the time value of money. For these reasons, the Court should overrule the Mitchell Objection.[5]

### 2.    The Court Should Overrule the May Objection

The May Objection is likewise without merit.[6] May and Welchans offer absolutely no support for their conclusory assertions that "a review of the docket demonstrates Plaintiff's counsel did not perform $13 million worth of legal services" and that "Plaintiffs' counsel did not take on much risk because the case would easily settle if Vanguard were offered an 85% discount." Although it appears that both May and Welchans are attorneys, Baker Suppl. Decl. ¶8, they fail to

---

[5] The Mitchell Objection also fails to address whether Mitchell has filed any objections to class action settlements within the last five years, as required by the Court (Preliminary Approval Order ¶31), and is thus procedurally deficient.

[6] It does not appear that Welchans is a Settlement Class Member, as the only information provided in the May Objection corresponds to an account that appears to be held solely by May. Baker Suppl. Decl. ¶8.

engage whatsoever with the facts, legal analysis, and arguments presented in the Fee Brief, and they fail to cite any legal precedent or salient facts supporting their position. Plaintiffs' Counsel detailed the work they performed – over 5,600 hours of professional time (Fee Brief at 13-14), the substantial litigation risks and risk of non-payment that they faced (*id.* at 10-14), as well as the fact that the estimated recovery of 15.4% of maximum damages is favorable compared to settlements of comparable size class actions and is based on Plaintiffs' *best case scenario* – which assumes Plaintiffs would prevail at class certification, summary judgment, trial, and appeals, and that a jury accepted in full Plaintiffs' novel damages theory (*id.* at 6-7). The adversarial arms'-length negotiations overseen by an experienced mediator, who is a former federal judge, also demonstrate that Vanguard and the other Defendants (represented by experienced and informed counsel) did not "easily settle" the Action for $40 million. (Final Approval Brief at 11-13). Thus, the Court should overrule the May Objection.

### 3.    The Court Should Overrule the Chernoff Objection

The Chernoff Objection is also without merit. Chernoff makes similar flawed and conclusory assertions as Mitchell regarding Vanguard's alleged (but unproven) conduct and the opportunity loss of compounding returns. Those arguments fail for the same reasons as Mitchell's objection. *Supra* §III(C)(1). Despite Chernoff's claims that Vanguard's conduct was "documented and irrefutable," he points to no such evidence. Chernoff also asserts that the amount of attorneys' fees is not warranted by the amount of the Settlement and estimated percent of damages recovered. To the contrary, the Settlement Amount and estimated percentage recovered for the Settlement Class strongly support the amount of attorneys' fees requested, as the 15.4% recovery compares favorably to recoveries in similar sized cases. Fee Brief at 6-8. For these reasons the Court should overrule the Chernoff Objection.

### 4.    The Court Should Overrule the Kiribamune Objection

The Kiribamune Objection is likewise without merit. Kiribamune provides no support for his conclusory assertion that the Settlement amount is inadequate simply because it "will cover only a fraction of the capital gains tax we had to pay." To the contrary, the relief provided to the Settlement Class is adequate, taking into account the costs, risks, complexity, and delay of continued litigation. Final Approval Brief at 13-17. Moreover, the relevant measure of damages is the amount of *excess* capital gains taxes paid *net of* potential future tax benefits, not simply the amount of capital gains taxes paid. Kiribamune provides no support whatsoever for his assertion that the attorneys' fees requested are "too excessive."[7] The Court should overrule the Kiribamune Objection.

### 5.    The Court Should Overrule the Duram "Objection"

Duram sent an email to the Court's chambers explaining that he received Postcard Notices a few days after the claims submission deadline. Duram does not expressly object to the Settlement, but his email was filed as an "objection." (Dkt. No. 160). It is not evident from his email whether or not Duram is a Settlement Class Member.[8] Baker Suppl. Decl. ¶9.

It is SCS's understanding that these late notices received by Duram, Larson, and others who have contacted Class Counsel and SCS, are due to a nominee that sent out a batch of Postcard Notices to potential Settlement Class Members on or around February 11, 2025. Evans Suppl. Decl. ¶6. SCS has informed potential Settlement Class Members who received these late notices that SCS is still accepting claim submissions. *Id*. Plaintiffs anticipate moving the Court to accept

---

[7] The Kiribamune Objection also fails to address whether Kiribamune is represented by any counsel, or whether he has filed any objections to class action settlements within the last five years, as required by the Court (Preliminary Approval Order ¶31), and is thus procedurally deficient.

[8] The Court filed a similar email from Randy Larson on February 20, 2025 (Dkt. No. 168), which was not filed as an "objection," informing the Court of Larson's receipt of a late notice.

reasonably late valid claims when Plaintiffs move for distribution of the settlement funds upon completion of the claims validation process. Baker Suppl. Decl. ¶10.

In any event, that some potential Settlement Class Members received individual notice after the claims filing deadline due to a late mailing by a nominee does not render the Settlement or the Notice Program deficient. In *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 227 (D.N.J. 2005), the court overruled objections that notices were received too late where "the overwhelming majority received their Notices with more than sufficient time to review the Notice, call the toll-free number or Class Counsel for more information, and/or even to consult with counsel" and "the vast majority of the Class Members received their Notices within 45 to 60 days before any of the deadlines, and about three months before the Fairness Hearing." Moreover, the *Varacallo* court explained that "[e]ven for those did not receive a Class Notice Package, the Summary Notice[...] was published in leading newspapers and magazines...." *Id.* As the *Varacallo* court noted, "Rule 23 only requires the 'best possible notice under the circumstances.' It does not require perfect notice." (*See also* Final Approval Brief at 23-25). Here, SCS disseminated individual notice to over 200,000 potential Settlement Class Members at least 45 days before any of the relevant deadlines, caused over 100,000 more notices to be sent via nominees or after receiving contact information from nominees (most of which were sent well in advance of the deadlines), and published the Summary Notice twice in leading online newswires over one month or more before the deadlines. Evans Decl. ¶¶6-10.

## 6. The Court Should Overrule the Wiedwald Objection

The Wiedwald Objection is also without merit. Wiedwald incorrectly asserts that the Settlement Amount is inadequate because the Plan of Allocation does not use individual tax rates as an input variable. Estimated tax rates were incorporated into Plaintiffs' expert's estimation of

maximum aggregate damages. *See* Final Approval Brief at 14 and n.3. Individual tax rates were not incorporated into the Plan of Allocation to avoid requiring the submission of tax returns, for the reasons detailed in the Final Approval Brief at 22.

Wiedwald's comparison of the amounts recovered in the SEC Settlement and the Settlement in this Action is inapt, because the SEC Settlement involved entirely distinct legal claims (for misrepresentations, as opposed to breach of fiduciary duty), with a different standard of proof (administrative proceeding versus civil action), against different defendants (only Vanguard was named), with different litigation risks and posture (including not requiring Rule 23 class certification). *See* Dkt. No. 156-26 (SEC Settlement). In fact, the SEC Settlement, which came months *after* this Settlement was signed and preliminarily approved by the Court and was not known to Plaintiffs or their counsel until it was published in January 2025, expressly credits the $40 million recovery already achieved for investors in this Settlement. *Id.* ¶44. That the SEC Settlement provides additional funds for Settlement Class Members does not take away from the value provided, and risks avoided, by this Settlement.

Wiedwald makes the conclusory assertion that this Action is "not complex" because "Vanguard's own internal documents" purportedly showed its knowledge of the tax impact of its decision, but he ignores that those allegations had not been proven or admitted. Even if Plaintiffs had had the benefit of the SEC's findings (which postdated the Settlement) in this Action, there was no guarantee that Plaintiffs would prevail at class certification, summary judgment, or trial on their claims, given Defendants' anticipated defenses and the different nature of claims alleged by the SEC.[9]

---

[9] Plaintiffs and Class Counsel did not have access to the SEC's findings until they were published in January 2025. Dkt. No. 156 ¶¶55-56. Plaintiffs and Class Counsel also did not have access to

Finally, contrary to Wiedwald's assertion, the Plan of Allocation provides reasonable and proportional compensation to investors as those who received greater capital gains distributions and incurred greater tax liabilities will receive greater distributions from the Net Settlement Fund, subject to the weights accounting for differences between the various TRFs in the amount of excess distributions and the relative losses of the time value of money. The Plan of Allocation is described in detail in the Long Notice (Evans Decl., Ex. A at 4-5), and support for the Plan of Allocation is described in the Final Approval Brief at 20-23. For these reasons the Court should overrule the Wiedwald Objection.

### 7.    The Court Should Overrule the Warner Objection

The Warner Objection also lacks merit. Warner and Breyfogle claim that the Plan of Allocation may underestimate their damages because: (1) they did not *plan* to sell their TRFs and thus would have paid no taxes if not for the 2021 distribution; (2) they paid net investment income taxes ("NIIT") and relatively high state taxes; and (3) they incurred collateral tax consequences.[10] However, in order to accurately account for actual future TRF sales (or lack thereof), rather than *plans* (which can change), one would need to wait until every Settlement Class Member disposed of their TRF shares, which could take decades. The Plan of Allocation uses assumptions for when Settlement Class Members would sell their shares in order to allow settlement claims to be calculated and distributed now, rather than decades into the future when such *plans* may (or may not) finally come to fruition. *See* Final Approval Brief at 22. Accurately accounting for individual NIIT and state tax liabilities and collateral tax consequences incurred would require claimants to

---

any of Vanguard's internal documents during the pleading stage as discovery was stayed until after Plaintiffs prevailed on Defendants' motions to dismiss. *See* Dkt. No. 92.

[10] It does not appear that Breyfogle is a Settlement Class Member, as the only information provided corresponds to an account that appears to be held solely by Warner. Baker Suppl. Decl. ¶11.

submit tax returns and potentially additional documentation, which the Plan of Allocation avoids for the reasons described in the Final Approval Brief at 22.

The Warner Objection also proposes that new language be added to the Settlement that clarifies that nothing in the Settlement reduces or limits Settlement Class Members' ability to participate in the Fair Fund established by the SEC Settlement. No such language is necessary because: (A) eligibility criteria for participation in the SEC's Fair Fund will be determined by the SEC, who have not yet made such determinations (Baker Suppl. Decl. ¶12); and (B) nothing in this Settlement, including the releases by Settlement Class Members, stands to preclude or limit Settlement Class Members' ability to recover in a Fair Fund that appears to provide recovery for essentially the exact same set of impacted TRF investors, especially in light of the SEC's express acknowledgement of this Settlement. Dkt. No. 156-26 (SEC Settlement) ¶44. For these reasons the Court should overrule the Warner Objection.

### 8.    The Court Should Disregard the Agnich Email

On February 19, 2025, an email to the Court's chambers from Robert Agnich was filed (Dkt. No. 166, "Agnich Email"). Agnich claims that Class Counsel did not return his emails or phone call. That is false. Class Counsel emailed Agnich on February 5, 2025, and spoke with Agnich for nearly 20 minutes on February 6, 2025. Baker Suppl. Decl. ¶13. The Claims Administrator timely received the valid exclusion request from Agnich's wife, as referenced in the email. *See* Evans Suppl. Decl. ¶11, Ex. A. Agnich has not submitted any objection or the "input" he vaguely alludes to. The Court should disregard the Agnich Email.

### D.    The Brewer Objection is Without Merit

An objection was also filed by John W. Brewer (Dkt. No. 165, "Brewer Objection"), challenging only the calculation of weights under the Plan of Allocation.[11] Brewer is simply Monday-morning-quarterbacking the details of the Plan of Allocation devised by Class Counsel and Plaintiffs' damages expert, whom are each intimately familiar with the case and the complex damages and economic issues involved. Contrary to Brewer's assertions, the assumptions and general methodology underlying the calculation of the weights by Plaintiffs' expert, Dr. Tabak, are set forth in the Final Approval Brief and supporting declaration. (*See* Final Approval Brief at 22 n.5 and Dkt. No. 156 ¶49).

Notably, Brewer does not assert any evidence of actual intra-class conflicts, and in fact he expressly disclaims that "I do not have any affirmative grounds to suggest that those who have prepared the current Plan of Allocation have any conflict or structural incentive to favor certain Class Members over others." Brewer Objection at 5. Indeed, Brewer recognizes that five of the twelve Plaintiffs owned the 2015 and 2025 TRFs that Brewer held (*id*.), and they nonetheless approved the Settlement and Plan of Allocation on behalf of the entire Settlement Class. (*See* Dkt. No. 120 (complaint) ¶¶23, 25, 27, 29, 30; Dkt. Nos. 156-7 through 156-18 (Plaintiffs' declarations)). Moreover, Plaintiffs were a knowledgeable and sophisticated group of investors who dedicated significant time to overseeing Plaintiffs' Counsel throughout the litigation including, for example, a former senior counsel for the FTC who spent at least 140 hours on the

---

[11] The Brewer Objection was filed on February 19, 2025, a day after the Court-imposed deadline for objections. Unlike the Wiedwald and Warner Objections, which were also filed late but bore a stamp indicating they were timely received by the Clerk of Court on February 18, 2025, the Brewer Objection contains no such indication that it was timely *received*, only Brewer's certification that it was *sent* on February 12, 2025. To the extent the Brewer Objection is thus untimely, it is procedurally invalid and waived. Preliminary Approval Order ¶¶31-32.

Action (Dkt. No. 156-12), a business professor at the University of Colorado (Dkt. No. 156-9), and a chief investment officer for an international real estate company (Dkt. No. 156-16).

Brewer asserts that the Plan of Allocation must be the "fairest" possible formula for all Settlement Class Members, but that is not the applicable standard for approval. A proposed Plan of Allocation need only have a reasonable and rational basis to warrant final approval. *Hemispherx*, 2011 WL 13380384 at \*7 (citing *In re Schering-Plough Corp. Sec. Litig.*, 2009 WL 5218066, at \*5 (D.N.J. Dec. 31, 2009)); (*see also* Final Approval Brief at 21). "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000). Here, the Plan of Allocation had a rational basis, as detailed in the Final Approval Brief at 20-23. With respect to Brewer's qualms with the discount rate applied, the rate Dr. Tabak applied in calculating the weights is the same 8.0% interest rate he used in estimating aggregate damages. *See Id.* at 22 n.5 and 14 n.3. The 8.0% interest rate was the federal prime rate at the time of calculation, which courts often use for prejudgment interest. *See, e.g., Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 498 (E.D. Pa. 2021); *Gleason v. Norwest Mortg., Inc.*, 2008 WL 2945989, at \*3 (D.N.J. July 30, 2008).

Brewer's unsupported opinion that there *might* be a fairer calculation of weights that a special master (appointed at the Settlement Class's expense) could theoretically assess does not negate the fact that the Plan of Allocation, devised by Class Counsel and Plaintiffs' well-informed damages expert and unanimously approved by Plaintiffs who collectively held eleven of the twelve TRFs, has a rational and reasonable basis to fairly allocate the Net Settlement Fund. Brewer concedes that he cannot demonstrate that the Plan of Allocation uses an inappropriate discount rate, as he claims, nor that it is unfair or prejudicial to investors in the 2025 TRF like himself (and several of the Plaintiffs). In *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 289–90 (3d Cir. 2011), the

Third Circuit noted that the district court referred the $295 million settlement to a special master to consider and recommend (among other issues) a distribution plan—an arduous and expensive two-year process that generated "several lengthy Report and Recommendations" after reviewing "competing econometric reports furnished by several experts." The Third Circuit did ***not*** say that such a process was required or necessarily suitable for assessing any plan of allocation, nor did it change the legal standard for approving a proposed plan. *Id.* No such expensive and lengthy undertaking is merited here for allocating a Net Settlement Fund roughly 10% the size of the *Sullivan* settlement, where the Plan of Allocation has a rational, reasonable basis, was developed by counsel and a well-informed expert, and was approved by a diverse set of Plaintiffs without any evidence of actual intra-class conflict or bias. Accordingly, the Court should overrule the Brewer Objection.

### E.    The Hughes Objection is Without Merit

An objection was also filed by John Hughes (Dkt. No. 161, "Hughes Objection"). None of the arguments raised in the Hughes Objection provide any grounds for rejecting or amending the Settlement, Plan of Allocation, or the requests for attorneys' fees. The Hughes Objection should be overruled as well.

#### 1.    The Hughes Objection Falsely Portrays the SEC Settlement as a "Pre-Existing Obligation"

The Hughes Objection is fundamentally flawed because it falsely asserts that the Settlement provides no recovery for Settlement Class Members beyond "what Vanguard ***already*** must pay them under regulatory settlements," blatantly mischaracterizing the SEC Settlement as a "pre-existing obligation." Hughes Objection at 1 (emphasis in original). In reality, the SEC Settlement was dated January 17, 2025, four months ***after*** the Parties signed a binding term sheet at the mediation, and nearly two months ***after*** the Court preliminarily approved the Settlement.

17

Hughes provides absolutely no evidence, nor are Plaintiffs or Class Counsel aware of any, indicating that Vanguard had already agreed to pay any amount to the SEC at the time the Settlement Amount was negotiated and agreed at the mediation. Baker Suppl. Decl. ¶14. To the contrary, the timing of the two settlements makes clear that the SEC Settlement is the one that encompasses consideration "already" promised to, and indeed already paid into the Escrow Account for, the Settlement Class.[12]

The SEC Settlement simply added a backstop, effectively guaranteeing the $40 million recovery already secured in this Action only if this Settlement was ultimately terminated or not approved. The SEC has not objected to the Settlement, nor has it suggested in any respect that the Settlement does not merit final approval. Indeed, the more plausible inference to draw from the timing of the two settlements is that the SEC may have only negotiated a $95 million settlement payment from Vanguard, but they added a provision guaranteeing the $40 million already secured in this Settlement so that the SEC could claim a larger top-line recovery. That the SEC Settlement was announced on the very last business day before Inauguration Day also suggests that optics played a role in the negotiation of the SEC Settlement, including the unusual timing of its announcement given the well-underway settlement approval process here.

None of the cases that Hughes cites supports the proposition that the existence of a ***later*** additional settlement somehow deprives a substantial ***prior*** settlement of its value. None of the cases Hughes cites even remotely resemble the facts presented here. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995) (assessing the economic value of coupons provided under the settlement); *In re Subway Footlong Sandwich*

---

[12] Defendants caused the entire Settlement Amount to be paid into the Escrow Account on December 17, 2024, one month before the SEC Settlement. Baker Suppl. Decl. ¶14.

*Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) ("And after the settlement, just as before, the rare sandwich that falls short of the full 12 inches will still provide the customer the same amount of food as any other. The injunctive relief approved by the district judge is utterly worthless."); *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017) (proposed settlement "merely requires ARS to continue using the same voicemail message it voluntarily adopted back in 2011"); *Drazen v. Pinto*, 106 F.4th 1302, 1331 (11th Cir. 2024) ("the Agreement provided for preferential treatment for [the plaintiffs]... and guaranteed that their [counsel's] attorney's fees of up to $10.5 million would not be reduced").

Hughes attempts to argue that the Settlement Class would be better off if the Court rejected the Settlement because the Settlement Class would recover the same amount from the SEC's Fair Fund without deducting any attorneys' fees and expenses for Plaintiffs' Counsel, but that unremarkable proposition is ***always*** the case in any settlement where attorneys' fees are awarded from a common fund. Any class would be better off if it stiffed its attorneys after reaping the rewards from the attorneys' efforts in creating a settlement fund. Hughes is essentially arguing that Plaintiffs' Counsel deserve no compensation for the thousands of hours of work they committed to this Action that resulted in the $40 million Settlement. This flies in the face of the long-standing common fund doctrine, as explained in the Final Approval Brief at 3-4, which Hughes simply ignores.

To the extent Hughes baselessly insinuates that counsel for the Parties may have known about the SEC Settlement four months in advance during the mediation, Class Counsel has already expressly denied that under penalty of perjury. Dkt. No. 156 ¶¶55-57. The mediator, Judge Phillips, also submitted a declaration attesting to the adversarial and arms'-length negotiations at the mediation. Dkt. No. 156-24 ¶8. That Vanguard may have known of its own ongoing regulatory

negotiations with the SEC is unremarkable and has no bearing on the fairness, reasonableness, or adequacy of the Settlement. Contrary to Hughes' baseless speculation (Hughes Objection at 5), there is absolutely no evidence suggesting that prior to the mediation, Vanguard had already committed to paying to the SEC whatever amount was subsequently negotiated in this Action, much less that Plaintiffs or their counsel had reason or ability to know of any such agreement at the mediation or at any point prior to the announcement of the SEC Settlement.

## 2.    Hughes' Criticisms of the Notice Are Misplaced and Lack Merit

The notice issued to Settlement Class Members was approved by the Court two months *before* the SEC Settlement was announced (Preliminary Approval Order ¶9) and disseminated to Settlement Class Members beginning in December 2024 (Evans Decl. ¶6). Hughes' objection that the notice was nevertheless deficient for failing to disclose the SEC Settlement is nonsensical. The SEC Settlement itself was publicly announced. Dkt. No. 156-25. *Drazen* counsels no differently regarding notice. 106 F.4th at 1337 (district court erred in failing to inform class members of defendants' total liability exposure or that a dispositive issue in the case was pending decision in the Supreme Court). Here, the Long Notice explained that the $40 million Settlement Amount represented approximately 15.4% of the maximum damages estimated by Plaintiffs' expert. Unlike the pending Supreme Court decision in *Drazen*, the SEC Settlement has zero effect on any term or provision of this Settlement, it simply guaranteed the payment of the $40 million already committed in the Settlement.

Hughes also misconstrues Plaintiffs' account of the maximum damages estimated by Plaintiffs' damages expert. As described in the Final Approval Brief at 14 n.3, which Hughes ignores:

> Plaintiffs' expert, Dr. Tabak, estimated the present value of aggregate damages by using the "Alternative Methodology" detailed in Dr. Tabak's expert reports (Dkt. Nos. 125-3 and 141-2). The key assumptions used in arriving at this damages estimate include: (i) investors would sell all of their TRF shares 10 years after the target date(s); (ii) the Court would apply an interest rate equal to the federal prime rate (8.0% at the time of calculation); (iii) investors would fall one income tax bracket lower in retirement when they sold their TRFs; and (iv) only distributions tied to investors who redeemed Investor TRFs and bought the equivalent Institutional TRFs on the same day were attributed to Defendants' conduct. Dr. Tabak also incorporated data on taxable investors' 2021 holdings from Vanguard's internal documents, as well as IRS data on the population distribution of capital gains tax rates. Baker Decl. ¶44.

Further, as explained in the Final Approval Brief and Fee Brief, the $259.5 million figure is Dr. Tabak's estimate of the present value of aggregate damages that would be recovered by the class in Plaintiffs' *best-case scenario*. (Final Approval Brief at 14; Fee Brief at 6-7). Those are the "maximum" estimated aggregate damages because they do not account for the myriad litigation risks that Plaintiffs faced, or a claims rate of less than 100% of the class, or the discount from having to wait through years of continued litigation, appeals, and claims processing before recovering a judgment. *See id.*

As explained in Dr. Tabak's expert reports (Dkt. Nos. 125-3 and 141-2), applying his "Alternative Methodology" as opposed to his "Primary Methodology" is necessary to calculate damages without waiting decades to find out how and when class members actually dispose of their TRF shares and what offsetting tax benefits (if any) they ultimately receive at some future date from the 2021 distribution. The Alternative Methodology necessarily employs assumptions to account for these yet-undetermined variables on an aggregate basis for hundreds of thousands of class members, including projecting how many TRF shares were held by class members in non-Vanguard taxable accounts, when class members would dispose of their shares, what their individual capital gains tax rates were for 2021 and what it would be at such future time, or what

state they might live in. Naturally, there are a range of values one could apply for each of these assumptions, with varying degrees of aggression and realism. Hughes speculates that Plaintiffs could have arrived at an even higher aggregate damages estimate because they could have used more aggressive assumptions or included each scintilla of possible damages regardless of how provable they were (especially on a class-wide basis through common proof) or how material they were to settlement negotiations. However, the converse is true as well. Defendants contended that much more conservative assumptions were appropriate, as some class members likely sold long before their "target date," reducing estimated aggregate damages to a fraction of what Plaintiffs claimed.[13] In any event, Plaintiffs were under no obligation to calculate and/or provide every possible permutation, or the most aggressive possible estimate, nor did they purport to do so in presenting their estimate of the present value of aggregate damages using a disclosed set of assumptions under the Alternative Methodology.

Finally, Hughes wrongly asserts that "Class counsel erred in assuming the burden of speculating about potential tax savings." Hughes Objection at 8. Creating a novel damage model for trial was not Plaintiffs' only challenge; they also bore the burden of proof to satisfy the predominance inquiry for class certification under Rule 23(b)(3). Accounting for future tax benefits may have been Defendants' burden at the merits stage as an affirmative defense (assuming the Court accepted that framing for this novel tax-based damages theory), but Plaintiffs still had to show that these individualized inquiries could be handled through a common damages methodology that could be applied class-wide based on common sources of proof, in order to

---

[13] Investors may sell the TRFs at any point for myriad reasons, even if they originally planned to never sell and pass the funds on through their estates as Hughes purports: they might be rebalancing their portfolio away from securities and into real estate; they may prefer to invest in different securities; their income or tax status may change; or they may incur major unexpected expenses or loss of income and need to sell the TRFs for cash.

satisfy predominance for their class certification motion. Hughes ignores this reality.[14] Moreover, even if Plaintiffs had adopted Hughes' ill-informed approach and still managed to obtain class certification (and survive an inevitable Rule 23(f) appeal), they could not realistically assert in settlement negotiations that there was absolutely no offsetting value to potential future tax benefits in the aggregate, regardless of whose burden it would be. Hughes' argument simply ignores the realities of economics and the significant challenges inherent in complex class action litigation.

### 3.    Hughes' Objections to the Plan of Allocation Lack Merit

Hughes' arguments regarding purported deficiencies in the Plan of Allocation fail for similar reasons as the Brewer Objection. Hughes identifies no actual conflicts of interest or evidence of bias. The Plan of Allocation has a rational, reasonable basis, was developed by counsel and a well-informed expert, and was approved by a diverse set of Plaintiffs who held eleven of the twelve TRF vintages and unanimously approved the Settlement. *See supra*, §III(D). In contrast, the court in *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189 (3d Cir. 2012) found that "the representative plaintiffs and their counsel could not adequately represent the entire class" in determining settlement allocation between two subgroups because all of the representative plaintiffs were in the same subgroup. Here there are no alleged "misaligned incentives or intra-class conflict" with which the *Dewey* court was concerned. *Id.* at 188. The Settlement does not treat Settlement Class Members inequitably simply because different claimants receive different recoveries under the Plan of Allocation, which "is simply a reflection of the extent of the injury that certain class members incurred and does not clearly suggest that the class members had antagonistic interests." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271–72 (3d Cir. 2009).

---

[14] Hughes should be familiar with this particular aspect of litigation as he appears to be an attorney at a major law firm, Milbank LLP, where his biography on the firm's website touts his "significant experience in class action lawsuits." Baker Suppl. Decl. ¶15.

Hughes essentially argues that the Plan of Allocation, developed by Class Counsel and Plaintiffs' well-informed economic damages expert, is flawed because it assumes TRF investors would sell their shares ten years after the respective "target date" for their fund. Hughes instead relies on his own unsupported assumption that class members would not ever sell their TRF holdings. An assumption must be made for this factor to calculate distributions now and avoid waiting decades to determine each class member's actual outcome. *See* Final Approval Brief at 22. That Hughes disagrees with the assumption selected by Plaintiffs and their expert, based on nothing more than his own conjecture, is not grounds for finding the Plan of Allocation lacks a rational basis. To the extent Hughes asserts that the Plan of Allocation "disadvantages elderly class members" by assigning lower weights to earlier TRF vintages, one could just as easily argue that applying Hughes' preferred assumption would disadvantage younger class members in the same way by assigning relatively lower weights to the later TRFs.[15]

Hughes' proposed "two-track claims process" is also fundamentally flawed, as class members could not prove (and would be incentivized to lie about) their future plans, and he suggests no reliable factual basis upon which to calculate the probabilities of future tax savings. These are issues Plaintiffs and their expert already grappled with in arriving at their proposed damages model. Hughes' half-baked and unsupported assertions of what he thinks might be a fairer

---

[15] Hughes also incorrectly, and baselessly, asserts that elderly class members are "more likely to pass away without selling." Hughes Objection at 9-10. Such class members may also be more likely to sell their funds sooner in need of liquidity since they are less likely to have significant income in retirement, and younger class members would be just as likely to sell or not sell at times relative to their respective (presumably later) target dates.

allocation do not weigh against approving the proposed Plan of Allocation, nor do they render the Settlement unfair or inequitable in any respect.[16]

### 4. Hughes' Additional Claims of Procedural Deficiencies Lack Merit

Hughes' assertion that the Court-approved notice program was inadequate are plainly belied by the extremely high participation rate of Settlement Class Members. Evans Suppl. Decl. ¶13 (over 180,000 claims received out of roughly 312,000 potential Settlement Class Members who were sent direct notice (*Id*. ¶5 ). Hughes even concedes that he received notice via email, he just happened to overlook it. Hughes Objection at 11. Hughes also elides the publication of the Summary Notice, establishment of the Settlement-dedicated website, and the significant media coverage that this Settlement received (*see* Baker Suppl. Decl. ¶16), which was apparently sufficient to allow Hughes to find all relevant details about the Settlement in timely fashion despite overlooking the email notice he received. Hughes Objection at 11. Moreover, Hughes completely fails to engage with any of the case law Plaintiffs cited showing that courts in this Circuit routinely approve similar notice programs. *See* Final Approval Brief at 25.

Hughes also decries as "Draconian" the opt-out requirements that were previously approved by the Court, although he does not claim that he was prevented or dissuaded from opting out himself. Preliminary Approval Order ¶¶25-26.[17] Of the twelve requests for exclusion received by SCS, only three were rejected as failing to adhere to the Court's requirements. Evans Suppl.

---

[16] Hughes received total capital gains distributions of only $6,750.67. While his actual damages (even assuming no offsetting future tax benefit) are likely only slightly over $1,000, Hughes actually *benefits* from the Plan of Allocation as his investment in the 2050 TRF has a weight of 14.394, third-highest of the twelve fund weights. Any re-weighting of the funds in the manner Hughes suggests would almost certainly decrease his relative claim, and thus his recovery.

[17] The requirement that an exclusion request be signed under penalty of perjury requires a single sentence. There is no evidence that any Settlement Class Members were dissuaded from opting out by that (or any other) requirement. Indeed, none of the deficient exclusion requests were rejected on that basis. Baker Suppl. Decl. ¶17**.**

Decl. ¶11. Each were given notice and an opportunity to cure the deficiencies, which included failing to provide contact information and failing to sign the requests. Baker Suppl. Decl. ¶17. None responded. Evans Decl. ¶15; Evans Suppl. Decl. ¶11. Other courts in the Third Circuit regularly impose the same or comparable requirements for exclusion requests as those imposed by the Preliminary Approval Order here. *See* Baker Suppl. Decl., Exs. 3-5 (*Whiteley v. Zynerba Pharmaceuticals, Inc., et al.,* 2:19-cv-04959-NIQA (E.D. Pa.), Dkt. No. 44, ¶22; *In re Electric Last Mile Solutions, Inc. Securities Litigation,* No. 2:22-cv-545-MEF (D.N.J.), Dkt. No. 131, ¶23; *Beltran v. SOS Limited, et al.*, No. 1:21-cv-7454-RBK (D.N.J.), Dkt. No. 47, ¶24). Thus, there is no support for Hughes' contention that the opt-out requirements are coercive in any way.

The overwhelming response of Settlement Class Members affirmatively ***opting in*** by filing over 180,000 claims, Evans Suppl. Decl. ¶13, also cuts against Hughes' unsupported speculation that the opt-out requirements somehow "strong-armed class members to stay in." Hughes Objection at 12. Hughes' objection to the Court's requirement that Settlement Class Members requesting exclusion must document the amount of their total holdings in the Investor TRFs at the time the 2021 capital gains distributions were made ignores the fact that requirement is needed to verify that the requestor is actually a Settlement Class Member, particularly if they do not provide an Identification Number, which not all Settlement Class Members were assigned.

### 5.    The Court Should Deny Hughes' Vague Requests for Discovery

As an initial matter, Hughes' claim that the Parties ignored his requests for further information is belied by his communications with Class Counsel. Hughes Objection, Ex. A. Hughes requested further information and documents on February 3, 2025. *See id.* Plaintiffs filed the Motions and supporting papers, which addressed many of the concerns from Hughes' email, on February 4, 2025. Dkt. Nos. 154-56. Hughes therefore could not have reviewed those filings at

the time of his inquiry. Hughes did not specify what information he still sought after reviewing those papers, nor did he address how Plaintiffs' filings did or did not resolve his questions. As demonstrated above, Plaintiffs believe that their submissions in support of the Motions adequately address all of the salient concerns raised by Hughes in his February 3, 2025 email.

Hughes does not specify anywhere in his objection exactly what documents or information he is still seeking from which Parties, after having now reviewed Plaintiffs' Motions. To the extent Hughes seeks the non-public expert reports or calculations of Dr. Tabak prepared at Class Counsel's direction for litigation and/or settlement purposes, both attorney work product and settlement privilege preclude discovery of any such documents.

The cases that Hughes cites regarding discovery are inapposite. In *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 316 (3d Cir. 2005) the Third Circuit "recognized that discovery may be appropriate if lead counsel has not conducted adequate discovery or if the discovery conducted by lead counsel is not made available to objectors," and "it is undisputed that no formal discovery was undertaken by class counsel." Here, in contrast, Plaintiffs reviewed over 200,000 pages of documents from Defendants and third parties in discovery, and Hughes does not appear to be seeking any of those materials. *Girsh*, 521 F.2d at 157 likewise involved an objector seeking documents produced to plaintiffs during discovery. The Third Circuit has also since explained that its finding in *Girsh* "was predicated on the total inadequacy of the record upon which the settlement was approved and the totality of the circumstances surrounding the settlement hearing in which the objector was denied meaningful participation," *Cmty. Bank*, 418 F.3d at 316, circumstances which are not present here.

More recently, the Third Circuit has rejected discovery requests by class action objectors unless "objectors can make a colorable claim that the settlement should not be approved."

27

*McDonough v. Horizon Blue Cross Blue Shield of New Jersey*, 641 F. App'x 146, 152 (3d Cir. 2015). In *McDonough*, the Third Circuit found that "[t]he District Court did not err in concluding that the objectors had failed to make the requisite showing that further discovery was warranted," after years of litigation and the completion of significant document discovery. *Id.* at 153 ("The objectors' demand for additional discovery is not linked to any identified issue with the settlement, nor have the objectors articulated any fact they might hope to uncover"). For the reasons explained above, Hughes has not made a colorable claim that the Settlement should not be approved, and the Court should deny his putative discovery requests.

## IV.    CONCLUSION

For the foregoing reasons, and those set forth in Plaintiffs' opening briefs, the Court should overrule each of the objections and grant Plaintiffs' motions for: (1) final approval of the proposed Settlement and Plan of Allocation; and (2) for an award of attorneys' fees, reimbursement of expenses, and awards to Plaintiffs.

Dated: February 25, 2025                    **THE ROSEN LAW FIRM, P.A.**

By: */s/Joshua Baker*
Joshua Baker (*pro hac vice*)
Phillip Kim (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
       jstern@rosenlegal.com
       jbaker@rosenlegal.com

Jacob A. Goldberg (PA ID: 66399)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817

Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com

*Interim Class Counsel for Plaintiffs and the
Proposed Class*

**DOVEL & LUNER, LLP**
Jonas B. Jacobson
Simon Franzini
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: (310) 656-7066

*Additional Counsel for Plaintiffs*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Mark C. Rifkin
Matthew M. Guiney
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/545-4653

*Additional Counsel for Plaintiffs*

**GOLOMB LEGAL, P.C.**
Richard M. Golomb
Kevin W. Fay
One Logan Square
130 N. 18th Street, #1600
Philadelphia, PA 19103
Tel: (215) 985-9177
Fax: (215) 985-4169

**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
W. Daniel "Dee" Miles, III
James B. Eubank
218 Commerce Street
Montgomery, Alabama 36104
Tel: (334) 269-2343
Fax: (334) 954-7555

*Additional Counsel for Plaintiffs*

29

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204

*Additional Counsel for Plaintiffs*