**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN VANGUARD CHESTER FUNDS LITIGATION | Case No. 2:22-cv-955-JFM<br><br>CLASS ACTION |

**PLAINTIFFS' SUPPLEMENTAL RESPONSE TO JOHN HUGHES' OBJECTIONS**

## <u>TABLE OF CONTENTS</u>

I.     THE COURT SHOULD OVERRULE THE HUGHES OBJECTIONS
       AND APPROVE THE SETTLEMENT ............................................................... 1

       A.     The Present Value of a Potential Fair Fund Recovery Must Be
              Discounted ........................................................................................... 4

       B.     The Relevant Value of Approving the Settlement is the Total Settlement
              Amount ................................................................................................ 8

       C.     The Court Cannot Substitute Its Own Judgment For That of Plaintiffs,
              Class Counsel, and the Overwhelmingly Positive Response of the
              Settlement Class .................................................................................. 11

       D.     Class Counsel's Request for Attorneys' Fees is Merited .................................... 13

II.    THERE IS NO IMPROPER CONFLICT OF INTERESTS BETWEEN
       PLAINTIFFS AND CLASS COUNSEL ........................................................ 18

III.   UPDATED NOTICE TO THE CLASS IS NOT REQUIRED OR
       WARRANTED ............................................................................................ 21

IV.    CONCLUSION ............................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) .......................................................................................... 14, 15

*Caplan v. Braverman*,
   876 F. Supp. 710 (E.D. Pa. 1995) ........................................................................ 20

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) .............................................................................. 12

*Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
   739 F. Supp. 3d 270 (E.D. Pa. 2024) ..................................................................... 9

*Devine v. Ne. Treatment Centers, Inc.*,
   2021 WL 4803819 (E.D. Pa. Oct. 14, 2021) .......................................................... 10

*Drazen v. Pinto*,
   106 F.4th 1302 (11th Cir. 2024) .......................................................................... 17

*Ehrheart v. Verizon Wireless*,
   609 F.3d 590 (3d Cir. 2010) ........................................................................... 12, 13

*Enos v. Adidas Am., Inc.*,
   2021 WL 5622121 (D. Ore. Aug. 26, 2021) .......................................................... 19

*Evans v. Jeff D.*,
   475 U.S. 717 (1986) ............................................................................................. 10

*Girsh v. Jepson*,
   521 F.2d 153 (3d Cir. 1975) .................................................................................. 10

*Handschu v. Special Servs. Div.*,
   787 F.2d 828 (2d Cir. 1986) ................................................................................. 22

*Hugo v. Levan*,
   2011 WL 13173025 (S.D. Fla. July 12, 2011) ....................................................... 23

*In re Baby Prods. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013) .................................................................................. 16

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ................................................................................... 9

*In re Cendant Corp. Sec. Litig.*,
  404 F.3d 173 (3d Cir. 2005) ................................................................................. 14, 15

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*,
  2010 WL 2735414 (E.D. Pa. July 2, 2010) ............................................................. 23

*In re GAC Corp.*,
  681 F.2d 1295 (11th Cir. 1982) ............................................................................. 22

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ................................................................................. 13, 16

*In re Ikon Off. Sols., Inc., Sec. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000) .......................................................................... 14, 15

*In re MetLife Demutualization Litig.*,
  689 F. Supp. 2d 297 (E.D.N.Y. 2010) ..................................................................... 22

*In re Metro. Life Ins. Co. Sales Practice Litig.*,
  1999 WL 33957871 (W.D. Pa. Dec. 28, 1999) ......................................................... 12

*In re Nat'l Media Corp. Sec. Litig.*,
  1992 WL 237362 (E.D. Pa. Sept. 15, 1992) ............................................................... 9

*In re Packaged Ice Antitrust Litig.*,
  2011 WL 717519 (E.D. Mich. Feb. 22, 2011) .......................................................... 23

*In re Processed Egg Prods. Antitrust Litig.*,
  2017 WL 5585717 (E.D. Pa. Nov. 20, 2017) ........................................................... 10

*In re Raviscent Techs., Inc. Sec. Litig.*,
  2005 WL 906361 (E.D. Pa. Apr. 18, 2005) ............................................................... 9

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005) ................................................................................. 20

*In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*,
  869 F.3d 551 (7th Cir. 2017) ............................................................................... 16

*In re Tenaris S.A. Sec. Litig.*,
  2024 WL 1719632 (E.D.N.Y. Apr. 22, 2024) ......................................................... 12

*In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*,
  1994 WL 702638 (E.D. Pa. Nov. 3, 1994) ............................................................... 11

*In re Viropharma Inc. Sec. Litig.*,
  2016 WL 312108 (E.D. Pa. 2016) ........................................................................... 9

*Keepseagle v. Vilsack*,
   102 F. Supp. 3d 306 (D.D.C. 2015) ........................................................................ 23

*Koby v. ARS Nat'l Servs., Inc.*,
   846 F.3d 1071 (9th Cir. 2017) ................................................................................ 16

*Lopez v. CSX Transp., Inc.*,
   2020 WL 13878691 (W.D. Pa. Oct. 27, 2020) ........................................................ 20

*Lundsted v. JRV Holdings, LLC*,
   2017 WL 3071733 (E.D. Mich. July 19, 2017) ....................................................... 20

*Mansor v. JPMorgan Chase Bank*,
   2017 WL 4159935 (D. Mass. Sep. 19, 2017) .......................................................... 20

*Marshall v. Milberg LLP*,
   2009 WL 5177975 (S.D.N.Y. Dec. 23, 2009) ......................................................... 22

*McIntosh v. Katapult Holdings, Inc.*,
   2024 WL 5118192 (S.D.N.Y. Dec. 13, 2024) ......................................................... 12

*Ortiz v. Am. Airlines, Inc.*,
   2020 WL 4504385 (N.D. Tex. Aug. 5, 2020) .......................................................... 19

*Ponzio v. Pinon*,
   87 F.4th 487 (11th Cir. 2023) ................................................................................. 12

*Reynolds v. Beneficial Nat. Bank*,
   288 F.3d 277 (7th Cir. 2002) .................................................................................. 17

*Solkoff v. Pennsylvania State Univ.*,
   435 F. Supp. 3d 646 (E.D. Pa. 2020) ..................................................................... 10

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011)..................................................................................... 13

*Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*,
   2023 WL 1370852 (Del. Ch. Jan. 31, 2023)........................................................... 19

*Walsh v. Great Atl. & Pac. Tea Co.*,
   96 F.R.D. 632 (D.N.J.).............................................................................................. 11

*Weber v. Gov't Emp'rs Ins. Co.*,
   2009 WL 2496811 (D.N.J. Aug. 11, 2009) ............................................................. 23

*White v. Chevron Corp.*,
   2017 WL 2352137 (N.D. Cal. May 31, 2017) ........................................................ 19

**Rules**

Pa. R. Prof. Conduct 1.7 .................................................................................................... 20

Pa. R. Prof. Conduct 1.7(a)(2) ........................................................................................... 18

Pa. R. Prof. Conduct 1.7(b) ................................................................................................ 20

Plaintiffs Haifan Liang, Julia Lucas, Donald R. Lichtenstein, Samuel B. Skraly, Ardes Poisson, Valerie M. Verduce, John Harvey, Caitlin Brigham, Jeffrey Chaussee, Zeb Bradford, Benjamin Deming, and James Daily ("Plaintiffs") submit this memorandum pursuant to the Court's Orders dated March 12, 2025 (Dkt. No. 177) and March 17, 2025 (Dkt. No. 179), in further response to the objections filed by John Hughes (Dkt. No. 161 and 173, "Hughes Objection" and "Hughes Supplemental Objection," respectively, and together the "Hughes Objections").[1]

## I.    THE COURT SHOULD OVERRULE THE HUGHES OBJECTIONS AND APPROVE THE SETTLEMENT

The analysis of the SEC Settlement presented in the Hughes Objections is fundamentally incorrect on both the law and the facts. Mr. Hughes asks the Court to compare the outcomes for the Settlement Class in two scenarios: if the Court approves the Settlement and if the Court rejects the Settlement. Mr. Hughes argues that rejecting the Settlement will invariably result in a larger recovery for the Settlement Class. That premise, the factual predicate to his argument, is not true. Mr. Hughes is comparing apples to oranges. More precisely, he is comparing an orange you might eat several years from now to the apple in your hand, and he contends that if you take a bite out of the apple in your hand you get no value from that bite and only look at what is left over. That is not a valid logical framework to apply in considering the approval of the Settlement as fair, reasonable, and adequate under Rule 23(e)(2).

---

[1] All capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Stipulation of Settlement dated November 6, 2024 (Dkt. No. 148, "Stipulation"), Plaintiffs' opening memoranda in support of their motions for final approval of the Settlement (Dkt. No. 154-1, "Final Approval Brief") and for awards of attorneys' fees and expenses (Dkt. No. 155-1, "Fee Brief"), Plaintiffs' Reply in further support of their motions (Dkt. No. 170, "Reply"), and Plaintiffs' Response to the Hughes Supplemental Objection (Dkt. No. 174, "Suppl. Resp."). Citations and quotations are omitted and emphasis is added, unless otherwise noted.

First, the baseline value to the Settlement Class of rejecting the Settlement is not $40 million, it is less. That is because the relevant figure for the comparison is the *present value* of that $40 million. This is a critical distinction because of the large temporal gap between when Settlement Class Members would receive a distribution under an approved Settlement, and when Settlement Class Members might receive a distribution from the SEC's Fair Fund following a rejection of the Settlement. The former will take a few months, the latter typically takes several years. Therefore, the present value of the $40 million that Settlement Class Members *may* receive through the SEC's Fair Fund several years from now must be discounted to account for the time value of money. Mr. Hughes also speculates that if the Settlement is rejected, Plaintiffs may (eventually) be able to recover some additional amount from Defendants. That is one possibility, but rejecting the Settlement also restores the significant risks that Plaintiffs and the class will recover no additional value at all. In sum, the real value to Settlement Class Members of the Court rejecting the Settlement is not guaranteed to be $40 million or more, as Mr. Hughes propounds. The present value of that $40 million must be significantly discounted and the Court cannot assume that any additional recovery will be achieved.

Second, the value to the Settlement Class of approving the Settlement is not the Net Settlement Amount ($40 million less any award of attorneys' fees and expenses), it is the total Settlement Amount of $40 million. The Stipulation provides for a payment of $40 million, and both the Stipulation and Preliminary Approval Order expressly state that the Settlement and consideration of its approval are ***not*** contingent upon the disposition of any requests for attorneys fees and expenses. Those requests are contingent on approval, not vice versa, and the Court must consider them separately and apart from approval of the Settlement. The total Settlement Amount is the measure that courts routinely use to assess the reasonableness of the settlement amount for

approval purposes, not the net settlement amount. This makes sense because attorneys' fees and expenses are considered part of the Settlement Class's remedy. The $40 million Settlement is clearly a better recovery than the present value of the $40 million by way of the Fair Fund. If the Fair Fund distribution process takes long enough, and there is reason to suspect it will, even the Net Settlement Amount could provide a larger present value for the Settlement Class.

At bottom, the correct framing of this issue is as follows. The Court must determine if the proposed Settlement is fair, reasonable, and adequate under Rule 23. To make that assessment from a purely economic standpoint—ignoring all of the other Rule 23 and Third Circuit factors that the Court must consider, which all weigh in favor of approval—the Court must compare the *present value* to Settlement Class Members of two outcomes: (1) rejecting the Settlement and receiving an unknown distribution several years from now through the SEC Fair Fund, plus a *possibility* of eventually obtaining an additional recovery (or not) in this Action; and (2) approving the $40 million Settlement today. Plaintiffs' and Class Counsel's requests for awards of fees and expenses from the common fund they created for the Settlement Class are an independent and subsequent consideration that the Court may only reach after approving the Settlement. It simply cannot be said that rejecting the Settlement inevitably makes Settlement Class Members better off. It may, or it may not. The Court cannot ignore the massive uncertainty that would follow rejection, or the comparative value that approval provides in avoiding years of delay.

Plaintiffs and Class Counsel believe that the certainty and expediency of payment under the Settlement is preferable to the risk of rejecting this Settlement and *potentially* recovering a greater amount (or not) many years from now. That valuation and choice is theirs to make, not the Court's. In this situation, choosing the bird in hand is entirely consistent with the fiduciary duties

of both Class Counsel and the Court. The Court should approve the Settlement because approval does not leave free money on the table, it simply declines to place a bet.

### A.    The Present Value of a Potential Fair Fund Recovery Must Be Discounted

If the Court approves this Settlement, the Claims Administrator estimates that it will complete claims processing and be ready to distribute funds to Settlement Class Members (subject to the Court's approval) in July of this year. Declaration of Joshua Baker ("Baker Decl."), Ex. 1 (Declaration of Paul Mulholland) ("Mulholland Decl.") ¶13. Conversely, if the Court rejects this Settlement and Vanguard pays $40 million to the SEC's Fair Fund, Settlement Class Members will not actually receive those funds until the completion of a complex Fair Fund distribution approval process that often takes many years. *See id.* ¶¶4-11. Accordingly, the amount that investors may eventually receive through the Fair Fund must be discounted to its present value to account for the time value of money. When calculated under any reasonable assumptions, the present value of a Fair Fund recovery is assuredly ***less than*** $40 million. *See id.* ¶12.

Before any money is distributed to investors through the SEC's Fair Fund, a litany of procedural steps and approvals must be completed. First, a tax administrator must be selected and approved, which requires the selection of a tax administrator after the tax administrator prepares a budget and an order issued by the SEC approving that selection and the proposed budget. *Id.* ¶7. Then a fund administrator or distribution agent must be selected and approved, which involves a lengthy selection process where the fund administrator must prepare and submit a proposed budget, and an order issued by the SEC approving the selection of the fund administrator and its proposed budget. *Id.* Then a distribution plan must be submitted, which requires research and coordination between multiple parties during the drafting process, where typically several drafts are exchanged over several months. *Id.* Then the distribution plan must go through a public notice and comment period and must be approved by an order from the SEC after all comments have

been addressed, potentially resulting in the submission of a new distribution plan which starts the notice and comment process over anew. *Id*. The distribution only occurs after all claims have been reviewed, any disputes have been resolved, and a payee list has been drafted by the fund administrator and reviewed and approved by both the tax administrator and the SEC. *Id*. Only after the completion of each of these steps will a distribution of funds be authorized and finally paid.

As the Claims Administrator, SCS, attests from its own experience administering SEC Fair Funds, this process can take, and has in fact taken, eight years or more to complete before distributions are made. *Id.* ¶8. Plaintiffs are aware of *at least* thirty SEC Fair Funds that took over five years between the initial order directing payment and the first order to distribute those funds, with thirteen cases taking at least seven years and three spanning more than a decade. Baker Decl. ¶4, Ex. 2. Other SEC Fair Funds have still not been distributed well over five years after the initial order. *Id.* ¶4. For illustrative purposes, if you apply the same 8% discount rate that Plaintiffs used to calculate aggregate damages and the plan of allocation weights, assume the Fair Fund accumulates interest at a net tax-effective rate of 1.15% (the average from the past ten years) and is distributed 7.25 years after the SEC Settlement was entered (just six months longer than the average time from payment order to distribution for the SEC Fair Funds administered by SCS), the net present value of that Fair Fund distribution in July 2025 is just $25.68 million, slightly *less* than the estimated Net Settlement Fund. Mulholland Decl. ¶13.

At this time, the pertinent interest rates and tax rates that will apply over the coming years while the Fair Fund distribution process is pending are unknowable, as is the amount of time it will take before a distribution of the Fair Fund is finally made. Thus, any attempt to compare the value of approving the Settlement to the value that might be eventually received via the Fair Fund is inherently speculative. It is clear, however, that Mr. Hughes' central premise that Settlement

Class Members will undoubtedly fare better if the Settlement is rejected is incorrect. There is no question that the present value of a $40 million eventual recovery through the Fair Fund must be significantly discounted, the only question is the amount of the discount.

Moreover, there are other reasons why a Fair Fund recovery may not provide a superior outcome for Settlement Class Members. The eligibility criteria for the Fair Fund have not yet been determined and may leave out some Settlement Class Members who have submitted claims and stand to recover under this Settlement.[2] The Fair Fund distribution plan may require the submission of tax returns or other supporting documentation, which could dissuade Settlement Class Members who have completed the less burdensome and invasive claims submission process here from seeking recovery from the Fair Fund. The Fair Fund distribution plan could also apply drastically different weights between the different TRFs, or no weights at all, such that some Settlement Class Members will receive less than they would under the proposed Plan of Allocation here.

There is also reason to believe that the administrative process for this particular Fair Fund will take longer than most. The SEC has already extended the deadline to submit a proposed plan of distribution by over a year. Dkt. No. 174-2. There is no evidence of any progress made or expected timing for any of the other steps that must precede distribution. The proposed Plan of Allocation for this Settlement has already drawn several objections, including from Mr. Hughes. Any proposed Fair Fund distribution plan will likely have to face and address similar objections and potentially require amendments to the plan and a second round of notice and comment. The current political administration has been drastically cutting resources and changing operating directives for numerous government agencies including the SEC, which could further slow the

---

[2] Plaintiffs do not expect that participation in the Settlement, if approved, will have any preclusive effect on eligibility for the Fair Fund as a general matter, but the precise contours of who is eligible to recover under the Fair Fund may not exactly match the Settlement Class definition here.

SEC's Fair Fund distribution approval process or introduce other uncertainties. *See also* Mulholland Decl. ¶¶9-11 (anticipating a high likelihood of significant delay in administering a Fair Fund in this case).

There is also a chance that the $40 million may never reach the Fair Fund at all even if this Settlement is rejected. Vanguard might raise vigorous legal challenges to its apparent obligation to pay $40 million to the Fair Fund if this Settlement were rejected merely due to the existence of the guarantee provision in the SEC Settlement. Indeed, Vanguard's counsel outlined some of those arguments at the Settlement Hearing. Baker Decl., Ex. 3 ("Hearing Tr.") 57:2-58:17. Litigation could go on for years before Vanguard ever actually pays any additional money into the Fair Fund, and Vanguard may even prevail, leaving the Settlement Class with no recovery at all.[3]

Finally, while Plaintiffs *might* obtain some further recovery from Defendants in the event that the Court rejects the Settlement and the Parties are returned to their litigation positions, they also might not. Of course, the actual distribution of a potential additional recovery would not be made for some time, as the Parties would need time to negotiate a new settlement and/or litigate through trial and appeals. Any potential settlement would then have to pass through the approval and claims administration processes once again, which would need to start anew. Even the speculative value of a potential additional recovery, therefore, would have to be discounted to present value by a significant and currently indeterminable amount. Moreover, as detailed in Plaintiffs' opening memoranda, Plaintiffs faced significant litigation risks that would all be restored if the Settlement were rejected. *See* Final Approval Brief at 15-17; Fee Brief at 10-12. If the proposed class were not certified, or if Defendants prevailed on anticipated motions for

---

[3] Plaintiffs reserve the right to challenge the merits of Vanguard's arguments if this potential dispute were to materialize. The risks of greater uncertainty and delay exist regardless of Plaintiffs' position on the merits of Vanguard's arguments.

summary judgment or to exclude Plaintiffs' damages expert, or if Plaintiffs do not prevail at trial, or if their theory of damages is rejected, Plaintiffs and the class would recover no additional recovery. *See id.* Thus, the value of any potential additional recovery that Plaintiffs *might* achieve for the Settlement Class after a rejection of this Settlement is inherently speculative, and its present value (if any) would need to be significantly discounted to account for the substantial delay before any such funds would be actually received by Settlement Class Members.

**B.    The Relevant Value of Approving the Settlement is the Total Settlement Amount**

The Stipulation provides for a Settlement Amount of $40 million, which was already timely paid into an escrow account. Reply at 18 n.12. This is a common fund cash settlement, not a claims-made or coupon settlement. That means the total value received by the Settlement Class as consideration for the Settlement is $40 million.

Plaintiffs and Class Counsel have made a separate application to the Court for awards of attorneys' fees and expenses and service awards to Plaintiffs. Those awards will be paid out of the common fund, but only if the Settlement is approved. Conversely, the approval of the fee and expense application is ***not*** a condition of the Settlement, and thus the requested awards should not be deducted from the value of the Settlement when weighing the Settlement's approval. The Stipulation expressly provides that: "The procedure for, and allowance or disallowance by the Court of, the Fee and Expense Application are not conditions of the Settlement set forth in this Stipulation and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement." Stipulation ¶8.3. The Court adopted and endorsed this feature of the Settlement in its Preliminary Approval Order: "... any application for attorneys' fees and interest, or expenses or payments to the Class Representative submitted by Class Counsel, ... *will be considered separately from the fairness, reasonableness, and adequacy*

*of the Settlement.*" Dkt. No. 152 ¶35. The relevant value of the Settlement is therefore the total Settlement Amount, as the terms of the Settlement make clear that the requests for attorneys' fees and expenses must be considered independently from, and can only be granted upon, approval of the Settlement.

That the approval of the proposed settlement is determined prior to, and independently of, any application for attorneys' fees and expenses is a defining feature of class action common fund settlements. *See, e.g., In re Nat'l Media Corp. Sec. Litig.*, 1992 WL 237362, at *1 (E.D. Pa. Sept. 15, 1992) ("Having approved a final settlement of the class action in this matter, the only issue remaining open for the court's determination is the proper amount of attorneys' fees and costs to be awarded to plaintiffs' counsel out of the settlement fund."). In securities class action settlements, which are almost always structured as common fund settlements just like this one, the relevant figure used in assessing the value of the settlement fund is the total settlement amount, not the net amount after deducting requested fees. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 241 (3d Cir. 2001) (assessing the range of reasonableness of the settlement fund, one of the *Girsh* factors used in the Third Circuit to assess approval of class action settlements, by comparing the "total settlement amount" to the estimated damages); *Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 739 F. Supp. 3d 270, 281 (E.D. Pa. 2024) (assessing reasonableness of settlement by comparing total settlement amount to estimated damages); *In re Viropharma Inc. Sec. Litig.*, 2016 WL 312108, at *14 (E.D. Pa. 2016) (same); *In re Raviscent Techs., Inc. Sec. Litig.*, 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (same). There is no reason to depart from that long-standing analytical framework here.

Attorneys' fees and expenses should not be deducted from the total Settlement Amount considered in evaluating the Settlement because attorneys' fees are considered part of the

plaintiffs' remedy. *See Solkoff v. Pennsylvania State Univ.*, 435 F. Supp. 3d 646, 655 (E.D. Pa. 2020) ("the relevant settlement amount [for evaluating the fairness of a proposed settlement] is the total amount of the settlement even though the total settlement amount includes attorneys' fees") (citing *Evans v. Jeff D.*, 475 U.S. 717, 731–32 (1986) (noting that attorneys' fees do not belong to the attorney but are instead part of the plaintiff's remedial arsenal)); *Devine v. Ne. Treatment Centers, Inc.*, 2021 WL 4803819, at *2 (E.D. Pa. Oct. 14, 2021) (citing *Solkoff*, 435 F. Supp. 3d at 655).[4]

The fact that Plaintiffs and Class Counsel have separately requested awards of attorneys' fees and expenses to be taken from the common fund they helped to create does not weigh against approval of the Settlement as reasonable. *See In re Processed Egg Prods. Antitrust Litig.*, 2017 WL 5585717, at *10 (E.D. Pa. Nov. 20, 2017) ("that the parties have agreed the attorneys' fees and costs may be awarded from the settlement amount would not weigh against approving the settlement. ... This *Prudential* factor ["whether any provision for attorneys' fees are reasonable"] requires analysis of the *settlement agreement* terms regarding attorney fees. Here, it simply allows for them, which the Court finds reasonable.") (emphasis in original).

Even if the Court were to use the projected Net Settlement Fund as the point of comparison, approving the Settlement may still provide the Settlement Class with a superior recovery. If the Settlement is rejected and the Fair Fund is not distributed for another seven years or more (which is eminently plausible and perhaps even likely, *see* Mulholland Decl. ¶¶9-11), it could have a lower present value than even the Net Settlement Fund. *Id.* ¶13. Even if the Court focuses only on the

---

[4] *Solkoff* and *Devine* involved fairness assessments of settlements under the Fair Labor Standards Act ("FLSA"), but "[i]n determining whether an FLSA collective action is fair and reasonable, courts in the Third Circuit apply the factors laid out in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), which are used to evaluate the fairness of Rule 23 class action settlements." *Devine*, 2021 WL 4803819, at *3.

Net Settlement Fund, which it should not, the analysis is the same: approve the Settlement and distribute the money now or reject it and hope the gamble eventually pays off.

### C.    The Court Cannot Substitute Its Own Judgment For That of Plaintiffs, Class Counsel, and the Overwhelmingly Positive Response of the Settlement Class

Here, there is no real dispute as to any of the other Rule 23(e)(2) or *Girsh* factors that courts in the Third Circuit consider when weighing final approval of a Settlement. Each of those factors supports approval. *See* Final Approval Brief at 8-20; Reply at 3-5. Mr. Hughes' arguments regarding the SEC Settlement speak only to the reasonableness of the settlement amount; they do not impact any of the other factors the Court must consider. There is no factual basis to find that the potential benefits of rejecting the Settlement conclusively outweigh the value that approving the Settlement provides. In fact, it is reasonable to conclude, as Plaintiffs and Class Counsel have, that the economic value and certainty of approval compared to the gamble of rejection actually supports the reasonableness of the settlement amount and weighs in favor of approval. Even if the Court, in its own estimation, were to think that the gamble of rejection might be worth eliminating the value and certainty of approval, at worst that factor can only be said to be mixed or neutral. It is not dispositive, and the Court cannot ignore all of the other factors favoring approval. More importantly, to the extent the Settlement presents a judgment call, it is not the Court's call to make.

Here, Plaintiffs and their experienced and well-informed counsel support approval of the Settlement, even in view of the potential alternative for an uncertain recovery through rejection of the Settlement. When weighing approval of a proposed class action settlement "[i]n exercising [its] discretion, a court should be slow to substitute its judgment for that of experienced counsel who, as here, have arrived at settlement after extensive litigation and a careful assessment of the risks and potential rewards involved in a full trial and appeal." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 1994 WL 702638, at *3 (E.D. Pa. Nov. 3, 1994) (quoting *Walsh v. Great*

*Atl. & Pac. Tea Co.*, 96 F.R.D. 632, 642–43 (D.N.J.), *aff'd*, 726 F.2d 956 (3d Cir. 1983)); *In re*

*Metro. Life Ins. Co. Sales Practice Litig.*, 1999 WL 33957871, at *26 (W.D. Pa. Dec. 28, 1999)

(same); *Ponzio v. Pinon*, 87 F.4th 487, 507 (11th Cir. 2023) ("The district court was 'entitled to

rely upon the judgment of experienced counsel for the parties. Indeed, the [court], absent fraud,

collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'")

(quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *McIntosh v. Katapult Holdings,*

*Inc.*, 2024 WL 5118192, at *8 (S.D.N.Y. Dec. 13, 2024) ("absent fraud or collusion, courts should

be hesitant to substitute their judgment for that of the parties who negotiated the settlement.")

(cleaned up); *In re Tenaris S.A. Sec. Litig.*, 2024 WL 1719632, at *4 (E.D.N.Y. Apr. 22, 2024)

("absent evidence of fraud or overreaching, [courts] consistently have refused to act as Monday

morning quarterbacks in evaluating the judgment of counsel.").

The reaction of the Settlement Class also overwhelmingly favors approval of the

Settlement. At baseline, this Settlement received an "unprecedented" claims rate (68%), with over

211,000 potential Settlement Class Members filings claims and only nine objections filed.

Mulholland Decl. ¶15. Over 202,000 of those claims, or 95.7%, were filed *after* January 17, 2025,

when the SEC Settlement was announced. *Id.* This further demonstrates that the Settlement Class

overwhelmingly favors approving the Settlement even in view of the SEC Settlement.

Even if Plaintiffs and Class Counsel subjectively believed that rejecting the Settlement was

a more favorable outcome, which they do not, the Third Circuit has held that events postdating a

class action settlement, but preceding approval, which make a settlement less favorable to the

parties who entered it, "do not provide a legitimate basis for rescinding the settlement." *Ehrheart*

*v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010). Even if Plaintiffs believed that the SEC

Settlement provided a desirable opportunity to improve their recovery, "a party cannot avoid its

independent contractual obligations simply because a change in the law confers upon it a benefit that could have altered the settlement calculus." *Id.* at 596 (finding "[t]he District Court erred by permitting Verizon to escape the consequences of its informed, counseled and voluntary decision to settle."). There is always a risk that events postdating the settlement will improve or worsen what a party might have recovered, but that is not grounds for rejecting the parties' considered decision to enter the settlement. Here, the SEC Settlement was a particularly unexpected subsequent development (from Plaintiffs' perspective), but that does not change the analysis.

Faced with an inherent uncertainty of outcomes between approving and rejecting the Settlement, the Court must approve the Settlement. To reject the Settlement in these circumstances would "run afoul of the strong presumption in favor of voluntary settlement agreements," which the Third Circuit has "explicitly recognized with approval." *Ehrheart*, 609 F.3d at 594. "This presumption is especially strong in 'class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.'" *Id.* at 595 (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)). "This policy also ties into the strong policy favoring the finality of judgments and the termination of litigation. Settlement agreements are to be encouraged because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts." *Id.* at 595; *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 311 (3d Cir. 2011).

**D.    Class Counsel's Request for Attorneys' Fees is Merited**

Mr. Hughes' central argument, that there is no real benefit to the $40 million Settlement and the Settlement Class is better off receiving the $40 million through the Fair Fund because attorneys' fees and expenses will not be deducted from the Fair Fund, is really an argument that the Court should reduce or eliminate attorneys' fees because it would make the Settlement Class better off if they keep all of the common fund. That argument would apply to every common fund

class action settlement. It ignores the express language of the Stipulation and Preliminary Approval Order stating that the request for attorneys' fees and expenses "will be considered separately from the fairness, reasonableness, and adequacy of the Settlement," Dkt. No. 152, and it would vitiate the very core of the common fund doctrine: "that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 205 (3d Cir. 2005) ("[W]e agree with the long line of common fund cases that hold that attorneys 'whose efforts create, discover, increase, or preserve a [common] fund' ... are entitled to compensation."); *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 192 (E.D. Pa. 2000) ("[T]here is no doubt that attorneys may properly be given a portion of the settlement fund in recognition of the benefit they have bestowed on class members.").

Mr. Hughes is essentially trying to use a potential loophole in the SEC Settlement to justify depriving Class Counsel of compensation for their considerable work in securing the $40 million Settlement for the benefit of the Settlement Class. Mr. Hughes argues that if the Settlement Class gets $40 million either way (which is not accurate, as explained above), the Court should choose the path where the lawyers do not get paid. That would be a grossly inequitable result. Mr. Hughes fundamentally misconstrues the relevant decision facing the Court. The Court's decision is whether to approve the full $40 million Settlement or reject it and gamble that the Settlement Class may or may not end up with a better recovery years down the road. The requested awards of attorneys' fees and expenses will be considered on their own merits under the relevant Third Circuit factors, but only if and after the Settlement is approved.

To the extent Mr. Hughes contends (implicitly or otherwise) that Class Counsel and Plaintiffs do not deserve compensation via attorneys' fees and expenses and service awards, that argument also fails. Class Counsel and Plaintiffs are wholly responsible for obtaining the entire $40 million common fund recovery for the Settlement Class and are thus entitled to reasonable compensation from the common fund their efforts created. *Boeing*, 444 U.S. at 478; *Cendant*, 404 F.3d at 205; *Ikon*, 194 F.R.D. at 192. Nothing about the SEC Settlement suggests otherwise.

There is no real question as to the procedural fairness leading to the Settlement. The Parties' agreement predates the SEC Settlement by four months. Plaintiffs and Class Counsel had no knowledge of the existence or status of Vanguard's settlement negotiations with regulators until the SEC Settlement was released. *See* Dkt. No. 156 ¶¶55-57; Hearing Tr. 45:7-46:1. There is no evidence contradicting Plaintiffs' assertion that the Settlement was reached through arms'-length negotiations between adversarial counsel under the guidance of an experienced mediator. *See* Final Approval Brief at 11-13; Dkt. No. 156-24 (Declaration of the Hon. Layn. R. Phillips) ¶8. The Parties were not negotiating in the shadow of an imminent but unsigned deal with regulators. As counsel for Vanguard confirmed during the Settlement Hearing, "at the time when the class action settlement was negotiated, the parties in the regulatory matters were not close to a deal." Hearing Tr. 60:23-25. On January 16, 2025, there was no reason to doubt that Plaintiffs and Class Counsel were entitled to compensation based on the entire $40 million benefit they achieved for the Settlement Class. That did not change when the SEC Settlement was released the next day.

The fact that the SEC Settlement contained a guarantee of the pre-existing $40 million Settlement does not erase or diminish the value of the benefit achieved by Plaintiffs and Class Counsel four months prior. None of the regulators involved in the SEC Settlement have objected to this Settlement, or to the fee and expense application. Reply at 18. The SEC Settlement expressly

15

credits Vanguard with an offset for the $40 million it had already paid in this Settlement. Dkt. No. 156-26 ¶44 ("Vanguard is entitled to an offset to the $135 million by [] the amount of $40 million for Vanguard's settlement of a class action," identifying this Settlement). Neither the regulators' own filings nor the reports of numerous news media outlets characterize the SEC Settlement as including the $40 million Settlement achieved here. *E.g.,* Dkt. No. 156-25 at 2 (SEC Press Release) ("The $106.41 million in ordered relief is in addition to $40 million that Vanguard agreed to pay," referring to this Settlement); *see also* Suppl. Resp. at 4 and n.4. In fact the opposite is true: the SEC and news reports each refer to a settlement amount achieved by regulators of $106 million, which is ***net of*** the $40 million offset due to the pre-existing Settlement. *Id.*

None of the cases in the Hughes Objections supports the unfounded proposition that the existence of a *later*, additive settlement somehow deprives a substantial *prior* settlement of its value. Nor do any of those cases even remotely resemble the circumstances here. *See Gen. Motors*, 55 F.3d at 806 (assessing the economic value of a settlement providing non-transferrable coupons for a new truck with "no cash value"); *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) ("And after the settlement, just as before, the rare sandwich that falls short of the full 12 inches will still provide the customer the same amount of food as any other. The injunctive relief approved by the district judge is utterly worthless."); *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017) (finding "the settlement's injunctive relief is of no real value. The injunction ... merely requires ARS to continue using the same voicemail message it voluntarily adopted back in 2011"); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 176–77 (3d Cir. 2013) (addressing an objection to the requested fees "on the ground that the Court should not consider the *cy pres* award as a class benefit for purposes of calculating

16

attorneys' fees," where a $35 million settlement allocated approximately $18.5 million to *cy pres*

recipients, $14 million to class counsel, and only $3 million to class members).

In *Drazen v. Pinto*, 106 F.4th 1302, 1338 (11th Cir. 2024) the Eleventh Circuit found that

"the District Court erred by treating the Settlement as creating a common fund rather than a claims-

made settlement," which was a critical distinction in that case. The *Drazen* settlement "provided

for preferential treatment for [the plaintiffs]... and guaranteed that their [counsel's] attorney's fees

of up to $10.5 million would not be reduced," despite the fact that there was only a 1.9% claims

rate and that "[o]f those 24,059 who filed claims, 12,396 asked for [$150] vouchers and 11,662

asked for [$35] cash," meaning the maximum actual benefit to claimants was $2.27 million, not

the $35 million amount that class counsel had presented to class members and the Court. There is

no dispute that the Settlement here is not a claims-made, reversionary, or illusory settlement.

Unlike here, *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 283–84 (7th Cir. 2002), was

a case rife with procedural deficiencies ranging from suspicious to shocking, including, among

other things: (1) the approval of a release for effectively no compensation of related claims worth

up to $2 billion in a certified class action in Texas that was already set for trial (compared to the

barely litigated case at issue that was settling for $25 million); (2) the district judge for the settling

case issuing an injunction barring the Texas class counsel from notifying the members of the

settling class of the status of the Texas litigation to assist them in deciding whether to opt out of

the $25 million settlement; and (3) the district judge encouraging the solo practitioners who

brought the settling case "to submit their fee applications in camera, lest the paucity of the time

they had devoted to the case (for which the judge awarded them more than $2 million in attorneys'

fees) be used as ammunition by objectors," where "the lawyers' efforts between the filing of the

complaint and the settlement negotiations were singularly feeble" and "[t]heir representation of the class was almost certainly inadequate." None of those facts are present here.

For these reasons, and the analysis laid out in the Fee Brief and Reply, the Court should award Class Counsel and Plaintiffs the full amounts requested in their fee and expense application.

## II.    THERE IS NO IMPROPER CONFLICT OF INTERESTS BETWEEN PLAINTIFFS AND CLASS COUNSEL

The Court also directed Plaintiffs to address "whether 'there is a significant risk that the representation of [Plaintiffs] will be materially limited by ... a personal interest of [Plaintiffs' Counsel],' under Pa. R. Prof. Conduct 1.7(a)(2)." Dkt. No. 179. The Court's concern was that "disapproving of the settlement would result in a larger recovery because Vanguard would pay the same amount (under the terms of the SEC settlement), but plaintiffs' counsel would be cut out." *Id.* n.1. The Court requested "reassurance that plaintiffs' counsel's role of advocating in favor of settlement is appropriate here." *Id.* It is appropriate for Class Counsel to support the Settlement here for two primary reasons. First, the factual predicate animating the Court's concern is unfounded, as explained above. Thus, advocating for the Settlement presents no inherent risk of conflict in the representation of Plaintiffs or the Settlement Class. Second, the personal interest of Class Counsel in seeking the award of attorneys' fees and expenses is no different here than in any case with contingent fee representation. Representing a client on a contingent fee basis does not materially limit counsel's representation of plaintiffs or a class, nor does it present a risk of violating Pa. R. Prof. Conduct 1.7(a)(2) or any other applicable rules of professional conduct.

It is simply not true that "disapproving of the settlement would result in a larger recovery." Rejecting the Settlement could easily result in a less valuable recovery for the Settlement Class. To the extent rejection could *potentially* lead to a larger recovery for the Settlement Class years down the road if Plaintiffs and Class Counsel were able to secure an additional recovery on top of

the $40 million paid into the Fair Fund (assuming that payment is made in full), Class Counsel's incentives to pursue that outcome (tempered by the material risks of failure) are aligned with those of the Settlement Class. If Plaintiffs and Class Counsel were to successfully recover more than $40 million for the Settlement Class, Class Counsel could seek an award of attorneys' fees even greater than those requested here. Of course, Plaintiffs could also get no further recovery at all, in which case the Settlement Class is better off with the $40 million Settlement rather than waiting years for the Fair Fund distribution. The Fair Fund may also take so long to distribute that even the Net Settlement Fund standing alone provides a greater present value for the Settlement Class. Vanguard may also dispute its obligation to pay into the Fair Fund, post-rejection, and it could prevail in whole or with a partial settlement.

Supporting approval of the Settlement rather than opting for the gamble presented by rejection is eminently reasonable and entirely consistent with Class Counsel's (and the Court's) fiduciary duties to the Settlement Class. "A fiduciary may reasonably select an investment alternative in view of its different risks and features, even if that investment option turns out to yield less than some other option. No fiduciary ... can foresee whether the risks associated with [] investment will come to fruition, and a fiduciary may reasonably choose to avert those risks in favor of a safer alternative." *White v. Chevron Corp.*, 2017 WL 2352137, at *10 (N.D. Cal. May 31, 2017); *Enos v. Adidas Am., Inc.*, 2021 WL 5622121, at *5 (D. Ore. Aug. 26, 2021) (quoting *White*, 2017 WL 2352137, at *10); *Ortiz v. Am. Airlines, Inc.*, 2020 WL 4504385, at *14 (N.D. Tex. Aug. 5, 2020) (same), *rev'd in part on other grounds*, 5 F.th 622 (5th Cir. 2021). *See also Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *24 (Del. Ch. Jan. 31, 2023) (finding no breach of fiduciary duty alleged where directors decided to "accept the

relative certainty of an all-cash, high-premium transaction that contemplated a prompt closing over a nominally higher-value all-stock transaction that posed valuation and closing risks").

An attorney's contingency fee interest is generally not a conflict that runs afoul of Pa. R. Prof. Conduct 1.7. *See Caplan v. Braverman*, 876 F. Supp. 710, 712 (E.D. Pa. 1995) ("Defendants argue that under Rule 1.7(b), Ewing's firm would be materially limited by [its] responsibilities to another client or to a third person, or by the lawyer's own interests because Ewing and Caplan have a contingent fee agreement based on the outcome of this litigation. We do not find that this is so."); *Lopez v. CSX Transp., Inc.*, 2020 WL 13878691, at *5 (W.D. Pa. Oct. 27, 2020) ("Attorney Timko's interest is no different from an attorney's interest in a normal contingency fee case—his interest in collecting a fee aligns with his client's interest in obtaining a judgment in her favor" and does not run afoul of Pa. R. Prof. Conduct 1.7); *Lundsted v. JRV Holdings, LLC*, 2017 WL 3071733, at *4 (E.D. Mich. July 19, 2017) (under Michigan Rule 1.7(b), which is similar to the Pennsylvania rule, a "lawyer does not have a conflict of interest with his or her client simply because the lawyer is seeking an award of attorney fees or is proceeding on a contingency fee arrangement."); *Mansor v. JPMorgan Chase Bank*, 2017 WL 4159935, at *2-3 (D. Mass. Sep. 19, 2017) (same under Massachusetts Rule 1.7, which is similar to the Pennsylvania rule). *See also* Pa. R. Prof. Conduct 1.7 Explanatory Notes (listed examples of a "personal interest" that could create a conflict do not include a contingency fee).

Moreover, for class action settlements in particular, the Rule 23(e) process is designed to address the Court's concern. For all class action settlements class counsel only get paid if the settlement is approved, giving class counsel a personal economic interest in approval. To address this concern, class settlements undergo the Rule 23(e) approval process. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005) (courts review and approve class settlements because

the "determination of attorneys' fees in class action settlements is fraught with the potential for a conflict of interest between the class and class counsel"). If the mere existence of class counsel's personal financial stake in the approval of a class action settlement rendered it inappropriate for counsel to advocate for that settlement, it would destroy the ability of any contingent fee counsel to advocate for any class action settlement. Instead, class counsel may advocate for the settlement within the protections of the Rule 23(e) process, where only after a settlement is approved on its own merits does the Court determine and award a reasonable amount of fees.

The record here confirms that, under supervision of the Court, the Rule 23(e) process is ensuring the vigorous litigation of the peculiar issues surrounding the SEC Settlement. Within this framework, and given the true facts at hand where rejecting the Settlement does ***not*** unequivocally benefit the Settlement Class, it is appropriate for Class Counsel to advocate for the Settlement.

## III.    UPDATED NOTICE TO THE CLASS IS NOT REQUIRED OR WARRANTED

No updated notice to the Settlement Class regarding the SEC Settlement is required or appropriate here, nor would a second opportunity for objections be necessary or helpful.

As an initial matter, the SEC Settlement was announced on January 17, 2025, a full month before the deadline for objections to the Settlement (February 18, 2025). This was not some overlooked regulatory filing, it was a major announcement of a nine-figure settlement against a preeminent financial institution. Unsurprisingly, news of the SEC Settlement was widely and quickly disseminated by numerous major news media outlets. Plaintiffs identified more than forty news articles about the SEC Settlement published in the two weeks following the initial announcement, in publications including the Wall Street Journal, The New York Times, CNBC, NBC News, Bloomberg News, local newspapers and news station websites nationwide, and press releases from state attorney generals' offices. Baker Decl., Ex. 4. Plaintiffs' opening motion papers, filed two weeks before the objection deadline, also discussed the SEC Settlement. Fee

Brief at 17-18. The SEC Settlement itself, including the specific terms giving rise to the instant dispute, was published and has remained freely available online on the SEC's website.[5]

Settlement Class Members had ample opportunity to consider the SEC Settlement before the deadlines to object, opt-out, or file claims in connection with this Settlement. This is not a situation where Settlement Class Members' decisions were already made, over 202,000 (95.7%) of the claims submitted came in *after* the SEC Settlement. Mulholland Decl. ¶15. Two other objectors, Mr. Warner and Mr. Wiedwald, also referenced the SEC Settlement in their objections (Dkt. Nos. 162 and 163) and Class Counsel and the Claims Administrator fielded dozens of additional inquiries about the SEC Settlement, Baker Decl. ¶7, further demonstrating that the Settlement Class had sufficient opportunity to consider the SEC Settlement and voice any related objections to approval of the Settlement. Not one of those objections or inquiries shared Mr. Hughes' misplaced concern over approving the Settlement. *Id.* There is no need for an updated notice about the widely publicized SEC Settlement, nor would an additional opportunity for objections be necessary or helpful here. The Court will have a total of five briefs from Plaintiffs, three from Mr. Hughes (a practicing class action attorney who has submitted extensive legal briefs), and one from Defendants, all discussing the impact of the SEC Settlement on the prospect of approving this Settlement. There is no need for any further exposition of this issue.

---

[5] Where numerous news articles appeared in widely-read national publications as well as more local or limited distributions, class members have been deemed to be on inquiry notice of the subject matter of the articles. *Marshall v. Milberg LLP*, 2009 WL 5177975, at *5 (S.D.N.Y. Dec. 23, 2009). Courts have also found that extensive publication notice, such as occurred here with respect to the SEC Settlement, can satisfy due process in the context of class action notices. *See Handschu v. Special Servs. Div.*, 787 F.2d 828, 833 (2d Cir. 1986) (approving publication over a period of weeks in several metropolitan New York newspapers); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 345, 349 (E.D.N.Y. 2010) (approving notice of settlement via "publication over a two-week period, four times in each of four widely read newspapers"); *In re GAC Corp.,* 681 F.2d 1295, 1300 (11th Cir. 1982) (notice "published twice in 53 leading newspapers worldwide" satisfied due process).

Updated notice is also not required because the guarantee provision in the SEC Settlement does not actually mean that Settlement Class Members are unequivocally better off if the Court rejects the Settlement. Updated notice is not required because the interests and rights of the Settlement Class have not been materially or substantially impaired by the SEC Settlement.[6]

Courts have found that additional notice is required only when the interests of the class have been materially or substantially impaired since the original notice was disseminated. *See, e.g., In re Packaged Ice Antitrust Litig.*, 2011 WL 717519, at *2-3 (E.D. Mich. Feb. 22, 2011) (additional notice informing class members of the plan of allocation and providing a claim form was required when not contained in the original notice); *Weber v. Gov't Emp'rs Ins. Co.*, 2009 WL 2496811, at *2-5 (D.N.J. Aug. 11, 2009) (requiring additional notice when the original notice program was found ineffective and the rights of the class would be substantially impaired absent additional notice). On the other hand, "when the interests of the class are minimally impacted, or not impacted at all, by events subsequent to the dissemination of the original notice, additional notice is neither necessary nor required." *Hugo v. Levan*, 2011 WL 13173025, at *12 (S.D. Fla. July 12, 2011) (finding additional notice "is neither necessary nor required" where "subsequent events have not strengthened the shareholders' claims or otherwise rendered the Settlement a less desirable outcome for Bancorp shareholders.").[7] The SEC Settlement did not

---

[6] Relatedly, no renewed claims process or opt-out process is needed here either because there is no reason to believe that the Settlement will impair Settlement Class Members' ability to recover in the Fair Fund. *See* Mulholland Decl. ¶5 (noting that in each of the cases in which SCS served as claims administrator for a class action settlement and subsequently as the fund administrator for the corresponding SEC Fair Fund, "investors were permitted to submit claims and eligible to recover under both the SEC Fair Funds and their corresponding Class Action [settlements].").

[7] *See also In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010) ("Notice in this circumstance is only required where the amendment to the settlement agreement would have a material adverse effect on the rights of class members."); *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 314 (D.D.C. 2015) ("an amendment

render the Settlement a less desirable outcome for the Settlement Class. The Settlement Class could have recovered more or less than $40 million before the Settlement secured that amount; rejecting the Settlement would still mean that the Settlement Class could recover more or less than the $40 million Settlement.

Practical considerations also weigh against issuing updated notice. Issuing new notice will be expensive, reducing Settlement Class Members' recovery. *See* Mulholland Decl. ¶14 (estimating the potential costs of additional notice). The process of issuing new notice would likely be prolonged depending on how long Settlement Class Members were given to respond, and if the claims process would also be restarted anew. The matter of what information to include in the updated notices would be hotly contested, particularly with regard to how to fairly and cogently represent the SEC Settlement and its potential impact on the proposed Settlement (if any), along with all of the uncertainties and contingencies involved with the Fair Fund. Plaintiffs therefore submit that it would be neither necessary nor appropriate to direct updated supplemental notice to the Settlement Class here.

## IV.    CONCLUSION

For these reasons, and those presented in Plaintiffs' Final Approval Brief, Fee Brief, Reply, and their response to the Hughes Supplemental Objection, the Court should overrule the Hughes Objections and approve the Settlement.

Dated: March 21, 2025                        **THE ROSEN LAW FIRM, P.A.**

                                             By: */s/Joshua Baker*
                                             Joshua Baker (*pro hac vice*)
                                             Phillip Kim (*pro hac vice*)

---

that neither ... expand[s] the scope of covered claims nor otherwise limits any legal right held by a class member need not be subject to a renewed Rule 23(e) process.").

Jonathan Stern (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
jstern@rosenlegal.com
jbaker@rosenlegal.com

Jacob A. Goldberg (PA ID: 66399)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com

*Interim Class Counsel for Plaintiffs and the Proposed Class*

**DOVEL & LUNER, LLP**
Jonas B. Jacobson
Simon Franzini
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: (310) 656-7066

*Additional Counsel for Plaintiffs*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Mark C. Rifkin
Matthew M. Guiney
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/545-4653

*Additional Counsel for Plaintiffs*

**GOLOMB LEGAL, P.C.**
Richard M. Golomb
Kevin W. Fay
One Logan Square
130 N. 18th Street, #1600
Philadelphia, PA 19103
Tel: (215) 985-9177

Fax: (215) 985-4169

**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
W. Daniel "Dee" Miles, III
James B. Eubank
218 Commerce Street
Montgomery, Alabama 36104
Tel: (334) 269-2343
Fax: (334) 954-7555

*Additional Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204

*Additional Counsel for Plaintiffs*