**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

```
-------------------------------------------------------X
                                                       :
                                                       :
IN RE: VANGUARD CHESTER                                :
FUNDS LITIGATION                                       :    No. 2:22-cv-955-JFM
                                                       :
                                                       :
                                                       :
                                                       :
-------------------------------------------------------X
```

**REPLY BRIEF IN FURTHER SUPPORT OF JOHN HUGHES'S
<u>OBJECTION TO THE PROPOSED CLASS ACTION SETTLEMENT</u>**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ..................................................................................................1

**ARGUMENT** ..............................................................................................................................3

I.    Parties Fail to Carry Their Burden of Showing that
the Class Benefits from this Deal...............................................................................3

    A.    Vanguard Is Obligated to Pay the Full $40 Million No Matter What. ..............3

    B.    Public Policy Considerations Do Not Support Vanguard's Reading................6

    C.    Correctly Calculated, the Present Value of Payments from the SEC Fair Fund
Greatly Exceeds the Present Value of Payments Offered Here.......................10

II.    Vanguard's Settlement Does Create Conflicts of Interest that are
Not Normally Present in a Case Like This One........................................................15

    A.    This Case Presents Unique Conflicts Challenges. ...........................................16

    B.    The Lack of Proactive Disclosure Exacerbated the Conflict. .........................19

    C.    Plaintiffs' Focus on Counsel Fees Highlights the Conflict.............................20

    D.    Plaintiffs' Arguments Merely Sidestep the Issue............................................22

III.    The Court Should Provide a Supplemental Notice. ...................................................23

**CONCLUSION** .........................................................................................................................24

## PRELIMINARY STATEMENT

Defendants' post-hearing brief makes two critical concessions that cut to the heart of this dispute. First, they admit they "are not aware of any evidence as to whether or how the Settlement impacted the thinking of the SEC or state regulators with regard to the regulatory settlement." (Vanguard Br. 5 n.2.) Second, they concede the right legal framework is an objective test and that the Court must consider the facts as they exist today, not when the settlement was originally negotiated. (Vanguard 10 n.5.) With these admissions clearing the underbrush, the question before the Court becomes crystal clear: Does approving this settlement benefit absent class members compared to rejection?

It does not. Not even close. That should end the inquiry.

Remarkably, the parties' own expert delivers the *coup de grâce*, concluding that, on an expected value basis, approving the settlement makes the class *worse off*—by $800,000, even after accounting for taxes and fees, and assuming a leisurely 6.75-year distribution timeframe. (Mulholland Decl., ¶ 12 & Ex. D.) That the parties submitted this declaration purportedly *in support* of the settlement is astonishing. How can they ask this Court to make explicit findings that this deal is "in the best interests of the Settlement Class" (Proposed Order, ECF No. 148-6, ¶ 7), when their own evidence shows it imposes a pecuniary *loss* compared to the alternative? The deal effectively picks the pockets of 312,697 defrauded investors and takes benefits they could otherwise enjoy thanks to taxpayer-funded enforcement programs.

The reality is even grimmer than their expert lets on. After correcting just a few of the most glaring errors in his analysis, the settlement's present value drops to $22.6 million. (This accounts for the reality that approval triggers appeals, automatically delaying any payout until mid-2027, at the earliest.) Meanwhile, the SEC Fair Fund (which typically distributes funds within 3.7 years, not the 6.75 years they claim) has a present value of $31.4 million—***39% more***

value even after adjusting for the delay. And this comparison assumes the class gets nothing here; rejection preserves the class's claims, offering potential incremental recoveries worth tens of millions more in expected value.

Cornered by these uncomfortable truths, Vanguard resorts to sowing doubt, coyly suggesting it might not have to pay the $40 million into the Fair Fund after all—if the Court rejects the deal for reasons Vanguard dislikes. (Vanguard Br. 13.) Nonsense. The "Guarantee Provision" is exactly what its name implies: an ironclad contractual obligation ensuring Vanguard pays—one way or another. The contrived notion that rejection creates uncertainty is baseless and lacks any textual support in the regulatory contracts. If the Court harbors even the slightest concern on this point, discovery will swiftly remove all doubt.

Vanguard's policy arguments similarly collapse under the weight of their own contradictions. The parties still have not produced even a single example of a prior class action settlement structured like this one—laying bare that this kind of arrangement is neither common nor necessary. An experienced attorney who has reviewed hundreds of securities class action settlements has never seen anything like this. (Schulman Decl. ¶ 21.) Vanguard itself called the situation "a fluke of timing" stemming from a poorly drafted agreement they concede "could have been written differently." But even the cases the parties tout emphasize that the Court's role is to protect *absent class members*—not to rewrite contracts that a sophisticated player like Vanguard now regrets.

Finally, plaintiffs sidestep the Court's concerns about conflicts of interest with a cursory response that misses the mark. This settlement structure creates serious conflicts well beyond the ordinary tensions involved in class representation. Class counsel's unwavering advocacy for approval—despite their own expert's admission that the deal harms the class—reveals a

glaring misalignment of interests. The class seeks to maximize total recovery from all sources (Fair Fund plus incremental recoveries here), while counsel is seeking to maximize its fees from this specific deal, even if it comes at the class's direct expense. Under well-settled rules, when faced with a conflict like this one, counsel's duty is to the *class*—not its own interests—and counsel must make fulsome disclosure to the Court, which did not happen here. This conflict renders counsel inadequate under Rule 23.

For these reasons, the motion for final approval should be denied.

## ARGUMENT

### I.    PARTIES FAIL TO CARRY THEIR BURDEN OF SHOWING THAT THE CLASS BENEFITS FROM THIS DEAL.

#### A.    Vanguard Is Obligated to Pay the Full $40 Million No Matter What.

Vanguard's arguments about its regulatory deals fundamentally mischaracterize the Objection. I am not arguing that "the Guarantee Provision requires the Court to reject the Settlement such that Vanguard *cannot* be entitled to the offset expressly provided in the Offset Provision." (Vanguard Br. 11; *see also id.* at 13.) Rather, the regulatory documents themselves do not dictate the Court's decision either way. Vanguard's contract with state attorneys general simply defines Vanguard's payment obligations under two distinct, mutually exclusive contingencies: Paragraph 37 (NY contract) and 18 (TX contract)—which Vanguard calls the "Offset Provision"—apply if the settlement is approved, while Paragraph 38 (NY contract) and 19 (TX contract)—the "Guarantee Provision"—govern if it is rejected. NY Assurance of Discontinuance ¶¶ 37-38, ECF No. 186-5; TX Settlement Term Sheet ¶¶ 18-19, ECF No. 186-3.

The legal basis for rejecting this settlement is rooted in requirements of the Class Action Fairness Act and Federal Rule of Civil Procedure 23, not Vanguard's contracts with regulators. The canon against surplusage is thus an irrelevant distraction. This is not a case where one

interpretation renders language meaningless. Both provisions have legal force in distinct scenarios. They coexist logically within the agreement.

Moreover, the fatal flaw here arises not from any one clause in isolation, but from the settlement's overall structure, through several provisions working in concert. Their net effect is that the civil settlement offers *zero* incremental consideration—not one dime—beyond what Vanguard already must provide under the regulatory deal. Courts routinely, and rightly, reject proposed class settlements that offer nothing beyond existing obligations or illusory benefits.

Vanguard's suggestion that it might refuse to pay regulators the $40 million if the settlement is rejected is pure fantasy. *See* Vanguard Br. 13 (claiming rejection "would inject substantial uncertainty regarding Vanguard's obligation"). The mechanics are spelled out in the agreements. If the Court rejects the settlement, funds in escrow here return to Vanguard within 10 business days, only to be immediately paid into the SEC Fair Fund. Stipulation ¶ 10.10, ECF No. 148; NY Assurance ¶ 38, ECF No. 186-5; TX Settlement ¶¶ 18-19, ECF No. 186-3. When pressed at the fairness hearing, Vanguard conceded this point. (ECF No. 184-4, at 57:14-21.) There is no scenario where Vanguard pockets the money and walks away for three straightforward reasons:

*First*, Vanguard's regulatory contract could not be clearer: "In the event Respondents do not pay the $40 million under the Class Action Settlement, as a result of . . . the Court's rejection of the Class Action Settlement, Respondents **shall** pay the $40 million into the Commission's Fair Fund within 10 days of such termination or rejection." (Assurance ¶ 38, ECF No. 186-5 (emphasis added).) "The meaning of the word 'shall' is not ambiguous. It is a word of command that normally creates an obligation impervious to judicial discretion." *In re FTX Trading, Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024) (internal quotations and citations omitted). Vanguard

itself invokes the term "Guarantee" 25 times in its brief, because the plain text created an iron-clad obligation to pay $40 million, period. Nothing in that text allows Vanguard to wiggle out because it dislikes the Court's reasoning. Sophisticated companies like Vanguard, represented by elite counsel crafting bespoke contracts, are bound by the plain text they agreed to.

*Second*, Vanguard essentially concedes its payment obligation kicks in if the Court rejects the settlement using traditional Rule 23 factors. But that's precisely what the Objection requests. The parties bear the burden of proving that this settlement is "fair, reasonable, and adequate, and in the best interests of the Settlement Class and each of the Settlement Class Members." Proposed Order and Final Judgment ¶ 7, ECF No. 148-6. If the Court is not persuaded these criteria are met, it rejects the settlement "on its own terms," triggering Vanguard's payment obligation even by its own strained logic. Furthermore, the conflict and adequacy concerns the Court raised offer an entirely independent basis for rejection under Rule 23 that bypasses Vanguard's contrived contractual interpretation arguments altogether.

*Third*, should the Court interpret specific provisions of Vanguard's regulatory contract in its ruling, that carries preclusive effect, both legally and practically. Vanguard availed itself of the opportunity to submit extensive briefing on its interpretation; if the Court disagrees based on the unambiguous plain text, that ends the matter. Regulators could invoke non-mutual offensive collateral estoppel to preclude Vanguard from relitigating the issue in another forum. Even setting aside formal issue preclusion, a clear ruling from this Court would make any future attempts to dodge its contractual commitments futile as a practical matter.

The plain text should end the matter. But if the Court harbors any doubt about Vanguard's obligation if this settlement is rejected, it should authorize discovery, direct Vanguard to provide a list of document custodians and witnesses with knowledge of the contract's

negotiation or its terms, and consider inviting briefing from the regulators (on the narrow question of whether Vanguard's obligations to pay would be triggered by rejection or not). Vanguard appears determined to inject uncertainty for tactical advantage—hinting its contract might not mean what it plainly says, without taking a definitive position.

This gamesmanship was underscored when I contacted Vanguard this week seeking clarification. (Exhibit A.) The company did not accommodate my request for a short call, and would not directly answer basic questions—absurdly claiming privilege over the company's understanding of its own contracts, despite the well-settled principle that only communications with counsel are privileged, not underlying facts about a company's understanding of its obligations. *E.g.*, *McCrink v. Peoples Benefit Life Ins. Co.*, No. 2:04-cv-01068-LDD, at *11 (E.D. Pa. Nov. 29, 2004); *see also Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 864 (3d Cir. 1994). The Court can draw an adverse inference from these evasive answers, rely on Vanguard's representations at the fairness hearing (ECF No. 184-4, at 57:14-21), and interpret the contracts' plain text definitively. But if any doubt remains, the Court should order discovery. The Court, charged with protecting the rights of 312,697 retail investors, is entitled to a clear and unambiguous record on this point before ruling.

**B.    Public Policy Considerations Do Not Support Vanguard's Reading.**

**1.    The Issue Presented Here Is Unique and Fact-Bound, and Unlikely to Recur in Any Future Cases.**

Vanguard's appeal to "public policy" rings hollow, given the conspicuous absence of even a single precedent involving a settlement structured like this one. That Vanguard—despite its vast resources and elite counsel—could not find a single comparable settlement should reassure the Court that any ruling here would be narrow and fact-bound, in no way hampering defendants' ability to settle parallel matters. (Vanguard 18.) The principle the Objection

seeks to vindicate is straightforward and well-established: a court cannot approve a settlement in exchange for nothing beyond what the class would receive if it were rejected.

This issue arises here only through an unprecedented perfect storm:

1. The civil case settled first;

2. The government matters settled in the brief window period between preliminary and final approval of the class action ("a fluke of timing," as Vanguard aptly puts it (Vanguard Br. 18));

3. *Zero* incremental consideration was offered to the class for releasing valuable claims; and

4. Vanguard's regulatory settlement seemingly was drafted without Rule 23 consideration in mind (Vanguard's civil litigation counsel was not involved in the regulatory deal and concedes that "the language, you know, could have been written differently for sure," ECF No. 184-4, at 58:7-8).

This precise constellation appears unprecedented in the 37 years since *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), transformed securities class actions. There's little reason to think a ruling here, addressing these unique facts, would ripple through future settlement negotiations. It simply reinforces the well-established rule that class settlements must actually benefit the class.

Moreover, defendants (and regulators) can easily sidestep this kind of problem in the future. Beyond the obvious approach—settling regulatory matters first and offering genuine incremental consideration to settle civil cases (as most defendants do)—defendants could wait until final approval before finalizing regulatory settlements. Vanguard admits (Vanguard Br. 19) precedent exists for making regulatory deals contingent on class approval. Vanguard offers only

its self-serving *ipse dixit* to claim that regulators might resist extending that precedent to other contexts—notably, without suggesting that it even asked for such terms here. (Vanguard Br. 19.)

Even simpler, if regulators merely want a "backstop" as Vanguard argues (Vanguard Br. 10), they could stipulate that funds from any rejected settlements must remain in escrow—available to satisfy any future class settlement or judgment at trial, reverting to the Fair Fund only if the litigation ultimately yields less than $40 million. This would provide the desired "backstop" without creating a situation where rejection costs the class nothing.

Competent transactional lawyers possess ample tools to achieve desired outcomes without creating zero-sum games for the class or forcing courts into approving deals that harm class members. Enforcing the fundamental tenet that class settlements must provide real value won't break the system.

### 2. Public Policy Supports Enforcing the Well-Established Rule that Class Settlements Must Benefit the Class.

To the extent public policy considerations are relevant, they firmly support the Objection, not Vanguard. The Class Action Fairness Act of 2005 contains a "class action bill of rights" codifying a federal policy that settlements must genuinely benefit class members. This legislation was a direct response to the "infamous Bank of Boston class action settlement" where class counsel fees left many class members "worse off than they were before the suit." S. Rep. No. 109-14, at 14-15 (2005), *available at* https://www.congress.gov/congressional-report/109th-congress/senate-report/14/1; *see also* Schulman Decl. ¶ 20. CAFA restricts "net loss" settlements (where class members are "obligated to pay sums to class counsel" exceeding their individual recovery) unless "the court makes a written finding that nonmonetary benefits to the class member substantially outweigh the monetary loss." Pub. L. No. 109-2, § 3, 119 Stat. 4, 7

(codified at 28 U.S.C. § 1713). That provision precludes this settlement—the rare deal that actually imposes a pecuniary loss on the class. (Schulman Decl. ¶ 19-21.)

Even assuming *arguendo* that provision does not apply directly on its terms here, it powerfully underscores the strong federal policy that class actions must benefit the class. Approving a deal that diverts money from government-run enforcement programs to private class counsel—while requiring the class to surrender valuable claims for nothing—directly violates this core principle. "No class action settlement that yields zero benefits for the class should be approved," and a deal "that seeks only worthless benefits for the class and yields only fees for class counsel is no better than a racket and should be dismissed out of hand." *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 553, 556 (7th Cir. 2017) (cleaned up) (quoting *In re Walgreen Co. S'holder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016)).

Contrary to plaintiffs' suggestion (Pls.' Br. 22), these concerns are not limited to one objector. John Brewer (the only other class member who attended the hearing) joined this Objection on the record. Others have reached out, unsolicited, to offer support upon learning of the Objection; the lack of disclosure before the objection deadline passed left most class members unaware of these issues. Additionally, an organization dedicated to class action fairness learned of these issues only this month (*see* Schulman Decl. ¶ 16) and has submitted a declaration rebutting plaintiffs' attempts to minimize these concerns. This Objection raises serious questions affecting the rights of all 312,697 class members, not the mere private interests of one.

Finally, the parties' reliance on *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010) (cited in Vanguard Br. 14, 17; Pls.' Br. 12, 13), is misplaced and ultimately self-defeating. The Third Circuit correctly observed that "[t]he purpose of Rule 23(e) is to protect the *unnamed members of the class*. Under Rule 23(e), a district court acts as a fiduciary, guarding

the claims and rights of the *absent class members*." *Id.* at 593 (emphasis added). Verizon, a named party, tried to back out of a preliminarily approved settlement after Congress amended the law to rescind the cause of action. The Court held merely that a *named* "party cannot avoid its independent contractual obligations" under the guise of Rule 23 review. *Id.* at 596.

Ironically, that is essentially what Vanguard now attempts. It agreed to a regulatory deal that provides Vanguard no protection or offset if this Court rejects the civil settlement. Now wishing it "ha[d] been written differently" (ECF No. 184-4, at 58), Vanguard asks the Court to rewrite its contract to add provisions that simply aren't there. As the world's second-largest asset manager, with nearly $10 trillion under management—and represented by some of the world's most elite law firms—Vanguard hardly qualifies for judicial charity, especially not at the expense of 312,697 retail investors it was found to have defrauded. The Court's duty is to protect the victims, not the perpetrators seeking to minimize the cost of their misconduct.

**C.    Correctly Calculated, the Present Value of Payments from the SEC Fair Fund Greatly Exceeds the Present Value of Payments Offered Here.**

The parties' eleventh-hour pivot to a time-value-of-money argument, introduced via a post-hearing declaration, is both procedurally improper and substantively meritless. (Vanguard Br. 10 n.5.) Procedurally, the Court should not even consider this new report. It contains several disputed assertions, and the parties refused my request to depose the expert this week, thereby preventing the development of a proper factual record on his highly contestable assumptions. Other class members, like objector John Brewer (who previously raised related concerns about the discount rate, *see* ECF No. 165), had no opportunity to challenge this late-breaking analysis. If given the opportunity, he told me he could have questioned whether a present value calculation is even the correct analytical lens in this context, given that SEC fair funds earn interest (currently more than 4%), effectively mitigating much of the "time value" delay. (Mulholland

Decl. ¶ 12 & Ex. C, ECF No. 184-2). Courts shouldn't let parties "handicap" objectors with new submissions most of the class had no opportunity to respond to. *Redman v. Radioshack Corp.*, 768 F.3d 622, 638 (7th Cir. 2014).

But even indulging this flawed analysis for argument's sake reveals its bankruptcy. It suffers from at least three fatal errors, each independently confirming that this settlement leaves the class worse off, not just nominally, but in present value terms too.

## 1.    The Parties Ignore the Value of Potential Incremental Recoveries.

First, the parties' calculation conveniently assigns zero value to a critical asset the class retains if this settlement is rejected: their valuable ongoing claims against Vanguard. Lead counsel fought another firm to secure appointment in this case (ECF No. 36, 44, 49) and clearly wants to continue as class counsel even if the settlement is rejected—hardly the behavior of sophisticated counsel who believes their case lacks value.

These preserved claims realistically hold substantial economic value, likely tens of millions in expected value terms, whether through a future (and potentially larger) settlement now that Vanguard's misconduct is documented by regulators, or through a trial verdict. Any credible economic comparison must account for the significant value of these preserved claims, which likely dwarfs any arguable cost of delay in receiving the Fair Fund distribution.

## 2.    The Parties Overlook that Appeals Would Delay Distribution Until May 2027 or later.

Second, the parties blithely assert distributions under this deal could commence "as early as July 2025" (Vanguard 14; Pls. 2), ignoring the settlement's explicit terms. Appeals of approval automatically stay the effective date until all appeals (including petitions for certiorari) are fully and finally resolved. (Stipulation ¶ 1.14, 1.15, 10.5, ECF No. 148.)

Given the fundamental flaws raised here regarding lack of consideration and adequacy of counsel, an appeal by objectors is not just possible, but virtually certain. Adam Schulman, an experienced attorney at a nonprofit dedicated to class action fairness that has won most of its appeals challenging unfair settlements (including all it has brought in the Third Circuit) views this settlement as more egregious than any his organization previously contested. (Schulman Decl. ¶¶ 7-8, 18-21.) A successful appeal, of course, would render approval today purely an exercise in wasted time and resources, further harming the class.

Even assuming an unsuccessful appeal, the settlement's value falls to $22.6 million after accounting for appellate delays (even using Mr. Mulholland's methodology). An average Third Circuit appeal takes 17 months—30 days for the notice of appeal, 11 months from notice of appeal to final order, 90 days for certiorari petitions, and six weeks for Supreme Court action. *See* U.S. Judicial Conference, Table B-4A, *available at* https://www.uscourts.gov/sites/default/files/2025-01/jb_b4a_0930.2024.pdf. Once the settlement becomes effective, it then takes seven months for various administrative tasks before class counsel can obtain the distribution order (based on the Rosen firm's track record in prior cases). This pushes any potential distribution under this settlement to May 2027 or later.[1]

---

[1]    *See* Baker Dec. ¶¶ 5-7 (citing three prior Rosen firm settlements to support approval here). The cases are: *Whiteley v. Zynerba Pharmaceuticals,_ Inc., et al.*, 2:19-cv-04959-NIQA (E.D. Pa.) (order of final distribution on March 2, 2022 (ECF No. 54) after order of final approval on September 16, 2021 (ECF No. 51)); *In re Electric Last Mile Solutions, Inc. Securities Litigation,* No. 2:22-cv-545-MEF (D.N.J.) (order of final approval on November 6, 2024 (ECF No. 156), with request for distribution set to be decided on April 21, 2025 (ECF No. 164)); *Beltran v. SOS Limited, et al.*, No. 1:21-cv-7454-RBK (D.N.J.) (order of final distribution on November 9, 2023 (ECF No. 62) after order of final approval on January 19, 2023 (ECF No. 59)).

If the Court enters a final approval order here in just over a month (on May 1, 2025) and we then have an appeal that delays the distribution to May 1, 2027, interest brings the nominal future value of the settlement fund to $41,137,793, after which legal fees ($13,333,333), other costs ($877,457), and plaintiffs' incentive awards ($240,000) reduce the settlement to a nominal amount of $26,687,003. Thus, even using the parties' chosen discount rate, approving this

### 3. The Parties Grossly Inflate the Time the SEC Fair Fund Process Takes.

Third, the parties' dire predictions about Fair Fund delays are based on misdirection and demonstrably flawed data. Vanguard's claim that "One analysis by the SEC found that the average Fair Fund *distribution* lasts over six years" (Vanguard Br. 7 n.3 (emphasis added)) actually measures the time until fund *termination*—when unclaimed money escheats to the U.S. Treasury, which occurs long after most victims have received compensation.

Mr. Mulholland's declaration attempting to justify a 6.75-year average distribution time (Mulholland Decl. ¶ 10) is even more problematic. His calculation rests on a sample of just four small funds (all under $10 million) that his own firm, SCS, apparently administered. Tellingly, the only completed SEC administrative proceeding he lists (the type analogous to Vanguard's fair fund) was done in just 3.6 years, aligning closely with my own analysis below.

His inflated average appears to rest on several glaring errors. (Mulholland Decl., Ex. B.) For example, one fund listed as "Waiting on Approval" (*Advanced Emissions System*) was actually established on January 26, 2023. For that fund, he inexplicably claims a 10-year timeline for distribution (driving up his average significantly); the parties declined my request to depose Mr. Mulholland about this, and offered no substantive response when I noted the issue. (Exhibit B.) He seems to be counting delays stemming from defendants' failure to pay the required penalties immediately (which is not an issue here, as Vanguard has already paid the $135 million). SCS also missed court-ordered deadlines in at least one of the cases, raising questions about whether SCS was itself a source of delay. *See* Distribution's Agent First Status Report, *SEC v. United Dev. Funding III, LP*, No. 3:18-cv-01735-L (N.D. Tex. Jan. 21, 2022), ECF

---

settlement locks in a **~12% loss** for the class in present value terms *before* even correcting Mr. Mulholland's other significant analytical errors regarding the Fair Fund timeline.

No. 29-1 ("The Distribution Agent respectfully acknowledges that this report is untimely under the Order . . . ."). This cherry-picked, error-ridden sample says more about SCS's particular track record in small, potentially troubled administrations than it does about typical timelines for large, well-funded SEC Fair Funds like the one established here.

My analysis of the 25 largest SEC Fair Funds (attached as Exhibit C), which are more than $50 million, shows that significant distributions to victims occur within **3.7 years** of the fund's establishment, on average. This more robust data projects a likely distribution from the Vanguard Fair Fund around October 2028, not deep into the 2030s as the parties imply.[2]

4.      **The Parties' Remaining Attacks on the SEC Fair Fund Process Are Meritless.**

Finally, the parties' remaining efforts to cast doubt on the Fair Fund alternative are equally baseless. Vanguard manufactures uncertainty by claiming "it is uncertain whether residents" of five states can participate. (Vanguard Br. 7.) This ignores that the SEC's Fair Fund was created under Sarbanes-Oxley § 308(a) using Vanguard's $13.5 million civil penalty to start. The funds obtained by state regulators were added to this existing fund as "gifts," under Sarbanes-Oxley § 308(b), 15 U.S.C. § 7246(b), which explicitly requires that such contributions

---

[2]      Larger funds often have multiple distribution dates, so for the 25 larger funds I identified analyzed, I used a high-quality AI model (OpenAI's o1-pro) to review, for each fund, the extensive documentation posted at https://www.sec.gov/enforcement-litigation/distributions-harmed-investors/distributions-commission-administrative-proceedings-notices-orders-pertaining-dis-gorgement-fair/archive-terminated-fair-funds-disgorgement-plans to identify the primary or main distribution date or distribution order. I spot-checked several examples manually to confirm that the outputs seemed generally reasonable and grounded in the documentation available, but to preserve the neutrality of this analysis, I did not alter any dates selected by the AI model. (Two funds involving direct administration by the defendants themselves, rather than a third-party administrator, lacked comparable data points and were excluded from the average). While one could quibble over precise interpretations or date selections in individual complex cases, an average derived from 23 large, diverse funds provides a far more robust and reliable benchmark for estimating timelines than Mr. Mulholland's questionable extrapolation from just four small funds managed by a single administrator facing apparently unique delays.

"shall be" allocated "in accordance with subsection (a)," *i.e.*, the same provision that governs allocation of the civil penalties that the Commission itself obtained. That means victims of the underlying misconduct generally qualify to receive compensation from the fund, without regard to their state residency. (Indeed, if certain state residents *were* somehow excluded from the Fair Fund, that would raise serious adequacy and typicality issues under Rule 23 counseling *against* approval without separately represented subclasses, given that none of the named plaintiffs hail from the states Vanguard mentions).

Plaintiffs fundamentally misstate the legal burden of proof regarding the settlement's merits. It is not objectors' burden to prove that rejection "will invariably result in a larger recovery" (Pls.' Br. 1) or "conclusively outweigh" approval (*id.* at 11), or that the class "will undoubtedly fare better" (*id.* at 6) or be "unequivocally better off" from rejection (*id.* at 23). Rather, the parties must prove the settlement satisfies Rule 23(e)(2) and is in the best interest of the class. *See, e.g., Briseño v. Henderson,* 998 F.3d 1014, 1030 (9th Cir. 2021) ("Rule 23(e)(2) assumes that a class action settlement is invalid."); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) ("proponents of the settlement bear the burden"). On this record, considering the lack of incremental value and the readily available, superior Fair Fund alternative, they haven't come close to meeting that burden.

## II.    VANGUARD'S SETTLEMENT DOES CREATE CONFLICTS OF INTEREST THAT ARE NOT NORMALLY PRESENT IN A CASE LIKE THIS ONE.

While the Objection takes no position on professional responsibility issues, the concern raised in the Court's March 17 order (ECF No. 179) goes directly to a core Rule 23 requirement: whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Under settled Third Circuit law, counsel facing significant conflicts of interest cannot adequately represent a class. *See In re Fine Paper Antitrust Litig.*, 617

F.2d 22, 27-28 (3d Cir. 1980) ("[T]he presence of the alleged conflict would create divided loy-alties which would constitute inadequate representation. Under Rule 23, the trial judge has a con-stant duty, as trustee for absent parties in the class litigation, to inquire into the professional com-petency and behavior of class counsel." (citations omitted)). In fairness to class counsel, they didn't intentionally engineer this conflict. But its existence now provides an additional, inde-pendent ground requiring rejection of this settlement as currently framed.

### A.    This Case Presents Unique Conflicts Challenges.

The conflict here stems from the unusual interplay between the parallel regulatory and civil remedies negotiated by Vanguard. Rejecting this settlement clearly benefits the class: Vanguard's $40 million flows directly into the SEC Fair Fund (where it will eventually be dis-tributed to the class members), *and* the class retains its valuable civil claims against Vanguard for potential future incremental recovery. But under that scenario, class counsel earns no fee from the $40 million Fair Fund distribution. Approving this settlement, conversely, allows class counsel to take its substantial fee directly from that same $40 million, while simultaneously ex-tinguishing the class's ongoing claims for zero incremental value.

This creates a stark misalignment of interests. The class benefits by maximizing *total* recovery across all available avenues (the Fair Fund distribution plus any incremental value obtained through continued litigation). Class counsel's financial interest under this deal structure, however, is tied solely to maximizing the fee derived from this specific settlement fund—even if, as their own expert demonstrates, doing so demonstrably reduces the class's overall financial takeaway compared to rejection.

Other incentives likely compound this core conflict. Counsel may reasonably fear that the $135 million regulatory payout diminishes the perceived settlement value of the remain-ing civil case. Vanguard may argue that the $135 million it paid the SEC offsets, or reduces, its

exposure here. While Vanguard cannot use the $13.5 million penalty as an offset, it might claim

credit for amounts that were characterized as remediation payments.[3] Counsel might prefer to

avoid renegotiating, even though a smaller settlement delivering incremental value serves the

class better than one that merely shuffles money from one pot to another. Moreover, doing more

work to get the same settlement, or even a slightly larger one, may also seem unappealing to

class counsel compared to investing time in fresh cases. Counsel seeks 325% of their standard,

undiscounted hourly rate from this settlement (even though the Third Circuit has "strongly sug-

gest[ed] that a lodestar multiplier of 3 . . . is the appropriate ceiling for a fee award," *In re Cend-

ant Corp PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001)). The "premium" is likely to shrink if

litigation continues, because counsel would need to invest additional effort in the case.

These distorted incentives extend to the named plaintiffs. If their requested

$20,000 "incentive awards" dwarf their actual individual damages, they may be motivated to

support *any* deal that secures their personal payment, even one detrimental to the class as a

whole. *See In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013) (warning that if the

incentive awards "more than compensates the class representatives for any actual damages they

might have incurred," then "the class representatives ha[ve] 'no interest in vigorously prosecut-

ing the [interests of] unnamed class members'"); *see also In re Aqua Dots Prods. Liab. Litig.*,

---

[3]    Although rejection introduces the theoretical risk that arguments about offsetting the reg-
ulatory payout could diminish the case's remaining settlement value, strong countervailing fac-
tors suggest a subsequent settlement negotiation might actually yield a *larger* net recovery for
the class. The SEC's now-public findings of fraud dramatically strengthen the class's position on
the merits and increase Vanguard's exposure, likely outweighing technical offset arguments in
practice. Moreover, any experienced mediator would likely counsel Vanguard that avoiding the
embarrassment and continued expense of a second rejection requires sweetening the pot some-
what beyond the current offer. Nevertheless, class counsel may harbor legitimate concerns about
this theoretical negotiation risk, however small, which subtly contributes to the conflict of inter-
est discussed in Section II.A that favors locking in the current deal.

654 F.3d 748, 752 (7th Cir. 2011) (class representatives are inadequate if they propose "that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a [benefit] that already is on offer").

This underscores why plaintiffs are profoundly mistaken in asserting the "choice" to settle is solely theirs "to make, not the Court's." (Pls. 3; *see also id.* at 11). In the class action context, the Court acts as a "fiduciary" and "guardian" for the absent members. *Drazen v. Pinto*, 106 F.4th 1302, 1328 (11th Cir. 2024) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)). The Court not only *can* override the representatives' judgment when adequacy is questioned, it *must* do so when conflicts taint their ability to act solely in the class's best interest.

While the initial settlement in September may well have been negotiated in good faith based on the facts then known, everything changed when Vanguard's regulatory deal was announced in January. At that moment, Vanguard (not class counsel) created a situation where class counsel's financial interests diverged sharply from the class's interests. From that point forward, counsel had an overriding fiduciary duty to act in the best interest of the class, even if it meant sacrificing or delaying their own anticipated fee. *See* Restatement (Third) of Agency § 8.01, cmt. b (2012) ("[T]he general fiduciary principle requires that the agent subordinate the agent's interests to those of the principal and place the principal's interests first as to matters connected with the agency relationship . . . ."); American Law Institute, Principles of the Law of Aggregate Litig. § 1.05, cmt. f (2010) (fiduciary duty "forbids a lead lawyer from advancing his or her own interests by acting to the detriment of the persons on whose behalf the lead lawyer is empowered to act."); *cf. Pierce v. Visteon Corp.*, 791 F.3d 782, 787 (7th Cir. 2015) ("[I]t is un-fathomable that the class's lawyer would try to sabotage the recovery of some of his own

clients."). Persisting in advocating for a settlement that their own expert demonstrates causes financial harm to the class, simply because it facilitates their fee, violates that fundamental duty of loyalty.

**B.    The Lack of Proactive Disclosure Exacerbated the Conflict.**

Compounding the substantive conflict was counsel's troubling failure to proactively and transparently disclose these issues to the Court. "[B]ecause the class members are not in a position to evaluate the settlement and attorney fees themselves, the court acts on their behalf, and is therefore entitled to disclosure comparable to what would be appropriate when a lawyer submits a proposed settlement to a client." New York City Bar, Formal Opinion No. 2004-01, *available at* https://www.nycbar.org/reports/formal-opinion-2004-01-lawyers-in-class-actions/.

That obligation to keep the Court fully informed runs even deeper in this specific context. This is a consumer class action involving complex securities law claims, being settled *before* any class was otherwise certified under Rule 23(b)(3). In such circumstances, where absent class members "lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf," and the court therefore acts as their primary guardian, potential conflicts of interest demand "an even higher level of scrutiny." *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) . . . .").

Despite being clearly on notice of this fundamental conflict—certainly no later than my February 3, 2025, email raising the issue directly (ECF No. 161, Ex. A), roughly two weeks after the regulatory deals were announced—class counsel's subsequent brief requesting final settlement approval simply sidestepped the problem entirely. (ECF No. 154-1). When I contacted the parties, hoping perhaps they were already working internally to address the issue, I was met with silence from Vanguard and a terse non-response from plaintiffs' counsel. Their failure to confront the issue forthrightly and proactively with the Court forced a *pro se* objector to bring to the Court's attention critical structural problems that the parties should have raised.

This lack of candor weighs heavily in the adequacy analysis under Rule 23. Courts rightly view the non-disclosure or minimization of potential conflicts as a serious failing in class litigation, undermining the trust necessary for the representative structure to function. As the Seventh Circuit bluntly warned, "[w]hen class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Creative Montessori*, 662 F.3d at 918. While the conflict itself may have arisen through no initial fault of class counsel's actions, their subsequent failure—and Vanguard's—to proactively alert the Court once the regulatory deal created this stark misalignment, instead leaving it to an uncompensated objector to raise these fundamental problems, fell short of their responsibilities to the class and the Court.

**C.    Plaintiffs' Focus on Counsel Fees Highlights the Conflict.**

Plaintiffs' briefs inadvertently underscore the very conflict they seek to minimize, through their notable preoccupation with how the Objection might jeopardize class counsel's anticipated fees. Under Rule 23, attorneys' fees are relevant to the fairness of a settlement primarily as a *deduction* from the gross settlement amount. To determine the *net benefit* actually flowing to the class, fees must be subtracted; they represent a cost borne by the class. *See GM Trucks*, 55

F.3d at 821 (discussing the "economic reality"). Counsel's desire to earn those fees is not a valid reason under the law to approve the underlying deal.

Plaintiffs invoke the principle that fee negotiations should ideally be "considered separately" from settlement approval (Pls.' Br. 8-10), but they fundamentally misapply it here. That principle exists to prevent counsel's personal fee expectations from improperly tainting their recommendation on the settlement amount itself during negotiations—ensuring the focus remains squarely on maximizing the class's recovery first. *See, e.g.*, Maine Board of Overseers of the Bar, Opinion No. 17 (Jan. 15, 1981) ("[T]he amount of the underlying claim be resolved prior to consideration of the fee for counsel."), *available at* https://www.mebaroverseers.org/attorney_services/opinion.html?id=89495. It aims to shield the class from counsel "motivated by a desire to grab attorney's fees instead of a desire to secure the best settlement possible for the class," which "violate[s] its ethical duty to the class." *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 694 (11th Cir. 2017); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013) (class counsel has a "responsibility to seek an award that adequately prioritizes direct benefit to the class). Plaintiffs, however, perform a rhetorical two-step: first arguing the fees should not be considered when assessing the settlement, then pivoting to explicitly advocate for their fee request as a reason supporting settlement approval itself. (Compare Pls.' Br. 8-10 with *id.* § I.D). This internal inconsistency strongly suggests their recommendation *is*, in fact, improperly influenced by their own fee prospects in this specific deal structure.

The conflict here is not, as plaintiffs try to suggest (Pls.' Br. 13-14), inherent in "every common fund" case. Nor is the Objection asking the Court to approve the deal and then arbitrarily slash appropriate fees. Rather, the point is narrow and specific to these facts: in this unique situation—where the settlement consideration entirely overlaps with funds the class

-21-

receives regardless via the Fair Fund—counsel's clear fiduciary duty demands prioritizing the class's actual best interest (maximizing total recovery from all sources) over their own fee interest, which, under this deal, is tied only to diverting this specific, non-additive pot of money from the Fair Fund.

Moreover, even if the Court could consider fairness to counsel when deciding whether to approve this settlement (and it should not under Rule 23), there's no fundamental unfairness to counsel in rejecting this specific deal. Their fee request reflects a 3.25x multiplier on their standard hourly rates. (Fee Motion, ECF No. 155-1, at 19). Contingency multipliers exist precisely to compensate counsel for the inherent risk that some cases, through no fault of their own, yield no recovery or fee. And rejection here doesn't preclude counsel from seeking a fee from a future, genuinely value-adding settlement in this litigation, should one be reached. But ultimately, counsel's potential financial outcome is simply irrelevant to the Court's Rule 23 determination. The Court's sole duty under the law is to approve this settlement *only* if it serves the class's "best interest," not to act as a guarantor for counsel's payday. *See* Proposed Order ¶ 7, ECF No. 148-6.

### D.    Plaintiffs' Arguments Merely Sidestep the Issue.

Plaintiffs' remaining arguments attempting to neutralize the conflict issue are unpersuasive and can be swiftly dispatched.

First, they contend that because (in their flawed view) the class benefits from the settlement, no meaningful conflict exists. This argument is entirely circular and begs the central question before the Court. Under plaintiffs' argument, whether counsel faced an disqualifying conflict in advocating for this deal depends on the logically distinct question of whether the settlement actually benefits the class compared to rejection. As demonstrated extensively above and

in the initial Objection, based on the parties' own expert and corrected calculations, it demonstrably does not. Their premise fails, and so the argument built upon it collapses.

Second, plaintiffs try to normalize the situation by claiming this conflict is no different from the general tension inherent in any standard contingency fee class action. This comparison misses the forest for the trees. While ordinary contingency fees create certain recognized agency costs and tensions that Rule 23 review accounts for, the unprecedented structure of this particular settlement—where approval serves primarily to divert funds the class would otherwise receive via regulators, directly benefiting counsel at the class's net expense—creates a conflict far more acute, direct, and structurally problematic than the norm. Trying to equate this specific misalignment with routine dynamics merely underscores plaintiffs' unwillingness to confront the unique conflict created by Vanguard's regulatory deal and its impact on the Rule 23 analysis.

## III.    THE COURT SHOULD PROVIDE A SUPPLEMENTAL NOTICE.

For all the reasons detailed above, the straightforward and correct course is simply to deny the pending motion for final approval. Should the Court deny approval, directing the parties merely to post a supplemental notice on the settlement administrator's website and via available email channels would be sufficient for now. Rejection preserves the status quo; class members retain their legal rights against Vanguard, and formal mailed notice under Rule 23 can await any potential *future* settlement negotiation that actually offers genuine, incremental value to the class.

However, if the Court finds itself contemplating approving this particular settlement despite the fundamental flaws identified, then providing a formal supplemental notice to the class, including by mail, is essential before any final judgment is entered. Unlike rejection, approval permanently extinguishes valuable legal rights for over 300,000 absent class members. Basic principles of due process demand they receive clear, unambiguous notice of the stakes

before that forfeiture occurs, specifically explaining the critical point obscured in the original no-tice materials: that the settlement consideration offered here largely duplicates money they are already poised to receive through the government-administered SEC Fair Fund, meaning ap-proval offers little to no net financial benefit while requiring them to surrender potentially valua-ble ongoing claims.

The parties' vague reference to general news coverage of the SEC settlement can-not substitute for adequate legal notice under Rule 23 concerning the terms and implications of this specific private class action settlement. The news reports the parties rely on did not explain the crucial zero-sum interplay with this litigation. Indeed, even sophisticated observers reviewing the official notice materials failed to grasp this core issue until the Objection filings highlighted it. The class deserves explicit notice of this fundamental trade-off before their right to seek any further recovery from Vanguard is extinguished forever.

## CONCLUSION

The Motion for final settlement approval should be denied.

Dated: March 28, 2025

Respectfully submitted,

*/s/ John Hughes*

John Hughes[4]

---

[4]     This brief is submitted strictly in my personal capacity. The positions taken are mine alone and should not be attributed to any organization I may be associated with.

# EXHIBIT A



John Hughes <john.j.hughes@gmail.com>

---

## In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

---

**Zimmerman, Amy** <azimmerman@debevoise.com>                              Fri, Mar 28, 2025 at 7:47 AM
To: John Hughes <john.j.hughes@gmail.com>
Cc: Joshua Baker <jbaker@rosenlegal.com>, Jonathan Stern <jstern@rosenlegal.com>, Phillip Kim
<pkim@rosenlegal.com>, Erica Stone <estone@rosenlegal.com>, Jacob Goldberg <jgoldberg@rosenlegal.com>,
"jday@paulweiss.com" <jday@paulweiss.com>, "amctootle@paulweiss.com" <amctootle@paulweiss.com>,
"aehrlich@paulweiss.com" <aehrlich@paulweiss.com>, "dkramer@paulweiss.com" <dkramer@paulweiss.com>, "Fetzer,
Brandon" <bfetzer@debevoise.com>, "O'Connor, Maeve" <mloconnor@debevoise.com>, "Greenfield, Elliot"
<egreenfield@debevoise.com>

Mr. Hughes,


Defendants' submission is entirely consistent with our statements at the March 11 hearing.  With regard to the specific
statement that you identified in your email,  we refer you to page 16 of Defendants' brief, where that precise statement
is addressed.


With respect to the other issues you raise, it is clear that we simply disagree.  Defendants do not believe that your
objection has any merit or that you are entitled to discovery.


Regards—

Amy


**Amy C. Zimmerman** (she/her/hers)  |  Debevoise & Plimpton LLP  |  azimmerm@debevoise.com  |  +1 212 909 6923  |  66 Hudson Boulevard,
New York, NY 10001  |  www.debevoise.com

---

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is
privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this
communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and
by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you.
The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at
www.debevoise.com.

---

**From:** John Hughes <john.j.hughes@gmail.com>
**Sent:** Thursday, March 27, 2025 2:49 PM
**To:** Zimmerman, Amy <azimmerman@debevoise.com>
**Cc:** Joshua Baker <jbaker@rosenlegal.com>; Jonathan Stern <jstern@rosenlegal.com>; Phillip Kim
<pkim@rosenlegal.com>; Erica Stone <estone@rosenlegal.com>; Jacob Goldberg
<jgoldberg@rosenlegal.com>; jday@paulweiss.com; amctootle@paulweiss.com;
aehrlich@paulweiss.com; dkramer@paulweiss.com; Fetzer, Brandon <bfetzer@debevoise.com>;

O'Connor, Maeve <mloconnor@debevoise.com>; Greenfield, Elliot <egreenfield@debevoise.com>
**Subject:** Re: In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

---

**\*EXTERNAL\***

---

Amy,

Thanks for checking on the contracts—much appreciated.

On the Guarantee Clause, do you have a few minutes later today for a brief call? Your response below was helpful but left a few key points unresolved. Given the stakes, I'd like to ensure the Court clearly understands Vanguard's exact position and any areas where it is not providing a direct answer. Specifically, here's what I'd like to discuss:

1. Does Vanguard stand by the answers it gave at the fairness hearing (ECF No. 184-4, at 57:14-21), or does its recent brief (and your email) reflect an intention to walk back those statements?

2. As you likely know, Pennsylvania's privilege statute (42 Pa. C.S. § 5928) is narrow, covering only specific communications with counsel—not underlying facts. Generally, a party's understanding of its legal obligations is factual and not privileged, even if informed by discussions with counsel. *See Mwambu v. Monroeville Volunteer Fire Co. #4*, 1128 C.D. 2020, 9 (Pa. Cmmw. Ct. Mar. 14, 2022). Thus, I believe Vanguard must clearly state whether it currently understands itself obligated to pay the $40 million to the Fair Fund if the Court rejects the settlement based on my objection. If Vanguard considers that information privileged, I'd note it waived any privilege by answering this question previously on the record without objection.

3. When you write, "Vanguard would engage with the regulators regarding the impact of the Court's actions," I don't see evidence cited in the brief showing regulators have discussed this scenario with Vanguard or indicated any willingness to reopen their proceedings. Does Vanguard have any nonprivileged evidence relevant to this point? Additionally, can Vanguard identify any regulators it has spoken with about my objection or the potential consequences of the Court rejecting the settlement based on that objection—or confirm no such discussions have occurred? As you know, Vanguard's communications with regulators aren't protected by attorney-client privilege, and even if another privilege applied, basic information such as dates and general subject matter still must be disclosed in a privilege log, so at a minimum, the question of whether any conversations have occurred should be one Vanguard can answer (even if there's a dispute regarding whether the substance of those discussions is privileged).

Please let me know your availability for a quick call to clarify these points or at least better understand Vanguard's precise position.

Thanks,

John

On Thu, Mar 27, 2025 at 12:09 PM Zimmerman, Amy <azimmerman@debevoise.com> wrote:

Mr. Hughes,


Vanguard confirms that there are no other contracts or orders with regulators that modify or influence the meaning of the SEC Order ¶¶ 44-45, the NYAG Assurance of Discontinuance ¶¶ 37-38, or the NASAA Texas Term Sheet ¶¶ 18-19. We will see whether there is a signed version of the NASAA Texas Term Sheet that we can produce.


Defendants made clear in their submission that the only reasonable interpretation of the Guarantee Provision that gives meaning to the Offset Provision is that the Guarantee Provision's "rejection" language refers to a rejection by the Court of the Settlement based on its own merits, and not to a rejection based on the Guarantee Provision itself. Accordingly, as Defendants stated in their submission, if the Court were to credit the Hughes Objection and reject the Settlement on the basis of the Guarantee Provision, that would create substantial uncertainty regarding Vanguard's obligation to contribute the $40 million to the SEC Fair Fund and could potentially disrupt the resolution achieved by Vanguard, the SEC, NYAG, and the NASAA coalition of state regulators. In that scenario, Vanguard

would engage with the regulators regarding the impact of the Court's actions.  It makes no sense to suggest that there could or should be discovery of what might happen in hypothetical future discussions.

Moreover, Vanguard's legal strategy with respect to potential future discussions with regulators is protected by the attorney-client privilege and work product doctrine, as is Vanguard's legal interpretation of the SEC Order, NYAG agreement, and NASAA term sheet.

Regards—

Amy

**Amy C. Zimmerman** (she/her/hers) │ Debevoise & Plimpton LLP │ azimmerm@debevoise.com │ +1 212 909 6923 │ 66 Hudson Boulevard, New York, NY 10001 │ www.debevoise.com

---

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in New York at 1-212-909-6000) and then delete and discard all copies of the e-mail. Thank you. The latest version of our Privacy Policy, which includes information about how we collect, use and protect personal data, is at www.debevoise.com.

---

**From:** John Hughes <john.j.hughes@gmail.com>
**Sent:** Wednesday, March 26, 2025 10:44 PM
**To:** Joshua Baker <jbaker@rosenlegal.com>
**Cc:** Jonathan Stern <jstern@rosenlegal.com>; Phillip Kim <pkim@rosenlegal.com>; Erica Stone <estone@rosenlegal.com>; Jacob Goldberg <jgoldberg@rosenlegal.com>; jday@paulweiss.com; amctootle@paulweiss.com; aehrlich@paulweiss.com; dkramer@paulweiss.com; Zimmerman, Amy <azimmerman@debevoise.com>; Fetzer, Brandon <bfetzer@debevoise.com>; O'Connor, Maeve <mloconnor@debevoise.com>
**Subject:** Re: In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

**\*EXTERNAL\***

---

Josh,

I wanted to follow up with you on two issues:

**Redactions.** Thank you for implementing the redactions in ECF No. 185. There are two remaining housekeeping matters that need attention

1. Per Judge Murphy's order (ECF No. 183), the original unredacted filing (ECF No. 170) should be removed from the docket. Please contact the clerk's office to arrange this.

2. Would you please also contact external services (PacerPro, CourtListener, DocketBird, Law360, etc.) to ensure they replace the unredacted version with the redacted one once ECF No. 170 is removed from the official docket? These services typically honor such requests, but the request must be made by the original filing party.

**Mulholland Report.** To answer your question, here are some examples of the kind of errors and issues that I think would appropriately be explored through a deposition:

1. Some of the data in Exhibit B appears to be missing and/or incorrect. For instance, the fair fund in *Advanced Emissions Systems* has been established (contrary to his exhibit), and it was set up just two years ago, not nine years as he asserts. This and similar errors significantly inflate the average he is reporting and/or turn it into a metric that is not measuring anything useful for this situation.

2. He seems to be conflating pure administrative proceedings (which are under the SEC's control) with court cases and/or hybrid situations (where the SEC does not control the timing).

3. His methodology for NPV analysis appears invalid and unreliable because, contrary to ordinary practice, he used a historical, backwards-looking interest rate, rather than using official government or consensus futures market expectations of future rates during the period in which interest would be paid.

4. There are unique and *sui generis* issues in the specific cases he is relying on (and he only has four). A deposition could establish the factual predicates for why those cases are not meaningful examples from which to extrapolate to the SEC Fair Fund's program as a whole.

Please let me know your position on this request.

Thanks,

John

On Mon, Mar 24, 2025 at 3:47 PM Joshua Baker <jbaker@rosenlegal.com> wrote:

Hi John,


Plaintiffs do not believe there are any grounds for deposing Mr. Mulholland. Please identify the purported "material errors or omissions" that you assert his declaration "appears to contain." We cannot substantively consider your request based solely on your vague and unsupported assertions.


Regards,


Josh Baker

THE ROSEN LAW FIRM, P.A.

101 Greenwood Avenue, Suite 440

Jenkintown, PA 19046

Tel: 215.600.2817

Fax: 212.202.3827

jbaker@rosenlegal.com

www.rosenlegal.com

**From:** John Hughes <john.j.hughes@gmail.com>
**Sent:** Monday, March 24, 2025 8:00 AM
**To:** Jonathan Stern <jstern@rosenlegal.com>; Phillip Kim <pkim@rosenlegal.com>; Erica Stone <estone@rosenlegal.com>; Joshua Baker <jbaker@rosenlegal.com>; Jacob Goldberg <jgoldberg@rosenlegal.com>; jday@paulweiss.com; amctootle@paulweiss.com; aehrlich@paulweiss.com; dkramer@paulweiss.com; azimmerman@debevoise.com; bfetzer@debevoise.com; mloconnor@debevoise.com
**Subject:** In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

[EXTERNAL EMAIL]

Counsel,

After reviewing your post-hearing submissions from Friday, I'd like to request discovery on a few newly raised issues. Please let me know your position on these requests as soon as possible this week:

1. Mr. Paul Mulholland's declaration appears to contain several material errors or omissions. A deposition would clarify the record for the Court. Are the parties willing to make Mr. Mulholland available for deposition, and if so, when?

2. Vanguard's brief attaches its settlement with the New York Attorney General and notes that it executed "a series of substantially identical term sheets with other individual NASAA members." (Vanguard Br. 5.) Is Vanguard willing to produce any legally operative settlement documents for the NASAA members it settled with? And will it produce any other operative settlement documents not already attached to its Friday submission?

3. Vanguard suggests there is some doubt about whether it must pay the $40 million to the SEC Fair Fund (or whether it would do so) in the event that the Court rejects the settlement based on my objection. (Vanguard Br. 13.) Is Vanguard willing to produce a corporate representative for deposition, or respond to interrogatories or requests for admission, or otherwise clarify the following: If the settlement is rejected here "based on the Hughes Objection" (as Vanguard uses that phrase in its brief), is Vanguard legally required to pay the $40 million to the SEC Fair Fund or not? Does Vanguard intend to do so or not?

If the parties are open to discussing discovery on these points, I'm happy to meet and confer about the most efficient way to provide the Court with a complete record on which to resolve these issues.

Thanks,
John

# EXHIBIT B

 Gmail

**John Hughes <john.j.hughes@gmail.com>**

## In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

**Joshua Baker** <jbaker@rosenlegal.com>                           Thu, Mar 27, 2025 at 10:00 PM
To: John Hughes <john.j.hughes@gmail.com>
Cc: Jonathan Stern <jstern@rosenlegal.com>, Phillip Kim <pkim@rosenlegal.com>, Erica Stone
<estone@rosenlegal.com>, Jacob Goldberg <jgoldberg@rosenlegal.com>, "jday@paulweiss.com"
<jday@paulweiss.com>, "amctootle@paulweiss.com" <amctootle@paulweiss.com>, "aehrlich@paulweiss.com"
<aehrlich@paulweiss.com>, "dkramer@paulweiss.com" <dkramer@paulweiss.com>, "azimmerman@debevoise.com"
<azimmerman@debevoise.com>, "bfetzer@debevoise.com" <bfetzer@debevoise.com>, "mloconnor@debevoise.com"
<mloconnor@debevoise.com>

Hi John,

The Court's Order (Dkt. No. 183) does not instruct Plaintiffs to do anything beyond filing the redacted
documents, but we will take steps to alert the clerk and have the relevant unredacted documents
removed.

We appreciate your clarifications, although we do not concede the merits of any of the purported errors
you identify. We maintain our position that a deposition of Mr. Mulholland is neither appropriate nor
necessary.

Thanks,

Josh

---

**From:** John Hughes <john.j.hughes@gmail.com>
**Sent:** Wednesday, March 26, 2025 10:44 PM
**To:** Joshua Baker <jbaker@rosenlegal.com>
**Cc:** Jonathan Stern <jstern@rosenlegal.com>; Phillip Kim <pkim@rosenlegal.com>; Erica Stone
<estone@rosenlegal.com>; Jacob Goldberg <jgoldberg@rosenlegal.com>; jday@paulweiss.com;
amctootle@paulweiss.com; aehrlich@paulweiss.com; dkramer@paulweiss.com;
azimmerman@debevoise.com; bfetzer@debevoise.com; mloconnor@debevoise.com
**Subject:** Re: In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

[EXTERNAL EMAIL]

Josh,

I wanted to follow up with you on two issues:

**Redactions.** Thank you for implementing the redactions in ECF No. 185. There are two remaining housekeeping
matters that need attention

1. Per Judge Murphy's order (ECF No. 183), the original unredacted filing (ECF No. 170) should be removed from the
docket. Please contact the clerk's office to arrange this.

2. Would you please also contact external services (PacerPro, CourtListener, DocketBird, Law360, etc.) to ensure they replace the unredacted version with the redacted one once ECF No. 170 is removed from the official docket? These services typically honor such requests, but the request must be made by the original filing party.

**Mulholland Report.** To answer your question, here are some examples of the kind of errors and issues that I think would appropriately be explored through a deposition:

1. Some of the data in Exhibit B appears to be missing and/or incorrect. For instance, the fair fund in *Advanced Emissions Systems* has been established (contrary to his exhibit), and it was set up just two years ago, not nine years as he asserts. This and similar errors significantly inflate the average he is reporting and/or turn it into a metric that is not measuring anything useful for this situation.

2. He seems to be conflating pure administrative proceedings (which are under the SEC's control) with court cases and/or hybrid situations (where the SEC does not control the timing).

3. His methodology for NPV analysis appears invalid and unreliable because, contrary to ordinary practice, he used a historical, backwards-looking interest rate, rather than using official government or consensus futures market expectations of future rates during the period in which interest would be paid.

4. There are unique and *sui generis* issues in the specific cases he is relying on (and he only has four). A deposition could establish the factual predicates for why those cases are not meaningful examples from which to extrapolate to the SEC Fair Fund's program as a whole.

Please let me know your position on this request.

Thanks,

John

On Mon, Mar 24, 2025 at 3:47 PM Joshua Baker <jbaker@rosenlegal.com> wrote:

Hi John,

Plaintiffs do not believe there are any grounds for deposing Mr. Mulholland. Please identify the purported "material errors or omissions" that you assert his declaration "appears to contain." We cannot substantively consider your request based solely on your vague and unsupported assertions.

Regards,

Josh Baker

THE ROSEN LAW FIRM, P.A.

101 Greenwood Avenue, Suite 440

Jenkintown, PA 19046

Tel: 215.600.2817

Fax: 212.202.3827

jbaker@rosenlegal.com

www.rosenlegal.com

**From:** John Hughes <john.j.hughes@gmail.com>
**Sent:** Monday, March 24, 2025 8:00 AM
**To:** Jonathan Stern <jstern@rosenlegal.com>; Phillip Kim <pkim@rosenlegal.com>; Erica Stone <estone@rosenlegal.com>; Joshua Baker <jbaker@rosenlegal.com>; Jacob Goldberg <jgoldberg@rosenlegal.com>; jday@paulweiss.com; amctootle@paulweiss.com; aehrlich@paulweiss.com; dkramer@paulweiss.com; azimmerman@debevoise.com; bfetzer@debevoise.com; mloconnor@debevoise.com
**Subject:** In re Vanguard Chester Funds Litig. - E.D. Pa. Case No. 2:22-cv-955-JFM

[EXTERNAL EMAIL]

Counsel,

After reviewing your post-hearing submissions from Friday, I'd like to request discovery on a few newly raised issues. Please let me know your position on these requests as soon as possible this week:

1. Mr. Paul Mulholland's declaration appears to contain several material errors or omissions. A deposition would clarify the record for the Court. Are the parties willing to make Mr. Mulholland available for deposition, and if so, when?

2. Vanguard's brief attaches its settlement with the New York Attorney General and notes that it executed "a series of substantially identical term sheets with other individual NASAA members." (Vanguard Br. 5.) Is Vanguard willing to produce any legally operative settlement documents for the NASAA members it settled with? And will it produce any other operative settlement documents not already attached to its Friday submission?

3. Vanguard suggests there is some doubt about whether it must pay the $40 million to the SEC Fair Fund (or whether it would do so) in the event that the Court rejects the settlement based on my objection. (Vanguard Br. 13.) Is Vanguard willing to produce a corporate representative for deposition, or respond to interrogatories or requests for admission, or otherwise clarify the following: If the settlement is rejected here "based on the Hughes Objection" (as Vanguard uses that phrase in its brief), is Vanguard legally required to pay the $40 million to the SEC Fair Fund or not? Does Vanguard intend to do so or not?

If the parties are open to discussing discovery on these points, I'm happy to meet and confer about the most efficient way to provide the Court with a complete record on which to resolve these issues.

Thanks,
John

# EXHIBIT C

## 25 Largest Fair Funds on SEC's Archive of Terminated Fair Funds

| Case Name | File No. | Sanctions Date | Primary Distribution Date | Years | Amount |
|---|---|---|---|---|---|
| Invesco Funds Group, Inc., AIM Advisors, Inc., and AIM Di... | 3-11701 | October 8, 2004 | December 11, 2009 | 5.2 | $375,000,000 |
| Banc of America Capital Management, LLC, BACAP Distributo... | 3-11818 | February 9, 2005 | June 5, 2008 | 3.3 | $375,000,000 |
| Alliance Capital Management, L.P. | 3-11359 | January 15, 2004 | February 11, 2009 | 5.1 | $321,230,003 |
| Massachusetts Financial Services Co., John W. Ballen and ... | 3-11393 | February 5, 2004 | April 18, 2008 | 4.2 | $309,000,000 |
| Prudential Equity Group, LLC f/k/a Prudential Securities ... | 3-12400 | August 28, 2006 | March 11, 2010 | 3.5 | $270,000,000 |
| Pilgrim Baxter & Associates, Ltd. | 3-11524 | June 21, 2004 | April 12, 2007 | 2.8 | $250,000,000 |
| Bear, Stearns & Co., Inc. and Bear, Stearns Securities Corp. | 3-12238 | March 16, 2006 | April 28, 2009 | 3.1 | $250,000,000 |
| Specialist | Multiple | March 30, 2004 | July 19, 2006 | 2.3 | $247,028,778 |
| JPMorgan Chase & Co. | 3-15507 | September 19, 2013 | August 11, 2017 | 3.9 | $200,000,000 |
| Smith Barney Fund Management LLC and Citigroup Global Mar... | 3-11935 | May 31, 2005 | May 12, 2010 | 4.9 | $183,704,031 |
| Millennium Partners, L.P., Millennium Management, L.L.C.,... | 3-12116 and 3-11292 | December 1, 2005 | June 5, 2009 | 3.5 | $180,575,005 |
| Putnam Investment Management LLC | 3-11317 | November 13, 2003 | December 2, 2008 | 5.1 | $153,524,387 |
| Canadian Imperial Holdings Inc. and CIBC World Markets Corp. | 3-11987 | July 20, 2005 | November 21, 2011 | 6.3 | $125,000,000 |

| Case Name | File No. | Sanctions Date | Primary Distribution Date | Years | Amount |
|---|---|---|---|---|---|
| Credit Suisse Securities (USA) LLC, DLJ Mortgage Capital,... | 3-15098 | November 16, 2012 | September 25, 2017 | 4.9 | $120,004,330 |
| G-Trade Services LLC, ConvergEx Global Markets Limited, a... | 3-15654 | December 18, 2013 | November 3, 2016 | 2.9 | $110,978,358 |
| Morgan Asset Management, Inc.; Morgan Keegan & Company, I... | 3-13847 | June 22, 2011 | July 25, 2014 | 3.1 | $100,300,000 |
| Janus Capital Management LLC | 3-11590 | August 18, 2004 | September 8, 2008 | 4.1 | $100,000,000 |
| AEGON USA Investment Management, LLC; Transamerica Asset ... | 3-18681 | August 27, 2018 | unknown* | N/A | $97,692,040 |
| Barclays Capital Inc. | 3-17978 | May 10, 2017 | unknown* | N/A | $93,537,659 |
| Harold J. Baxter | 3-11740 | November 17, 2004 | April 12, 2007 | 2.4 | $80,000,000 |
| Gary L. Pilgrim | 3-11739 | November 17, 2004 | April 12, 2007 | 2.4 | $80,000,000 |
| Edward D. Jones & Co., L.P. | 3-11780 | December 22, 2004 | October 20, 2006 | 1.8 | $75,000,000 |
| Federated Investment Management Company, Federated Securi... | 3-12111 | November 28, 2005 | July 21, 2010 | 4.6 | $72,000,000 |
| American Skandia Investment Services, Inc. | 3-13446 | April 17, 2009 | January 25, 2011 | 1.8 | $68,000,000 |
| Knight Securities L.P | 3-11771 | December 16, 2004 | January 29, 2008 | 3.1 | $66,841,731 |
| **Average** | | | | **Average: 3.7** | |

* These funds were administered by the respondents directly, not the SEC, and thus there were no specific orders of distribution