**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE VANGUARD CHESTER FUNDS LITIGATION** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| | : | **NO.  22-955** |
| | : | |
| | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                                    **May 19, 2025**

At the start of this dispute, we asked "[i]f a fiduciary considers two options to accomplish the same objective, and option A carries certain drawbacks that option B does not, could choosing option A breach a fiduciary duty?"[1]  We said "maybe" and sent the case into discovery. Now we are back with another question: if a class is guaranteed to get more money if we reject a proposed settlement than approve it, are we obliged to reject it?  Our answer is yes.  Here's how that strange situation arose.

After discovery and class certification briefing, the parties went to mediation and reached a settlement.  That settlement, which we preliminarily approved, would provide $40 million to the class in exchange for a release of all claims.  One-third of the $40 million — over $13 million — would go to class counsel as attorneys' fees.  The settlement is not binding on the class unless we approve it.  So far, nothing too strange.

Then, after wrapping up the proposed settlement in this case, Vanguard settled an investigation into regulatory charges with the SEC and a variety of states for the same challenged investment decisions.  Under the SEC settlement, Vanguard must pay $135 million to harmed

---

[1] *In re Vanguard Chester Funds Lit.*, 2023 WL 8091999, at *1 (E.D. Pa. Nov. 20, 2023) (DI 100).

investors, mostly into a fund established by the SEC.  But there's a catch in the SEC settlement.
Vanguard negotiated a deal that it can reduce its payment into that fund by $40 million if the
proposed settlement in this case is approved.  But if settlement in this case *doesn't* happen for
whatever reason, then Vanguard must pay that same $40 million into the SEC's fund instead.

So Vanguard is on the hook for $135 million regardless of whether we approve or reject
the settlement in this case.  But it matters to the class (and plaintiffs' counsel).  If we approve,
the harmed investors lose $13 million to attorneys' fees.  If we reject, the harmed investors get
that $13 million themselves, through the SEC settlement (and could very well recover even more
because this litigation will continue).  As readers may have deduced, this is an unhappy situation
for plaintiffs' counsel, who only found out about the SEC settlement after it was publicly
announced.  Vanguard's deal puts plaintiffs' counsel in a difficult spot — how can they advocate
for settlement if the class is better off rejecting it?  Notably, we didn't find out about the SEC
settlement (from plaintiffs or Vanguard) until a class member, John Hughes, brought it to our
attention in a remarkable objection.  He asks us to reject the proposed class settlement because
how can any settlement stand when it is guaranteed to net the class less money?  A simple and
compelling point.  The named plaintiffs, their counsel, and Vanguard cannot deny the math.  But
they adamantly, and creatively, dispute Mr. Hughes's objection.  After oral argument and
additional rounds of briefing, we can safely conclude that the proposed settlement provides no
value to the class and therefore reject it.

## I.    Background

In December 2020, Vanguard made it easier to invest in its lower-fee fund.[2]  Many

investors in a higher-fee fund moved their money into the now lower-fee fund.  This forced

Vanguard to sell off significant assets, resulting in capital gains for investors who kept their

money in the higher-fee fund — and therefore unanticipated capital gains taxes.  Plaintiffs are

harmed investors who say that Vanguard disregarded viable alternatives that could have

accomplished the same goal without the costs.  We discussed the allegations in detail at the

motion-to-dismiss stage.  *See In re Vanguard Chester Funds Lit.*, 2023 WL 8091999 (DI 100).

We now consider a proposed settlement agreement, the background of which we discuss below.

### A.    Factual allegations

Vanguard offers target retirement funds.  These are mutual funds designed to diversify

investments across index funds based on an investor's anticipated retirement year.  DI 154-1 at

10.  Before 2021, Vanguard offered two tiers of these plans — Institutional Funds for retirement

plans with over $100 million invested and Investor Funds for everyone else.  *Id.*  The funds were

basically identical, except the Institutional Funds offered lower management fees.  *Id.*  In

December 2020, defendants lowered the minimum investment threshold for the Institutional

Funds from $100 million to $5 million, resulting in "an elephant stampede" of retirement plans

"ditch[ing] the Investor Funds in favor of the Institutional Funds."  *Id.* at 11.  "Retirement plans

making the switch had to redeem their Investor Fund shares and buy new Institutional Fund

---

[2] As we did at the motion-to-dismiss stage, we refer to Vanguard as the defendant that
lowered the minimum investment amount.  But we appreciate that labeling Vanguard — the
company — as the one having decision-making authority is an oversimplification.  And we refer
to defendants' briefing as Vanguard's but acknowledge that all defendants responded together in
DI 186.

shares," and as a result, Investor Funds had to sell off substantial assets to satisfy the

redemptions. *Id.* This meant "unprecedented levels of capital gains" that were distributed to

investors at the end of 2021 (as legally required) and on which investors had to pay unexpected

capital gains taxes. *Id.* Some investors filed suit. The theory of plaintiffs' case is that

"[d]efendants disregarded viable alternatives that would have accomplished the same goal . . .

without harming taxable investors." *Id.*

### B.    Proposed settlement

Following motions to dismiss that we granted in part and denied in part, DI 101, the case

proceeded to discovery and class certification briefing, DI 112. Before we decided whether to

certify the class, the parties participated in private mediation. DI 148 at 3-4. The mediation

resulted in a settlement agreement that would resolve the case and release all claims against

defendants. *Id.* at 4. On November 6, 2024, the settlement agreement was filed on the docket.

DI 148. Under this agreement, the class would get $40 million, *id.* at 11, defendants would deny

all wrongdoing, *id.* at 4, the class would give up their claims, *id.* at 12-15, and class counsel

would get attorneys' fees "paid solely from the Settlement Fund" of approximately $13.3

million, DI 148-2 at 1. We reviewed the settlement, considered the Rule 23 factors, and

preliminarily approved the settlement on November 25, 2024. DI 152. A claims administrator

sent over 300,000 notices to potential class members and published notice with PR Newswire

and GlobeNewswire. DI 156-1 ¶¶ 10, 12. We scheduled a settlement hearing for March 11,

2025. DI 152 ¶ 6.

### C.    Objections to the proposed settlement and initial responses from plaintiffs

As the hearing approached, we received objections from class members. Some argued

4

that the settlement was too small, DI 158, while others said that counsel's fees were too large, DI 157. Others objected on both of those grounds. DI 159; DI 162. And we received objections disputing the formulas used to calculate class members' distributions. DI 163; DI 165. These objections raised interesting questions, though we do not address them today. Rather, we focus on an objection by one class member — John Hughes — which raised serious concerns about whether we could approve the settlement. DI 161.

Mr. Hughes, a lawyer who apparently has invested significant time into considering this case, drew our attention to something no party in this case thought to: a recent order from the U.S. Securities and Exchange Commission ("SEC"), which requires Vanguard to pay $135 million in remediation to harmed investors for the same conduct addressed in this case. *Id.* at 6-7. The SEC order — issued on January 17, 2025 — resulted from a deal Vanguard made with the SEC, the Office of the New York State Attorney General, and members of the North American Securities Administrators Association (the "SEC settlement"). DI 186-2 at 10-14. Most of the $135 million must be paid "to a Fair Fund established by the [SEC] for the benefit of investors." *Id.* ¶ 45. But Vanguard can offset $40 million of that from "settlement of a class action against it and certain related parties" in this case. *Id.* ¶ 44. Importantly, that offset applies only if a settlement in this case is approved. *Id.* ¶ 45. The order dictates "in the event Vanguard does not pay the $40 million under the Class Action Settlement, as a result of the termination or withdrawal of the Stipulation of Settlement or the Court's rejection of the Class Action Settlement, Vanguard will be obligated to pay the $40 million into the Commission's Fair Fund pursuant to Section 308(b) within 10 days of such termination or rejection." *Id.*

As Mr. Hughes describes it, "Vanguard committed to pay the full $135 million regardless

of what happens here.  That means that, not only is there no new consideration, the class actually

is better off rejecting the deal since the SEC Fair Fund will not deduct the $14,450,790.90 in fees

and incentives plaintiffs seek here."  DI 161 at 7.  He adds "rejection keeps this case alive,

potentially yielding additional, incremental recoveries later.  Now armed with the SEC's

findings, class counsel might even negotiate a larger settlement.  But even if the class gets

nothing here, it's still better off rejecting this deal."  *Id.*

     Mr. Hughes describes the SEC settlement as a pre-existing obligation.  DI 161 at 6

("Vanguard is already obligated to pay the entire $135 million settlement regardless of whether

this deal is approved.  There is no consideration given in exchange for the release.").  Plaintiffs

says that is a mischaracterization — the SEC settlement really came "four months ***after*** the

Parties signed a binding term sheet at the mediation, and nearly two months ***after*** the Court

preliminarily approved the Settlement."  DI 170 at 22 (emphasis in original).  In light of this

timing, plaintiffs argue that the "SEC Settlement simply added a backstop, effectively

guaranteeing the $40 million recovery already secured in this Action only if this Settlement was

ultimately terminated or not approved."  *Id.* at 23.  And while class counsel professes that they

had no knowledge of the SEC settlement during this case's mediation, they acknowledge that

Vanguard would have known.  *Id.* at 24-25.

     Mr. Hughes clarifies that "[n]o class is certified yet, so the stipulation is just a private

agreement among the parties — not a contract binding *on the class*.  By its terms, the stipulation

becomes operative only after Court approval."  DI 173 at 2 (emphasis in original) (citing DI

148 ¶¶ 1.14, 1.15, 10.5, 40).  He adds "[c]ounsel's belief that the settlement made sense six

months ago cannot salvage a deal that is now worthless to the class." *Id.*[3]

### D. Settlement hearing

At the settlement hearing on March 11, 2025, we discussed Mr. Hughes's objection in depth. DI 181. We asked Vanguard to explain how the SEC settlement came to be, and the extent to which it was based on the proposed settlement in this case. Vanguard's counsel told us that the SEC settlement was never "intended to be used as a reason to reject this settlement" and argued that the SEC settlement's guarantee provision existed merely as a backstop for if this settlement went "off the rails." *Id.* at 57:22-58:17. But Vanguard's counsel in this case "did not negotiate the SEC settlement." *Id.* at 60:18-19. Vanguard used a different firm. Because of that, counsel in this case did not know the specifics of how the SEC settlement came to be. *Id.* at 61:1-14.

Vanguard's representative present at the hearing informed us that Vanguard "told the SEC about the progress and litigation as it was going forward," but she did not know "precisely how it factored into their decision-making." *Id.* at 62:22-24. Given this lack of clarity, we ordered supplementary briefing from plaintiffs and Vanguard. DI 177; DI 179. Plaintiffs, DI 184, Vanguard, DI 186, and Mr. Hughes, DI 187, all filed supplemental briefing. We analyze the arguments below.

---

[3] While acknowledging that the class would receive more money if the settlement were rejected, plaintiffs argue that rejection would "stiff[] [class] attorneys after reaping the rewards from the attorneys' efforts in creating a settlement fund." DI 170 at 24. According to plaintiffs, "that unremarkable proposition is always the case in any settlement where attorneys' fees are awarded from a common fund." *Id.* To this, Mr. Hughes says "[r]ejection also does not mean counsel goes unpaid. It simply restores the parties to litigation and gives counsel incentives to obtain genuine, incremental value — as they must do to earn fees under the common fund doctrine." DI 173 at 3.

II.    **Analysis**

Rule 23(e) requires court approval for class action settlements, which must be "fair, reasonable, and adequate."  Our review must "independently and objectively analyze the evidence and circumstances . . . in order to determine whether the settlement is in the best interest of those whose claims will be extinguished."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)).  We cannot "substitute the parties' assurances or conclusory statements for [our own] independent analysis of the settlement terms."  *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350-51 (3d Cir. 2010).  We have a "fiduciary responsibility, as the guardian of the rights of the absentee class members."  *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

A.    **The proposed settlement does not provide value to the class.**

Of particular dispute here is the adequacy of the settlement. Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate.").  "The primary touchstone of [the adequacy] inquiry is the economic valuation of the proposed settlement."  *In re General Motors*, 55 F.3d at 806.  We must "scrutinize the settlement's value and any evidence offered to support it," including "evidence pertaining to the incremental value created by the [settlement]."  *Id.* at 810.  A proposed settlement must provide "real value" to the class.  *Id.* at 809.  To determine whether the proposed settlement provides real value, we must determine the effect (if any) of the SEC settlement.

1.      *The parties agree with the "unremarkable proposition" that the class would be entitled to more money if we reject the proposed settlement than if we approve it.*

The SEC settlement, issued on January 17, 2025, requires Vanguard to pay $135 million in remediation to harmed investors for the same conduct addressed in this case. DI 186-2 at 10-14. While most of the $135 million must be paid to the SEC's Fair Fund, paragraph 44 permits Vanguard to offset $40 million of that from settlement in this case (the "offset provision"). *Id.* ¶ 44. Paragraph 45 limits the offset provision — "in the event Vanguard does not pay the $40 million under the Class Action Settlement, as a result of the termination or withdrawal of the Stipulation of Settlement or the Court's rejection of the Class Action Settlement, Vanguard will be obligated to pay the $40 million into the Commission's Fair Fund" (the "guarantee provision"). *Id.* ¶ 45. In other words, if we approve the proposed settlement, Vanguard pays $40 million pursuant to the proposed settlement agreement in this case; if we reject the proposed settlement, Vanguard pays $40 million into the Fair Fund.

While Vanguard pays $40 million in either scenario, the class does not get $40 million in both scenarios. Money distributed from the Fair Fund faces only reasonable administrative fees — so if we reject the proposed settlement, the class gets nearly the entire $40 million.[4] But if we

---

[4] We understand that the SEC may appoint a paid fund administrator that can be "paid a reasonable fee" for their services. Fair Fund and Disgorgement Plans Rule, 17 C.F.R. § 201.1105(d) (2019). Our review of approved administration fees in other proceedings suggests any "reasonable fee" would be significantly less than the over $14 million due under the proposed settlement. A sampling is listed below:

approve the proposed settlement, class members receive only $25,441,666.67.  The proposed

settlement reduces the $40 million as follows — $13,333,333.33 goes to attorneys, $985,000 is

deducted for litigation expenses, $240,000 is paid to named plaintiffs.  DI 148-2 at 1.

     The parties do not seriously dispute the math that, at least facially, the class would be

entitled more money if we reject the proposed settlement than if we approve it.  *See, e.g.*, DI 170

at 24 (plaintiffs telling us it is an "unremarkable proposition" that "the Settlement Class would

be better off if the Court rejected the Settlement because the Settlement Class would recover the

same amount from the SEC's Fair Fund without deducting any attorneys' fees and expenses");

DI 181 at 57:14-20 (Vanguard's counsel being asked "do you agree with the basic logic that if I

reject the settlement, that the class will get more money?" and responding "I can't disagree that

| Commission Administrative Proceeding | Payments to Fair Fund | Authorized Payments to Fund Administrator(s) |
|---|---|---|
| BitClave PTE Ltd., File No. 3-19816 Exchange Act Release No. 101750 (Nov. 25, 2024) | $29,344,197.00 | $52,460.20 |
| FCA US LLC and Fiat Chrysler Automobiles N.V., File No. 3-19541 Exchange Act Release No. 99967 (Apr. 16, 2024) | $40,000,000.00 | $254,388.33 |
| American Express Financial Corporation, File No. 3-12114 Exchange Act Release No. 82231 (Dec. 7, 2017) | $15,000,000.00 | $87,988.52 |

     Fund administrators may be paid more than the amounts listed above — additional payments may be authorized "so long as the total amount paid to the Fund Administrator, including the invoice to be paid, does not exceed the total amount of the approved cost proposal submitted by the Fund Administrator."  *See, e.g.*, American Express Financial Corporation, Order Approving Application of Fund Administrator for Payment of Fees and Expenses and Approval of Future Fees and Expenses, Exchange Act Release No. 82231 (Dec. 7, 2017).  We are not privy to the "cost proposal[s]," *id.*, submitted to the SEC, but no one has suggested to us that the fees would be anywhere near those associated with the proposed settlement in this case.

if you reject this settlement, that's the way the math would work").[5]

>    2.    *The SEC settlement's guarantee provision is unambiguously invoked if we reject the proposed settlement.*

Vanguard asks us to read words into the SEC settlement that do not exist.  DI 186 at 14-17.  The SEC settlement's guarantee provision reads "in the event Vanguard does not pay the $40 million under the Class Action Settlement, as a result of the termination or withdrawal of the Stipulation of Settlement **or the Court's rejection of the Class Action Settlement**, Vanguard will be obligated to pay the $40 million into the Commission's Fair Fund."  DI 186-2 ¶ 45 (emphasis added).  Vanguard asks us to insert "on its own terms" at the end of the bolded clause, DI 186 at 15, so that the relevant language would read, "in the event Vanguard does not pay the $40 million under the Class Action Settlement, **as a result of the Court's rejection of the Class**

---

[5] Plaintiffs argue that "the eligibility criteria for the Fair Fund have not yet been determined and may leave out some Settlement Class Members who have submitted claims and stand to recover under this Settlement" and speculates that SEC requirements "could dissuade Settlement Class Members who have completed the less burdensome and invasive claims submission process here from seeking recovery from the Fair Fund."  DI 184 at 12.  And Vanguard says something similar: "there is no way to know how any particular class member would be impacted by payment of the $40 million through the Fair Fund rather than through the Settlement. For example, it is uncertain whether residents of states or territories that are not part of the multistate regulatory agreement — Michigan, Virginia, Kentucky, Nebraska, Puerto Rico, the U.S. Virgin Islands and Guam — will be eligible to receive any payment from the Fair Fund."  DI 186 at 20.

As flagged by Mr. Hughes, the SEC settlement dictates that all payments by Vanguard (including the $40 million at issue here) must be made pursuant to Section 308(b) of the Sarbanes-Oxley Act of 2002.  DI 186-2 ¶ 45.  Section 308(b) — codified at 15 U.S.C. § 7246(b) — mandates that all funds "be available for allocation in accordance with subsection (a)," which directs funds to "the benefit of the victims of such violation," 15 U.S.C. § 7246(a).  And as Mr. Hughes points out, "if certain state residents were somehow excluded from the Fair Fund, that would raise serious adequacy and typicality issues under Rule 23 counseling against approval without separately represented subclasses, given that none of the named plaintiffs hail from the states Vanguard mentions."  DI 187 at 17.  Neither plaintiffs nor Vanguard respond to these points from Mr. Hughes.

11

**Action Settlement *on its own terms***, Vanguard will be obligated to pay the $40 million into the Commission's Fair Fund."  Vanguard says that a failure to do so "would render the [o]ffset [p]rovision a nullity."  *Id.* at 16.  According to Vanguard, if we do not add "on its own terms," then we would always reject a proposed class action settlement based on the guarantee provision, meaning the offset provision could never be invoked.

Vanguard says this is a problem and points us to Third Circuit precedent on contract interpretation.  DI 186 at 15-16.  The principle that comes from the cited precedential cases — *Sloan*, *CardioNet*, and *CTF Hotel Holdings* — is that we must give meaning to all contract provisions whenever possible.  And that makes sense.  We ascertain the meaning of a contract by interpreting the words written.  But in the cited cases, the Third Circuit employs this principle in ways materially distinct from how Vanguard asks.  *Sloan* involved an "unequivocal[]" condition precedent immediately followed by a term that, under one interpretation, would have eliminated the condition precedent entirely.  *Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 181-82 (3d Cir. 2011).  So, the Third Circuit adopted an interpretation that did not do that.  *Id.* (holding that unequivocal "pay-if-paid" clause was not eliminated by language detailing how parties could resolve disputes related to non-payment).  *CardioNet* involved a proposed interpretation of a general term that would have eliminated a prior, specific term.  *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 173-74 (3d Cir. 2014).  The Third Circuit restricted the general term to the scope of the specific term to avoid rendering it "devoid of meaning."  *Id.* (holding that mandatory arbitration only applied to disputes within the scope of a prior, specific provision when it was incorporated into and immediately preceded mandatory arbitration provision).  And *CTF Hotel Holdings* involved two provisions that contradicted each other — a mandatory

arbitration provision and a provision protecting against mandatory arbitration.  *CTF Hotel Holdings v. Marriott Int'l*, 381 F.3d 131, 137-38 (3d Cir. 2004).  Rather than strike one of the clauses from the contract, the Third Circuit found the two provisions applicable in different scenarios.  *Id.* (holding that arbitration was mandated for disputes with one company — pursuant to one contract term — and not mandated for disputes with another — pursuant to different contract term).[6]

Vanguard's invocation of the general principle of giving meaning to all provisions of a contract lacks footing in *Sloan*, *CardioNet*, and *CTF Hotel Holdings*.  The provisions at issue in the SEC settlement do not necessarily invalidate or contradict one another.  The guarantee provision and offset provision "coexist logically within the agreement."  DI 187 at 6.  They "have legal force in distinct scenarios."  *Id.*  The offset provision applies if the proposed settlement is approved, and the guarantee provision applies if the proposed settlement is rejected.  We see no logical inconsistency that must be reconciled.  Doing what Vanguard requests would require us to rewrite a contract to account for entirely foreseeable events — not merely give meaning to all contract provisions.

Moreover, the Third Circuit instructs us against using "the guise of interpretation" to "construe a contract in such a way as to modify the plain meaning of its words."  *Mellon Bank,*

---

[6] Vanguard cites one other precedential case, *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir. 1973), DI 186 at 16, for the proposition that a "contract is to be considered as a whole, and, if possible, all its provisions should be given effect."  While this quotation accurately describes a general contract-interpretation principle, the *Capitol Bus* opinion really focused on a later part of that sentence "a contract should be construed so as to give effect to its general purpose."  478 F.2d at 560 (adopting interpretation that aligned with general purpose of contract and course of conduct).  There is no analysis of how courts ought to handle a contract provision that may never be invoked.

*N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1010 (3d Cir. 1980).  Our job is to "bind parties

by the objective manifestations of their intent," and "eschew the ideal of ascertaining the parties'

subjective intent."  *Id.*  at 1009.  The "strongest external sign of agreement between contracting

parties is the words they use in their written contract."  *Id.*  The SEC settlement's language is

clear, and we will not modify it through purported contract interpretation so that Vanguard may

escape the consequences of its agreement.

>    3.    *Public policy considerations do not overcome the plain language of the SEC settlement.*

Finally, Vanguard argues that rejecting the proposed settlement in light of the SEC

settlement would undermine "the settlement of civil and regulatory actions" and make it

"difficult, if not impossible, for companies and government regulators to reach negotiated

resolutions that include offsets for class action settlements, eliminating a powerful tool for

settlement."  DI 186 at 22.  If that were really true, Vanguard could have easily proven it rather

than merely speculate.  Vanguard itself proposed a solution to this purported problem —

regulators can add specific language in settlement agreements to limit when guarantee provisions

are invoked.  *See generally id.* at 14-17 (asking us to read "on its own terms" into the guarantee

provision).  Vanguard could have insisted on that here.[7]

Vanguard reminds us that we have a "circumscribed role" in reviewing proposed class

---

[7] For all we know, Vanguard did make this request and the regulators refused it with the hope that we would reject the proposed settlement, delivering more money to harmed investors. Or perhaps Vanguard and the regulators had a shared interest in producing a resolution with as high an apparent value as possible, and no incentive whatsoever to look out for the interests of plaintiffs' counsel in this case.  The point is that we cannot know exactly how the SEC settlement came to be, and that is why contract language is where this dispute begins and ends.

action settlements.  DI 186 at 21.  We agree and find that Vanguard's proposal — adding words to an unambiguous settlement agreement involving non-parties — would expand our role far more than simply interpreting the words in the agreement.  Accordingly, public policy considerations do not support approval of the proposed settlement agreement.[8]

**B.    Even accounting for the time value of money, we are not persuaded that approving the proposed class settlement benefits the class.**

Pressed by Mr. Hughes's cogent objection — and admittedly surprised by the SEC settlement — plaintiffs argue that the time value of money makes the proposed settlement more valuable than $40 million distributed through the Fair Fund.[9]  According to plaintiffs, there is a

---

[8] Plaintiffs cite *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) for the proposition that "even if Plaintiffs and Class Counsel subjectively believed that rejecting the Settlement was a more favorable outcome, which they do not, the Third Circuit has held that events postdating a class action settlement, but preceding approval, which make a settlement less favorable to the parties who entered it, do not provide a legitimate basis for rescinding the settlement."  DI 184 at 18-19 (cleaned up).  *Ehrheart* is inapplicable here.

In *Ehrheart*, a named party sought to get out of a preliminarily approved settlement after Congress amended the law to rescind the cause of action.  609 F.3d at 593-96.  The Third Circuit explained that a named party "cannot avoid its independent contractual obligations" under the guise of Rule 23 review.  *Id.* at 596.  Here, we consider the interests of *unnamed* class members in rejecting a bad settlement to which they are not yet bound.

[9] Plaintiffs also argue that we must consider the "relevant value" of the proposed settlement to be $40 million, not $40 million minus attorneys' fees.  DI 184 at 14-15.  We disagree.  We must assess the "real value" of the settlement, *In re General Motors*, 55 F.3d at 806, and that is case dependent.  For example, the Third Circuit in *In Re General Motors* assessed the cash value of a certificate that a class member would obtain with no regard to how attorneys' fees might have enhanced the overall settlement value.  55 F.3d at 809-810.  Plaintiffs cite one precedential case, *In re Cendant*, 264 F.3d at 241, for the proposition that "the relevant figure used in assessing the value of the settlement fund is the total settlement amount, not the net amount after deducting requested fees."  DI 184 at 15.  We agree that the Third Circuit included attorneys' fees in the total settlement value for *In re Cendant*.  264 F.3d at 228-29, 241.  But *In re Cendant* does not say that must always be the case.  Our responsibility is to assess the real value of the settlement.  *In re General Motors*, 55 F.3d at 806.  Here, the real value of the settlement requires deduction of attorneys' fees.

"large temporal gap between when [class members] would receive a distribution under [this settlement], and when [class members] might receive a distribution from the SEC's Fair Fund following a rejection of [this settlement]."  DI 184 at 8.  "Therefore, the present value of the $40 million that [class members] *may* receive through the SEC's Fair Fund several years from now must be discounted to account for the time value of money."  *Id.* (emphasis in original).

Plaintiffs detail a potentially lengthy process that must be completed before money in an SEC Fair Fund may be distributed.  *Id.* at 10-11.  According to a Declaration by Paul Mulholland of Strategic Claims Services — the Claims Administrator for the proposed settlement — "the average time from when respondents were ordered to pay civil money penalties to the date when the SEC Fair Funds were ultimately distributed to investors was nearly seven years."  DI 184-2 ¶ 6.  SCS calculates the net present value of $40 million in the Fair Fund, assuming it was paid out in about seven years, to be $26.5 million.  *Id.* ¶ 12.  In contrast, if we approved the proposed settlement, SCS claims that it could distribute the funds class members — $25.7 million — as early as July 2025.  *Id.* ¶ 13.  Using SCS's own calculations, distribution via the Fair Fund is still better for the class even when accounting for the time value of money: the net present value of $26.5 million via the Fair Fund is more than $25.7 million via the proposed settlement.  Plaintiffs argue that we should still approve the proposed settlement because its value would "surpass" the value of $40 million in the Fair Fund if the SEC faced any delay beyond the seven-year average. *Id.*  We are not persuaded by this argument.  But there are a variety of other issues with this analysis too, as pointed out by Mr. Hughes.

First, Mr. Mulholland "assigns zero value to a critical asset the class retains if this settlement is rejected: their valuable ongoing claims against Vanguard." DI 187 at 13.

16

According to Mr. Hughes "[t]hese preserved claims realistically hold substantial economic value, likely tens of millions in expected value terms, whether through a future (and potentially larger) settlement now that Vanguard's misconduct is documented by regulators, or through a trial verdict. Any credible economic comparison must account for the significant value of these preserved claims, which likely dwarfs any arguable cost of delay in receiving the Fair Fund distribution." *Id.*  Plaintiffs did not respond to this argument.

Next, Mr. Mulholland failed to account for appeals delaying the distribution of the proposed settlement funds. *Id.* This is notable because appeals automatically stay distribution per the terms of the proposed settlement agreement. DI 148 at 8, 29.  Plaintiffs did not respond to this issue.  Finally, according to Mr. Hughes, Mr. Mulholland inflated the Fair Fund distribution timeline by using a "cherry-picked, error-ridden sample [set]" for his analysis.  DI 187 at 15-16.  Mr. Hughes analyzed his own set — "the 25 largest SEC Fair Funds" — and found an average distribution timeline of 3.7 years. *Id.* at 16.  Again, plaintiffs did not respond to this argument.  We are persuaded by Mr. Hughes that the time value of money, at a minimum, does not support approving the settlement.  It may even favor rejecting it.  In any case, it is plaintiff's job to persuade us of the proposed settlement's value, and they have failed to do so. *In re General Motors*, 55 F.3d at 785 ("proponents of the settlement bear the burden").

## C.    The other relevant factors do not overcome the proposed settlement's lack of economic value.

As mentioned above, we may approve a class settlement only upon finding that it is "fair, reasonable, and adequate" when considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The parties also addressed the similar and overlapping factors set out in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).[10] "[T]here is an open question within this Circuit concerning the continued relevance of the factors outlined in *Girsh*, following the 2018 amendments to Rule 23(e)(2)." *Matthews v. Phila. Corp. for the Aging*, 2025 WL 992198, at *4 n.2 (E.D. Pa. Apr. 1, 2025). As we expressed in *Matthews*, we think the Rule offers the sounder and simpler approach. *Id.*; *see also Miller v. Del-One Fed. Credit Union*, 2025 WL 1359033, at *4-5 (D. Del. May 9, 2025) (Bibas, J., sitting by designation) ("The best way to figure out what a written law means is to read the words of its text as they were ordinarily understood when it was enacted."). But, as is likely often the case, it does not make a difference in the outcome here. Because the briefing came in largely through the lens of the *Girsh* factors, it is convenient for us to do the same (and we will give the parties the benefit of the doubt).

---

[10] These factors are:

(1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 488 (3d Cir. 2017).

Adequacy of a settlement is addressed in the eighth and ninth *Girsh* factors — the "range of reasonable settlements in light of the best possible recovery . . . and . . . in light of all the attendant risks of litigation." *In re General Motors*, 55 F.3d at 806. Setting those two aside because adequacy is addressed in detail above, we assess the parties arguments regarding "(1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; [and] (7) the ability of the defendants to withstand a greater judgment." *Halley*, 861 F.3d at 488.

This case is complex, expensive, and may continue for quite some time. As plaintiffs tell us, Vanguard "vigorously opposed [p]laintiffs' motion for class certification and [p]laintiffs faced substantial risk of failing to certify the class or losing a Rule 23(f) appeal given the novel facts and arguments surrounding Plaintiffs' proposed damages models." DI 154-1 at 23. And, as we have discussed before, we agree that it may be difficult for plaintiffs to prove their damages. *See In re Vanguard*, 2023 WL 8091999 at *8 (DI 100 at 15-16). The case proceeding through class certification, summary judgment, and trial will be no small feat for all parties. Accordingly, if a settlement had value, this factor would favor approval.

"[T]he reaction of the class to the settlement" is generally positive. As plaintiffs describe it, this settlement received an "unprecedented" claims rate of "(68%), with over 211,000 potential Settlement Class Members filings claims and only nine objections filed." DI 184 at 18. For most settlements, this reaction could support approval, though "vociferous objections from a small minority of class members may overcome a presumption of acceptance by a silent

majority." *Halley*, 861 F.3d at 495 (internal quotations omitted).

Here, we certainly have "vociferous objections" that could overcome the high claims rate. But more fundamentally, we are concerned that the class has insufficient information about the existence and potential consequences of the SEC settlement — and that could have led to a disproportionately high claims rate.[11]  Plaintiffs tell us "95.7% [of the claims] were filed after January 17, 2025, when the SEC Settlement was announced." *Id.*  That assuages some of our concern, at least as to constructive notice of the SEC settlement.  But it was Mr. Hughes — not plaintiffs or class counsel — that brought the guarantee provision to our attention.  DI 187 at 21-22.  Plaintiffs have not provided us with assurances that class members understood rejection could lead to more money in their pockets.  Moreover, the overwhelmingly significant effect of the SEC settlement is that the class can receive the full $40 million payment from Vanguard without subtracting attorneys' fees.  Attorneys' fees were one of the primary concerns raised by objectors.  *See* DI 157-162.  Given that the class was not fully informed of the SEC settlement, we cannot adequately evaluate this factor and therefore find it to be neutral.

"[T]he stage of the proceedings and the amount of discovery completed" slightly favors approving a settlement.  This case has been active for over three years.  *See* DI 1 (complaint filed on March 14, 2022).  Interim class counsel was appointed in September 2022.  DI 49.  Since then, the proceedings have involved motions to dismiss, "hundreds of thousands of pages of documents" in discovery, lay and expert depositions, class certification briefing, mediation, preliminary approval of settlement, issuance of notice to the settlement class, and a hearing on

---

[11] We saw enough concern to require briefing on notice issues.  DI 177.  And upon learning of Mr. Hughes's objection, another objector joined on the record.  DI 181 at 76:7-9.

settlement.  DI 154-1 at 17, 24.  The proceedings are clearly not at an early stage.  But on the other hand, we had not yet decided on class certification and the parties had not yet briefed summary judgment.  We find this factor would slightly favor approving a settlement if it had value.

We address the next three factors together: the risks of establishing liability, the risks of establishing damages, and the risks of maintaining the class action through the trial.  Given our finding that the proposed settlement provides no value to the class, there is no risk associated with the case proceeding.  At worst, the class would be in the same position as they are now — in receipt of the $40 million Vanguard will pay into the Fair Fund and no more.  This factor does not support approving the settlement.

Finally, we consider "the ability of the defendants to withstand a greater judgment."  This factor is "most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement*."  In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 440 (3d Cir. 2016).  Because plaintiffs do not assert that Vanguard's ability to pay was a factor in determining the settlement amount, DI 154-1 at 25, we find this factor to be neutral.  All together, we find that the *Girsh* factors do not support approval of the proposed settlement (and, again, the result is the same under the plain terms of Rule 23(e)).

### D.    There is an open question as to whether the class representatives and class counsel were adequate during this settlement review process.

At the settlement hearing, we became concerned that a conflict of interest had developed between the class and its representatives and counsel.  As explained, there was no dispute that rejecting the settlement would result in a larger recovery for the class.  *Supra* Part II(A-B).  But approving the settlement would benefit the class representatives and class counsel.  *See id.*  As

Mr. Hughes put it, "[t]he class benefits by maximizing total recovery across all available avenues (the Fair Fund distribution plus any incremental value obtained through continued litigation). Class counsel's financial interest under this deal structure, however, is tied solely to maximizing the fee derived from this specific settlement fund — even if, as their own expert demonstrates, doing so demonstrably reduces the class's overall financial takeaway compared to rejection." DI 187 at 18.

Under Rule 23(e)(2)(A), we must consider whether "the class representatives and class counsel have adequately represented the class." Counsel facing significant conflicts of interest cannot adequately represent a class. *In re Fine Paper Antitrust Litig.*, 617 F.2d 22, 27-28 (3d Cir. 1980). We have a "continuing duty to monitor the status, as to possible conflict, of the class attorneys to assure that the class is adequately represented." *Id.* at 27. And Pennsylvania Rule of Professional Conduct 1.7(a)(2) prohibits lawyers from representation if "there is a significant risk that the representation . . . will be materially limited by the lawyer's responsibilities to another client . . . or by a personal interest of the lawyer." We ordered all parties to brief us on this issue. DI 179.

Plaintiffs make two arguments for why class counsel's support for the settlement "is appropriate." DI 184 at 24-47. First, they dispute the "factual predicate" that rejecting the settlement would result in a larger recovery to the class due to the time value of money. *Id.* at 24-25. But as discussed, plaintiffs' own calculations demonstrate that distribution via the Fair Fund is better for the class even when accounting for the time value of money: the net present value of $26.5 million via the Fair Fund is more than $25.7 million via the proposed settlement. *See supra* Part II(B). The argument is telling: that class representatives and counsel dispute this

factual predicate underscores the risk that their interests conflict with the class.  And we also see the tension in the lack of engagement with the reality that rejecting the settlement keeps the class's claims against Vanguard alive, meaning a potentially greater recovery for the class at no additional risk to the class.  DI 184 at 24-25 (arguing "[i]f [p]laintiffs and [c]lass [c]ounsel were to successfully recover more than $40 million for the Settlement Class, [c]lass [c]ounsel could seek an award of attorneys' fees even greater than those requested here").  Plaintiffs retort that "[a] fiduciary may reasonably select an investment alternative in view of its different risks and features, even if that investment option turns out to yield less than some other option.  No fiduciary . . . can foresee whether the risks associated with [] investment will come to fruition, and a fiduciary may reasonably choose to avert those risks in favor of a safer alternative." *Id.* at 25 (quoting *White v. Chevron Corp.*, 2017 WL 2352137, at *10 (N.D. Cal. May 31, 2017)).  But plaintiffs did not demonstrate that distribution via the proposed settlement is a "safer alternative" to the Fair Fund, so this argument does not quell our concerns.

Second, plaintiffs argue that "the personal interest of [c]lass [c]ounsel in seeking the award of attorneys' fees and expenses is no different here than in any case with contingent fee representation."  DI 184 at 24.  We disagree.  This is not like "any case with a contingent fee."  For one, class actions are unique: "The determination of attorneys' fees in class action settlements is fraught with the potential for a conflict of interest between the class and class counsel." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005).

And this particular class-action settlement has a unique problem.  Contingent fee cases generally award attorneys' fees proportional to the overall settlement value, necessarily aligning the interests of clients and their counsel — a larger overall settlement means more money for the

client *and* more money for counsel.  That alignment once existed here, but "everything changed when Vanguard's regulatory deal was announced in January."  DI 187 at 20.  The SEC settlement guaranteed $40 million to the class with no attorneys' fees deducted or claims extinguished.  As Mr. Hughes describes it, "[a]t that moment, Vanguard (not class counsel) created a situation where class counsel's financial interests diverged sharply from the class's interests."  *Id.*  "Counsel might prefer to avoid renegotiating, even though a smaller settlement delivering incremental value serves the class better than one that merely shuffles money from one pot to another," extinguishes claims, and then deducts attorneys' fees.  *Id.* at 19.  Renegotiating a new settlement would require class counsel to invest additional effort and might lead to a smaller award of attorneys' fees than what is currently proposed.  That potential cost to counsel directly conflicts with the class's interest in securing even a modest additional settlement (at no risk to the class).  *Id.*[12]

Finally, we share Mr. Hughes's concern regarding the lack of proactive disclosure from class counsel regarding the impact of the SEC settlement.  DI 187 at 21-22.  "While the conflict itself may have arisen through no initial fault of class counsel's actions, their subsequent failure . . . to proactively alert the Court once the regulatory deal created this stark misalignment, instead leaving it to an uncompensated objector to raise these fundamental problems, fell short of their responsibilities to the class and the Court."  *Id.* at 22.

These concerns strike us as worth highlighting because of how unusual they are.  But in

---

[12] And we agree with Mr. Hughes that this concern may extend to class representatives as well — "[i]f [the class representatives'] requested $20,000 'incentive awards' dwarf their actual individual damages, they may be motivated to support any deal that secures their personal payment, even one detrimental to the class as a whole."  DI 187 at 19.  Plaintiffs did not respond to this point.

the end, it is moot.  Our rejection of the settlement means the class gets its $40 million through the Fair Fund and the conflict of interest is eliminated.  *See, e.g.*, *Hall v. Adelphi Three Corp.*, No. 21-1106, 2023 WL 869232, at *4 (D.N.J. Jan. 27, 2023) (holding that conflict-of-interest issue in class action mooted by extinguishment of dispute that created conflict and collecting cases for same proposition).  Class counsel may continue litigating this case — or attempt settlement with Vanguard — and now without interests that conflict with the class.

## III.    Conclusion

For the foregoing reasons, we find that the proposed settlement is not "fair, reasonable, and adequate" as required by Rule 23(e).  The SEC settlement guarantees class members the exact benefit that would have been provided by this proposed settlement — but without deduction for attorneys' fees or requiring claims to be extinguished.  Accordingly, we are compelled to reject the proposed settlement.